## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA,
## NORTHERN DIVISION

|  |  |
|---|---|
| **GEORGE CLINTON** | |
| *Plaintiff,* | |
| **v.** | Civil Action No. 4:25-cv-00108-MW-MJF |
| **ARMEN BOLADIAN;** **BRIDGEPORT MUSIC, INC.;** **WESTBOUND RECORDS, INC.;** **NINE RECORDS, INC.,** **SOUTHFIELD MUSIC, INC.; and** **EASTBOUND RECORDS, INC.** | JURY TRIAL DEMANDED |
| *Defendants.* | |

## FIRST AMENDED COMPLAINT

Plaintiff George Clinton, ("George Clinton" or "Clinton") through undersigned counsel, files these claims against Defendants Armen Boladian ("Boladian"), Bridgeport Music, Inc. ("Bridgeport"), Westbound Records, Inc. ("Westbound"), Nine Records, Inc. ("Nine Records"), Southfield Music, Inc. ("Southfield"), and Eastbound Records, Inc. ("Eastbound") (together, "Defendant Business Entities") (Defendant Business Entities collectively with Boladian, "Defendants"), stating as follows:

1

## INTRODUCTION

1.    GRAMMY award-winning singer, songwriter, record producer, bandleader, and visionary George Clinton ("Clinton") is one of the most influential artists alive today. An American icon, his works have been and are celebrated across the globe.

2.    In 2019 Clinton received the GRAMMY Lifetime Achievement Award at the GRAMMY Salute to Music Legends.

3.    After launching his career in the 1960s, Clinton authored and recorded thousands of songs and sound recordings while painstakingly building one of the richest and most sampled music catalogs[1] ("catalog") in United States history.

4.    Clinton achieved his first top ten hit with his doo-wop and R&B band, The Parliaments, after the release of their record, "(I Just Wanna) Testify" in 1967.

5.    His songs "Flashlight", of the Parliament album (1977); "Mothership Connection (Star Child)", of the Parliament album (1975); "I'd Rather Be With You" of the Bootsy's Rubber Band album (1976); "(Not Just) Knee Deep" of the Funkadelic album (1979); and "Atomic Dog" of the George Clinton album (1982) are some of the most sampled songs in United States History.

---

[1] A music catalog is a collection of songs (i.e., a list of musical compositions) and sound recordings originating from the same creator.

6.      Following his initial worldwide success in 1967, Defendants developed a decades long scheme to acquire music rights from Clinton and used those rights to bring lawsuits to extort money from successful music artists for routine music sampling[2].

7.      In addition to bringing lawsuits for music sampling, Defendants used Clinton's music catalog to (1) collect tens of millions of dollars in royalties[3] without paying any money to Clinton, (2) sign agreements for usage and sampling of Clinton's work without Clinton's knowledge or express consent, (3) add fictitious songwriters to Clinton's music and (4) retain millions of dollars in licensing fees, royalties, and monies.

8.      In order to stop Defendants scheme and rightfully reclaim ownership of his music catalog, Clinton has served Defendants with termination notices pursuant to sections 203 and 304(c) of the Copyright Act, codified under 17 U.S.C. § 203 and 17 U.S.C. §304(c).

---

[2] Routine sampling involves using portions of existing recordings and incorporating them into new compositions, often looped to create new sounds or rhythms.

[3] Royalties are monies generated from the licensing and copyright of songs and recordings. These monies serve as a primary form of payment for musicians, who are typically the asset owner of the right to use their music.

9.      17 U.S.C. § 203 permits authors to terminate grants of copyright assignments and licenses that were made on or after January 1, 1978, and thirty-five (35) years after the execution of the grant or license.

10.     Similarly, 17 U.S.C. § 304(c) permits authors to terminate grants of copyrights and assignments that were made before January 1, 1979, and fifty-six (56) years after the execution of the grant or license.

11.     Despite receiving valid termination notices from Clinton, Defendants have willfully refused to acknowledge Clinton's full statutory rights and continue to unlawfully copy, sell, license, and distribute George Clinton's music and image, disregarding his rights in violation of Federal and State laws, as set forth in detail below.

12.     Clinton has suffered and continues to suffer significant economic injury as a result of Defendants wrongful conduct and now brings this action for declaratory judgment and copyright infringement seeking redress before this Honorable Court.

## PARTIES

13.     Plaintiff Clinton is an individual residing in the State of Florida.

14.     Defendant Armen Boladian is an individual, residing in the State of Michigan.   Boladian is the sole owner of several entertainment companies,

including, but not limited to, Bridgeport Music, Inc., Westbound Records, Inc., Nine Records, Inc., Southfield Music, Inc., and Eastbound Records, Inc.

15.     Defendant Bridgeport Music, Inc. is a Michigan corporation.  Its principal office is located in West Bloomfield, Michigan.  Bridgeport is owned and operated by Defendant Boladian who is the President, Director, and Treasurer.

16.     Defendant Westbound Records, Inc. is a Michigan corporation.  Its principal office is also located in West Bloomfield, Michigan.  Westbound is owned and operated by Defendant Boladian who is the President, Director, and Treasurer.

17.     Defendant Nine Records, Inc. is a Michigan corporation.  Its principal office is also located in West Bloomfield, Michigan.  Nine Records is owned and operated by Defendant Boladian who is the President, Director, and Treasurer.

18.     Defendant Southfield Music, Inc. is a Michigan corporation.  Its principal office is also located in West Bloomfield, Michigan. Southfield is owned and operated by Defendant Armen Boladian who is the President, Director, and Treasurer.

19.     Defendant Eastbound Records, Inc. is a Michigan corporation.  Its principal office is located in West Bloomfield, Michigan. Eastbound is owned and operated by Defendant Armen Boladian who is the President, Director, and Treasurer.

## **JURISDICTION AND VENUE**

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Defendants are citizens of a state other than the state in which Plaintiff is a citizen.

21.    The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) in that this action concerns a federal question regarding copyright law.

22.    This Court has specific personal jurisdiction over the Defendants because Defendants committed and continue to commit tortious acts within the State of Florida under Fla. Stat. Ann. § 48.193(1)(a)(2).

23.    This Court has supplemental jurisdiction under 28 U.S.C. §1367(a) over Plaintiff's state law claims because all claims alleged herein form part of the same case or controversy.

24.    Further, Defendants have purposefully availed themselves of the privileges of conducting activities within the State of Florida by transacting business within the State; committing tortious acts within the State; committing the actions alleged in this lawsuit directed at Clinton, an individual residing in the State; and deriving substantial revenue from their deliberate course of conduct

targeting the State of Florida.  Defendants continue these actions today.  As such

Defendants are subject to personal jurisdiction here.

25.    Venue in this District is proper under 28 U.S.C. § 1391 because a

substantial part of the events or omissions giving rise to the claims alleged herein

occurred in this District.

## FACTUAL ALLEGATIONS

### I.    George Clinton: Artist, Icon, Pioneer of Funk, and the Hip-Hop Godfather

26.    Clinton is an iconic musician, singer, songwriter, record producer, and

bandleader, and is recognized as one of the foremost pioneers of Funk music.

27.    Clinton was inducted into the Rock and Roll Hall of Fame in 1997

and awarded the GRAMMY's Lifetime Achievement Award at the 2019

GRAMMY Salute to Music Legends.

28.    As a testament to his musical genius, he is one of the most sampled

artists in music history (earning him the title of the Godfather of Hip-Hop).  His

works, including but not limited to, "Atomic Dog," "Flash Light," "P.Funk (Wants

to Get Funked Up)," "The Motor Booty Affair," "Aquaboogie," "Give Up The

Funk," "Mothership Connection," "Sir Nose D'Voidoffunk"  and "Big Bang

Theory" have been heavily sampled by artists across numerous musical genres.

29.    In 1968, recognizing social change and the growth of Rock and Roll,

Clinton created a new Black rock band known as "Funkadelic".

30.    By the late 1970s, Clinton's artistic genius and revolutionizing inspiration earned him "superstar" status.  He was releasing four to six albums per year through major record labels, producing multiple side acts in addition to his two main acts, Parliament and Funkadelic, all while touring nonstop at stadium capacity, with a wildly elaborate stage production.

31.    In 1973, Clinton created a new act – "Parliament", which was later combined with Funkadelic in early 1975.  The combination was hugely successful, releasing 3-4 albums per year with chart topping hits and touring nonstop to sold-out crowds at stadium capacity with a large market of devoted fans.

## II.    Defendants Successfully Scheme to Defraud Clinton.

32.    According to information and belief, Defendant Boladian expressed his views that Black artists lacked the education and intelligence to understand issues such as copyright infringement and legal proceedings - accordingly, he felt emboldened and entitled to take advantage of artists like Clinton.

33.    From 1968 through 1975, and 1981 through 1990, Boladian was Clinton's business partner, publishing administrator, financial consultant, and agent.

34.    Boladian formed Defendant Bridgeport Music, Inc., in 1969 "[t]o engage in the business of publishing music."[4]

35.    Boladian further created entertainment companies Westbound in 1969 and Nine Records, Southfield, and Eastbound in 1973.

36.    Boladian is the sole owner and proprietor of each of his entertainment companies including Defendant Business Entities.  As the President, Director, and Treasurer, he functions as the sole decision maker for Bridgeport, Westbound, Nine Records, Southfield, and Eastbound, including but not limited to day-to-day business operations, matters of corporate governance and financial decisions.

37.    Upon information and belief, the Defendant Business Entities are a "one-man" operation, run solely by Armen Boladian.  The Defendant Business Entities employ little to no staff and have no assets other than copyrights.[5]

38.    Boladian is known throughout the music industry as a "copyright troll[6]," meaning that he collects copyrights to various catalogs, holds on to the

---

[4] As set forth in Bridgeport's articles of incorporation. (Publicly available at: https://cofs.lara.state.mi.us/CorpWeb/CorpSearch/CorpSearchFormList.aspx?SEARCH_TYPE=1).

[5] Tim Wu, *Jay-Z Versus the Sample Troll*, Slate, November 16, 2006, https://slate.com/culture/2006/11/the-shady-one-man-corporation-that-s-destroying-hip-hop.html.

[6] *See Id.* ("Similar to its cousins the patent trolls, Bridgeport and companies like it hold portfolios of old rights (sometimes accumulated in dubious fashion) and use lawsuits to extort money from successful music artists for routine sampling, no matter how minimal or unnoticeable…")

rights, then files lawsuits to get money from producers and musicians who sample[7] the songs he looted the rights to (despite how miniscule the sampling may be).

39.    As a copyright troll, Defendants did not need to employ any staff or serve any function other than to assert copyright infringement claims for musical works that they acquired and to maintain their only assets which comprise of Clinton's portfolio of copyrighted musical works.

40.    After decades of employing his copyright scheme, Boladian has earned a reputation for exploiting young, gifted artists by utilizing his industry knowledge to financially benefit from the illegal sampling and distribution from the work of said artists.

41.    Boladian has filed several lawsuits against artists based on their alleged improper and illegal sampling of Clinton's music, including Clinton himself for sampling his own work.  For example, in *Bridgeport Music, Inc. v. 11C Music*, 202 F.R.D. 229 (M.D. Tenn. 2001), Bridgeport sued nearly 800 artist-defendants seeking monetary damages and other relief for sampling Clinton's music. Clinton has never been included as a plaintiff in these lawsuits nor has he received any portion of the millions secured by Boladian.

**III.    Clinton Seeks to Regain Control Over His Catalog Through Sections 203 and 304(c) of the Copyright Act**

---

[7] Sampling is a technique in which an artist takes a piece of a song, and then alters, mutates, or distorts it to create a new song.

42.    Under the 1909 Copyright Act, the term of copyright protection included an initial 28-year period, followed by a 28-year renewal term. Because authors often grant the rights to their works before their true value is known, Congress's goal with renewal terms was to give authors an opportunity to own their works after their value has been ascertained. Unfortunately, this purpose was thrwarted, as authors faced market pressure essentially forcing them to also grant the renewal term at the time that they granted their initial copyright term.

43.    To correct this, in 1976 Congress introduced a termination right to the 1976 Copyright Act whereby copyrights would revest in the author before any future assignment could be deemed valid.

44.    Much like the authors under the 1909 Copyright Act, more modern authors often enter into long and arduous agreements before they know the true value of their work. Because of this, they are often locked into earning royalties disproportionately small compared to the fair market value of their works.

45.    The "second bite at the apple" conferred by the 1976 Copyright Act is extremely valuable to authors as it allows them to finally own their creations as well as financially benefit from the works.

46.    Under this approach, Clinton has sought to regain control over his catalog by filing termination notices with the U.S. Copyright Office to terminate

the grants, transfers, licenses, and assignments that Defendants have garnered over Clinton's music.

47.     Clinton relied on 17 U.S.C. §§203 and 304(c) of the Copyright Act of 1976 to effectuate valid and enforceable termination notices upon Defendants.

48.     Under § 203, an author may terminate any rights that were granted on or after January 1, 1978, within five years beginning at the end of a thirty-five-year period from the date of the grant.  Further, 17 U.S.C. §203(b) states that upon the effective date of termination, "all rights under this title that were covered by the terminated grants revert to the author[.]"

49.     To effectively terminate any grants, transfers, licenses, and assignments, the author must serve an advanced notice in writing, signed by the author, or by their duly authorized agents, upon the grantee or the grantee's successor in title. The notice must state the effective date of termination, which must fall within a 5-year period specified under § 203(a)(4). A copy of the notice must be recorded in the Copyright Office before the effective date of termination. Lastly, the notice of termination must comply with any requirements that the Register of Copyrights prescribes by regulation in 37 C.F.R. § 201.10.

50.     Similarly,   304(c) covers musical works protected by Federal copyrights that occurred prior to January 1, 1978.  The termination may occur

beginning at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured.

51.    To effectively terminate grants, transfers, licenses, and assignments under § 304(c), an advance termination notice must be served on the grantee or the grantee's successor in title. The notice must state the effective date of the termination, which shall fall within the five-year period specified in § 304(c). A copy of the notice shall be recorded in the Copyright Office before the effective date of termination.

52.    Clinton has filed valid and timely termination notices on Defendants and recorded those notices with the U.S. Copyright Office in accordance with 17 U.S.C. §§203 and 304(c) of the Copyright Act. A master list of notices of termination served alphabetical by title is attached hereto as **Exhibit A**.

53.    Plaintiff put Defendants on notice of his statutory termination rights and the effective termination dates for each musical work.

54.    Despite the validity and timeliness of these notices, Defendants have blatantly ignored Clinton's timely and valid termination notices for no legitimate reason other than their own greed.

55.    Defendants, by refusing to return Clinton's work while simultaneously refusing to exploit those same works, are essentially holding

Clinton's copyrights hostage and paralyzing Clinton from financially benefitting from his statutory right to terminate the transfer of his copyrights to Defendants.

56.     Defendants have recognized the notices and relinquished the rights to "Atomic Dog", "Big Bang Theory", "Black Hole Theme", "Body Language", "Colour Me Funky", "Computer Games", "Free Alteration", "Get Dressed", "Gloryhallastoopid", "I'm Mo Be Hittin' It", "Loopzilla", "Man's Best Friend", "May We Bang You", "One Fun at a Time", "One Nation Under a Groove", "Party People", "Play Me or Trade Me", "Pot Sharing Tots", "The Freeze (Sizzlaleenmean)", "Troumbipulation", and "Wolf Tickets".

57.     Defendants have refused to relinquish the rights to other works in **Exhibit A** despite being served with a valid termination notice. In fact, Defendants have chosen in bad faith to ignore the notices despite at least two years' advance notice, and in blatant disregard of Clinton's rights and the damage being done to him daily as a result.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DECLARATORY RELIEF UNDER 17 U.S.C. §203
### *Against all Defendants*

58.     Plaintiff realleges and incorporates paragraphs 1 through 57 as if fully set forth herein.

59.     Copyright termination rights are available under 17 U.S.C. §203.

60.    Section 203 allows authors to terminate "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978[.]"

61.    Under 17 U.S.C. §203, Plaintiff could terminate any rights that were granted on or after January 1, 1978, within five years beginning at the end of a thirty-five-year period from the date of the grant.

62.    This termination right is available for any work not considered a work made for hire.  As defined in 17 U.S.C. §101, a "work made for hire" is (1) "a work prepared by an employee within the scope of his or her employment" or (2) "a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary,

pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

63.    Sound recordings were specifically excluded from the definition of work for hire under the 1976 Copyright Act. Therefore, agreements between Clinton and Defendants that uses any alleged "work for hire" language only creates an artificial work for hire relationship. In fact, contractual language does not create a "work for hire" relationship under the 1976 Copyright Act.

64.    Further, under 17 U.S.C. §203(b), "[u]pon the effective date of termination, all rights under this title that were covered by the terminated grants revert to the author[.]"

65.    Plaintiff is entitled to copyright termination rights.

66.    Plaintiff created, recorded, and published his catalog through his own companies and through Defendants deception and willful acts lost rights to his own musical works.

67.    Plaintiff filed timely, valid, and enforceable termination notices under Section 203 of the copyright acts that would revert the rights back to Plaintiff when the termination dates become due. *See* **Exhibit B.**

68.    Defendants willfully chose to ignore and/or failed to properly respond to Plaintiff's timely and valid termination notices

69.     Plaintiff seeks to have this Court enter a declaratory judgement that Plaintiff's termination notices are valid, effective, and that the remaining copyrights identified in the notices automatically revert to George Clinton on the corresponding termination date of each copyright work.

## SECOND CAUSE OF ACTION
## DECLARATORY RELIEF UNDER 17 U.S.C. §304
### *Against all Defendants*

70.     Plaintiff realleges and incorporates paragraphs 1 through 57 as if fully set forth herein.

71.     Under 17 U.S.C. §304(c)(3), an author may terminate any rights that were granted before January 1, 1978 "at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later."

72.     Plaintiff created, recorded, and published his catalog through his own companies and through Defendants deception and willful acts lost rights to his own musical works.

73.     Plaintiff's termination notices are valid and enforceable.

74.     Plaintiff's timely and valid termination notices were served and recorded with the U.S. Copyright Office as required by the Copyright Act. *See* **Exhibit C.**

75.     Plaintiff timely filed and served notice to Defendants to terminate the grants, transfers, licenses, and assignments that Defendants have garnered over Plaintiff's catalog.

76.     Defendants willfully chose to ignore and/or failed to properly respond to Plaintiff's timely and valid termination notices.

77.     Plaintiff seeks to have this Court enter a declaratory judgement that Plaintiff's termination notices are valid, effective, and that the remaining copyrights identified in the notices automatically revert to George Clinton on the corresponding termination date of each copyright work.

## THIRD CAUSE OF ACTION
## COPYRIGHT INFRINGEMENT CLAIMS – RECAPTURED WORKS UNDER COPYRIGHT ACT §§ 203 AND 304(c).
### *Against all Defendants*

78.     Plaintiff realleges and incorporates paragraphs 1 through 57 as if fully set forth herein.

79.     Under 17 U.S.C. §501, infringement of copyright occurs when someone "violates any of the exclusive rights of the copyright owner."

80.     Pursuant to 17 U.S.C. §106, copyright owners have the exclusive rights to reproduce, prepare derivative works based upon, distribute copies of, and publicly perform their copyrighted works.

81.     Defendants have intentionally precluded Plaintiff from enjoying any of his exclusive rights.

82.     As of each effective termination date included in Plaintiff's timely and valid termination notices, the copyright in each noticed work automatically returns to Plaintiff.

83.     As of the effective termination dates for each song included in Exhibits B & C, rights to each single noticed by Plaintiff would automatically revert back to Plaintiff.

84.     Despite the valid and automatic reversion of copyrights to Plaintiff, Defendants continue to claim ownership of singles noticed by Plaintiff well beyond the effective termination dates referenced in each notice without acquiring any license, grant, and/or any other contractual agreement with Clinton.

85.     By purposefully exercising control of Plaintiff's §106 exclusive rights, Defendants are knowingly and willfully committing copyright infringement.

86.     As additional effective termination dates come to pass, Plaintiff's claims for copyright infringement only expand.

87.     As a result, Plaintiff seeks actual damages, or in the alternative statutory damages for willful copyright infringement.

## FOURTH CAUSE OF ACTION
## FRAUD FORRECAPTURED WORKS
## UNDER COPYRIGHT ACT §§ 203 AND 304(c).
### *Against All Defendants*

88.    Plaintiff realleges and incorporates paragraphs 1 through 57 as if fully set forth herein.

89.    In accordance with the Termination Notices identified in Exhibit B & C, Defendants have been put on actual and/or constructive notice that George Clinton has successfully recaptured all ownership interests in association with the musical works identified in Exhibits B & C pursuant to the Copyright Act §§ 203 and 304(c).

90.    Despite being placed on notice, Defendants have willfully, knowingly, and unlawfully continued to misrepresent themselves as the owner of the recaptured musical works and continue to represent themselves as owners of the recaptured musical works to this day.

91.    Defendants knowingly and intentionally lied and misrepresented to Plaintiff, and continue to lie and misrepresent, the amount and nature of the agreements that Defendants have entered into on behalf of the recaptured musical works and the amount of royalties and monies they are collecting from the recaptured musical works with the intent to hide and conceal from Plaintiff millions of dollars in revenue that Plaintiff is rightfully owed.

92.    Defendants intentionally lied, misrepresented, and deceived Plaintiff by materially misrepresenting themselves as owner of the recaptured musical works; entering into agreements with third-parties related to the recaptured musical

works; and collecting, royalties, other monies, and profits from agreements that Defendants continue to enter into on behalf of Plaintiff absent Plaintiff's knowledge or authority.

93.    To this day, Defendants through deceptive practices and acts and omissions, still engage in unauthorized agreements and still collect and deprive Plaintiff of royalties, licensing fees, monies, and other fees that are rightfully owed to Plaintiff for intellectual property work created by Plaintiff.

94.    Defendants have frequently lied and omitted—and continue to lie and omit—the nature and number of agreements they have entered into on behalf of the recaptured musical works and royalties and monies collected on behalf of Plaintiff for Plaintiff's recaptured musical works.

95.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff suffered and continues to suffer injuries and damages in excess of millions of dollars due to Defendants' misrepresentations, for which Defendants are liable.

96.    Plaintiff seeks all damages, interest, costs, and all other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**<u>PRELIMINARY INJUNCTION</u>**
***Against All Defendants***

97.    Plaintiff realleges and incorporates paragraphs 1 through 57 as if fully set forth herein.

98.    Plaintiff has pled significant, consequential, and sufficient facts set forth in this Complaint, which support a substantial likelihood of success on the merits.

99.    Plaintiff suffered and continues to suffer substantial harm as Defendants continue their systemic, abusive, and fraudulent practice to steal and divert assets that are rightfully owed to Plaintiff—irreparably harming Plaintiff.

100.    Further, based on Defendants' actions, specifically Boladian. Plaintiff has reason to believe that Boladian is soliciting the sale of assets including the rights and ownership interests in Plaintiff catalog—irreparably harm Plaintiff.

101.    Plaintiff's significant and devastating injuries that occurred and will continue to occur, outweighs any possible harm that Defendants might accrue by the entry of a temporary injunction limiting any asset transfer, sale, or otherwise.

102.    The entry of a temporary injunction and/or preliminary injunction will not conflict with the public interests.

103.    Accordingly, Plaintiff seeks a preliminary injunction against all Defendants to prevent further harm to Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Honorable Court enter judgment against Defendants, jointly and severally:

A. Declaratory judgment that Plaintiff's termination notices are valid, effective, and that the remaining copyrights identified in the notices automatically revert to George Clinton on the corresponding termination date of each copyright work.

B. Award of actual damages and profits pursuant to 17 U.S.C. § 504(b), or in the alternative, statutory damages in the maximum amount allowable pursuant to 17 U.S.C. § 504(c), $150,000.00 for each act of willful infringement with respect to each of Plaintiff's works after each effective termination date;

C. Punitive damages in an amount to be determined by a jury, for the intentional, actual, and malicious conduct of Defendants in their individual capacities;

D. Attorneys' fees and the costs of this action and other costs that may be associated with this action; and

E. Any and all other relief that this Court deems equitable, just, and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury of all claims triable within this matter.

Respectfully submitted,

DATED: May 15, 2025

/s/ Eli Hare
One of the Plaintiff's Attorneys

Ben Crump
Sue-Ann Robinson
Gabrielle Higgins
Chris O'Neal*
**BEN CRUMP LAW, PLLC**
122 South Calhoun Street
Tallahassee, Florida 32301
Tel. 800.715.5999
ben@bencrump.com
sueann@bencrump.com
gabrielle@bencrump.com
chris@bencrump.com

Diandra "Fu" Debrosse*
Eli Hare
Mitchell W. Laing*
**DiCELLO LEVITT LLP**
505 20th Street North
Suite 1500
Birmingham, Alabama 35203
Tel. 205.855.5700
fu@dicellolevitt.com
ehare@dicellolevitt.com
mlaing@dicellolevitt.com

Éviealle J. Dawkins*
**DiCELLO LEVITT LLP**
801 17th Street, NW
Suite 430
Washington, D.C. 20006
Tel. 202.975.2288
edawkins@dicellolevitt.com

***Counsel for Plaintiff***

*Motion for *pro hac vice* admission to be filed.

## **CERTIFICATE OF SERVICE**

I do hereby certify that a true and accurate copy of the foregoing has been furnished by electronic mail on this 15th day of May, 2025 to the following:

Richard S. Busch
David Niemierzycki
KING & BALLOW
26 Century Boulevard, Suite NT700
Nashville, TN 37214
rbusch@kingballow.com

Barry Richard
BARRY RICHARD LAW FIRM
101 East College Avenue, Suite 400
Tallahassee, FL 32301
barryrichard@barryrichard.com
dawnkrow@barryrichard.com
*Counsel for Defendants*

                                        */s/ Eli Hare*_____
                                        OF COUNSEL