## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

GEORGE CLINTON,

     *Plaintiff,*

v.                           Case No. 4:25cv108-MW/MJF

ARMEN BOLADIAN;
BRIDGEPORT MUSIC, INC.;
WESTBOUND RECORDS, INC.;
NINE RECORDS, INC.;
SOUTHFIELD MUSIC, INC.; and
EASTBOUND RECORDS, INC.,

     *Defendants.*

_____/

### DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT PURSUANT TO RULE 12 OF THE FEDERAL RULES OF CIVIL PROCEDURE, OR IN THE ALTERNATIVE, MOTION TO STRIKE PURSUANT TO RULE 12(F) AND MEMORANDUM OF LAW IN SUPPORT

PLEASE TAKE NOTICE that Defendants ARMEN BOLADIAN ("Boladian"), BRIDGEPORT MUSIC, INC., ("Bridgeport") WESTBOUND RECORDS, INC., ("Westbound"), NINE RECORDS, INC., ("Nine") SOUTHFIELD MUSIC, INC., ("Southfield") and EASTBOUND RECORDS, INC. ("Eastbound") (collectively "Defendants") hereby move for dismissal of the First Amended Complaint, *with prejudice*, filed by Plaintiff GEORGE CLINTON ("Plaintiff" or "Clinton") pursuant to Rules 9 and 12 of the Federal Rules of Civil

1

Procedure, on the grounds that, pursuant to FED. R. CIV. P. 12(b)(6),[1] for the reasons set forth in the attached Memorandum below and in the contemporaneous motion for sanctions pursuant to FED. R. CIV. P. 11, Clinton's First Amended Complaint fails to state a claim upon which relief can be granted. Briefly:

1. **Counts 1 & 2 For Declaratory Relief (as they pertain to the Westbound Sound Recordings)**: Westbound is the owner of the Sound Recordings Clinton recorded for Westbound (the "Westbound Sound Recordings") and Clinton does not have reversion rights as a matter of law for several independent reasons.

First, in 1972, Clinton and Westbound entered into a work for hire agreement (the "1972 Agreement") in which they agreed Westbound is the owner of the Westbound Sound Recordings. They modified that agreement in 1975 (the "1975 Modification"), and Clinton acknowledged Westbound's ownership again. Under the 1909 Copyright Act, which governs these recordings, there is no right to terminate grants pertaining to sound recordings created under a work for hire agreement. 17 U.S.C. §§ 203, 304 respectively. Second, *res judicata*, bars any challenge Clinton may try to make to the 1972 Agreement or 1975 Modification, including whether the 1972 Agreement is a work for hire agreement, in light of the results of the 2011

---

[1] All of the grounds for the instant motion are found within the pleadings and things which the Court may take judicial notice of, making the instant motion proper under FED. R. CIV. P. 12. However, to the extent that the Court disagrees, Defendants would prefer converting the instant motion to one for Summary Judgment under FED. R. CIV. P. 56, pursuant to FED. R. CIV. P. 12(d).

lawsuit he filed against Westbound and Boladian in the Central District of California, *Clinton v. Boladian, et al.*, Case No. cv-11-10062 (C.D. Cal.) (the "California Litigation"). In that case, Clinton initially raised virtually the same issues he raises herein, claiming that he never signed any agreements with Westbound, and that there was never any work for hire agreement entered into between Westbound and Clinton, but then, he abandoned those claims upon threat of Rule 11 sanctions when his counsel was presented with the undeniable proof that he did execute the 1972 Agreement and 1975 Modification, and was provided copies of those Agreements. Clinton is therefore precluded under Eleventh Circuit authority from relitigating any issues related thereto. Finally, Cinton did not list any sound recording rights in his 1984 bankruptcy (current, future, or contingent) and therefore he is precluded from claiming any rights to those sound recordings now.

2.    **Counts 1 & 2 For Declaratory Relief (as they pertain to the Musical Compositions)**: Further, pursuant to FED. R. CIV. P. 12(b)(6), no relief under the first two Causes of Action can be granted with regards to the musical compositions subject to the termination notices on the grounds of bankruptcy estoppel, collateral estoppel, and *res judicata*. In 1999, in this very Court, Clinton and his publishing company, Malbiz Music, Inc., ("Malbiz") sued Bridgeport and Boladian, claiming, among other things, that Malbiz was the owner of all musical compositions Clinton wrote prior to March 4, 1982 (the "Subject Compositions"), and that Clinton was

entitled to royalties for them. *Clinton, et al. v. Boladian, et al.*, 99-cv-242, (N.D. Fla.) (Hinkle, J.) (the "Florida Litigation"). On summary judgment, Judge Hinkle ruled that Clinton's failure to list any rights to the Subject Compositions estopped him from seeking any rights in those musical compositions individually, stating:

> In his bankruptcy schedules, however, Mr. Clinton did not list any assets or rights to payment in the past or in the future - whether fixed or contingent and whether based on contract or the copyright laws or anything else - relating to these compositions. Mr. Clinton's bankruptcy schedules asserting he owned no such rights estop him from now claiming the contrary. [] Moreover, even if Mr. Clinton owned such assets when he filed his bankruptcy petition, they became the property of the bankruptcy estate and, because unscheduled, have not been abandoned back to Mr. Clinton.

(citations omitted). Malbiz's claims to ownership of the Subject Compositions went to trial, after which Judge Hinkle ruled that Malbiz assigned all rights to Bridgeport in the Subject Compositions pursuant to a December 2, 1983 Addendum (the "December 2, 1983 Addendum") to a March 4, 1982, agreement, and declared Bridgeport owner of them. Judge Hinkle later denied Clinton and Malbiz's motion to set aside the Judgment on the grounds of fraud and literally required Clinton's counsel to retract and apologize to Bridgeport counsel Barry Richard for the allegations made in the motion.

The foregoing rulings by Judge Hinkle now preclude Clinton from claiming any reversion rights under res judicata, collateral estoppel, and bankruptcy estoppel.

In addition, Judge Hinkle ruled that separate agreements Clinton signed on December 2, 1983, for musical compositions Clinton wrote thereafter were work for hire agreements with Bridgeport. Thus, those musical compositions are not subject to reversion rights. The same work for hire language is found in 1985 Agreements between Bridgeport and Clinton.

3.     **Count 3 for Copyright Infringement:** The Third Cause of Action for Copyright Infringement must likewise fail because copyright infringement requires ownership of the copyrighted works. Because Clinton is not the owner of the Subject Compositions (nor any of the musical composition at issue) or the Westbound Sound Recordings, for all of the reasons discussed above, this claim fails. In addition, because the termination notices for both the sound recordings *and* the musical compositions were void *ab initio*, he cannot maintain an action for copyright infringement.

4.     **Count 4 for Fraud**: Pursuant to Fed. Rs. Civ. P. 9 and 12, Clinton's Fourth Cause of Action for Fraud for Recaptured Works must fail. First, there is literally no allegation of fraud in the First Amended Complaint that is not barred by *res judicata* or collateral estoppel, or bankruptcy estoppel, or timeliness, for all of the reasons discussed above. Indeed, all that is left in the First Amended Complaint are allegations pertaining to a business dispute regarding the efficacy of Clinton's

termination notices. The fraud allegation should thus be dismissed under Rule 9 and 12(b)(6).[2]

5.    **Count 5 for Preliminary Injunction**: Finally, Clinton's Fifth Cause of Action for Preliminary Injunction must also fail. As a threshold matter, injunctions are relief, not causes of action. Further, even if that were not the case, because Clinton's other Causes of Action must fail, he will not be able to establish a likelihood of success on the merits – the prerequisite to injunctive relief – he will not be able to show that he is entitled to an injunction, preliminary or otherwise.

As such, all these claims must fail. Furthermore, dismissal *with prejudice* is appropriate as there is no truthful amendment which could salvage these spurious claims and defunct causes of action.

Finally, **in the alternative** pursuant to FED. R. CIV. P. 12(f), Defendants hereby move and respectfully request the Court to strike Paragraphs 6, 7, part of paragraph 8, 32, 38 through 41, inclusive, on the grounds that these paragraphs are wholly immaterial to the remaining causes of action, are barred by *res judicata*, collateral estoppel, and bankruptcy estoppel, and are impertinent and scandalous given they solely relate to decades-old allegations of fraud by Defendants – allegations which

---

[2] Ironically, it is Clinton who has been attempting fraudulently (by claiming he did not sign documents he clearly did) and through admitted perjury in the Florida Litigation to claim ownership of the Subject Compositions and Westbound Sound Recordings, as discussed fully in the attached Memorandum of Law and accompanying Motion for Rule 11 Sanctions.

have already been judicially determined to have been meritless, or were abandoned in prior litigation. Indeed, Clinton has already voluntarily dismissed Causes of Action in *this* litigation related to these allegations but for some inexplicable reason did not delete these allegations.

## **LOCAL RULE 7.1(K) REQUEST FOR ORAL ARGUMENT**

PLEASE ALSO TAKE NOTICE that Defendants request one hour of oral argument time pursuant to Local Rule 7.1(K).

## <u>CERTIFICATE OF GOOD FAITH CONFERENCE</u><br><u>PURSUANT TO LOCAL RULE 7.1(B)</u>

Pursuant to Local Rule 7.1(B), the undersigned counsel conferred with counsel for Plaintiff and is authorized to represent that Plaintiff objects to the relief sought by this motion.

Dated: 7/3/25                    Respectfully submitted,

KING & BALLOW

*/s/ Richard S. Busch*
Richard S. Busch (*Pro Hac Vice*)
David Niemierzycki (Fla. Bar. 1023763)
KING & BALLOW
26 Century Boulevard, Suite NT700
Nashville, TN 37214
Telephone: (615) 259-3456
*rbusch@kingballow.com*

*/s/Barry Richard*
**BARRY RICHARD** (Fla. Bar 105599)
Barry Richard Law Firm
101 East College Avenue, Suite 400
Tallahassee, FL 32301
(850) 274-1814
barryrichard@barryrichard.com
dawnkrow@barryrichard.com

*Attorneys for Defendants*

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) OR IN THE ALTERNATIVE TO STRIKE PURSUANT TO FED. R. CIV. P. 12(F)

### I.    INTRODUCTION & FACTUAL BACKGROUND

Defendants[1] submit this memorandum of law in support of their motion to dismiss all of Plaintiff George Clinton's claims. Also, filed contemporaneously herewith, is Defendants' Motion for Rule 11 sanctions. As discussed below, and in Defendants' Motion for Rule 11 sanctions, the First Amended Complaint ("FAC") represents Clinton's third attempt to state a viable cause of action against Defendants, but it fares no better than the previous two attempts. Clinton's claims are all barred as a matter of law for several independent reasons and should be dismissed with prejudice.

### A. Clinton's Relationship with Defendants

Boladian has been the sole owner of the Defendant entities since the 1960s. FAC ¶¶14, 34-37. Westbound is his record label and it owns the Westbound Sound Recordings. FAC ¶16. Bridgeport is Boladian's publishing company and thus owns and administers musical compositions. FAC ¶15. Defendant Nine is a distributor for Westbound. FAC ¶17. Southfield is Boladian's ASCAP-affiliated music publisher. FAC ¶18. Eastbound is another of Boladian's record labels. FAC ¶19. Nine,

---

[1] Defendants defined themselves and various other terms in the accompanying Motion to Dismiss, and refer the Court to those defined terms as used herein.

Southfield, and Eastbound do not have any substantive relationship to the claims in the FAC, and were not even included on any of the subject copyright termination notices. *See* Doc. Nos. 32-1, 32-2, 32-3.

Clinton and the group "The Funkadelics," for which Clinton was the producer/lead singer, began recording for Westbound in or about 1969. FAC ¶28. In 1972, Clinton signed a work for hire agreement in which he agreed Westbound was the owner of the sound recordings he recorded for Westbound. Ex. 1 at ¶1[2] ("Company [Westbound] hereby employs Artist [Clinton]… as a recording artist and musician for the purpose of making master recordings … Artist hereby accepts such employment upon all the terms and conditions of this Agreement."); *id*. at ¶11 ("All master recordings made hereunder, as well as all performances thereon and all phonograph records derived therefrom, together with any property rights therein, whether presently existing or hereinafter created, will be the exclusive property of Company free of any claim whatsoever by Artist or by anyone deriving rights from Artist.").

In 1975, Clinton wanted to leave Westbound to go to another record label and

---

[2] The Court may take judicial notice of the contracts governing the sound recordings and musical compositions as they are central to the issues in this case. *See Alt. Materials, LLC v. TCH Constr. Grp., Inc.*, No. 5:20-cv-239-AW-MJF, 2021 U.S. Dist. LEXIS 195245, at *2 (N.D. Fla. Feb. 11, 2021) (citing *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)). *See also* forthcoming Req. for Judicial Not.

Boladian accepted his request. As part of Clinton's departure, Clinton executed a Modification of the 1972 Agreement, which referenced and modified the 1972 Agreement, shortening the term thereof and (more importantly for our purposes here) also confirmed that Westbound owned all sound recordings Clinton had ever recorded for Westbound. Ex. 2 at ¶¶1, 2 and 3 (referencing the 1972 Agreement and saying: "In consideration of the mutual covenants herein contained and for other good and valuable consideration, receipt of which is hereby acknowledged, you and we hereby agree to **modify the aforesaid Agreement** only in accordance with the terms and conditions as more fully set forth below" and "You hereby acknowledge and agree that we [Westbound] shall retain in perpetuity the exclusive worldwide right, title and interest in and to all master recordings and the copyrights thereon embodying the performances…") (emphasis added).

On the music publishing side, in 1971 Bridgeport on the one hand, and Clinton on the other (on behalf of his music publishing company, Malbiz), entered into a co-publishing agreement in which Bridgeport and Malbiz would own 50/50 all musical compositions written by Clinton during the time Clinton was recording for Westbound. Ex. 3. On March 4, 1982, Clinton, on behalf of Malbiz, and Bridgeport, entered into an agreement in which Malbiz assigned to Bridgeport certain songs, and then, on December 2, 1983, the parties entered into an "Addendum" (the "December 2, 1983 Addendum") to this March 4, 1982, agreement, in which Clinton on behalf

3

of Malbiz assigned to Bridgeport all of Malbiz's interest in all songs Clinton wrote or co-wrote prior to March 4, 1982, including the songs that were subject to the March 4, 1982, agreement. Ex. 9 at 186:17-190:4. On December 2, 1983, and April 4, 1985, Clinton also entered into two Songwriter Agreements with Bridgeport wherein Bridgeport hired Clinton as a songwriter. Exs. 4, 5. The 1983 Exclusive Writer's Agreement provides that: "Publisher [Bridgeport] hereby engages Writer [Clinton] as a songwriter and composer" and by the addendum executed the same day that "It is understood and agreed that it is the intention of Publisher and Writer that Writer shall be Publisher's 'employee for hire' here under within the meaning of the United States Copyright Act of 1976…; that each of the Compositions acquired by Publisher [Bridgeport] hereunder shall be a 'work for hire' within the meaning of the Copyright Act". Ex. 4. The 1985 Writer's Agreement provides that Bridgeport "employs Writer [Clinton]… to render Writer's exclusive writing services" with identical work-for-hire language (with reference to the statute) as in the 1983 Exclusive Writer's Agreement. Ex. 5. The musical compositions created pursuant to these agreements are referred to herein as the "Work-For-Hire Compositions".[3]

Under the express terms of these various agreements, Defendants were, respectively, the exclusive owners of the Westbound Sound Recordings and the

---

[3] Those listed on Doc. No. 32-1 at pp. 128-137 starting with "Bangladesh".

Subject Compositions (those created on or before March 4, 1982, and at issue in the Florida Litigation) and the Work-For-Hire Compositions at issue in this case. The Parties operated accordingly until Clinton began a decades-long campaign to besmirch Boladian and try to use any means necessary, including admittedly committing perjury in this Court (*See* Rule 11 Motion at pp. 11-12) to try to fraudulently attempt to gain control of all of the foregoing.

### B. Clinton's Bankruptcy and the Previous Actions. [4]

In June 1984, Clinton filed for bankruptcy, but failed to list any musical compositions, sound recordings, right to receive royalties, or any contingent or future interests related to musical compositions or sound recordings *in any regard*. Ex. 6.

In 1999, Clinton and Malbiz filed the Florida Litigation alleging, *inter alia*, that Boladian and Bridgeport had fraudulently forged his signature on the December 2, 1983 Addendum, or, alternatively, if he signed the December 2, 1983 Addendum, he did not have authority to do so because he previously gave ownership of Malbiz to his wife. Ex. 7 (Florida Complaint); Ex. 9, Trial Tr. at 17:24-18:4. At summary judgment, Judge Hinkle held that because Clinton's 1984 Bankruptcy documents

---

[4] The Court may take judicial notice of the docket and filings from these previous actions involving the current litigants. *Stringer v. Doe*, No. 5:11cv1/RS/EMT, 2011 U.S. Dist. LEXIS 77639, at *10 (N.D. Fla. June 16, 2011) ("In this case, the court takes judicial notice of the public dockets of cases filed by Plaintiff in other federal courts."). *See also* forthcoming Req. for Judicial Not.

had not listed any musical compositions or rights to royalties on the Schedules, he

was estopped from claiming any rights in any copyrights or royalties. Ex. 8 at 2, n.1.

Specifically, Judge Hinkle ruled:

> In his bankruptcy schedules, however, Mr. Clinton did not list any assets
> or rights to payment in the past or in the future - whether fixed or
> contingent and whether based on contract or the copyright laws or
> anything else - relating to these compositions. Mr. Clinton's bankruptcy
> schedules asserting he owned no such rights estop him from now
> claiming the contrary. [] Moreover, even if Mr. Clinton owned such
> assets when he filed his bankruptcy petition, they became the property
> of the bankruptcy estate and, because unscheduled, have not been
> abandoned back to Mr. Clinton.

*Id.* (citations omitted). Malbiz's ownership claims that remained went to trial. Judge

Hinkle ruled that Clinton not only had the authority to sign the December 2, 1983

Addendum (thus rejecting the 'I gave Malbiz to my wife' defense), but did sign it,

and Bridgeport was thus the owner of all musical compositions owned by Malbiz

that Clinton wrote or co-wrote prior to March 4, 1982. Judge Hinkle further ruled

that Clinton had no rights to those compositions created thereafter, based on a

separate December 2, 1983 Exclusive Writer's Agreement, stating it was "the

equivalent of an employee-for-hire of Bridgeport with respect to the works created

then on during the term of the [1983] writer's agreement." Ex. 9 at 189:19-23;

190:15-18.

Defendants' contemporaneously-filed Rule 11 motion details the procedural

posture thereafter in more detail, but briefly: Clinton filed an appeal which was

dismissed. Clinton filed a motion to set aside a final judgement alleging fraud on the Court by Boladian and his counsel Barry Richard (also counsel of record here), which was denied, and in which the Court ordered that counsel for Clinton to file an unequivocal retraction of allegations of fraud by Boladian and Richard in order to avoid sanctions. Clinton then appealed again, but Judge Hinkle's judgment was affirmed. 54 F. App'x 684 (11th Cir. 2002). Clinton has subsequently admitted that he knowingly committed perjury when he testified he gave Malbiz to his wife, which is also discussed in more detail in the Rule 11 motion filed contemporaneously herewith. Mot. at 10-12.

Not having learned his lesson from the Florida Litigation, Clinton filed the California Litigation in 2011, this time pertaining to the sound recordings. Like in this action, Clinton started off with a wide-cast fifteen count complaint, and like the Florida Litigation, Clinton tried to argue that he had never executed agreements with Westbound, ***and that there was "no work for hire agreement regarding these sound recordings"***. *See generally*, Ex. 10, *Clinton v. Boladian, et al*., Case No. cv-11-10062 (C.D. Cal.), Original Complaint; *id*. at ¶¶40-42 (emphasis added).[5] There, the

---

[5] Clinton and his various counsel cannot keep their stories straight among themselves. In separate pending litigation against George Clinton in the United States District Court for the Eastern District of Michigan, where it behooves Clinton to so claim, Clinton asserts that he was an employee of Westbound for the purposes of creating sound recordings. Ex. 14 (arguing that there was an "indisputable employment" relationship between Westbound and Clinton). Here, however, where

court dismissed the Original Complaint without prejudice for failure to prosecute. Ex. 11. As explained in the Rule 11 Motion, after threat of Rule 11 Sanctions in *that* action, Clinton filed an Amended Complaint in the California Litigation abandoning the following claims: that Clinton never executed any agreement concerning the sound recordings Clinton recorded for Westbound in the late 1960s and 1970s; Clinton did not enter into any work for hire agreements; Clinton was neither accounted to nor paid royalties to which he was entitled; Boladian and Westbound engaged in fraud and copyright infringement of the Westbound Sound Recordings among many other dastardly things; and Clinton should be declared the owner of all of the Westbound Sound Recordings and receive damages. Ex. 12, Amended California Complaint. The court in the California Litigation subsequently granted Defendants' motion to dismiss the Amended Complaint. *See generally Clinton v. Boladian*, No. CV 11-10062-R, 2013 U.S. Dist. LEXIS 198324 (C.D. Cal. May 2, 2013) (attached as Ex. 13). As discussed below, Clinton is barred under *res judicata* from now claiming he did not sign the 1972 Agreement or the 1975 Modification, or that they were not work for hire agreements, or litigating any of his other abandoned

---

Clinton understands that such a finding would mean he created the Westbound Sound Recordings as a work-for-hire, he asserts the exact opposite in his original Complaint. Doc. No. 1, at ¶76 ("Plaintiff is not and has never been an employee of any of the Defendants"); *id*. at ¶78 ("Plaintiff never signed a work for hire agreement with any of the Defendants nor did he sign any employment agreements with any of them."). Clinton has now withdrawn those allegations after being presented with his admissions in the Michigan litigation. *See generally*, FAC.

claims.

## II.   LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege sufficient facts to state a claim that is plausible on its face." *Kennedy v. Secretary*, No. 24-11027, 2025 U.S. App. LEXIS 11648, at *1 (11th Cir. May 14, 2025) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A] plaintiff must provide 'more than labels, and conclusions.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

While factual allegations in a complaint are taken as true and reasonable inferences drawn in favor of the non-moving party, the Eleventh Circuit has also "held that a district court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a Rule 56 motion." *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010). As discussed in footnotes 2, 4, and the forthcoming request for judicial notice these matters may be considered under Rule 12. However, should the Court, in its sound discretion disagree, Defendants would prefer the Court treat this motion as if brought under Rule 56 pursuant to FED. R. CIV. P. 12(d) rather than have the Court elect not to consider those materials.

## III.    ARGUMENT

### A. Nine, Eastbound, and Southfield Should be Dismissed.

The FAC does not make *any* factual allegations regarding Nine, Eastbound, or Southfield related to Clinton's stated causes of action. The FAC only alleges Mr. Boladian's connection with the companies. The reason for this failure is simple: they have nothing to do with the instant dispute. The listed recipients of the termination notices were largely Tercer Mundo, Inc., Nene Montes, Bridgeport, Boladian, and Westbound. *See* Doc. Nos. 32-1. 32-2, 32-3. Nine, Eastbound, and Southfield were not recipients on any of the notices. *Id*.

The FAC simply does not allege *any* facts to support liability of Nine, Eastbound, or Southfield. They must therefore be dismissed. *Douglas v. Yates*, 535 F.3d 1316, 1322 (11th Cir. 2008) ("[W]e must demand that the complaint state with some minimal particularity how overt acts of the defendant caused a legal wrong."); *Smith v. Davis*, No. 5:24-cv-167-MTT-AGH, 2024 U.S. Dist. LEXIS 200306, at *3 (M.D. Ga. Nov. 4, 2024) ("A district court may dismiss a complaint if the plaintiff fails to state any factual allegations that connect a defendant with an alleged [wrong].")

### B. Clinton's First and Second Causes of Action for Declaratory Relief Fail to State a Claim upon which Relief May be Granted.

#### 1. Clinton is not entitled to Declaratory Relief on The Westbound Recordings.

There are three independent reasons Counts 1 and 2 fail to state a claim. First, as discussed above, Clinton and Westbound entered into the 1972 Agreement in which Clinton and Westbound agreed that Clinton was employed by Westbound to create the Westbound Sound Recordings, and then, in the 1975 Modification, Clinton acknowledged, while referencing the 1972 Agreement, that Westbound was the owner of all of the Westbound Sound Recordings. Exs. 1, 2. Under the 1909 Copyright Act, which is applicable to the Westbound Sound Recordings, as discussed below, and which applies the 'simple insistence and expense test', the language in the 1972 Agreement is sufficient to create a work-for-hire agreement. *Murray v. Gelderman*, 566 F.2d 1307, 1310 (5th Cir. 1978); Ex. 1 at ¶1 ("Company hereby employs artist…. Artist hereby accepts such employment upon all of the terms and conditions of this Agreement."); *id*. at ¶¶2,3 (providing Westbound the right to select which compositions are recorded and requiring Westbound to pay for recording sessions). Second, Clinton affirmatively asserted in the California Litigation that he never entered into any work for hire agreements with Westbound (*see* Ex. 10 at ¶¶40-42), but as discussed above and in Defendants' Rule 11 Motion, he abandoned those allegations and related claims for copyright infringement and

11

fraud (Ex. 12), barring him from relitigating those claims now. *See Thomas v. Evans*, 880 F.2d 1235, 1240 (11th Cir. 1989) ("A plaintiff may be sanctioned under Rule 11 for filing claims barred by res judicata."). Finally, Clinton is estopped from claiming any rights to the Westbound Recordings, including termination rights, under bankruptcy estoppel, for the same reasons Judge Hinkle ruled that Clinton had no rights in the Subject Compositions.

### a. Res Judicata Bars Clinton From Claiming The Westbound Sound Recordings Are Not Works For Hire

Clinton claimed in the California Litigation that he did not enter into any written agreement with Westbound, and specifically not any work for hire agreement, and that therefore Westbound had committed copyright infringement, fraud, and other wrongdoing as a result, by way of their exploitation of the Westbound Sound Recordings. Ex. 10, Original Complaint at ¶¶40-42 (each detailing an album bearing the Westbound Recordings and claiming (the typo in ¶40 notwithstanding) that "there is no work for hire agreement regarding these sound recordings"); *id*. at ¶¶88-108 (claiming ownership of the Westbound Recordings and claiming unauthorized use and copyright infringement by Westbound's exploitations thereof).

After the Court dismissed the Original Complaint for failure to prosecute (Ex.

11), Clinton then filed an Amended Complaint abandoning those claims. Ex. 12.[6] By raising, then abandoning claims that there was no work-for-hire agreement with Westbound, Clinton is thus barred under *res judicata* from reasserting those claims now. N.D. Fla. Loc. R. 15.1(A) ("Allegations in a prior pleading that are not set out in the amended pleading are deemed abandoned."); *Bilal v. Driver*, 251 F.3d 1346, 1347 n.1 (11th Cir. 2001); *Dinkins v. Leavitt*, No. 1:07-CV-0486-TWT-AJB, 2007 U.S. Dist. LEXIS 102709, at *27-28 (N.D. Ga. Dec. 17, 2007) (abandoned claims cannot be resurrected in a new lawsuit under *res judicata*) *report and recommendation adopted by* 2008 U.S. Dist. LEXIS 11113 (N.D. Ga. Jan. 11, 2008), *aff'd* 315 Fed. Appx. 171, 174-76 (11th Cir. 2008), *reh'g en banc denied* 345 Fed. Appx. 534 (11th Cir. 2009), *cert. denied sub nom. Dinkins v. Sebelius*, 558 U.S. 844, *reh'g denied* 558 U.S. 1065 (2009).

### b. The Westbound Sound Recordings Are Works For Hire and Not Subject to Reversion Under the 1909 Copyright Act

While *res judicata* bars Clinton's claims, it is nonetheless clear as a matter of law that the Westbound Sound Recordings were created as works for hire, and thus not subject to reversion under the applicable 1909 Copyright Act.

---

[6] While not important for the purposes of the instant motion, it should be noted, as explained more fully in the contemporaneous Rule 11 Motion, even before the court dismissed the complaint, Westbound's counsel sent a letter to Clinton's counsel with attached exhibits demonstrating the frivolous nature of the claims in the original Complaint. *See* Rule 11 Motion at pp. 12-14, Rule 11 Motion Ex. 12.

First, during the meet and confer process, and in the First Amended Complaint, Clinton contended that the 1976 Copyright Act's Definition of Works-Made-For-Hire applied to determining whether the Westbound Sound Recordings are subject to terminations. FAC ¶63. He argues that the 1976 Act's definition expressly excludes sound recordings from being deemed works-mad-for-hire. Clinton is wrong.[7] All Westbound Sound Recordings were created *prior to* 1978 (*see* Doc. No. 32-3 (Schedule of Westbound Recordings)), and thus are governed by the 1909 Act. 17 U.S.C. § 102; *see RCTV Int'l Corp. v. Rosenfeld*, No. 13-23611-CIV-SIMONTON, 2016 U.S. Dist. LEXIS 136867, at *26 (S.D. Fla. Sep. 30, 2016) ("Because the works in *Corcovado* were created before January 1, 1978, the 1909 Copyright Act — not the 1976 Copyright Act — governed the issues in that case.").

Unlike the 1976 Copyright Act, the 1909 Act was clear that works-made-for-hire vest with the "employer" (*see* 17 U.S.C. § 62 (1909)), and the Supreme Court, in *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 743-44 (1989), made clear:

> Because the 1909 Act did not define "employer" or "works made for hire," the task of shaping these terms fell to the courts. They concluded that **the work for hire doctrine codified in § 62 referred only to works made by employees in the regular course of their**

---

[7] *See* United States Copyright Office's Circular No. 56, *Copyright Registration for Sound Recordings*, Revised March 2021 ("Circular 56"), available at <https://www.copyright.gov/circs/circ56.pdf>. ("If the performer or producer created the sound recording during the course of his or her employment under a typical employment relationship, then the sound recording is a work made for hire, and the employer is the author of the sound recording").

**employment**.

(emphasis added).

This is determinative because the plain language of the Copyright Act shows that works-made-for-hire are not subject to the termination rights under Sections 203, 304. The applicable Section 304 provides: "In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, **other than a copyright in a work made for hire**, the exclusive or nonexclusive grant of a transfer … executed before January 1, 1978, … is subject to termination under the following conditions:…" 17 U.S.C. § 304(c) (emphasis added).

As such, when courts have weighed the validity of termination notices sent under these provisions, they have noted that if the works are made for hire, the termination notice would not be effective. *See, e.g.*, *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 119 (2d Cir. 2018) (quoting 17 U.S.C. § 304(a)(1)(B)); 17 U.S.C. § 304(c)) ("[U]nder § 304, in the case of works created (in the relevant time period) for an 'employer for whom such work is made for hire,' the employer for hire becomes effectively the author and owns not only the initial term, but also the renewal term.").

In this regard, the Old Fifth Circuit, whose opinions are binding within the Eleventh Circuit,[8] explained that the simple "instance and expense" test is employed.

---

[8] *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

*Murray*, 566 F.2d at 1310 ("The crucial element in this determination appears to be whether the work was created at the employer's insistence[9] and expense").

Here, the 1972 Agreement makes clear not only that Westbound had employed Clinton to create sound recordings but that Westbound had done so at its expense, meaning that the Westbound Sound Recordings were created at the instance and expense of Westbound and are works for hire. Ex. 1 at ¶1 ("Company hereby employs artist…. Artist hereby accepts such employment upon all of the terms and conditions of this Agreement.").[10] The Agreement also gives Westbound the right to "select the musical compositions and other material to be performed" by Clinton. *Id.* at ¶2. Westbound also agreed to pay "all costs of recording sessions." *Id.* at ¶3.

Finally, as mentioned above, and in the contemporaneously filed Rule 11 motion, Clinton has actually conceded this point in other pending litigation. In *Worrell v. Clinton*, 22-cv-11009 (E.D. Mich.), because it was in his interest to do so there, Clinton admitted that there was an "indisputable employment" relationship with Westbound during the time Clinton was recording for Westbound. Ex. 14.

---

[9] The Fifth Circuit first used the term "insistence" rather than "instance." Later opinions adopted the nomenclature espoused by its sister-circuits. *See Easter Seal Soc'y for Crippled Children & Adults of La., Inc. v. Playboy Enters.*, 815 F.2d 323, 327 (5th Cir. 1987).

[10] As explained in the Rule 11 Motion, the 1975 modification further codified the work-for-hire status of the Westbound Employment Agreement by its use of "retain". The use of "retain" confirms that the 1972 Westbound Agreement was a work-for-hire employment agreement and *not* a terminable copyright assignment. *See* Mot. at p. 22-23.

Judicial estoppel prevents him from arguing to the contrary here. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.")

   **c.  *Clinton is further Estopped under Bankruptcy Estoppel from exercising Termination Rights in the Westbound Recordings.***

    i)  *Bankruptcy Estoppel and* Res Judicata *apply to the Westbound Recordings.*

  Clinton's failure to list *any* interest in the Westbound Recordings – including any future reversionary interests in them – in his Bankruptcy proceedings independently also bars him from seeking terminations for the Westbound Recordings and Subject Compositions written prior to its filing in 1984.

  "A debtor seeking shelter under the bankruptcy laws has a statutory duty to disclose all assets, or potential assets to the bankruptcy court." *Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1274 (11th Cir. 2010) (citing 11 U.S.C. §§ 521(1), 541(a)). While Section 541 defines what assets from that schedule form the bankruptcy estate and what are excluded, that does not mitigate the duty to disclose under Section 521. *Id*. This duty to disclose includes potential assets, intangible assets and future interests. *See id.*; *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 784 (9th Cir. 2001) ("This court has held that a debtor who failed to disclose a pending claim as an asset in a bankruptcy proceeding where debts were permanently

discharged was estopped from pursuing such claim in a subsequent proceeding.").

Here, Clinton failed to list any musical compositions, sound recordings, right to receive royalties, or *any* future or contingent rights therein in his bankruptcy proceedings despite there being line items on the bankruptcy form for "Patents, copyrights, franchise, and other general intangibles," "contingent and unliquidated claims of every nature" and "equitable and future interests, life estates, and rights or power exercisable for the benefit of the debtor." *See* Ex. 6. As such, Judge Hinkle ruled that Clinton was barred under bankruptcy estoppel from claiming any rights in the pre-1984 Subject Compositions. Ex. 8, at 2 n.1 (quoted fully, *supra*) (citing, *inter alia*, *Chandler v. Samford Univ.*, 35 F. Supp. 2d 861, 863 (N.D. Ala. 1999) (applying estoppel: "This holding stems from the requirement that a debtor seeking the shelter provided by federal bankruptcy laws disclose all legal or equitable property interests to a bankruptcy court"); *Scoggins v. Arrow Trucking Co.*, 92 F. Supp. 2d 1372, 1376 (S.D. Ga. 2000) (a person seeking protection of bankruptcy "should not be permitted to duck his bankruptcy court disclosure obligation, then 'fess up' without consequence once exposed by his adversary").

The same is true for the Westbound Recordings. The result is clear: by not listing any potential, putative, or potential rights – even his claims for authorship, ownership, or future terminations interest – Clinton is estopped from seeking the termination rights here.

ii)    *Clinton's Authority to the Contrary is Inapt.*

During the meet and confer process, Clinton's counsel sought to rely on *Lil'*
*Joe Recs., Inc. v. Ross*, 752 F. Supp. 3d 1287, 1305 (S.D. Fla. 2024), to argue that
Clinton's failure to list future sound recording reversionary rights did not result in
bankruptcy estoppel. *Ross* is, however, factually inapposite and does not involve the
issue at hand.

The court in *Ross* was weighing the following issue: whether a copyright
owner who filed bankruptcy, **and listed his copyright in his list of assets,** maintains
a reversion right in that intellectual property so he can later send, at the appropriate
time, an effective termination notice. *Id*. at 1292-93. ***Thus, in that case, as noted,***
***the bankruptcy filings properly disclosed the author's interest in the sound***
***recordings***, but the reorganization plan and the transfers were silent as to the
termination rights. *Id*. The issue of bankruptcy estoppel for failure to identify assets
was not implicated. *Ross* is thus inapposite because, by failing to list any interest in
the Westbound Sound Recordings, whether fixed, future, or contingent, Clinton
violated his statutory duty to disclose all assets under 11 U.S.C. §521, and is thereby
estopped from claiming any interest in them now. *Robinson*, 595 F.3d at 1274 (citing
11 U.S.C. §§ 521(1), 541(a)).

Clinton is thus conflating (1) the impact of Clinton's failure to satisfy his
disclosure requirements under Section 521 with (2) whether or not Clinton's

termination rights were properly part of the 1984 Bankruptcy Estate under Section 541.

Judge Hinkle's finding with respect to the Subject Compositions is therefore equally applicable to the Westbound Sound Recordings because those too, as discussed above, were nowhere mentioned in any regard in Clinton's bankruptcy petition. Ex. 6. Clinton is therefore barred from claiming future rights now:

> In his bankruptcy schedules, however, Mr. Clinton did not list any assets or rights to payment in the past or in the future - whether fixed or contingent and whether based on contract or the copyright laws or anything else - relating to these compositions. Mr. Clinton's bankruptcy schedules asserting he owned no such rights estop him from now claiming the contrary."

Ex. 8 at 2, n. 1 (gathering sources).

In the meet and confer process, Clinton's counsel has also raised the doctrine of excusable neglect for failing to list his assets. That, however, also fails for three reasons. First, Clinton's bankruptcy petition was fully litigated in the Florida Litigation and he cannot relitigate anything concerning it now under *res judicata* and collateral estoppel. Second, as discussed more fully in the accompanying Rule 11 motion, excusable neglect only applies in the bankruptcy litigation itself, and does not apply in separate litigation long after the bankruptcy litigation is closed. *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 387-95 (1993); *In re Wing*, 55 B.R. 91, 93 (Bankr. D.D.C. 1985). And, finally, even in the same proceeding, Clinton would have to show the following four elements for excusable neglect to

apply: (1) the danger that the neglect caused prejudice; (2) the length of the delay resulting from the neglect and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the party guilty of neglect; and (4) whether the party guilty of neglect acted in good faith. *Pioneer*, 507 U.S. at 387-95. He cannot meet any of those four for numerous reasons: Initially, as mentioned, Clinton's bankruptcy petition was fully litigated in the Florida Litigation so he is barred under collateral estoppel and *res judicata* from even raising excusable neglect now, and, as far as the elements are concerned (which do not even apply), Defendants were creditors in the bankruptcy so they would suffer prejudice (in addition to being defendants in the Florida Litigation where the issue of Clinton's bankruptcy was litigated). It has been 40 years since Clinton's bankruptcy. Clinton has had numerous opportunities to raise these issues over the last 40 years. There was no reason Clinton could not have previously raised any issue, and Clinton has not acted in good faith as discussed fully herein, and the Rule 11 motion.

### 2. Clinton is not Entitled to Declaratory Relief for the Subject Compositions.

#### a. Clinton is Barred under Res Judicata, Collateral Estoppel, and Bankruptcy Estoppel from claiming terminations in the Subject Compositions Written Prior to the 1984 Bankruptcy.

Defendants incorporate herein, by reference, the discussion above concerning

*res judicata*, bankruptcy, res judicata, and bankruptcy estoppel as it relates to Clinton's 1984 bankruptcy petition. In short, Clinton actually litigated all issues concerning his bankruptcy petition in the Florida Litigation and is barred from relitigating those issues again. Judge Hinkle's ruling that Clinton's failure to list any of the Subject Compositions in his bankruptcy petition, whether present, future, or contingent, precludes him from having any rights in any of the Subject Compositions. Clinton is thus estopped under the aforementioned doctrines from seeking terminations as explained above.

### b. The 1983 and 1985 Writer's Agreements created works-made-for-hire.

The 1976 Act provides the following definition: "a 'work made for hire is – (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially commissioned for use as a contribution to a collective work, … if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

Here, the two agreements clearly fall within the first prong. Like under the 1909 Act, in evaluating whether the creating party is an employee under the 1976 Act, courts use common law agency principles. *Cmty. For Creative Non-Violence,* 490 U.S. at 751. Courts also look to the agreements between the parties defining the relationship. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1142 (9th Cir. 2003) ("[N]ot only did the contracts internally designate the compositions as 'works

made for hire,' they provided that MTM 'shall be deemed the author thereof for all purposes.' This is consistent with a work-for-hire relationship under the Act, which provides that 'the employer or other person for whom the work was prepared is considered the author.' 17 U.S.C. § 201(b).")

Here, just as in *Warren*, the 1983 Exclusive Writer's Agreement contains express language creating an employment relationship and providing that all compositions created during the term would be works-made-for-hire as defined under the 1976 Act. Ex. 4 (quoted more fully, *supra*, "It is understood and agreed that… each of the Compositions acquired by Publisher hereunder shall be a 'work made for hire' within the meaning of the Copyright Act"). As such, Judge Hinkle ruled in the Florida Litigation: "The December 2nd, 1983, writer's agreement makes Mr. Clinton the equivalent of an employee-for-hire of Bridgeport with respect to the works created then on during the term of the agreement." Ex. 9 at 190:15-18. Thus, Clinton is barred by *res judicata* on these Work-For-Hire Compositions.

The 1985 Agreement has identical language: "that each of the Compositions acquired by Publisher [Bridgeport] hereunder shall be a 'work for hire' within the meaning of the Copyright Act." Ex. 5.

As such The Work-For-Hire Compositions are just that: works-made-for-hire. Clinton is barred by *res judicata* on the compositions written pursuant to the 1983 Agreement. Ex. 9 at 190:15-18. While Judge Hinkle considered the terms of the 1985

Agreement, he ruled that it was not at issue in the case. *Id*. at 191:24-192:1. However, given that the language in the two agreements is identical, the result should be the same in respect to Judge Hinkle's ruling, and as they are clearly "work[s] prepared by an employee within the scope of his or her employment" (17 U.S.C. § 101), and the Agreement expressly contemplated the Act in its terms (*Warren, supra*).

### C. Clinton's Claim for Copyright infringement Must Be Dismissed.

Clinton's Copyright Infringement claims likewise fail for all of the reasons stated above. Westbound and Bridgeport own the copyrights at issue here. Because the termination notices were invalid, Clinton cannot show that he is the copyright holder for the works at issue, vitiating his claim for copyright infringement.[11]

Additionally, for the Westbound Recordings and those Work-For-Hire Compositions for which the termination dates have not passed (*see* Doc. Nos. 32-1, 32-3 (providing the effective dates of termination)), Bridgeport and Westbound are well within their rights to continue to exploit them *regardless* of the effectiveness of the termination notices. *See* 17 U.S.C. § 203(a)(4)(A) (providing two year's minimum written notice for the "effective date of termination"); *id*. at § 203(b) (providing that no rights in and to the copyrights revert until the "effective date of

---

[11] Furthermore, termination notices *only apply to a joint author's pro-rata share of the work*. 12 Nimmer on Copyright 2310 (2025). Should this case continue, Defendants will prove they retain fractional shares of these compositions. Copyright co-owners may not sue each other for copyright infringement. *Korman v. Iglesias*, 778 F. App'x 680, 681 n.2 (11th Cir. 2019).

termination"); *id*. at §§304(c) (providing the same two-year notice requirement and that termination is not effective until the effective date).

### D. Clinton Has Not – And Cannot – Adequately Plead Fraud.

"Pleading a fraud claim with particularity means 'identifying the who, what, when, where, and how of the fraud alleged.'" *Datum Software, Inc. v. Citizant, Inc.*, No. 23-12538, 2024 U.S. App. LEXIS 19947, at *13 (11th Cir. Aug. 8, 2024). The *Datum* Court further elaborated:

> Specifically, the complaint must show:
>
> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id*. (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)). Failure to adhere to this standard necessarily calls for dismissal. *Id*. "More specifically, the plaintiff must allege facts related to each defendant's participation in the fraud." *Pleasant Prairie Logistics, LLC v. Monroe*, Civil Action No. 1:23-cv-01741-SDG, 2024 U.S. Dist. LEXIS 58573, at *4-5 (N.D. Ga. Mar. 31, 2024) (dismissing a fraud claim that "revolves around a business dispute," finding "[t]he complaint is far too general with respect to the details of the alleged fraud. It contains no dates, times, or places where the alleged fraud occurred. It contains no statements and no specific parties to whom fraudulent statements were made. It also does not

clearly allege exactly what omission might have been fraudulent").

Put simply, Clinton has not met this requirement. Paragraphs 32, 38 through 41, inclusive, of the FAC (subject to the motion to strike, *infra*), raise Clinton's age-old and already-adjudicated conspiracy theories about the disproven fraud by which Clinton claims Westbound and Bridgeport acquired the rights at issue. However, these allegations, in addition to being wholly immaterial, are barred by collateral estoppel and *res judicata*. They are also barred by the applicable statues of limitations as the latest-in-time allegation from these paragraphs is from 1990. *See* Fla. Stat. Ann. § 95.11(3) (providing for a four-year limitations period for actions sounding in fraud under Florida Law); *McCormick v. Hanover Grp.*, No. 302011, 2012 Mich. App. LEXIS 961, at *16 (Ct. App. May 15, 2012) (applying a six-year limitations period for actions in Fraud under Michigan Law).

What's left, after these allegations are properly stricken or removed from consideration under these preclusive doctrines, is nothing but allegations entirely duplicative of the dispute underlying the declaratory judgment causes of action which are threadbare and improperly vague under *Datum*. *See, e.g.*, FAC ¶90 ("Defendants have willfully, knowingly, and unlawfully continued to misrepresent themselves as the owner of the recaptured musical works"); FAC ¶92 (vague, nonspecific allegations that "Defendants intentionally lied, misrepresented, and deceived Plaintiff by materially misrepresenting themselves as owner of the

recaptured musical works…").[12] *Cf. Kaazar Capital Partners Ltd. v. Bactrac Techs., LLC*, No. 1:17-cv-2721-AT, 2019 U.S. Dist. LEXIS 86788, at *27 (N.D. Ga. Mar. 14, 2019) (denying summary judgment on fraud claim, finding "a reasonable jury could also find that this is a simple business dispute that boils down to a contract dispute and Defendants' incomplete delivery of the gold required under the contract").

Finally, for the Westbound Recordings and musical compositions for whose termination dates have not yet passed, it is not even incorrect – much less fraudulent – for Bridgeport and Westbound to hold themselves out to be the owners regardless of the effectiveness of the termination notices. Even if a property right is subject to a reversionary future interest, it cannot constitute fraud to fully enjoy those property rights prior to such reversion.

### E. Clinton's Cause of Action for a Preliminary Injunction Fails as a Matter of Law.

"An injunction is a type of relief or remedy rather than an independent cause of action." *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1231 (11th Cir. 2021). Regardless, issuance of a preliminary injunction requires Plaintiff to show a likelihood that he will succeed on the merits of his claims. *Study Edge, LLC v.*

---

[12] Further underscoring the slap-dash nature of this fraud claim are the mutually-exclusive allegations that Defendants have somehow simultaneously refused to exploit the works (FAC ¶55) *and* that they are exploiting the works to collect royalties that they are allegedly withholding from Clinton (FAC at ¶91).

*Skoolers Tutoring Ctr., LLC*, 2017 U.S. Dist. LEXIS 216268, *2-3, Case No. 1:17cv76-MW/GRJ (N.D. Fla. Dec. 8, 2017).

For all the reasons discussed herein, Clinton cannot make a showing of a likelihood of success on the merits. Furthermore, in addition to showing a likelihood of success on the merits, a party requesting a preliminary injunction must also show: irreparable injury will be suffered unless the injunction issues; the threatened injury to the movant is greater than the damage to the non-moving party should the injunction be issued; and that the injunction, if issued will not disserve the public interest. *Dream Defs. v. Governor of Fla.*, 119 F.4th 872, 875 (11th Cir. 2024).

Clinton makes passing attempts at showing of these requirements. *See* FAC ¶¶101, 102. The Court need not give Rule 12 deference to these threadbare legal conclusions in considering the instant motion. *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.")

As such Clinton's request for a preliminary injunction – to the extent that the FAC even properly does that[13]– must be denied, and this cause of action dismissed.

---

[13] *Cf. Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) (citing Fed. R. Civ. P. 65(a), noting that that rule requires an opponent to a motion for injunctive relief the opportunity to prepare and be heard).

### F.  Leave to Amend Would Be Futile.

Here, dismissal should be with prejudice. "In this circuit, a district court need not allow a party to amend his complaint '(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) *where amendment would be futile*." *W. Sur. Co. v. Steuerwald*, 760 F. App'x 810, 814 (11th Cir. 2019) (quoting *In re Engle Cases*, 767 F.3d 1082, 1108-09 (11th Cir. 2014)) (emphasis kept).

### 1.  This Action was Brought in Bad Faith.

"An action is brought in bad faith when the claim is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons." *Pedraza v. United Guar. Corp.*, 313 F.3d 1323, 1336 (11th Cir. 2002).

Here, there is clearly bad faith. Clinton started this charade with a Press Conference maligning Boladian which was followed by a sweeping multi-count complaint of sprawling allegations he *knew* to be false based on the previous actions seeking rights that he *knew* he is not entitled to based on the outcome thereof. His entire FAC hinges on whether or not the terminations he sent are valid. He knows they are not for all the reasons discussed above. This action was dead on arrival and completely without color. Clinton also knows he abandoned the claim in the

California Litigation that he did not enter into any written agreements with Westbound, and his agreements with Westbound were not work for hire agreements, and that his claims in this case to the contrary are therefore barred by res judicata among other reasons.

Worse still, Clinton has taken *diametrically opposite* positions regarding his employment status for the sound recordings in a separate concurrently pending litigation. In this action he claimed, "Plaintiff is not and has never been an employee of any of the Defendants," (Doc. No. 1, at ¶76), and "Plaintiff never signed a work for hire agreement with any of the Defendants nor did he sign any employment agreements with any of them." (*Id.* at ¶78). While he removed these express allegations in the FAC, Clinton has still pleaded that the sound recordings are not works-made-for-hire. *See* FAC ¶¶62-63. Yet, earlier this year Clinton filed a motion for summary judgment in *Worrell v. Clinton, et al.*, 22-cv-11009 (E.D. Mich), claiming that he had an "indisputable employment" relationship with Westbound. Ex. 14.

Under threat of sanctions, Clinton has already amended once. Yet, he just cannot help himself to take pot-shots at Mr. Boladian. As discussed below, although entirely irrelevant to the instant claims, Clinton still retained scandalous allegations against Boladian, such as, racially-charged allegations (FAC ¶32) and referring to Boladian as a "copyright troll" (FAC ¶¶38-41). These irrelevant, scandalous

allegations are a tacit admission that Clinton brought this action in bad faith. He should not be given leave to amend a second time.

### 2. *Amendment Would Be Futile.*

The Eleventh Circuit "ha[s] regularly affirmed similar dismissals with prejudice and dismissals without granting leave to amend because the plaintiff's claims were futile." *Pedraza*, 313 F.3d at 1336 (gathering sources).

There can be no truthful amendment that would not be barred for all the reasons discussed above. Leave to amend should be denied.

### G. Alternatively, Certain Allegations in the FAC Should be Stricken under FED. R. CIV. P. 12(f).

While the FAC removed some of the more heinous accusations from the Original Complaint, several vestiges remain. Accordingly, Defendants would ask that if the Court is not inclined to dismiss the FAC in its entirety, that pursuant to FED. R. CIV. P. 12(f), that the Court strike Paragraphs 6, 7, part of paragraph 8, 32, 38 through 41, inclusive.

Federal Rule of Civil Procedure 12(f) permits a court to "order stricken from any pleading . . . any redundant, immaterial, impertinent, or scandalous matter." *Dzwonkowski v. Dzwonkowski*, 298 F. App'x 885, 887 (11th Cir. 2008).

Clinton has all but admitted that these Paragraphs are irrelevant to the claims which remain in the FAC. All of them either directly malign Boladian personally or spout the same fraud-based conspiracy theories advanced in the Florida and

31

California Litigations, which were either ruled against or abandoned under threat of sanctions.

For example, Paragraph 6 reiterates the "decades long scheme to acquire music rights from Clinton and … to extort money from successful artists for routine music sampling."[14]

Paragraph 7 reiterates the claims from the Florida Litigation that Boladian forged signatures and invented "fictitious songwriters to Clinton's music" and otherwise wrongfully withheld royalties from Clinton – the very issues Judge Hinkle ruled against Clinton on in the Florida Litigation. Paragraph 8 also makes reference to this "scheme".

Paragraph 32, the first paragraph under the header, "Defendants Successfully Scheme to Defraud Clinton" accuses Boladian of racism alleging him of expressing that "Black artists lacked the education and intelligence to understand issues such as copyright infringement and legal proceedings – accordingly, he felt emboldened and entitled to take advantage of artists like Clinton."

Paragraphs 36 through 41, inclusive, each call Boladian a "copyright troll" that "has earned a reputation for exploiting young, gifted artists." Paragraph 41 accuses Boladian of suing for damages based on uses of "Clinton's music" in 2001.

---

[14] *But see Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 801 (6th Cir. 2005) ("To begin with, there is ease of enforcement. Get a license or do not sample.")

Even if successful in this action (he should not be), Clinton cannot truthfully allege that in 2001, it was "Clinton's music" but rather musical compositions that belonged exclusively to Bridgeport and sound recordings belonging to Westbound as discussed above.

All of the foregoing paragraphs, in addition to being barred by *res judicata* and collateral estoppel, ***are completely irrelevant to the remaining issues of the FAC***. There was simply no reason for Clinton to plead these irrelevant, immaterial, and scandalous allegations – including accusing Boladian of racism. Given the scandalous nature and the fact that they have "no possible relation to the controversy", they must be stricken. *Allstate Fire & Cas. Ins. Co. v. Maida*, No. 19-CV-81452-MARRA, 2020 U.S. Dist. LEXIS 204161, at *5 (S.D. Fla. May 26, 2020) (citing *Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*, Fla., 306 F.2d 862, 868 (5th Cir. 1962)).

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that their motion be granted.

Dated: July 3, 2025                    Respectfully submitted,

KING & BALLOW

*/s/ Richard S. Busch*
Richard S. Busch (*Pro Hac Vice*)
David Niemierzycki (Fla. Bar. 1023763)
KING & BALLOW

26 Century Boulevard, Suite NT700
Nashville, TN 37214
Telephone: (615) 259-3456
*rbusch@kingballow.com*


*/s/Barry Richard*
**BARRY RICHARD** (Fla. Bar 105599)
Barry Richard Law Firm
101 East College Avenue, Suite 400
Tallahassee, FL 32301
(850) 274-1814
barryrichard@barryrichard.com
dawnkrow@barryrichard.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants, certifies that this brief contains 7987 words, which complies with the word limit of L.R. 7.1(F).

DATED: July 3, 2025                    By: <u>*/s/*Richard S. Busch</u>
                                           Richard S. Busch