# EXHIBIT 1

A G R E E M E N T

AGREEMENT made this 3rd day of August , 1972,
by and between WESTBOUND RECORDS, INC. of 14843 Joy Road, Detroit,
Michigan (hereinafter referred to as "COMPANY") and the undersigned
persons, (hereinafter referred to as "ARTIST") individually and jointly as
a member of the Group known as:

    FUNKADELIC,    GEORGE CLINTON, PRODUCER.

1.    (A)  Company hereby employs Artist in his individual
capacity and as a member of the Group mentioned above, any variation
thereof or such other group as the Company may designate (such group
being hereinafter referred to as "The Group"), as a recording artist and
musician for the purpose of making master recordings, from which phono-
graph records will be produced which embody the recorded performances of
Artist, and for such purposes as are normally incidental thereto.  Artist
hereby accepts such employment upon all of the terms and conditions of this
Agreement.

    (B)  During the initial term and option periods of this Agree-
ment, and any extensions or renewals thereof, Artist shall not perform for the
purpose of making master recordings or phonograph records for any person or
business entity other than Company.  For a period of five (5) years following
the termination or expiration of this Agreement Artist shall not perform for
such purpose (for anyone other than Company) any musical composition or
other material recorded hereunder.

    (C)  Artist acknowledges that the services to be rendered by
him and the rights granted by him hereunder are unique and extraordinary and
that the breach of this Agreement will cause irreparable damage to Company
and will justify Company's application for equitable relief in addition to any
available remedies.

2.    (A) Artist will render services at recording sessions scheduled at times and places designated by Company. Company shall select the musical compositions or other material to be performed by Artist and shall also determine the number and identity of the musicians, vocalists and other performers (if any) to be recorded at such sessions. Upon Company's request (exercisable in its sole discretion), Artist shall repeat any performance recorded hereunder.

(B)  Artist agrees to record a minimum of two (2) 33 1/3 RPM LP phonograph record album sides and two (2) 45 RPM single record sides or their equivalent during the initial term of this Agreement and during each subsequent option period. Notwithstanding the foregoing, Artist shall record additional record sides at Company's request, and such additional sides may in Company's discretion be applied in satisfaction of such minimum obligation in any subsequent option period of this Agreement.

(C)  If, during the initial term of this Agreement or any option period, the minimum number of record sides specified above are not recorded by reason of Artist's failure or refusal to record such record sides or if Artist fails or refuses to render services at any recording session scheduled by Company, Company may elect to extend the initial term of this Agreement or the option period during which such failure or refusal occurs, as the case may be, until such minimum number of record sides are recorded by Artist or until Artist renders such services. Written notice of Company's election to extend this Agreement pursuant hereto shall be mailed to Artist by certified mail, not more than thirty (30) days after the expiration of the initial term or option period, as the case may be.

(D) Phonograph records manufactured from master recordings made hereunder shall be distributed and offered for sale under such trademarks, trade names or labels and by such distributors and licensees as Company alone

-2-

may determine.

(E) Company shall have the right to determine which of Artist's performances shall be coupled with other performances of the Artist, upon phonograph records of such sizes and speeds as Company alone shall determine.

(F) Company shall have the right to couple performances rendered by the Artist with performances rendered by others upon phonograph records of such sizes and speeds as Company alone shall determine.

3. Company agrees to pay all costs of recording sessions hereunder, including without limitation the costs of arrangers, musicians, copyists, vocalists, payments due to any union pension and welfare fund, payroll and employment taxes and recording costs (such as studio time, equipment and personnel charges and mastering costs). All such payments and costs shall be considered the Company's advances to the Artist which shall be recouped from any royalties or other payments due to Artist from Company. Any costs or expenses which are incurred by Company by reason of Artist's failure to appear or tardiness in appearing at a recording session scheduled by Company shall be paid by the Artist to the Company as Artist's absolute liability without reference to any royalties due and payable to Artist, and Company, at its option, may deduct such costs or expenses from such royalties.

4. Company agrees to pay to Artist in consideration of the services to be rendered by Artist hereunder:

(A) A royalty of three (3 %) per cent of the suggested list price (exclusive of all sales and excise taxes and duties, and less the portion of such price allocated by the Company to containers or packaging) for ninety (90%) per cent of all phonograph records (exclusive of pre-recorded tapes) sold at retail within the United States under the authority of Company, on both sides of which are embodied only performances recorded hereunder, and which are paid for and not subject to return; and one-half (1/2) of such royalty with respect

-3-

to pre-recorded tapes (contained in cartridges or otherwise) sold at retail within the United States under the authority of Company, embodying performances recorded hereunder, and which are paid for and not subject to return.

(i) Artist acknowledges receipt of the sum of Five Thousand ($5,000.00) Dollars paid by Company to Artist at the time of the execution of this Contract. Company represents that it will pay to Artist another Five Thousand ($5,000.00) Dollars within six (6) months of the signing of this Contract, which sum Company acknowledges does not constitute royalties and is not recoupable by the Company.

(B) With respect to phonograph records sold at retail outside of the United States under the authority of Company which contain performances rendered by Artist hereunder, Company will pay to Artist a royalty equal to one-half (1/2) of the royalties specified in subdivision (A) of this paragraph. Such royalties, at Company's election from time to time, may be based upon the suggested retail list price for such records in the country of manufacture or the country of sale or England or the United States, and shall be computed in the national currency of the country so elected. Artist shall be paid at the same rate of exchange as Company is paid, provided, however, that royalties on such sales shall not be due and payable until payment therefor has been received by Company in the United States of America.

(C)   (i) In the event that any performance rendered by Artist hereunder is coupled on a phonograph record with any performance rendered by another Artist, it is agreed that as to such record, Artist shall receive that proportion of the royalties payable to Artist (as herein provided) as the number of Artist's performances embodied on such record bears to the total number of performances embodied thereon.

(ii) In the event that any master recording made hereunder embodies Artist's performance together with the performances of another artist or artists to whom Company is obligated to pay a royalty, it is agreed that the royalty payable to Artist (as herein provided) with respect to phonograph
SEE RIDER ATTACHED **

-4-

**RIDER To Contract between Westbound Records, Inc. and Funkadelic, George Clinton, Producer -

4 (C) (ii)  -        records made from such master recording. shall be multiplied by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of such royalty artists (including Artist) having performances embodied thereon, and in such case the costs of recording chargeable to Artist pursuant to Paragraph 3 hereof shall be multiplied by the same fraction.

-4A-

(D) In the event that phonograph records embodying any of Artist's performances recorded hereunder are sold at retail through any direct mail-order operation, including but not limited to record clubs, the royalties payable to Artist shall be one-half (1/2) of the royalties otherwise due and payable as herein provided. No royalty shall be payable to Artist with respect to phonograph records distributed to subscribers of such operation by reason of the purchase of a specified number of phonograph records or by reason of distributions to subscribers of "bonus" or "free" records. If Company is paid by any mail-order and/or record club distributing licensee on any basis less favorable than that basis upon which royalties are payable to Artist pursuant to Paragraph 4 (A) above, then Company shall be entitled to pay royalties hereunder on the same basis as it is paid by such licensee.

(E) No royalties shall be payable on "disc jockey" or "promotional" copies of records distributed for promotional purposes, and no royalties shall be payable with respect to any phonograph records for which Company does not receive payment. No royalties shall be payable on phonograph records which are sold as distress merchandise or which are sold by Company for less than fifty (50%) per cent of Company's full wholesale price therefor (as such price is established from time to time by Company prior to the calculation of any discounts, allowances or commissions deductible therefrom).

(F) No royalties shall be payable to Artist until Company has fully recouped all advance payments and all other charges against Artist's royalties pursuant to this Agreement or any other agreement between the parties.

5.    (A) The initial term of this Agreement shall commence as of the date first indicated above and shall continue for a period of five (5) years.

(B) Company shall have irrevocable options to extend the term of this Agreement - No Option Periods.

-5-

Each such option shall be deemed automatically exercised by Company, unless Company gives Artist written notice prior to the expiration of the initial term, or extended term as the case may be, of its intention not to exercise a given option. All terms and conditions herein contained shall be applicable during said option periods.

6. Royalties herein stated to be due and payable to Artist, charges or expenses properly deducted therefrom, will be computed for the preceding six (6) calendar month period within eighty (80) days after June 30 and December 31 of each year so long as phonograph records embodying Artist's performances recorded hereunder are sold and paid for. Such royalties will be paid to Artist within such eighty (80) day period and will be accompanied by appropriate royalty statements. All royalty statements and all other accounts rendered by Company to Artist will be binding upon Artist and not subject to any objections by Artist for any reason unless specific objection in writing, stating the basis thereof, is received by Company within one (1) year from the date rendered in which event such statements shall be binding in all respects except for those specifically stated in such written objections. All royalty statements, payments, notices and correspondence to Artist shall be sent to Artist at the address indicated above unless prior written notice to the contrary is received from Artist by Company.

7. Artist hereby grants to Company the sole and exclusive right to use and permit others to use Artist's name, likeness, biographical material and facsimile signature and the name of the group for advertising and trade purposes in connection with the manufacture, distribution, sale and exploitation (individually and as a member of the group) of phonograph records embodying artist's performances recorded hereunder, and in advertising Company, its artists and products. Artist hereby acknowledges that the name of the Group is during the term of this Agreement owned jointly by Company and the members of the Group,

-6-

and Artist hereby agrees not to use the name of the Group in any manner whatsoever without the express consent of Company and the other members of the Group.

8.  Artist represents that Artist is a member of the Group, and Company acknowledges that it is entering into agreements similar to this Agreement with the other members of the Group. All additions to or replacements of members of the Group and all matters which affect performances of the Group shall be mutually agreed upon by Company and a majority of the then-existing members of the Group.

9.  In the event Artist wishes to retain the services of a manager, business advisor, booking agent or other similar representative, such representative shall be mutually agreed upon by Artist and Company.

10.  Artist acknowledges that Artist is engaged in the business of musical entertainment. Artist hereby represents and warrants that Artist is free to enter into this Agreement and that Artist is under no disability, restriction or prohibition which will interfere in any manner with Artist's full compliance with and performance under this Agreement. Artist also warrants and represents that no performance recorded by Company hereunder will infringe or violate any right of any person or firm and that Company may exploit such master recordings made hereunder without liability or obligation to any other person or firm. In the event that Artist is a minor, Artist agrees to cause Artist's parent or guardian to execute the guarantee annexed hereto as Exhibit "A". Artist agrees to indemnify, save and hold Company harmless from any loss, damage or expense (including attorneys' fees) arising out of or connected with any claim by any third party which is inconsistent with the warranties, covenants or representations made by Artist in this Agreement.

11.  All master recordings made hereunder, as well as all performances embodied thereon and all phonograph records derived therefrom, together with any property rights therein, whether presently existing or hereafter created,

-7-

will be the exlusive property of Company free of any claim whatsoever by
Artist or by anyone deriving rights from Artist. Without limiting the generality
of the foregoing, Company shall have the exclusive right throughout the world
in its sole discretion and at any time to manufacture, advertise, sell, lease,
license, distribute or otherwise exploit said property and to authorize others
to do so or to refrain from doing so.

12. Company is not obligated to make or sell records manufactured
from the master recordings made hereunder or to license such master record-
ings or to have Artist record the minimum member of record sides referred to
in Paragraph 2 (B).

13. Company, in its sole discretion, may assign this Agreement or
any of Company's rights hereunder to any other person, firm or corporation.

14. Artist agrees and guarantees that with respect to any musical
composition created in whole or in part by Artist, either alone or in collabora-
tion with others, and which is recorded by Artist hereunder, the copyright pro-
prietor thereof will upon request grant to Company or its designee a mechanical
license authorizing Company or its designee to manufacture and sell phonograph
records embodying such musical composition as performed by Artist hereunder
upon payment of a royalty of not more than one and one-half (1 -1/2 ¢) cents
with respect to each such phonograph record manufactured and sold by Company.
In the event that such a license is not granted to Company or its designee and
Company or its designee pays royalties to such proprietor in excess of the amount
specified in the preceding sentence, Artist agrees that the difference between such
specified royalty and the royalty paid by Company or its designee may be deducted
from the royalties agreed to be paid to Artist hereunder.

15. The parties agree that if at any time one party has materially
breached any provision of this Agreement so as to constitute a default hereunder,
the other party may terminate this Agreement by giving notice of such default in
accordance with this Paragraph. As a condition precedent to any assertion by
Company or Artist that the other is in default in performing any obligation con-

-8-

tained herein, the party alleging the default must advise the other in writing of the specific facts upon which it is claimed that the other is in default and of the specific obligation which it is claimed has been breached, and said other party shall be allowed a period of thirty (30) days after receipt of such written notice within which to cure such default. The parties agree that no breach of any obligation shall be deemed to be incurable during such thirty (30) day period.

16. For the purpose of this Agreement:

(A) "Master recording", whenever referred to herein is intended to mean any original recording of sight and/or sound, whether on magnetic recording tape or wire, lacquer or wax disc, film or any other substance or material, whether now known or unknown, which is used in the manufacture of phonograph records or audio-visual performances.

(B) "Performance", whenever referred to herein is intended to mean any musical rendition or artistic service in connection with the production of a master recording including, but not limited to, arranging, conducting, accompanying, supervising and playing of any instrument.

(C) "Phonograph record", "record" or "phonograph recording", whenever referred to is intended to mean any and all objects manufactured in whole or in part from master recordings and which are intended to reproduce sound, including, but not limited to, wire, disc, film cylinder and (except where otherwise stated) tape, whether embodying sound alone or sight and sound or sound synchronized with visual images, e.g. audio-visual devices.

17. This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement or any provision thereof shall be binding upon Company unless confirmed by a written instrument signed by an officer of Company. No waiver of any provision of or any default under this Agreement shall affect Company's right thereafter to enforce such

-9-

provision or to exercise any right or remedy in the event of any other default, whether or not similar. The validity, construction and effect of this Agreement and all extensions and modifications thereof, shall be construed in accordance with the laws of the State of Michigan applicable to agreements wholly to be performed therein. Any notice to be sent to Company shall be sent to it at the address set forth above. Any notice to be sent to Artist shall be sent to the address set forth beneath Artist's signature. Notices shall be sent by certified or registered mail, return receipt requested.

IN WITNESS WHEREOF, the parties hereunto have caused this Agreement to be executed as of the date first indicated above.

In The Presence Of:

WESTBOUND RECORDS, INC.

By: _____
    Armen Boladian
Its    President

"Company"

FUNKADELIC

By: _____
    GEORGE CLINTON, PRODUCER

"ARTIST"

-10-