# EXHIBIT 9

1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

RECEIVED
HENDRICKS & LEWIS
*date* ( LW
from Janet Conway

| | |
|---|---|
| MALBIZ MUSIC, a Delaware Corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) Case No.: 4:99cv242 | |
| ARMEN BOLADIAN, an individual, and ) | |
| BRIDGEPORT MUSIC, INC., a Michigan ) Tallahassee, Florida | |
| corporation, and DOES 1 through 10, ) January 29, 2001 | |
| inclusive, ) 9 A.M. | |
| ) | |
| Defendants. ) | |

** _TRIAL_ **

TRANSCRIPT OF NON-JURY TRIAL
BEFORE THE HONORABLE ROBERT L. HINKLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          Law Offices of Johnnie L. Cochran
                            By:  DONALD WILSON
                                 Attorney at Law
                            4929 Wilshire Boulevard
                            Suite 1010
                            Los Angeles, California    90010


For the Defendants:         Greenberg, Traurig, P.A.
                            By:  BARRY RICHARD
                                 Attorney at Law
                            101 East College Avenue
                            P.O. Drawer 1838
                            Tallahassee, Florida    32301
                                 -and-
                            Rothschild, Barry & Myers
                            By:  JOSEPH P. DELLA MARIA
                                 Attorney at Law
                            55 W. Monroe Street
                            Suite 3900
                            Chicago, Illinois    60603-5012

**EXHIBIT**

tabbies

24



JUDY A. ELLAN, RPR
Official United States Court Reporter
111 North Adams Street * Tallahassee, Florida  32301-7717
(850) 561-6822 * Fax (850) 561-6827

1              P R O C E E D I N G S

2        (Call to Order of the Court.)

3        (Parties present.)

4              THE COURT:  Good morning.  Please be seated.

5              MR. WILSON:  Good morning.

6              MR. RICHARD:  Good morning, Your Honor.

7              THE COURT:  Is the plaintiff ready for trial?

8              MR. WILSON:  Yes, Your Honor.

9              THE COURT:  Defense ready for trial?

10             MR. RICHARD:  Yes, Your Honor.

11             THE COURT:  We'll start with opening statements for

12    the plaintiff.

13             MR. WILSON:  Thank you, Your Honor.

14             MR. RICHARD:  Your Honor, if I might, before

15    Mr. Wilson starts, we have agreed that the witnesses could

16    all remain in the courtroom, if that's okay with the Court.

17             THE COURT:  It is.

18             MR. WILSON:  Yes.

19             THE COURT:  Mr. Wilson?

20             MR. WILSON:  Yes.  Good morning, Your Honor.  I'm

21    Don Wilson, appearing on behalf of plaintiff, Malbiz Music,

22    Inc.

23             As Your Honor knows, this case originally started

24    with George Clinton and Malbiz Music, Inc., as plaintiffs in

25    this case.  And through the Court's motion some time ago, the

3

1    allegations and complaint of Mr. Clinton was dismissed from

2    this lawsuit; and today we are here to demonstrate Malbiz

3    Music, Inc.'s ownership in certain musical compositions.

4         At question are certain documents that Mr. Clinton

5    denies signing, and we have testimony with respect to that.

6         Also, there's the allegation that Mr. Clinton

7    transferred certain copyrights to Bridgeport Music for little

8    or no consideration; and we have testimony that that is not

9    true.

10        We plan on calling a couple of witnesses this

11   morning, Your Honor, since this trial is solely limited to

12   whether or not Malbiz Music, Inc., owns those compositions;

13   and my understanding is that in this trial we are also not

14   going to go into damages and how much those are, and that

15   will be reserved for a later date.

16        Thank you.

17        THE COURT:  All right.  Thank you.

18        Mr. Richard?

19        MR. RICHARD:  Thank you, Your Honor.

20        Your Honor called this trial for the limited

21   purpose, as you know, of determining whether or not Malbiz

22   has a sufficient interest in these compositions to assert a

23   claim in this case, whether it received that interest from

24   Mr. Clinton and whether it retained that interest.

25        There are two issues here.  One is the factual issue

1  to be tried today, and then I would note for future reference

2  that there is, depending upon what the Court does, an

3  additional legal interest.

4       My client's position is simply this:

5       Prior to 1982, Mr. Boladian and his company,

6  Bridgeport, had a business relationship with Mr. Clinton;

7  and, as part of that business relationship, advanced to

8  Mr. Clinton very substantial sums of money, which were never

9  recouped.

10       In 1983, Mr. Clinton, as the testimony will

11  establish, approached Mr. Boladian and requested some

12  substantial additional money for the purpose of enabling

13  Mr. Clinton to record new compositions going forward from

14  1983.

15       Mr. Clinton also was engaged in negotiations with a

16  record company through which he was attempting to obtain an

17  additional million-dollar loan.  He was unable to do it on

18  his own, and he desired that Mr. Boladian participate in a

19  joint venture with him which would give him the credibility

20  to be able to obtain that money.

21       Mr. Boladian advised Mr. Clinton that, because he

22  had not recouped the substantial sums he had already

23  invested, he was unwilling to loan any additional money or to

24  participate in the joint venture, unless Mr. Clinton agreed

25  to assign to Mr. Boladian all of his interest, either through

1  himself or his company, Malbiz Music, in the compositions

2  that Mr. Clinton had previously composed that had failed to

3  result to that point in a recoupment for Mr. Boladian and his

4  company, Bridgeport.

5          That agreement was reached; and, in fact,

6  Mr. Clinton signed an agreement, which will be Exhibit 18 in

7  this case, which is a critical document.  Exhibit 18 very

8  clearly states that all of the interests that Mr. Clinton and

9  his company had prior to 1983, and all of the compositions

10  that he had composed prior to that in which he had an

11  interest, were assigned -- all interests in them were

12  assigned to Mr. Boladian and his company, Bridgeport.  That

13  was signed by Mr. Clinton.  It was signed by him on his own

14  behalf and on behalf of Malbiz Music, and it states it on

15  Exhibit 18.

16          I presume from the comments of Mr. Wilson that there

17  will be some question as to the validity of Mr. Clinton's

18  signature on that document.  If that in this case, in fact,

19  is going to be Mr. Clinton's position, then, this trial today

20  will whittle itself down to the question of the validity of

21  that signature; and we are prepared to present testimony, not

22  only of eyewitnesses, but of a handwriting expert with

23  respect to the validity of that signature.

24          Thank you.

25          THE COURT:  All right.

Geo. Clinton
Testimony

*George Clinton - Direct*

6

1          Mr. Wilson, please call your first witness.

2          MR. WILSON:  I would like to call Mr. George

3    Clinton.

4          Excuse me, Your Honor.  Before we get started,

5    somebody should probably show me how to work the scanning, so

6    I can present documents.

7          THE COURT:  That, we can do.  You'll find it very

8    easy.  You just need to set the document on the screen, and

9    you can use that lectern to examine witnesses.

10          DEPUTY CLERK:  Please raise your right hand.

11     *GEORGE EDWARD CLINTON, PLAINTIFF'S WITNESS, DULY SWORN*

12          DEPUTY CLERK:  Be seated.

13          Please, state your full name and spell your last

14    name for the record.

15          THE WITNESS:  George Edward Clinton, C-L-I-N-T-O-N.

16          MR. WILSON:  There's no microphone back here?

17          THE COURT:  There is one.  It's the flat microphone

18    there, so we will be able to hear you from right there.  You

19    can use either one you wish.

20          MR. WILSON:  Okay.

21                        DIRECT EXAMINATION

22    BY MR. WILSON:

23    Q.  Good morning, Mr. Clinton.

24    A.  Good morning.

25    Q.  Could you state your occupation for the Court, please?

1   A.  Singer, songwriter, producer.

2   Q.  Okay.  And when did you begin your professional career as

3   either a singer, songwriter or producer?

4   A.  From 1957, '58.

5   Q.  And you began as what?

6   A.  Parliaments, The Parliaments, a group, vocal group called

7   *"The Parliaments."*

8   Q.  Okay.  Do you recall when you began your professional

9   career as a songwriter?

10  A.  Probably in 1959.

11  Q.  And do you recall how that began?

12  A.  I wrote one of the songs that Parliaments recorded called

13  *"Poor Willie"* and *"Party Boys."*

14  Q.  And did you retain the publishing of those compositions?

15  A.  *"Poor Willie"* and *"Party Boys"*?  No.

16  Q.  Did you assign the publishing of those compositions to

17  anyone?

18  A.  The publishing of those compositions went to Hull --

19  H-U-L-L -- B. Kessler.

20  Q.  Now, I would like to walk through your professional

21  career as a songwriter.

22      After the two songs that you had written and assigned the

23  publishing to Kessler in '58, '59, I believe you said, what

24  did you do next as a professional songwriter?

25  A.  Wrote songs for Jobett Publishing Company.

1   Q.   And do you remember approximately when that was?

2   A.   '61 to approximately '64.

3   Q.   And were you a staff writer for Jobett at that time?

4   A.   Yes.

5   Q.   All right.  Do you recall offhand approximately how many

6   songs you wrote for Jobett in that time period?

7   A.   No, I couldn't recall how many.

8   Q.   And Jobett Music owned the publishing to the songs that

9   you wrote during that time?

10   A.   Yes.

11   Q.   Then after your writing services with Jobett, what was

12   your next engagement as a professional songwriter?

13   A.   Well, different songs for different people; but as a

14   company, I wrote for Mito Music, which was another company in

15   Detroit that eventually sold out to Jobett, too.

16   Q.   Do you remember the time period within which you wrote

17   for Mito Music?

18   A.   Mito Music would have been '64 to approximately '66 --

19   '64 to like '66.

20   Q.   And were you writing for other companies at the time you

21   were writing for Mito?

22   A.   Yes, different people, uh-huh.

23   Q.   Who were some of the other people you were writing for

24   during that time?

25   A.   I wrote songs for different groups; Edwin Starr, Darrell

*George Clinton - Direct*

9

1    Banks, which was different artists on different labels.  I

2    wrote with Gene Rhett in New York City for different artists.

3    I can't recall the companies, but around '66, I started

4    writing for -- '66, '67, somewhere around there, I started

5    writing for Malbiz and Bridgeport.

6    Q.   Okay.  That was what time, again?

7    A.   Around '67.  Somewhere around in there.

8    Q.   Okay.  Now, at that time had you formed Malbiz?

9    A.   I was operating Malbiz, but I didn't have it corporated

10   or anything.  We started out -- probably the first record on

11   Westbound Records was Funkadelic record called *"Music from my*

12   *Mother,"* which was like '67, or -8, somewhere around in

13   there.  I don't think it got published or anything until like

14   '69 or '70.

15   Q.   And did you -- at that time, did you enter into any

16   written agreements with Bridgeport?

17   A.   '70 or '71.  Somewhere around in there.

18   Q.   Okay.  I would like to show you a document that I have as

19   Plaintiff's Exhibit 1 for identification.  It should show up

20   on your monitor there, if I do this correctly.

21        And I'm going to, since it doesn't show the entire

22   agreement, I'm going to ask you to look at the agreement, and

23   then I'm going to slowly push it up so it reviews more of the

24   agreement.  The agreement is, I guess, two or three pages;

25   and just ask you to take a look at it and see if you are

*George Clinton - Direct*

10

1  familiar with this document.  If I ever go too fast, just let

2  me know.

3  A.  Uh-huh.  Yes, sir.

4  Q.  Let me show you page 2.

5  A.  Hold on for a second.  Okay.  Uh-huh.  Yes.  Yes.

6  Q.  Now, do you recall having seen this agreement before?

7  A.  Say again?

8  Q.  Do you recall having seen this agreement before?

9  A.  I recall signing an agreement like this.  I can't

10  remember what it looked like, but I remember this particular

11  deal.

12  Q.  You'll see at the end, *"Very truly yours, Malbiz Music*

13  *Co.,"* and *"By"* and a signature, and below the signature line

14  printed *"George Clinton."*  Is that your signature?

15  A.  I think so.  And I say *"I think so,"* because there's so

16  many signatures like this one that I've seen on so many

17  different papers that I know I didn't sign, I couldn't be

18  sure.

19  Q.  Okay.  Now, further below that to the left, it has

20  *"Bridgeport Music, Inc.,"* and then an Yvonne Taylor.

21      Do you know who -- I think it's Yvonne, Yvonne, Taylor.

22  Do you know who that is?

23  A.  I seem to recall, I think she worked -- I can't say.  I

24  don't want to guess.  I don't want to guess.  I recall the

25  name.

1  Q.  Okay.  And do you recall the name in connection with

2  Bridgeport Music?

3  A.  Yes.

4  Q.  Do you know whether or not she was an officer of

5  Bridgeport Music?

6  A.  No, I'm not sure.  I can't remember who it was.

7  Q.  Let me go back to page 1 and direct your attention to the

8  unnumbered paragraph after *"Gentlemen,"* before paragraph 1;

9  and you notice that it covers a period of five years from the

10  date hereof, which is August 31st, 1971.

11  A.  Uh-huh.

12  Q.  Is your recollection that this agreement remained in

13  effect for the full five-year period?

14  A.  '76?  No, it didn't.  I don't know why, but it didn't.

15  Q.  Okay.  Do you recall when this agreement terminated?

16  A.  We did a record for Polygram and Warner Brothers in like

17  '75, '76; and my lawyer, Ina Meibach and Mr. Boladian had did

18  some kind of settlement that terminated all of our dealings

19  with Mr. Boladian.

20  Q.  Including this August '71 agreement?

21  A.  Yes.

22  Q.  Okay.  And you said that was what time, approximately?

23  A.  '75, '76.

24  Q.  All right.  So, if it was '76, it was only a short time

25  before this agreement perhaps would have --

1    A.   Right.

2    Q.   -- terminated in August of '76?

3    A.   Right.  Because we signed with Warner Brothers as

4    Funkadelic, and we were with Westbound at that time.  So, in

5    order for us to sign with Warner Brothers, we settled with

6    Westbound.

7    Q.   Okay.  Still directing your attention to that first

8    unnumbered paragraph, you'll see that the compositions that

9    are subject to this agreement are compositions -- I'm going

10    to attempt to underline it.  Let me see here.  Well, you'll

11    see, *"Compositions which are initially recorded by or on*

12    *behalf of Westbound Records, Inc., hereinafter referred to as*

13    *'the Musical Compositions'."*

14    A.   Uh-huh.

15    Q.   What happened or who owned the compositions that were not

16    initially recorded by or on behalf of Westbound Records,

17    Inc.?

18    A.   Some were Malbiz and others were Gold Forever Music.

19    Q.   I'm sorry.  What was that name again?

20    A.   Gold Forever, which were a company we recorded for as

21    Parliament at the same time as this -- as we signed this

22    contract, we did two different contracts, one was Parliament

23    and one was Funkadelic.  The songs for Parliament was on Gold

24    Forever Music.

25    Q.   Do you recall who owned Gold Forever Music?

1    A.  Holland -- Dossier Holland.

2    Q.  Were there any compositions during this time that were

3    owned by Malbiz, because they were not initially recorded by

4    or on behalf of Westbound Records so they wouldn't have been

5    subject to this agreement, nor were subject to your agreement

6    with Gold Forever Music?

7    A.  Yes.  I'm trying to think.  I had a group in Jersey

8    called "Parlett" that I did for Carnival Records.  On Roy

9    Handy, also did for Carnival Records; and Vivian Lewis that I

10   did for a number of labels.

11   Q.  During this time period, from August 31 of '71 through

12   the time in which this agreement was terminated in, I think

13   you said '75, '76, do you remember how many musical

14   compositions were written by you or co-written by you that

15   fell within the scope of this agreement?

16   A.  It's been four to five albums, approximately six songs,

17   seven songs apiece, that would have went under this

18   agreement, approximately.  Yeah, about that.

19   Q.  I'm going to direct your attention now to page 2,

20   paragraph 8, and I want to ask you:

21       Do you recall ever receiving accountings not less than

22   twice a year during the term of this agreement?

23   A.  Never, not once a year.

24   Q.  Okay.  Are you or is Malbiz still receiving any

25   accountings under the terms of this agreement?

George Clinton - Direct

14

1    A.    Never have.

2    Q.    Never ever?

3    A.    Never ever.

4    Q.    Did you ever contact Malbiz -- not Malbiz, excuse me.

5    Did you ever contact Bridgeport Music, Inc., with respect to

6    your not receiving any accountings pursuant to paragraph 8?

7    A.    Lots of times.

8    Q.    How did you contact Bridgeport Music?

9    A.    Well, I saw Armen practically every day, not every day,

10   but I saw him, you know, all of the time; and he said he

11   would get it; he would either get it or that he wasn't

12   selling records at the time.  He would buy us a car or a

13   truck or some equipment, you know, every two or three years,

14   he would do that, and food money, or something like that,

15   when we needed it.

16       As far as accounting for what records were ever sold,

17   never.

18   Q.   And the money for the food, the cars and the equipment,

19   what was your understanding of that money in terms of whether

20   it was an advance, a loan, a gift?  I mean, what was your

21   understanding as to the giving of that money?

22   A.    It started off as an advance.  Eventually, it would

23   become partial payment on whatever would have been owed,

24   because we were selling records, and we could never get any

25   accounting at all of what was, you know, how much the records

1  sold or anything.

2     He would give us a piece of paper sometimes saying what

3  expenses was; and on those papers, we would have things on

4  there like the recording session of the Ohio Players on a

5  list of bills he would give us, and vice versa with them.  He

6  would give us all the same bills.  Or Gary's car, one of the

7  guys in the band, would be on this thing that he was saying

8  that I owed him.

9  Q.  Was it appropriate that those things be on your

10  statements or your list of expenses?

11  A.  No.  And when I told him about it, he said, *"I think --"*

12  I forget her name *"-- that she made a mistake,"* the secretary

13  at the office at the time, *"I think she made a mistake, and*

14  *we'll get that straightened out."*

15     This was forever.  We never got a statement as to how my

16  records were selling.

17  Q.  Other than the money you may have received for food,

18  equipment, car payments, did you ever receive royalty

19  payments?

20  A.  Never.

21  Q.  And during this period of time, you guesstimate there

22  were approximately 30-some songs you said, four or five

23  albums and six or seven songs per album?

24  A.  Right.  I would think that, yeah.  More than that.

25  Q.  So, it was somewhere between 25 and 35 songs that fell

1    within the scope of this agreement?

2    A.   Yeah.

3    Q.   Do you recall were --

4    A.   It was more like 40 or 50.

5    Q.   40 or 50?

6    A.   Because I would do groups for him that wasn't our groups.

7    Did a couple of groups for Armen.  I forget the different

8    names of the groups, but we did like two or three groups for

9    him that wasn't our groups.

10   Q.   Did any of the songs that fell within the scope of this

11   agreement ever chart on *Billboard Magazine*, any of their

12   charts?

13   A.   Oh, yeah, lots of them.

14        MR. RICHARD:  Excuse me, counselor.

15        Your Honor, it sounds to me like we're getting into

16   the merits of the plaintiff's case as opposed to the limited

17   issue that you set trial for, unless counsel has something in

18   mind that I'm not following at this point.

19        THE COURT:  Mr. Wilson, what --

20        MR. WILSON:  Well, Your Honor --

21        THE COURT:  A certain amount of background, I

22   appreciate.  How far are we going with just background before

23   we get to the issues here today?

24        MR. WILSON:  All right.  Well, yeah, I'm just laying

25   a foundation, some of which will give the background and the

1  relationship, and some of -- well, I think all of it will

2  give the background and the relationship; and, you know, it's

3  important, while I don't intend to go into it in depth here,

4  to establish the pattern of the breaches of the contracts.

5          THE COURT:  All right.  I overrule the objection.

6  BY MR. WILSON:

7  Q.  I asked, did any of the songs chart?

8  A.  Yes, almost one from each album did.

9  Q.  Okay.  Now, I believe you said this agreement terminated

10  in '75, '76.

11     What was the next step in your professional career as a

12  songwriter after this agreement?

13  A.  I signed a deal with Casablanca Records as Parliament and

14  with Warner Brothers as Funkadelic.

15  Q.  And approximately when was that?

16  A.  '75, I believe -- '74, '75.

17  Q.  Okay.  And you remained in those relationships how long?

18  A.  Until '81.

19  Q.  Okay.  And during that time, were you still doing

20  business in terms of music publishing as Malbiz Music?

21  A.  Yes.

22  Q.  Okay.  And did the status of Malbiz Music change at any

23  point from a d/b/a for you?

24  A.  Yes.  Approximately '80 we changed it, in which I gave my

25  wife, you know, as a gift, as a gift, to publishing Malbiz,

1    because we was doing quite well, and we was living together

2    then, we hadn't gotten married yet, but we was living

3    together, and I wanted to make sure that she was taken care

4    of.  I gave her 75 percent of the company, and we were

5    selling lots of records then.

6    Q.   Okay.  Now, that was 1980.  But prior to that, did the

7    status of Malbiz change from the d/b/a to another form of

8    entity?

9    A.   We incorporated it.

10   Q.   Do you remember approximately when that was?

11   A.   That would have been '77.

12   Q.   Okay.

13   A.   I guess.

14   Q.   Okay.  So, in '77, you --

15   A.   '76 or '77.

16   Q.   In '77, you incorporated Malbiz.  Do you remember what

17   state it was incorporated in?

18   A.   New York.

19   Q.   Okay.  And then I believe you said in 1980 you gave 75

20   percent to Stephanie Clinton?

21   A.   Yes.

22   Q.   Okay.  Now, I believe you testified that in the area of

23   '75, you had an agreement with Casablanca and an agreement

24   with Warner Brothers?

25   A.   Right.

1   Q.  Were these agreements as recording artist?

2   A.  Recording artist, uh-huh.

3   Q.  Now, with respect to, let's take the Casablanca agreement

4   first.

5       With respect to the songs that you wrote and recorded as

6   a Casablanca artist, who owned the publishing on those

7   musical compositions?

8   A.  Malbiz and Rick Music.

9   Q.  Okay.  And Rick's Music was owned by whom?

10  A.  Owned by Casablanca.

11  Q.  All right.  Do you remember the nature of that

12  relationship?  I mean, you say they co-owned it.  Did one

13  party administer, or did each party administer their own

14  share?

15  A.  We administered our own shares, each party; and it was to

16  revert back to -- the Rick's Music part was to revert back to

17  Malbiz at a certain point.  But we each administered our own

18  particular shares.

19  Q.  Okay.  And what was the nature of the relationship with

20  Warner Brothers with respect to the compositions written on

21  the albums for Warner Brothers?

22  A.  All of that was Malbiz.

23  Q.  At what point did the Casablanca agreement terminate or

24  expire?

25  A.  We renegotiated it when it expired in 1980.

1    Q.  And the Warner Brothers relationship?

2    A.  Around the same time.

3    Q.  Okay.  I'm going to put up on the screen a document which

4    is entitled, *"Exclusive Songwriter's Agreement,"* which is

5    Plaintiff's Exhibit 2 for identification, and ask you to take

6    a look at it.  Again, this document is rather lengthy, and

7    I'm not going to necessarily need you to study the entire

8    document.  I'm just going to actually flip the first page,

9    and then continue to the last page, or what I have as the

10   last page.

11        As you can see, this is dated April, 1985, before George

12   Clinton and Bridgeport Music, Inc.

13   A.  I didn't sign this.

14   Q.  Well, let me go through it first.

15   A.  Okay.

16   Q.  Now, on this particular document, I don't have a separate

17   signature page, but the signature page that I do have

18   actually is entitled the rider to April 4, '85, agreement;

19   and it's the one that contains the signature.

20        I want to ask you:  Do you recall signing an April 4,

21   1985, exclusive songwriter agreement with Bridgeport Music?

22   A.  No.

23   Q.  And is that your signature next to the rider and above

24   the typed *"George Clinton"*?

25   A.  I can't tell, because it's all faded out there, but I

1   don't think so.

2   Q.  Okay.

3   A.  I really can't tell.

4   Q.  But you do not recall signing this agreement?

5   A.  I know I didn't sign it.

6   Q.  Were you -- did you have any dealings with Bridgeport

7   Music in 1985?

8   A.  In 1985, we did some -- some records we did at the

9   request of -- my lawyer at the time was Howard Hertz, over

10  there.  We did a deal -- we did a deal with two records, and

11  I'm thinking it might have been Capital or something, but it

12  was at his suggestion that we did this particular -- that we

13  did this particular deal that way.  And we was getting ready

14  to go into -- what you call it? -- a venture, some kind of

15  venture.  Armen was to put up some money for us to do this

16  project, this deal; and I was to put some songs into

17  Bridgeport as a good faith.  And we put two albums through

18  that particular situation.  It must have been *"One of my Best*

19  *Jokes of France,"* and *"It Shouldn't Have Been Fish"* probably

20  was the second one.

21      And at Howard's request -- he was both of our lawyers at

22  the time.  It was the only time that we did -- that I can

23  recall -- do any song writing -- I mean -- any songs with

24  Bridgeport that I did myself.

25  Q.  All right.  But that wasn't the April '84 exclusive

*George Clinton - Redirect*

22

1    songwriter agreement?

2    A.   No.

3            THE COURT:  When you say April '84, you mean,

4    Plaintiff's 2, April, '85?

5            MR. WILSON:  I'm sorry.  Yes, Your Honor, the April

6    4, '85, agreement.

7            THE COURT:  All right.  Thank you.

8    BY MR. WILSON:

9    Q.   Mr. Clinton, I'm going to show you another document dated

10   March 4, 1982, between Bridgeport Music and Malbiz Music, and

11   ask you to take a look at it.  It's a little wide.  Let me

12   zoom in.  Okay.  Plaintiff's Exhibit 3.

13           Do you recall this document?

14   A.   No, I don't recall this document, but I do recall these

15   particular songs right here that I did sell to Mr. Boladian.

16   Q.   You're speaking of these songs here, these six songs

17   here?

18   A.   Right, yeah, but this document wasn't the same document.

19   Q.   Okay.

20   A.   There were three songs on each side of the page.

21   Q.   You recall three songs on each side of the document that

22   you signed?

23   A.   Yeah, uh-huh.

24   Q.   I show you another document, which is Plaintiff's 4,

25   which is also dated March 4, 1982, and ask you to take a look

*George Clinton - Redirect*                                23

1    at this document, which has approximately, I believe, nine

2    musical compositions, some of which were the same as the

3    previous document, Number 3, and ask you to take a look at

4    it.

5         Do you recall this document?

6    A.  No.

7    Q.  Excuse me?

8    A.  No.

9    Q.  You don't recall ever signing a document such as this?

10   A.  No, not this.  Again, it's some of the same songs, but

11   it's [illegible] the document.

12   Q.  No[illegible]ched to this document, 3 and 4, there is an

13   addendum to the document of March 4, 1982.  I'm going to ask

14   you, do you recall ever signing an addendum to --

15   A.  No.

16   Q.  Well, let me take them one at a time.

17        Plaintiff's Exhibit 3, with the six songs, do you

18   remember -- do you recall ever signing an addendum?

19   A.  No.

20   Q.  All right.  And do you recall signing an addendum to

21   Plaintiff's 4, which listed the nine songs?

22   A.  No.

23   Q.  I'm going to show you another document, Plaintiff's 5,

24   which was given to me really as a separate document; and it,

25   too, is entitled *"Addendum"* to the March 4, 1982 agreement;

*Stephanie Clinton - Direct*

24

1  however, attached to this addendum are two exhibits, an

2  Exhibit A and an Exhibit B.  Do you recall ever executing

3  this addendum?

4  A.  No.

5  Q.  This is Exhibit A.  I'm going to ask you to take a look

6  at these compositions or these titles of compositions and

7  ask:

8     Do you recall Malbiz Music ever transferring ownership of

9  these compositions to Bridgeport Music?

10  A.  No.

11  Q.  And Exhibit B is a transfer of copyright, and it says,

12  *"See Exhibit A,"* in which I assume is Exhibit A that we

13  previously looked at; and it's dated December 2nd, 1983.

14     Do you recall ever signing this agreement?

15  A.  No.

16  Q.  Let me show you a document marked Number 6, Plaintiff's

17  Exhibit 6, for identification.  It is entitled, *"Writers*

18  *Agreement."*  It appears to be dated December 2nd, 1983,

19  between George Clinton, as writer, and Bridgeport Music.  I

20  ask you to take a look at it.

21  A.  Well, I didn't sign it.

22  Q.  Let me flip to the -- you don't recall signing a writer's

23  agreement --

24  A.  No.

25  Q.  -- on or about December 2nd, 1983, with Bridgeport Music?

*Stephanie Clinton - Direct*

25

1    A.  No, I never signed the agreement with Bridgeport Music.

2    Q.  After the August 31, 1971 agreement, and I believe you

3    also said there was a March 4th, '82 agreement for six songs

4    in two columns of three --

5    A.  Uh-huh.

6    Q.  -- were there any other agreements with respect to music

7    publishing that you signed with Bridgeport Music?

8    A.  No.

9    Q.  Now, you testified earlier that in 1980, I believe it

10   was -- 1980 you transferred 75 percent of the ownership in

11   Malbiz to Stephanie Clinton?

12   A.  Yes.

13   Q.  And you stated that that was for what purpose?

14   A.  To make sure, you know, we were a family, and make sure

15   she was taken care of.  The record business was jumping all

16   over the place.  So, I wanted to make sure that she was

17   stable and not gamble on it, and put it in her name.

18   Q.  Was there any consideration paid or was it a gift?

19   A.  It was a gift.

20   Q.  And from 1980 forward, after this gift was made, who was

21   responsible for operating and running the affairs of Malbiz

22   Music, Inc.?

23   A.  I mean, she had the last word in doing things.  I mean, I

24   could say what I wanted to do, but I would have to do it

25   through her.

*Stephanie Clinton - Direct*

26

1    Q.   During the period of March -- I'm sorry -- April 4th,

2    1985, were you a writer for Malbiz Music, Inc.?

3    A.   Yes.

4    Q.   Would it have been a breach of your relationship with

5    Malbiz to sign as an exclusive writer with anyone else?

6    A.   Yes.

7    Q.   And after 1980, did you have the authority to act on

8    behalf of Malbiz without the consent of Stephanie Clinton?

9    A.   No.

10   Q.   Okay.  Mr. Clinton, I just want to clarify something,

11   which I actually meant to do at the start of your testimony.

12        You know that, when this case was initially filed, you

13   were a plaintiff, correct?

14   A.   Right.

15   Q.   All right.  And you had certain causes of action that you

16   were maintaining individually against Bridgeport Music,

17   correct?

18   A.   Right.

19   Q.   All right.  And throughout these proceedings, at some

20   point your causes of action were dismissed by this court,

21   correct?

22   A.   Right.

23   Q.   All right.  And you realize that now, after initially

24   representing both you and Malbiz Music, Inc., I'm here today

25   solely representing Malbiz Music, Inc.?

*Stephanie Clinton - Direct*

27

1  A.  Yeah.

2  Q.  All right.  And that there exists the possibility that

3  your testimony, in response to either my questions or the

4  questions of opposing counsel, could expose you to potential

5  additional liabilities with respect to either Malbiz, the

6  defendants, or third parties in this case.  Do you understand

7  that?

8  A.  Yes.

9  Q.  Okay.  Do you recall any checks from, let's say, 1971

10  through the present, any checks being made payable by

11  Bridgeport Music to Malbiz Music, Inc.?  I'm talking about

12  the corporation now.

13  A.  No.

14  Q.  Did you, as an individual, receive any checks from

15  Bridgeport Music, Inc., between 1980 and the present?

16  A.  Never.  I'm sorry.  Say that again, 1980?

17  Q.  1980 to the present, you as an individual, any checks

18  made out to George Clinton.

19  A.  I'm sure I have, but I can't recall for what.  I'm sure I

20  have.

21  Q.  But you think you have?

22  A.  Yeah.

23  Q.  Do you have any idea the amount of money that you

24  received from Bridgeport Music over the years, say, from 1971

25  of August, when you entered into that first agreement, to the

1    present?  I'm not asking for an exact figure, just a rough

2    estimate, ballpark figure.

3    A.  A hundred fifty thousand, probably.

4    Q.  A hundred fifty thousand?

5    A.  I would think so.  I mean, that was for producing

6    records, sessions, and all stuff like that.

7    Q.  With respect to monies received for advances as opposed

8    to fees for services rendered, what portion of the 150 do you

9    think was attributed to just advances as opposed to fees that

10   might have been paid to you when you produced records for

11   Westbound, let's say?

12   A.  State it again?  I'm sorry.

13   Q.  Okay.  What portion, if any, of the money you received

14   was in payment of services rendered, such as producing

15   services, as opposed to advances or other monies just given

16   to you?

17   A.  I think most of it has been for recording stuff, for work

18   done, I mean, for recording records of anything.  A few times

19   he paid like the rent for us, which was a big amount,

20   $40,000.  I mean, I don't know what you would call that.

21   Q.  Well, what I'm looking at, in his opening statement

22   Mr. Richard said that Bridgeport had advanced you significant

23   or substantial sums -- I can't recall which term he used --

24   and I was trying to get at what you actually received.

25   A.  Oh, what I actually received myself would have been small

1   in comparison to what he might have spent for rent or loaned

2   me for, you know, to pay the house note, or something like

3   that, in which I did work for him, but never no hundreds of

4   thousands of dollars.  I mean, when you said that, I didn't

5   understand what you meant.  Never no -- a million-dollar

6   loan, I don't know where that come from at all.

7   Q.  Okay.  You would say that most of the money that you

8   received was actually in exchange for services performed?

9   A.  Yes.

10  Q.  As opposed to just advances or money given to you?

11  A.  Yes.

12          MR. WILSON:  I have no further questions at this

13  time, Your Honor.

14          THE COURT:  Cross-examine?

15          MR. RICHARD:  Yes, sir.

16                  CROSS-EXAMINATION

17  BY MR. RICHARD:

18  Q.  Mr. Clinton, you've signed many documents over the past

19  20 years, haven't you?

20  A.  Yes.

21  Q.  Songwriter's agreements, other contracts, documents

22  presented to you by lawyers for signature?

23  A.  Say that again?  I'm sorry.

24  Q.  I said, you signed many documents relating to your

25  compositions that were presented to you by lawyers over the

*Stephanie Clinton - Cross*

30

1    past 20 years, haven't you?

2    A.  Not that many.

3         MR. WILSON:  Objection, Your Honor.  I'm not -- I

4    don't know what he's referring to by *"many."*

5         THE COURT:  Overruled.

6    BY MR. RICHARD:

7    Q.  You've signed documents on behalf of yourself and on

8    behalf of Malbiz from time to time?

9    A.  From time to time myself, yeah.  Not that many, not a

10   whole lot.

11   Q.  Well, you sign songwriter's agreements whenever you

12   compose a song that you're selling, don't you?

13   A.  My own songs?  Yes.

14   Q.  Yes.  Every time you compose a song, and you enter into

15   an agreement with somebody to sell it for you, you sign one

16   or more songwriter's agreements, don't you?

17   A.  I didn't do that with many people, because most of them

18   was with myself.

19   Q.  And you signed documents from time to time both on behalf

20   of yourself and on behalf of Malbiz, did you not?

21   A.  A few times.  Not that many times, though.

22   Q.  Well, let's --

23   A.  Not any songwriter -- not any exclusive songwriter's --

24   Q.  I'm just saying you sign documents both on your own

25   behalf and on behalf of Malbiz, whatever type of documents

1    they may have been, legal documents, from time to time; is

2    that fair?

3    A.  From time to time, yeah.

4    Q.  Now, do you remember all of those documents that you

5    signed?

6    A.  No.

7    Q.  If I put some of them before you now, you wouldn't

8    remember all of them, would you?

9    A.  I wouldn't remember all that I signed, but I would

10   definitely remember the ones I didn't sign, though.

11   Q.  So, if I put all of the documents before you that bear

12   your signature, you would be able to tell me, *"I signed this*

13   *one; I didn't sign that one,"* with respect to all of them?

14   A.  I could tell you if I signed a contract for that song.

15   Q.  Well, when your counsel showed you Exhibit 1 and asked

16   you whether it was your signature, you said, *"I think it's my*

17   *signature, but there are so many of them floating around that*

18   *I can't tell for sure,"* or something to that effect.

19       Do you recall that testimony?

20   A.  Yes.

21   Q.  So, it would be difficult, I assume, if one were to

22   present you with any one of these documents signed over the

23   past 20 years or so for you to know for certain whether or

24   not it's your signature on it?

25   A.  I said that because it had been altered and has been

*Stephanie Clinton - Redirect*                                    32

1   stated in the court, and got a statement by the judge in New

2   York, that my handwriting had been altered on the contract,

3   one of those papers.  It's already stated in the courts.

4   That's already a finding.

5        So, I don't know which one that was done to, or which one

6   it wasn't.  That's why I said I couldn't tell if I did or

7   didn't, because I know there's some that has already been

8   proven that was changed.

9   Q.  That first document that Mr. Wilson showed you, do you

10  remember that, Exhibit 1?

11  A.  Yes.

12  Q.  That one you did sign, didn't you?

13  A.  I'm not sure that was the one I signed, because I told

14  you, those documents, all of the ones he showed me, there

15  were so many of them that had been altered and changed that I

16  can't tell you if this was the exact one that I signed.

17  Because there was one in there that I did sign a document

18  with those songs on that, but that wasn't the document.  I

19  know that.

20  Q.  So, you can't tell anymore, when you look at a signature,

21  whether it's really George Clinton's or not?

22  A.  Not from them.

23  Q.  Do you know who the officers are of Malbiz Music?

24  A.  Stephanie, myself, Don.

25  Q.  Do you know who the president is?

1    A.  Stephanie.

2    Q.  That group you just named, have always been the officers

3    of Malbiz?

4    A.  Not always, no.

5    Q.  Have you always been an officer?

6    A.  It was my company in the beginning.

7    Q.  But you've always been an officer, as long as it's been

8    an active corporation?

9    A.  Yes.

10    Q.  Now, the fact is, you've signed most of the documents

11    that were signed on behalf of Malbiz over the years, didn't

12    you?

13    A.  Yes.

14    Q.  Did Stephanie ever sign any of them?

15    A.  I'm not sure.

16    Q.  Very rarely?

17    A.  Very rarely, right.

18    Q.  Stephanie didn't object to your signing documents?

19    A.  Yes, she did, too.

20    Q.  She did?

21    A.  Yes.

22    Q.  You didn't have permission to sign those documents you

23    signed?

24    A.  No.

25    Q.  So, you signed documents that --

1    A.  I mean, I had permission to sign all of them, except for

2    a couple, if that's what you're asking.  I had permission to

3    sign most of the ones that I did sign, but there have been

4    cases where I wasn't supposed to sign it.

5    Q.  But she trusted you to exercise your judgment when you

6    signed the document, didn't she?

7    A.  I had to tell her, though.

8    Q.  Right.  But you had the authority to sign them when you

9    did?

10   A.  When I did -- with the exception of the one that I did

11   with -- with respect to Howard, she objected to that one, and

12   I did it, but she didn't know I did it.

13   Q.  You said you did do it without her knowing?

14   A.  Yeah.

15   Q.  And which document are we talking about?

16   A.  Well, I haven't seen that.  That one hasn't even been

17   shown.  I don't even know if we actually -- I did the deal.

18   I didn't even know if there was a paper drawn up on it, but

19   we did the record that way.

20   Q.  Other than whatever that one is you're talking about, do

21   you recall ever signing any document on behalf of Malbiz that

22   Stephanie objected to your signing?

23   A.  Not the paper itself.  I know I made the deal without her

24   liking it.  She didn't like it.

25   Q.  But when you signed it, it was with her okay?

1    A.   Most of the ones, yeah.  All the ones I know of, yeah.

2    Q.   Do you recall when you filed your bankruptcy petition in

3    Michigan back in the 1980s?

4    A.   Yes.

5    Q.   And do you recall that you listed on the bankruptcy

6    petition the fact that you had a debt to Mr. Boladian in the

7    amount of $600,000?  Do you remember that?

8    A.   Yes.

9    Q.   That was true, when you signed that, wasn't it?

10   A.   No.  I had also on the same document, that they can't

11   seem to verify that, I told the court then that he owed me

12   money, and that I didn't agree with that I owed him the

13   money.  That was on the list, but I also told them that he

14   owed me the money.  He owed me money, too.

15   Q.   Well, when you signed that bankruptcy filing under oath,

16   you were telling the truth, weren't you?

17   A.   No.

18   Q.   You were not telling the truth?

19   A.   You mean, that I signed that he owed me money -- that I

20   owed him money?

21   Q.   No, no.  I don't want to confuse you, and I don't want to

22   make you say something that you don't mean to say.

23       All I'm asking you is, when you signed that bankruptcy

24   petition, and you certified that you were telling the truth,

25   you believed that you were telling the truth, didn't you?

1    You didn't mean to sign something that wasn't true, did you?

2    A.   I told them that I didn't sign any document with Armen

3    Boladian.

4    Q.   All right.  I'm confusing you.

5    A.   Yes.

6    Q.   We're just talking now about the bankruptcy petition that

7    you filed back in the 1980s.

8    A.   Right.

9    Q.   And what you said on that bankruptcy petition I assume

10   was true, so far as you knew, wasn't it?

11   A.   What I said, yes, but not that it's stated that I owed

12   Armen money.

13   Q.   Right.  Now, it also said that you owed $600,000 to

14   Bridgeport Music, didn't it?

15   A.   I told them then, as I say now, I did not owe them the

16   money.  The lawyer that I had said -- did the talking.  I

17   didn't even do the talking, and I told Mr. Wilson the same

18   thing.  I told them I didn't owe Armen anything.

19   Q.   Was that your signature on the bankruptcy petition, where

20   it says "George Clinton" on the bottom?

21   A.   Yes.

22   Q.   You signed that bankruptcy petition?

23   A.   Yes, but I also told the lawyer that I did not -- I did

24   not owe Armen money.  He had $600,000 there.  I said I did

25   not owe him that.  I said it in the courtroom, too.

*Armen Boladian - Cross*                                      37

1    MR. RICHARD:  I have no further questions, Your

2    Honor.

3         THE COURT:  Redirect?

4         MR. WILSON:  Yes, Your Honor.

5              REDIRECT EXAMINATION

6    BY MR. WILSON:

7    Q.  Mr. Clinton, with respect to the bankruptcy petition, did

8    you complete the petition or was it completed on your behalf?

9    A.  It was completed on my behalf.  I told them that.

10   Q.  Do you recall by whom the -- who completed the petition

11   on your behalf?

12   A.  Boladian, Montes, and I forget the other lawyer's name.

13   I think he works with Mr. Hertz.

14   Q.  Was that your bankruptcy attorney?

15   A.  It was my bankruptcy attorney.  Mr. Boladian, Mr. Montes,

16   and whatever the other gentleman's name was.  They

17   completed -- they all went with me to the bankruptcy court.

18   Q.  You can just refer to the other gentleman as your

19   bankruptcy attorney --

20   A.  My bankruptcy attorney.  I'm sorry.

21   Q.  -- if you can't remember the name.

22        Do you recall your bankruptcy attorney thoroughly

23   explaining and going over your petition and the contents in

24   your petition?

25   A.  Not to -- thoroughly?  No, because I did not understand

1    that I had to say that I owed -- that I owed -- that Armen

2    owed me money; that he owed me money.  He didn't tell me that

3    part of it.  That's the -- when they threw my case out here,

4    I told you I didn't understand that, because they never said

5    that to me; that I had to put down there that he owed me.

6    And they filled that part of it out, because I don't remember

7    that at all being on there from the paper you showed me.

8    Q.   And did you sign the bankruptcy petition in your

9    attorney's office, or was it mailed to you for signature?

10   How did you come about signing the petition?

11   A.   I'm not sure.  I think I signed it in his office.  I'm

12   not sure.

13   Q.   But you don't recall him thoroughly going over and

14   explaining the contents?

15   A.   No, not all that stuff, no.

16   Q.   Did you owe Armen Boladian $600,000?

17   A.   No.  Armen owed me.

18   Q.   Did you owe Bridgeport Music $600,000?

19   A.   No.

20   Q.   Do you have any understanding as to why your bankruptcy

21   petition would have been completed with you owing or stating

22   that you owed either party $600,000?

23   A.   No.  I know Armen was with me there at the time we went;

24   Montes was with me, and the bankruptcy attorney, all of them

25   was together.

*Armen Boladian - Cross*                                    39

1   Q.  Okay.  Switching gears for a moment, with respect to

2   Malbiz, prior to 1977, when Malbiz was a d/b/a for you

3   individually, you signed all documents on behalf of Malbiz,

4   correct?

5   A.  Right.

6   Q.  After Malbiz became a corporation in 1977, did you sign

7   any documents on behalf of Malbiz?

8   A.  Not too many that I recall.

9   Q.  More specifically, did you sign -- I don't want to

10  confuse the issue by referring to agreements that are not

11  pertinent to this case, so I'm going to show you agreements

12  with respect to Malbiz and ask did you sign these documents.

13      This is Plaintiff's Exhibit 3, between Bridgeport Music

14  and it appears Malbiz, with your name and a parenthetical

15  below Malbiz Music dated March 4, 1982, listing six

16  compositions.  Did you sign this document on behalf of

17  Malbiz?

18  A.  No, I didn't sign this document.

19  Q.  Okay.  I'm going to show you another document dated the

20  same date, March 4, 1982, with what appears to be nine

21  compositions, along with some writers' names on there, and

22  ask you if you signed this document.

23  A.  No, I did not sign this one.

24  Q.  I show you an addendum between Bridgeport Music and

25  Malbiz Music dated March 4, 1982 --

1    A.    No.

2    Q.    -- and ask, did you sign this one on behalf of Malbiz

3    Music?

4    A.    No.

5            THE COURT:    Mr. Wilson, I think the last two you did

6    not refer to by exhibit numbers.

7            MR. WILSON:    I'm sorry.

8    BY MR. WILSON:

9    Q.    The nine compositions was Exhibit 4, dated March 4, 1982;

10   and the last one was an addendum, Exhibit 5, dated March 4,

11   1982.

12   A.    No.

13   Q.    So, none of these Malbiz documents you entered into?

14   A.    No.

15   Q.    You signed on behalf of Malbiz?

16   A.    No.    I signed the six songs, but that wasn't the paper

17   that it was on.    I remember it was three on one side and

18   three on the other.

19   Q.    All right.    And, again, did you have the authority after

20   1980 to sign on behalf of Malbiz Music?

21   A.    No.

22           MR. WILSON:    No further question.

23           THE COURT:    All right.    Mr. Clinton, you may step

24   down and return to counsel table.

25           Mr. Wilson, please call your next witness.

Stephanie Clinton
Testimony

1        MR. WILSON:  Okay.  I would like to call

2   Ms. Stephanie Clinton.

3        DEPUTY CLERK:  Please raise your right hand.

4   *STEPHANIE LYNN CLINTON, PLAINTIFF'S WITNESS, DULY SWORN*

5        DEPUTY CLERK:  Be seated.

6        Please, state your full name and spell your last

7   name for the record.

8        THE WITNESS:  Stephanie Lynn Clinton, C-L-I-N-T-O-N.

9                    DIRECT EXAMINATION

10  BY MR. WILSON:

11  Q.  Good morning, Ms. Clinton.

12  A.  Good morning.

13  Q.  When did you first meet Mr. George Clinton?

14  A.  February of 1977.

15  Q.  And at what point did you become married to Mr. Clinton?

16  A.  September 25, 1990.

17  Q.  And between '77 and -- I believe you said 1990?

18  A.  Uh-huh.

19  Q.  -- what was your relationship with Mr. Clinton?

20  A.  We lived together to what we both had committed to as a

21  relationship as a couple, first, for three years in

22  Southfield, Michigan; and, in 1980, November 17th, moved into

23  a house with 178 acres of property in Brooklyn, Michigan; and

24  we had that home for 16 years until it was stolen from us.

25  Q.  Now, you've heard that Mr. Clinton testified that in 1980

1    he transferred 75 percent of the ownership in Malbiz Music,

2    Inc., to you; is that correct?

3    A.   Yes.

4    Q.   And do you recall the circumstances under which that

5    transfer took place?

6    A.   It was about Christmastime of 1980.  We moved into our

7    home on November 17th of 1980, and he then immediately, after

8    we moved in, went on like a three-week promotion tour for

9    some artists that he had in his production company; and,

10   during that time, I kind of like made the house that we got

11   into our home.  And it was around Christmastime.  He told me

12   that he wanted me to know that he was committed to the

13   relationship; that it was him and me, and that's how it

14   was -- it was going to be him and me, and that was it.

15   Q.   Okay.  Did you pay any consideration for the 75 percent

16   ownership, or was it a gift?

17   A.   It was a gift.

18   Q.   Now, from 1980 forward, with you as 75 percent owner of

19   Malbiz Music, Inc., what activities or involvement, if any,

20   did you have on behalf of Malbiz Music, Inc.?

21   A.   Well, right about the time that George gave me the part

22   ownership in it, we were just coming out of a business

23   relationship with Siegel and Goldman in Los Angeles.  They

24   were accountants.  And there really wasn't too much going on.

25        I think George had just used, in October of 1980, Malbiz

1  as collateral for a loan for a Casablanca record deal, and --

2  I didn't -- there wasn't anything up -- the first thing I

3  remember actually being involved with in dealing with

4  anything was the March 4th, 1982 document, $6,000 for six

5  songs.

6  Q.  All right.  I'm going to show you Plaintiff's Exhibit

7  Number 3, which is a March 4th, 1982 agreement with respect

8  to six songs and ask you:  Is this the agreement to which

9  you're referring?

10  A.  The agreement was an agreement where George received

11  $6,000; in turn, Armen received six songs that had not been

12  released yet, but they had been recorded.

13  Q.  Do you recall if these are the six songs?

14  A.  No, I couldn't say that these are exactly the same songs.

15  These are among those songs that at that time were being

16  recorded but had not been released yet.

17  Q.  Now, as you can see from the signature line, it's

18  executed on behalf of Malbiz Music with George Clinton in a

19  parenthetical underneath Malbiz Music, with Malbiz listed as

20  the owner.

21      You said this was the first agreement that you recall

22  participating in.  In what way did you participate in this

23  agreement?

24  A.  George and I talked about it before we went to Armen.  We

25  met Armen at the bank, and I watched the exchange of -- I

1    watched George and Armen and Dorothy Barns all sign an

2    agreement with regard to six songs and $6,000; and I watched

3    the exchange of the money.

4    Q.  And was the money in cash or check?

5    A.  I don't recall if Mr. Boladian wrote a check, and then it

6    was cashed.  I don't recall.

7    Q.  I'm going to ask you to take a look at Plaintiff's

8    Exhibit 4, which is also an agreement with respect to nine

9    songs, and ask you:  Do you recall having seen this agreement

10   before?

11   A.  I've seen it before, but not at the bank.

12   Q.  Did you participate in the execution of this agreement?

13   A.  No.

14   Q.  Did Mr. Clinton ever tell you that he signed an agreement

15   for nine songs on the same day that an agreement for the sing

16   songs was signed?

17   A.  No.

18   Q.  Starting in 1980, after you received 75 percent ownership

19   of Malbiz Music, who was responsible for the administration

20   of the Malbiz Music catalog?

21   A.  I believe we would have been responsible for that up

22   until the point where -- we had difficulty making payments on

23   our home.  It went into foreclosure.  We went to Mr. Boladian

24   and worked out an agreement where Mr. Boladian would pay off

25   our home.  In exchange for his helping us with that, he would

*Armen Boladian - Cross*

1    administer Malbiz Music publishing.

2    Q.    Excuse me.  What date was this?

3    A.    I believe it was in about 1985.

4    Q.    Okay.  And pursuant to this agreement, was Mr. Boladian

5    to receive ownership in Malbiz Music?

6    A.    No.

7    Q.    He was simply to administer Malbiz Music?

8    A.    He was to administer Malbiz Music on our behalf, collect

9    the publishing money, pay the other songwriters.  He would

10   keep George's songwriter royalties; he would keep Malbiz

11   publishing royalties, until such time that he was repaid for

12   paying off the house, and then also collecting an additional

13   hundred thousand dollars as a thank you for helping us.

14   Q.    Do you recall what was the amount of the house?

15   A.    The price that the house was when we purchased it was

16   $475,000.

17   Q.    So, would it be safe to say that Mr. Boladian was allowed

18   to administer Malbiz and collect 575 -- the 475, plus an

19   additional hundred -- so he was allowed to retain $575,000

20   with respect to helping you out on the house?

21   A.    I'm not quite sure.  I really don't think we had any

22   equity in the house, because we had so much trouble, you

23   know, I think it just all -- but we had paid up to maybe 150,

24   $175,000 on the house ourselves.  And whatever Mr. Boladian

25   might have had to do, if he had to -- what do you call it? --

1  refinance, remortgage, I don't know, because I wasn't a party

2  to how he worked that out with the people we held the land

3  contract with.  But, in the event that he had to pay the full

4  price again, then, yes, he would collect $575,000.

5  Q.  All right.  Did he ever render accountings to Malbiz

6  Music, Inc., indicating what he had paid out with respect to

7  the house and how much money he had received?

8  A.  No.

9  Q.  Did he ever collect sufficient money to pay off the house

10  and keep a hundred thousand dollars, as far as you know?

11  A.  Well, yeah, after he transferred the copyright, I

12  believe, maybe --

13  Q.  I'm sorry.  You said, after who transferred -- I couldn't

14  hear you.

15  A.  After Bridgeport transferred the copyright and started

16  collecting like when -- about 1988, '89, from then, because

17  between 1985 and, let's say, '88, there wasn't very much

18  activity that, you know, I mean, we didn't hear the songs on

19  the radio, but we didn't have any accounting to look, you

20  know, any paperwork to look at.

21  Q.  Was this agreement between, I guess, you and Mr. Clinton

22  with respect to the house, and Mr. Boladian, ever reduced in

23  writing and signed by the parties?

24  A.  No.

25  Q.  But from 1985 forward, Malbiz Music allowed Mr. Clinton

1   to administer the catalog on the terms and conditions that

2   you just indicated?

3   A.  Mr. Boladian?

4   Q.  Mr. Boladian.

5   A.  Yeah.  Yes.  To administer the catalog, to apply the

6   publisher's share to the debt for the house, to apply

7   George's songwriter share to the debt of the house; and it's

8   what we agreed to, and it was never presented in writing.

9   Q.  At any point after 1980, did you consent or participate

10  in a transfer of copyrights in the Malbiz musical

11  compositions to Bridgeport Music?

12  A.  No.

13  Q.  Did you ever authorize anybody to transfer the Malbiz

14  catalog to Bridgeport Music?

15  A.  No.

16  Q.  Did anyone have such authority to do so without your

17  consent?

18  A.  No.

19  Q.  I want to show you a document previously marked as

20  Plaintiff's Exhibit 5.  It's entitled *"Addendum,"* and it's

21  dated March 4, 1982, between Bridgeport Music, Inc., and

22  Malbiz Music, and ask:  Do you recall ever seeing this

23  document before?

24  A.  I've seen it before, but only through prior legal

25  proceedings, you know, between Bridgeport and -- who was

1    that? -- Turce and Lynda, I guess.

2    Q.   Do you recall ever authorizing the execution of such an

3    addendum?

4    A.   No.

5    Q.   Now, you mentioned earlier that at some point, I believe

6    it was 1985 -- correct me if I'm wrong -- that the Malbiz

7    catalog was placed as collateral to secure a loan?

8    A.   That was in 1980; October of 1980.

9    Q.   Okay.  In 1980.  That was prior to you receiving your 75

10   percent --

11   A.   Yeah.

12   Q.   -- interest in Malbiz?

13   A.   Yes.

14   Q.   And prior to you receiving your 75 percent interest in

15   Malbiz in December of '80, did you have any interest in

16   Malbiz Music?

17   A.   No.

18   Q.   You were not an owner of Malbiz at that point?

19   A.   No.

20   Q.   After December of 1980, how active were you in the

21   affairs and administration of Malbiz Music, Inc.?

22   A.   I believe that I was -- I believe that I knew everything

23   that was going on with it.  It being administered, I don't

24   think it was being administered after we left Siegel and

25   Goldman, and I'm not sure where the money was going.

1    Q.  Did you ever make any inquiries between the time you left

2    Siegel and Goldman, your accountants that were administering

3    the catalog, and 1985, when you approached Mr. Boladian to

4    help you out with the house and allow him to administer

5    Malbiz?  During that four- or five-year period, I guess it

6    would have been a four-year period or so, do you recall who

7    administered Malbiz Music?

8    A.  No.  I remember asking his -- I remember asking George's

9    management what was going on with the publishing.

10   Q.  After 1980, December of 1980, when you obtained 75

11   percent interest in Malbiz Music, did you ever execute any

12   documents on behalf of Malbiz Music, Inc.?

13   A.  In 1995, I think we licensed a couple of songs in the

14   catalog to *New York Undercover*, a television show; and that's

15   all I recall.

16   Q.  And prior to that, do you remember contracts having to be

17   signed in the administration of Malbiz Music?

18   A.  After 1980, I believe the only songs -- the only new

19   compositions since December of 1980 were on the computer

20   games album for Capital Records, and I believe Malbiz did --

21   you know, I think Malbiz might have issued songwriter

22   contracts, but I think I -- I couldn't say for sure who

23   issued them or who made them up.

24   Q.  Okay.  What I'm attempting to try to understand, between

25   1980 and 1985, is how many contracts in Malbiz's ordinary

*Armen Boladian - Cross*

50

1   course of business were there that needed to be signed, to

2   get an indication of what percentage of those contracts you

3   may have signed.

4   A.  I don't remember -- I don't really remember any contracts

5   having to be signed, other than those few songwriter

6   contracts.

7   Q.  So, during that four- or five-year period, your

8   recollection is that there weren't many Malbiz contracts to

9   be signed?

10  A.  No, there wasn't really much activity, you know, that I

11  was aware of.

12  Q.  And during the period of 19 -- from 1980, Mr. George

13  Clinton was a writer for Malbiz Music, Inc.?

14  A.  He did write for Malbiz.

15  Q.  Did he write for anyone else during that period of time?

16  A.  Yes, I believe he did.

17  Q.  Do you recall who he wrote for?

18  A.  I don't -- I don't recall the publishing companies, but I

19  recollect that he did -- he did write songs that were used on

20  other artists.

21  Q.  And someone else other than Malbiz owned the publishing?

22  A.  And you're asking between 1980 and 1985?

23  Q.  Yes.

24  A.  No, I didn't -- I don't recall him writing for any other

25  publisher.

1    Q.  During that time period?

2    A.  During that time period.

3    Q.  And would that be because he was exclusive to Malbiz

4    Music?

5    A.  Not necessarily, no.  I came to find out, when I was

6    looking at copyright infringement, you know, the

7    compositions, I was wondering why two of the Capital

8    recordings between 1980 and 1985 were in Bridgeport.  I

9    thought that it was just more infringement, and then I came

10   to find out that there was something, a joint venture deal

11   that was being talked about back then with Nene Montes and

12   Armen Boladian, and that it was suggested to George to put

13   those songs in Bridgeport Music as a good-faith gesture

14   for -- whatever that was supposed to be, but I really didn't

15   know anything about the one joint venture, or I just thought

16   that they were infringed upon, like all of the other ones had

17   been.

18   Q.  I'm going to show you a document marked Plaintiff's

19   Exhibit 6, which is entitled *"Writer's Agreement,"* between

20   George Clinton and Bridgeport Music, dated December 2nd,

21   1983.  And, although Mr. Clinton testified that he did not

22   execute such an agreement, with respect to your position as

23   majority owner of Malbiz Music and given Malbiz's

24   relationship with Mr. Clinton during December of '83, would

25   it have been permissible for Mr. Clinton to enter into an

1  exclusive songwriter's agreement with another publisher?

2  A.  George doesn't enter into exclusive agreements.

3  Q.  Well, he's already testified he didn't sign this.  I'm

4  just asking --

5  A.  And I'm just saying, I've never known him to enter into

6  an exclusive agreement with anybody outside of himself.

7  Q.  But, given his relationship in December of '83 with

8  Malbiz Music, would it have been legally or contractually

9  permissible for him to enter into an agreement with a

10  third -- with another party?

11  A.  I don't believe so.

12  Q.  I believe you may have already answered this, but I just

13  want to be clear.  Well, actually, before I get to that.

14      With respect to Plaintiff's Exhibit 2, which is an

15  exclusive songwriter agreement, however, dated April 4, 1985,

16  between Bridgeport Music and George Clinton, as a writer,

17  would it have been permissible in April of '85, given

18  Mr. Clinton's relationship with Malbiz Music, Inc., to have

19  entered into an exclusive songwriter agreement with another

20  publisher?

21  A.  I don't believe so.

22  Q.  Now, when you say you don't believe so, that's because --

23          MR. RICHARD:  Objection, Your Honor, to leading this

24  witness.

25          THE COURT:  Sustained.

*Armen Boladian - Redirect*

53

1    BY MR. WILSON:

2    Q.   Why aren't you sure?

3    A.   George has written -- George is a songwriter who has

4    written many songs, and they've been published by many

5    different publishers.  He did the majority of his song

6    writing for Malbiz Music.  But if he were to enter into an

7    agreement that said he could only write for Bridgeport Music,

8    no, he could not enter into that agreement, nor -- further to

9    that, he wouldn't enter into that agreement.  It limits his

10   ability to make a living and feed his family, to go into an

11   exclusive songwriter's agreement with one company, such as

12   Bridgeport -- such as Bridgeport, that -- I didn't see this

13   songwriter's -- this agreement had anything to do with any

14   compensation of any kind.

15        He needed to be writing songs and getting songs

16   published, and he wouldn't -- he didn't make himself

17   exclusive to Bridgeport.  That would limit his ability to

18   make a living.

19   Q.   Okay.  And after 1980, when you acquired 75 percent

20   interest of Malbiz, even as an officer, did Mr. Clinton have

21   the authority to enter into agreements on behalf of Malbiz,

22   even agreements such as extraordinary agreements as

23   transferring all of Malbiz's compositions to a third party

24   without your consent?

25   A.   No.

1          MR. WILSON:  I have no further questions at this

2    time.

3          THE COURT:  Cross-examine?

4          MR. RICHARD:  Yes, sir.  With the Court's

5    permission, I have nothing for the evidence --

6          THE COURT:  Okay.

7          MR. RICHARD:  So, I'll cross-examine right here.

8                      CROSS-EXAMINATION

9    BY MR. RICHARD:

10   Q.  Ms. Clinton, when you say that you don't believe it was

11   legally or contractually permissible to enter into an

12   exclusive agreement with anyone, did George Clinton ever have

13   an agreement, to your knowledge, with Malbiz that prohibited

14   him from doing that?

15   A.  I don't know.

16   Q.  You never saw any agreement to that effect?

17   A.  No.

18   Q.  You never discussed one with him?

19   A.  No.

20   Q.  You will recall that Plaintiff's Exhibit 3 was the

21   contract which Mr. Clinton received $6,000 for six songs?

22   A.  Yes.

23   Q.  As I recall your testimony, you said that you accompanied

24   Mr. Clinton and Mr. Boladian to the bank, where they signed

25   the agreement and the $6,000 was withdrawn and presented to

1    George Clinton?

2    A.   Yes.

3    Q.   You saw George sign that agreement?

4    A.   I saw George sign an agreement stating $6,000 for six

5    compositions.

6    Q.   And that was Exhibit 3, which was presented?

7    A.   Yes.

8    Q.   And you saw Mr. Boladian sign it?

9    A.   Yes.

10   Q.   Is it common practice for George to sign agreements on

11   behalf of Malbiz?

12   A.   George and I discussed that agreement.

13   Q.   That was not my question.

14   A.   It was okay with me for him to sign the agreement.

15   Q.   My question was this, just so I don't confuse you:

16        Was it common practice, when a contract was signed on

17   behalf of Malbiz, for George Clinton to be the person who

18   would sign it?

19   A.   Yes, after an agreement was reached between George and

20   myself, then it was okay for him to sign it.

21   Q.   Did you ever sign contracts on behalf of Malbiz?

22   A.   No.

23   Q.   Now, you're saying that George was not allowed to sign

24   anything on behalf of Malbiz without first getting your

25   permission?

1  A.  Right.

2  Q.  That was an agreement you had with George?

3  A.  Yes.  We had to agree -- we had to agree to what was

4  going to be signed.

5  Q.  That was an agreement you had with George?

6  A.  Yes.

7  Q.  It was an oral agreement, I assume; it wasn't in writing?

8  A.  Correct.

9  Q.  Did you ever tell that to Mr. Boladian?

10  A.  No.

11  Q.  Did you ever tell that to anybody else connected with

12  Bridgeport?

13  A.  No.

14  Q.  Did you ever tell that to anyone connected with any other

15  company, to your recollection?

16  A.  I think the people that were associated with us knew it.

17  Q.  Well, did you ever tell it to anybody else that entered

18  into a contractual arrangement with Malbiz?

19  A.  Beyond that one document, Number 3, that you're referring

20  to, of the March 4th, '82, I don't remember any documents

21  that Malbiz was involved in that would require anybody's

22  signature.  So, it wouldn't even be discussed, because there

23  wasn't any --

24  Q.  Who signed checks for Malbiz?

25  A.  Malbiz didn't have -- up until 1980, it was Siegel and

1    Goldman.  Before that, it was Weise and Meibach.  After that,

2    there was no Malbiz bank account, per se.  I think the

3    royalties were going to --

4    Q.  There was no checking account?  Malbiz never had a

5    checking account?

6    A.  No, not until 1994, I believe.

7    Q.  Did you assist George with the preparation of his

8    bankruptcy papers?

9    A.  No.

10   Q.  Nothing to do with it?

11   A.  No.

12   Q.  Do you know who the lawyer was that was assisting him?

13   Mr. Hertzberg?

14   A.  I think his name was Hertzberg.

15   Q.  It was not Howard Hertz?

16   A.  No, it wasn't Howard.

17   Q.  Do you have any knowledge of any participation by

18   Mr. Boladian in the preparation of those papers?

19   A.  I wasn't involved in the bankruptcy.  I wasn't -- I

20   wasn't at any of the meetings.  I never met the bankruptcy

21   lawyer.  I don't know.

22          MR. RICHARD:  Thank you.  No further questions.

23          THE COURT:  Redirect?

24          MR. WILSON:  Yes, Your Honor.

25                    REDIRECT EXAMINATION

*Howard Hertz - Cross*                                    58

1    BY MR. WILSON:

2    Q.  Ms. Clinton, I just want to clarify one point, and make

3    sure either I didn't misunderstand or you didn't

4    misunderstand.

5        You indicated to me that you had signed licenses, I

6    believe, on behalf of Malbiz Music.  I think you made

7    reference to the *New York Undercover* television show.  Yet,

8    when Mr. Richard asked, had you ever signed any documents on

9    behalf of Malbiz Music, you said no.

10   A.  I apologize.

11   Q.  Okay.

12   A.  I did sign a licensing agreement in 1995, I believe it

13   was, for *New York Undercover*.

14   Q.  Okay.  Do you recall signing any other agreements on

15   behalf of Malbiz Music?

16   A.  No.

17   Q.  So, any of the songwriter agreements that Malbiz may have

18   entered into, you didn't sign any of those?

19   A.  No.  I think they were pretty much all prior to December

20   of 1980.

21   Q.  Okay.  All right.

22        MR. WILSON:  No further questions, Your Honor.

23        THE COURT:  All right.  Ms. Clinton, you may step

24   down.

25        Let's take a 15-minute break.  We'll start back at

*Ruth Holmes - Direct*                                                    59

1    11:00 by that clock.

2        (A recess was taken from 10:44 a.m. to 11 a.m.)

3            THE COURT:  Please be seated.

4            Mr. Wilson, please call your next witness.

5            MR. WILSON:  I have no further witnesses at this

6    time, Your Honor.

7            THE COURT:  So, the plaintiff rests?

8            MR. WILSON:  Yes, Your Honor.

9            MR. RICHARD:  I don't know if you formally

10   introduced your documents.  Did you want to do that?

11           THE COURT:  It is correct that you didn't move

12   those.  Do you want Plaintiff's 1 through 6 admitted?

13           MR. WILSON:  Yes, Your Honor.

14           THE COURT:  Any objection to those, Mr. Richard?

15           MR. RICHARD:  No, Your Honor.

16           THE COURT:  Plaintiff's Exhibits 1 through 6 are

17   admitted into evidence.

18       (PLAINTIFF'S EXHIBIT NOS. 1, 2, 3, 4, 5 AND 6:  Received

19   in evidence.)

20           THE COURT:  Mr. Richard, please call your first

21   witness.

22           MR. RICHARD:  The defendant would call Armen

23   Boladian.

24           THE COURT:  Is Mr. Boladian here?  Right up here,

25   sir.

Armen Boladian
Testimony

*Ruth Holmes - Direct*

60

1    DEPUTY CLERK:  Raise your right hand.

2    *ARMEN BOLADIAN, DEFENSE WITNESS, DULY SWORN*

3    DEPUTY CLERK:  Be seated.

4    Please, state your full name and spell your last

5    name for the record.

6    THE WITNESS:  Sure.  Armen Boladian,

7    B-O-L-A-D-I-A-N.

## DIRECT EXAMINATION

9    BY MR. RICHARD:

10   Q.  Mr. Boladian, what is your relationship with Bridgeport

11   Music, Inc.?

12   A.  President of the company, sir.

13   Q.  Prior to 1993, did you and Bridgeport have a business

14   relationship with George Clinton?

15   A.  Yes, I did.

16   Q.  What was the nature of that relationship?

17   A.  Well, Mr. Clinton was a writer and a performer, and we

18   were the record company and publishing company.

19   Q.  Did you have occasion over the years, prior to 1983, to

20   loan any money to Mr. Clinton?

21   A.  Yes, I did.

22   Q.  Was it a substantial sum of money?

23   A.  Between myself and Bridgeport Music, it was over a

24   million dollars.

25   Q.  Now, were those loans to Mr. Clinton personally or to his

1  company, Malbiz, or were you able to tell which?

2  A.  Well, it was basically Mr. Clinton.

3  Q.  Now, in 1983, did you have occasion to enter into an

4  agreement with Mr. Clinton?

5  A.  Yes.

6  Q.  Is that agreement memorialized in the form of a number of

7  separate documents?

8  A.  Yes, sir.

9       MR. RICHARD:  May I approach the witness, Your

10  Honor?

11       THE COURT:  You may.

12       MR. RICHARD:  I'm showing the witness Defendants'

13  Exhibits 14, 16, 17 and 18.

14       MR. WILSON:  I don't have -- are they the same as

15  mine?

16       MR. RICHARD:  Eighteen is your three.

17       MR. WILSON:  Okay.

18       MR. RICHARD:  I'll let you look at them.

19       THE COURT:  When you're showing those and whispering

20  back and forth, that's fine, just whisper.  If you speak any

21  louder, the court reporter tries to take down everything you

22  say.  So, you need to whisper quietly enough so that she and

23  I cannot hear you.

24  BY MR. RICHARD:

25  Q.  Mr. Boladian, will you review those, please, and tell me

1    if those are the documents that memorialize the 1983

2    agreement that you just testified to.

3            THE COURT:  Mr. Boladian, if you would, move those

4    away from the microphone.  There is a flat microphone there;

5    but, if the documents get on there, it is noisy.  So, if you

6    would, move those away from the microphone.

7            THE WITNESS:  Thank you.

8            Yes, sir, they are.

9    BY MR. RICHARD:

10   Q.  Would you tell the Court, please, the circumstances

11   leading to this agreement?

12   A.  Well, we had a business relationship, and we had advanced

13   a lot of money to Mr. Clinton; and they wanted additional

14   monies to further record production and also living expenses,

15   and just money in general.  And it was escalating into

16   humongous sums of money.  And at that point I had to have

17   some more security, and I said, *"The only way I would do this*

18   *is if we had the songs."*  And, furthermore, there was another

19   situation where Capital Records was going to back a

20   million-dollar loan for us; but then, again, they wanted me

21   to sign and be responsible for it.

22       So, looking at this huge amount of debt that would be

23   incurring, I just felt that I had to have the songs in order

24   to substantiate this kind of -- this kind of outlay of money.

25   Q.  Now, when you say you had to have the songs, this was an

*Ruth Holmes - Direct*                                       63

1    agreement that assigned you an interest in some songs?

2    A.  Yes, sir.

3    Q.  Which songs was that?

4    A.  There are many songs that are on the document.

5    Q.  The document purports to assign you an interest in all of

6    the compositions prior to 1983?

7    A.  Yes, sir.

8    Q.  Who prepared these documents?

9    A.  Mr. Hertz did.

10   Q.  Howard Hertz?

11   A.  Howard Hertz, yes.

12   Q.  He was your lawyer?

13   A.  Yes.

14   Q.  And where were they signed?

15   A.  They were signed in his office in Southfield, Michigan.

16   Q.  Who was present at the time that they were signed?

17   A.  I was there; Mr. Clinton was there; I believe Mr. Montes

18   may have been there; Howard's secretaries were in and out.

19   That's basically it.

20   Q.  Did everybody sign the documents in the presence of all

21   of the other parties?

22   A.  Yes.

23   Q.  Let me call your attention, in particular, to Defendants'

24   Exhibit 18, and ask you to look specifically at the two

25   signatures by Mr. Clinton, one on the first page and the one

*Ruth Holmes - Direct*

64

1    at the end of the addendum, which is attached, and ask

2    whether you recall seeing Mr. Clinton actually affix his

3    signatures in those two places.

4    A.    Yes, I did.

5    Q.    And was it on or about the date of that document?

6    A.    Yes.

7    Q.    Are these documents in the same form that you read them

8    now as when you reviewed them?

9    A.    Yes.

10    Q.    Were they attached together just as they are now?

11    A.    Yes, sir.

12    Q.    At the time that these documents were signed and at any

13    time prior to this, were you ever advised by George Clinton

14    or by Stephanie Clinton that George Clinton was not

15    authorized to sign on behalf of Malbiz without the permission

16    of Stephanie Clinton?

17    A.    No, I was not.

18    Q.    Was it your understanding at the time that these were

19    signed that Mr. Clinton was signing on his behalf and on

20    behalf of Malbiz?

21    A.    Yes, I was.

22    Q.    Was that a requirement of yours?

23    A.    I'm sorry, sir?

24    Q.    Did you require that?

25    A.    Well, I took his word for it.

1  Q.  No.  I mean, was it your requirement that he sign on

2  behalf of himself and Malbiz?

3  A.  Oh, yes; yes.

4         MR. RICHARD:  Your Honor, I would like to introduce

5  these exhibits -- once again, it's 14, 16, 17 and 18 -- into

6  evidence.

7         THE COURT:  Mr. Wilson, any objections to those?

8         MR. WILSON:  No, Your Honor.  I just have 14.  I

9  think the other three are exhibits that I have introduced

10 already.

11        MR. RICHARD:  We can give you additional ones.

12        THE COURT:  Defendants' Exhibits 14, 16, 17 and 18

13 are admitted.

14    (DEFENDANTS' EXHIBIT NOS. 14, 16, 17 AND 18:  Received in

15 evidence.)

16 BY MR. RICHARD:

17 Q.  Mr. Boladian, did you have anything whatsoever to do with

18 the preparation of bankruptcy papers on behalf of George

19 Clinton?

20 A.  No, I did not.

21        MR. RICHARD:  No further questions.

22        THE COURT:  Cross-examine?

23        MR. WILSON:  Yes, Your Honor.

24                    CROSS-EXAMINATION

25 BY MR. WILSON:

1    Q.  Good morning, Mr. Boladian.

2    A.  Good morning.

3    Q.  In your testimony earlier, you seem to have interchanged

4    advances and loans.  I would like some clarification with

5    respect to the money that you state you've given Mr. Clinton.

6        Was it loans or was it advances?

7    A.  They were advances.

8    Q.  Okay.  So, as such, was there any obligation to pay the

9    money back, or was this just to be recouped by you?

10   A.  We were going to be recouped.

11   Q.  And you say over the course it was close to a million

12   dollars between you, individually, and your company had given

13   him?

14   A.  Over a million dollars.

15   Q.  Okay.  Was any portion of this over a million dollars

16   given to Mr. Clinton prior to 1984?

17   A.  Yes.

18   Q.  Do you have any idea what portion of the million dollars

19   was given to Mr. Clinton prior to 1984?

20   A.  It was spread out over a period of years.

21   Q.  Yeah, but how much of the million was given to him prior

22   to '84?  Half of it, three-quarters of it?

23   A.  A major portion of it.

24   Q.  A major portion of it.

25       And would that major portion then have been discharged in

*Ruth Holmes - Cross*
67

1    Mr. Clinton's bankruptcy in '85, where he listed I believe

2    you as $600,000 and then Bridgeport, I believe, at $600,000?

3    A.  Yes, sir.

4    Q.  So, if those numbers were correct, then, a million-two of

5    what you had given him was discharged in bankruptcy?

6    A.  It was in the bankruptcy.

7    Q.  Okay.  I'm going to attempt to use the scanner again, so

8    these documents should appear on the screen in front of you.

9         This is Defendants' Exhibit 18, and I believe this is the

10   one that you testified earlier that you were present when

11   Mr. Clinton affixed his signature on this document?

12   A.  Yes, sir.

13   Q.  I'm going to show you another document which was listed

14   as Plaintiff's Exhibit 4, and I want to ask you:

15        Are you familiar with this document?

16   A.  Yes, I am.

17   Q.  And was this document signed by Mr. Clinton in your

18   presence?

19   A.  Yes, sir.

20   Q.  Could you explain why both of these documents, one with

21   six and then one with the nine, including the six with three

22   additional ones, were both signed on March 4th, 1982?

23   A.  Yes.  Because there were some additional songs added to

24   it.

25             MR. WILSON:  Judge, one moment, Your Honor.

*Ruth Holmes - Cross*                                      68

1           Excuse me, Your Honor, one moment.  I'm looking for

2    a document.

3    BY MR. WILSON:

4    Q.  Mr. Boladian, do you recall giving your deposition at a

5    case involving Bridgeport Music as the defendant and Nene

6    Montes, and his various entities in federal court?

7    A.  Yes, I do, sir.

8    Q.  And this would be the Central District of New York -- I'm

9    sorry -- Southern District of New York in a Priority case?

10   A.  Do you mean California, sir?

11   Q.  No.  There was originally a case in the Southern District

12   of New York that was brought by Priority Records that

13   inter-pleaded both you and Nene Montes.

14          Do you recall that?

15   A.  Okay.  Yes, I do.

16   Q.  Okay.  And do you recall having your deposition taken

17   with respect to that?

18   A.  It goes back a few years, but there was a deposition;

19   yes.

20   Q.  Okay.  Do you recall, with respect to that, Bridgeport

21   conceding that Clinton did not sign a March 4th, 1982

22   agreement, which was submitted to the copyright office; and,

23   in fact, admitted that the file composite document had been

24   materially altered?

25   A.  I don't recall that; no, sir.

*Ruth Holmes - Redirect*

69

1   Q.  So, your recollection is that you didn't testify either

2   in a deposition -- do you recall ever stating it in an

3   affidavit?

4   A.  Can you show me something?  I mean, you're going back how

5   many years?

6   Q.  Well, actually, what I'm reading from is a decision of

7   that court --

8   A.  Okay.

9   Q.  -- where, in that court's opinion, it says that --

10          MR. RICHARD:  Excuse me, Your Honor.

11  Q.   -- Bridgeport conceded --

12          MR. RICHARD:  Excuse me, Your Honor.  Counsel has

13  not laid a foundation by establishing whether we're talking

14  about a document which is in evidence here and that

15  deposition or a different document; and I would like to

16  request that he do so, so the record is clear, and also so it

17  is clear to my client.  It's a deposition about some

18  document.

19          MR. WILSON:  Okay.

20          THE COURT:  Well, apparently, Mr. Wilson is reading

21  from some court decision.

22          MR. WILSON:  That's correct.

23          MR. RICHARD:  Even then, Your Honor, I think we need

24  to know what document it refers to.

25          MR. WILSON:  Okay.  It's the Boladian affidavit.

1    BY MR. WILSON:

2    Q.  Do you recall preparing an affidavit with respect to that

3    case in which paragraphs 20 and 21, Bridgeport conceded that

4    Clinton did not sign the March 4, '82 agreement, which is

5    submitted to the copyright office; and, in fact, admitted

6    that it filed a composite document which it had materially

7    altered?

8    A.  I don't recall that.

9    Q.  Do you recall with respect to that, that to overcome the

10   rejection by the copyright office, Bridgeport had Clinton's

11   signature notarized in 1990, eight years after it had been

12   provided?

13   A.  I'd have to see some kind of documentation.  I don't

14   recall.

15          MR. RICHARD:  Your Honor, I would just like the

16   record to reflect that the document that was referred to

17   there is not the document we introduced as Exhibit 18 and is

18   not in evidence in this court.

19   BY MR. WILSON:

20   Q.  Were these two different documents, both dated March 4th,

21   one with nine composition and one with six compositions,

22   executed at the same time on March 4th?

23   A.  I believe they were, yes.

24   Q.  Okay.  If, in fact, the reason for the second one was

25   that you forgot three compositions, but yet they were

1    executed at the same time, why was it necessary to execute

2    the first one with only six?

3    A.   Because the additional songs were not completed yet.

4    Q.   Well, wait a minute.  If the additional songs were not

5    completed --

6    A.   Right.

7    Q.   -- you had titles for them, though, correct?

8    A.   No, there were not titles at that time.

9    Q.   So, how did the titles end up with the three additional

10   songs on the March 4th nine-song title that was signed at the

11   same time as the March 4 six?

12   A.   The other three were added on there, but the papers were

13   signed.

14   Q.   When were the other three added on?

15   A.   It might have been a few days afterwards.

16   Q.   Would -- did Mr. Clinton return those few days later and

17   sign the nine-song document?

18   A.   No.  They were signed at the same time.  We added it to

19   it, because we had power of attorney to add the songs to it.

20   Q.   So, in fact, the nine-song document was altered after

21   Mr. Clinton had signed it by adding three songs?

22   A.   Right.

23   Q.   Three additional songs?

24   A.   Right.

25   Q.   And could this nine-song March 4th agreement be the one

1      in your affidavit in paragraphs 20 and 21, be the ones

2      referred to as -- where you conceded that he did not sign the

3      March 4th, which had been submitted; and, in fact, the file

4      had been materially altered?

5      A.   It wasn't altered.  We just added three songs to it.

6      Would you call it altering?

7      Q.   Well, if I sign a document to give you six songs --

8      A.   Right.

9      Q.   -- and after I signed it, you add 50 percent more

10     compositions than I originally intended to give you, by

11     adding another three, I would say it's materially altered.

12          MR. RICHARD:  I object to that.

13          THE COURT:  The objection is sustained.  It's

14     argumentative, and it assumes facts different from what he

15     testified to.  Just ask him a question.

16          MR. WILSON:  Okay.

17     BY MR. WILSON:

18     Q.   Do you consider adding three additional compositions

19     after Mr. Clinton had signed the contract transferring six as

20     materially altering a document?

21     A.   No.

22     Q.   So, when you in your affidavit -- this March 4th, 1982,

23     is not the one that was referred to in the court decision

24     that had been materially altered?

25     A.   We just added three more songs to it, with Mr. Clinton's

1    knowledge.

2    Q.  How many songs would have to be added before it became

3    materially altered?

4    A.  I don't know.  You say, "*How many songs would have to be*

5    *added before it would be considered altered?*"

6    Q.  Materially altered; in other words, if three songs --

7    A.  That were added to it.

8    Q.  -- that were added does not materially alter the

9    document, how many songs would have to be added to a six-song

10   document before you would say it was materially altered?

11   A.  I wouldn't call that altering, if we had his permission.

12   Q.  When did Mr. --

13   A.  We have additional songwriter's contracts aside from

14   this.

15   Q.  I know, but right now I'm just focusing on these two.

16   And if I remember correctly, your testimony was that both of

17   these documents were signed on March 4th, 1982, at the same

18   time, having only listed six compositions.

19   A.  Right.

20   Q.  And a few days later, you went back, after Mr. Clinton

21   had already signed this document, and added in three more

22   compositions.

23   A.  Because we did not have the titles at that particular

24   time.  They didn't know what the titles of the songs were.

25   Q.  Why was it necessary to add them to a document that was

1  already signed as opposed to creating a new document with the

2  three additional titles?

3  A.  I think we do have some additional documents with these

4  songs listed on them.

5  Q.  No, but what I'm trying to get at is, why was it

6  important to add them to this specific document?

7  A.  These particular songs were part of an album, and we kind

8  of kept it together in that grouping.

9  Q.  But you could have done that with an additional

10  assignment.

11  A.  I know.  We didn't have the titles at the time, so we

12  just added it right to it.

13  Q.  Do you know who added these song titles?

14  A.  I believe my secretary did.

15  Q.  And, in addition to adding the song titles, she also

16  added the composers, correct?  That's the names that are

17  listed to the --

18  A.  Yes, the composers would have been down there as well,

19  because we weren't sure actually who had written what at that

20  particular time.

21  Q.  But you did --

22  A.  But we do have additional songwriter's agreements to back

23  this up as well.

24  Q.  But you do admit that three song titles were added after

25  Mr. Clinton's signature on this document?

*Howard Hertz - By the Court*                              75

1    A.   Yes, with his knowledge.

2    Q.   Do you have anything in writing stating his knowledge or

3    evidencing his knowledge?

4    A.   We've got several agreements, and I'm sure that it's in

5    one of them.

6    Q.   How much money did either you or Bridgeport and -- excuse

7    me.   Bridgeport, is it solely owned by you?

8    A.   Yes, sir.

9    Q.   Okay.   So, you own a hundred percent of the stock of

10   Bridgeport?

11   A.   Yes, sir.

12   Q.   And what state is Bridgeport incorporated?

13   A.   Michigan.

14   Q.   Okay.   Did you -- how much money did either you or

15   Bridgeport Music, Inc., advance Mr. Clinton after his

16   bankruptcy was discharged in 1985?

17   A.   I don't recall, but it was a substantial amount.

18   Q.   Now, we know that a million-two was discharged in the

19   bankruptcy.

20   A.   Right.

21   Q.   And you testified that you had given him over a million

22   throughout the course of dealing, so any idea how much over

23   the million-two that had been discharged?

24   A.   Between Bridgeport and the other companies?  Several

25   hundred thousand.

76

1    Q.  *"Several"* meaning three --

2    A.  Two to three, yes.

3    Q.  Two to three?

4    A.  Yes.

5    Q.  And those, too, were advances?

6    A.  Yes.

7    Q.  Okay.  Now, I want to take you back to August 31st of

8    1977 -- I'm sorry -- '71, which is Plaintiff's Exhibit 1.

9        Do you recall having seen this document before?

10   A.  Yes, I do.

11   Q.  And is this an agreement that you entered into with

12   Mr. Clinton and Malbiz in 1971?

13   A.  Excuse me?  Yvonne Taylor was doing the administering for

14   Bridgeport at the time, and that's Yvonne Taylor's signature.

15   Q.  And she entered into this agreement on behalf of

16   Bridgeport?

17   A.  Yes, she did.

18   Q.  Did she have the authority to enter into this agreement

19   on behalf of Bridgeport?

20   A.  Yes, she did.

21   Q.  Do you recall when this agreement was expired or

22   terminated?

23   A.  I'm sorry.  Repeat that again?

24   Q.  Do you recall in what year this agreement terminated?

25   A.  Well, it would have been during the duration of the

1    agreement.  What was the original date on here?

2    Q.  '71, August 31st, 1971.

3    A.  Then it would have continued for five years, unless there

4    were some additional options on there.

5    Q.  So, as far as you recall, it went until August 30th of

6    '76; it went for the full five years?

7    A.  Yes, sir.

8    Q.  You don't recall it being terminated earlier than the

9    full five years?

10    A.  I don't recall.

11    Q.  I refer your attention to Defendants' Exhibit 18, this

12    agreement here.

13    A.  Right.

14    Q.  Now, you had testified that this document was entered

15    into on or about March 4th, 1982, in Mr. Hertz's office.

16    A.  No.  This particular one was signed -- a portion of it

17    was signed in Mr. Hertz's office, but this particular one was

18    signed at the bank.

19    Q.  Now, when you say --

20    A.  -- when the money was paid and the check was cashed at

21    the bank.

22    Q.  Okay.

23    A.  At Manufacturers Bank in Detroit.

24    Q.  Now, you said a portion of it was signed at the bank and

25    a portion of it was signed in Mr. Hertz's office?

78

1   A.   There is an addendum to this as well.

2   Q.   Okay.  Let's go to the addendum.  It starts on the next

3   page, actually.

4        The addendum was signed on March 4th in Mr. Hertz's

5   office?

6   A.   Well, it was -- it was -- the addendum, in other words --

7   in other words, this was part of the March 4th agreement.

8             MR. RICHARD:  Excuse me, Your Honor.  Could you --

9   may I ask that counsel move it up a little bit further so my

10  client can see the --

11            THE WITNESS:  The date?

12            MR. RICHARD:  -- date of signature.

13            MR. WILSON:  There is nothing below that.

14            MR. RICHARD:  There's another page.

15            THE COURT:  Well, he can show what portions he --

16            MR. WILSON:  I just want him to focus on this part.

17            THE COURT:   -- wants, and you can clear it up on

18  redirect.

19            We can only talk one at a time, or the court

20  reporter is lost.

21            MR. RICHARD:  I just want to be the one.

22  BY MR. WILSON:

23  Q.   Mr. Boladian --

24  A.   This addendum was signed in Mr. Hertz's office.

25  Q.   Do you recall when?

1    A.   Can you bring the original date back?  It's at the top of

2    the agreement.

3    Q.   Well, I'll tell you, it's also the same date that's right

4    above the signatures here.

5    A.   Right.  Well, it says, March 4th, 1982, but it was

6    actually signed in Mr. Hertz's office on another date, right,

7    but it was pertaining to this particular agreement on this

8    date.

9    Q.   Do you know what date it was signed in Mr. Hertz's

10   office?

11   A.   I believe 1983, if this is the correct one.  I would like

12   to look at the agreement to refresh my memory, if that's

13   okay.

14        THE COURT:  If you don't remember without looking at

15   the whole agreement, tell him that.  He can show you the

16   agreement or not.

17        MR. WILSON:  Okay.

18        THE WITNESS:  This was signed in Mr. Hertz's office.

19   BY MR. WILSON:

20   Q.   Okay.  What I'm trying to get at, Mr. Boladian, is

21   whether or not the date that appears above the signatures,

22   *"The parties have hereunto set their hands effective the 4th*

23   *day of March 1982,"* if that was, in fact, the date that this

24   addendum was signed?

25   A.   Yes.

80

1   Q.  Yes, it was?

2   A.  Yes.

3   Q.  Okay.  Now, I refer you to Exhibit B, and I'll show you

4   the first page so you can familiarize yourself with the

5   document.

6       This is Exhibit B to the same addendum we just went over,

7   and it's entitled, "Transfer of Copyright," and it says, "See

8   Exhibit A," which is a list of musical compositions.

9   A.  Right.

10  Q.  And I refer you to page 2 of Exhibit B.

11  A.  Right.

12  Q.  And show you a date handwritten in, 2nd day of December

13  1983.

14  A.  1983, that's correct.

15  Q.  Okay.  Was this document signed on December 2nd, 1983?

16  A.  Yes.

17  Q.  And where was it signed?

18  A.  Mr. Hertz's office.

19  Q.  Okay.  Was Exhibit B completed on March 4th, 1982?

20  A.  It was all tied in with this particular agreement as

21  well.  The 1983 and the 1982 agreement were all tied in one,

22  together.

23  Q.  Okay.  Let me rephrase my question.

24      When Mr. Clinton signed the addendum --

25  A.  Right.

1   Q.  -- on March 4th, 1982 --

2   A.  Right.

3   Q.  -- in Mr. Hertz's office --

4   A.  Right.

5   Q.  -- was this a complete document?  Was Exhibit B attached

6   to the addendum at that time?

7   A.  Yes, everything was attached together.

8   Q.  Okay.  But Mr. Clinton did not sign Exhibit B on March

9   4th, 1982.

10  A.  But it pertains to that particular date, but, like I

11  said, it was all tied in with this particular agreement.

12  Q.  I understand.

13  A.  Maybe I misunderstood you, or maybe you didn't explain it

14  correctly, but it was all tied in with this agreement, 1983.

15  Q.  I understand it all being tied in.

16  A.  Right.

17  Q.  What I'm trying to understand is the sequence of events.

18      When Mr. Clinton showed up at Mr. Hertz's office on March

19  4th, 1982, he had already signed the first part at the bank,

20  correct?

21  A.  Correct.

22  Q.  He shows up at Mr. Hertz's office on March 4th, 1982, to

23  sign the addendum?

24  A.  Right.

25  Q.  Okay.  Was Exhibit B --

82

1  A.  No.

2  Q.  -- attached to the addendum on March 4th, 1982?  Just yes

3  or no.  Was that --

4       MR. RICHARD:  Excuse me, Your Honor.  I think the

5  witness was about to correct something.  I think he should be

6  able to before we roll passed it.

7       THE COURT:  Did you --

8       THE WITNESS:  All of the agreements were tied in

9  with 1983.  Even though it had March 1982 on there, it was

10  all tied in with the 1983 agreement as well.  Everything was

11  done at the same time.

12  BY MR. WILSON:

13  Q.  I understand that, Mr. Boladian, but it's probably best

14  if you answer the questions I ask.  That way we stay on the

15  same page.

16       When Mr. Clinton showed up at Mr. Hertz's office to sign

17  the addendum on March 4th, 1982, was Exhibit B attached to

18  the addendum?

19  A.  I believe it was, yes.

20  Q.  Okay.  But on March 4th, 1982, you didn't have

21  Mr. Clinton sign Exhibit B, correct?

22  A.  Yes.  It was all done in 1983, but a portion of it, the

23  first part, was signed at the bank when the money was paid on

24  March 4th, 1982; correct.

25  Q.  Uh-huh.  That's a given.  We understand that.

83

1   A.  Okay.

2   Q.  Now, I'm talking about when Mr. Clinton showed up at

3   Mr. Hertz's office on March 4th of '82.

4   A.  Right.

5   Q.  And he signed -- you testified that he signed the

6   addendum.

7   A.  Well, he was there in 1983, but it was pertaining to the

8   1982 agreement.  It's all tied into together.

9   Q.  Maybe if I rephrase the question.

10      Was this entire document, as it appears in Defendants'

11  Exhibit 18, was it on March 4th, 1982, did it exist as this

12  entire document?

13  A.  No.  This is a portion of it.  This was -- this

14  particular one was signed at the bank.

15  Q.  The first page?

16  A.  The others were signed in Mr. Hertz's office.

17  Q.  Okay.  Let's do it this way, because I think for some

18  reason we're not connecting.

19      Now, you should have Defendants' Exhibit 18 in front of

20  you, correct?  It's on a little sticker on the first page.

21  A.  I'm sorry.  What was your question, please?

22  Q.  Do you have Defendants' Exhibit 18 in front of you?

23  A.  Yes, I do, sir.

24  Q.  Okay.  And it's a -- one, two, three, four, five, six --

25  seven-page document?

84

1    A.   Correct.

2    Q.   Now, on March 4th, 1982, did this document appear as a

3    seven-page document?

4    A.   Yes, it did, in Mr. Hertz's office.

5    Q.   Okay.  Page 1, with the six compositions listed there,

6    page 1 you said was executed at the bank?

7    A.   Yes.

8    Q.   Then on March 4th, page 3 of the documents, which is

9    actually listed -- numbered as page 2 --

10   A.   Right.

11   Q.   -- that was signed on March 4th in Mr. Hertz's office?

12   A.   No.  It was signed December 2nd, 1983, in Mr. Hertz's

13   office.

14   Q.   Well, earlier you testified that the date above the

15   signatures was the date.  Now it's not the date?

16   A.   Well, what I'm saying is, that the top page was signed at

17   the bank; however, it all relates to -- I think I tried to

18   explain that.  Maybe I was confused and didn't understand

19   what you were saying.

20        But the whole thing as you see it now is the document

21   that was in Mr. Hertz's office.

22   Q.   Okay.  And that was not signed until 1983?

23   A.   Correct.

24   Q.   So, the date on page 2, where it says, *"The parties have*

25   *hereunto set their hands effective the date --"* they didn't

85

1   actually sign this on March 4th?

2   A.  Right.

3   Q.  That's your testimony; that's what you want to state?

4   A.  Yeah.  This particular sheet is all added into December

5   2nd, 1983.

6   Q.  So, actually, the entire addendum was not signed until

7   December 2nd of 1983?

8   A.  Right.

9   Q.  And when was the addendum created?  Do you know

10  approximately what date Mr. Hertz's office created this

11  document?

12  A.  It was on December 2nd, 1983, just like it says here.

13  Q.  Okay.  So, then, it was not made and entered into as page

14  1 as the addendum states, on March 4th, 1982?

15  A.  Well, this page was taken and added to as part of the

16  1983 agreement.

17  Q.  No, no.  I'm not talking about the first page with the

18  six songs.  I'm talking about the one entitled, *"Addendum."*

19  A.  Right.

20  Q.  And you see that, *"This agreement made and entered into,"*

21  on the second line, *"the 4th day of March 1982."*

22          MR. RICHARD:  Excuse me, Your Honor.  That's not how

23  it reads.  It reads *"effective."*

24          THE COURT:  I understand.

25          MR. WILSON:  No, not on page 1, it doesn't.  You're

86

1    talking --

2            THE COURT:  Folks, look, let's just ask the witness

3    a question and go from there.

4            Mr. Boladian, if you would, move that exhibit back

5    away from that microphone.  Thank you.

6            THE WITNESS:  I'm sorry.

7    BY MR. WILSON:

8    Q.  Do you see, Mr. Boladian, what I have on the screen, it

9    says, "*Addendum*"?

10   A.  Yes.

11   Q.  Okay.  And it says in the first two lines,

12   "*Notwithstanding anything to the contrary contained within*

13   *the agreement made and entered into on March 4th, 1982.*"

14   A.  Right.

15   Q.  Okay.  Was this agreement signed on March 4th, 1982?

16   A.  It was signed on December 2nd, 1983.

17   Q.  Did this agreement even exist on March 4th, 1982, this

18   document?

19   A.  Part of it did.  The top page did.

20   Q.  Did it ever come to your attention that Malbiz Music went

21   from the status of a d/b/a of Mr. Clinton to a New York

22   corporation?

23   A.  No, it did not.

24   Q.  What was your understanding with respect to -- what was

25   your initial understanding with respect to the status of

1    Malbiz Music?

2    A.  Mr. Clinton was the owner.

3    Q.  Did you know what type of entity it was?

4    A.  No, I did not.

5    Q.  So, in '77 you didn't know if it was a d/b/a -- I mean,

6    excuse me -- '71, when you entered into that agreement, you

7    didn't know if it was a d/b/a or a corporation?

8    A.  No, I did not.

9    Q.  Did you ever inquire?

10   A.  No, I did not.

11   Q.  Any particular reason why you didn't ask whether Malbiz

12   was a corporation or a d/b/a or a partnership or some other

13   entity?

14   A.  It really never came up, and we made our checks out

15   directly to Mr. Clinton.

16   Q.  Did you ever make any checks, do you recall, payable to

17   Malbiz Music, Inc.?

18   A.  I don't recall.  I don't believe we did.

19   Q.  I want to direct your attention back to the August 31st,

20   1971 agreement, which I've put on the screen.

21       Do you see it?

22   A.  I see it, yes.

23   Q.  Okay.  In the first unnumbered paragraph, after

24   "*Gentlemen*," if you go down -- one, two, three, four -- five

25   lines, I'll mark it here, do you see the "*which*"?  It should

1    show a little mark on your screen.

2    A.   Right.

3    Q.   Okay.  It says, "*which musical compositions are initially*

4    *recorded by or on behalf of Westbound Records, Inc.*

5    *(hereinafter referred to as 'The Musical Compositions'.)*"

6    A.   Right.

7    Q.   Is it your understanding that this agreement only covered

8    those compositions which were initially recorded by or on

9    behalf of Westbound Records, Inc.?

10   A.   At that time.

11   Q.   Okay.  And what was your understanding with respect to

12   the George Clinton written compositions which were not

13   initially recorded by or on behalf of Westbound Records,

14   Inc.?  What was your understanding with respect to the

15   ownership of those compositions in 1971?

16   A.   Mr. Clinton had done some things with other companies as

17   well, you know.

18   Q.   And your understanding was that Bridgeport did not own

19   those songs, pursuant to this agreement.

20       I want to direct your attention to paragraph 8.

21       Do you recall Bridgeport Music ever rendering accountings

22   to Malbiz?

23   A.   No.

24   Q.   You don't recall?

25   A.   No.  We advanced large sums of monies to Mr. Clinton, but

1   I don't recall directly to Malbiz Music.  There could have

2   been maybe one or two checks; but for the most part it was

3   made out to Mr. Clinton.

4   Q.  No.  What I'm wondering, though, were there any

5   accountings?  Were there any royalty statements showing how

6   much you had advanced and how much you had collected?

7   A.  Not at that time, no.

8   Q.  I believe it was Mrs. Clinton that testified that they

9   approached you in 1985 requesting assistance to help save

10  their home.

11  A.  Right.

12  Q.  Do you recall them approaching you in '85 to --

13  A.  I do.

14  Q.  Okay.  Do you recall an agreement -- I guess it was a

15  verbal agreement with them, with respect to Bridgeport

16  administering Malbiz compositions until such time as you

17  recaptured the purchase price of the home plus an additional

18  hundred thousand dollars?

19  A.  There were several different conversations; and, unless I

20  saw something, could I relate to exactly what you are talking

21  about.  There were many conversations that took place.

22  Q.  I know.  But do you recall any that concerned that

23  particular topic, about you purchasing the home and recouping

24  an additional hundred thousand?  Do you recall that

25  conversation?

90

1    A.  Vaguely, vaguely.  I don't recall word-for-word.

2    Q.  In 1985, were you administering Malbiz Music?

3    A.  No.

4    Q.  Did you know who was administering Malbiz Music in 1985?

5    A.  No.

6    Q.  With respect to the December 2nd, 1983 meeting at

7    Mr. Hertz's office, where I believe you said Exhibit 18, the

8    addendum portion of that, was signed --

9    A.  Yes, sir.

10   Q.  -- were there any other documents signed at that meeting?

11   A.  At that time?

12   Q.  Yes.

13   A.  There could have been.  I'd have to see, you know, the

14   documents.

15   Q.  But without referring to them, you don't -- do you recall

16   any documents being signed on that date at Mr. Hertz's

17   office?

18   A.  I believe this was -- this was one of the main ones.

19   There may have been -- there may have been another one.

20   Q.  Just so -- because, obviously, the many agreements that

21   purported to be signed and the complexity of this, I just

22   want to make sure that I understand.

23      In August, which was Plaintiff's Number 1, in August 31st

24   of '71, there was a five-year agreement which covered George

25   Clinton compositions initially recorded by or on behalf of

1    Westbound Records, correct?

2    A.  Right.

3    Q.  Now, prior to this '71 agreement, did you have any

4    publishing arrangements or relationships or agreements with

5    either Mr. Clinton or Malbiz Music?

6    A.  Yes, we did.

7    Q.  And when and what were those relationships?

8    A.  That was I believe 1969 -- 1968, '69.

9    Q.  And that was -- what was the nature of that relationship?

10   A.  Where he -- we had a publishing arrangement with him at

11   that time, and a recording arrangement as well.

12   Q.  With respect to the publishing arrangement, what songs

13   were covered by that '68, '69 agreement?

14   A.  Offhand, I'd have to see the compositions.  I mean, it

15   goes back a number of years.  I don't recall exactly.

16   Q.  Okay.  And then -- do you remember how long that

17   agreement lasted?

18   A.  That was a few years.

19   Q.  Okay.  Was that then superseded by this '71 agreement,

20   which is Plaintiff's Number 1?

21   A.  I think that was before the '71 situation.  I think so,

22   yeah.

23   Q.  Okay.  In August 31st of '71, was this the only agreement

24   in effect, or was the prior one --

25   A.  There were additional songwriter's agreements as well.

1    Aside from this blanket agreement, there's several individual

2    songwriter's agreements that would list all of the songs.

3    Q.  Okay.  So, there were single songwriter agreements

4    dealing with specific songs prior to this on, this '71?

5    A.  Right.

6    Q.  Okay.  And, then, in 1971, you entered into this

7    agreement for a five-year period covering only those songs

8    written by Mr. Clinton and initially recorded on behalf of

9    Westbound Records?

10   A.  Yes.

11   Q.  And then after '76, let's say, let's just use a five-year

12   period specified in this agreement, after '76, was there a

13   relationship with -- a publishing relationship with either

14   Mr. Clinton or Malbiz Music?

15   A.  I think it may have continued on to '77.

16   Q.  Which did?

17   A.  1977.

18   Q.  No.  What continued on?

19   A.  I'm sorry?

20   Q.  You said, "I think it continued on until 1977."  What

21   was --

22   A.  Yeah.  We did a couple of more albums before they went on

23   to Warner Brothers.

24   Q.  Okay.  Was that agreement in writing?

25   A.  Well, whatever we had would be documented -- would be

93

1    part of this agreement over here.

2    Q.  This '71 agreement, is that the one you are holding up?

3    A.  No, no, no.  I'm talking about whatever song -- are you

4    talking about an additional agreement aside from this?

5    Q.  What I'm trying to do is establish your relationship with

6    Mr. Clinton on the publishing side chronologically.

7    A.  Right.

8    Q.  You said there were some individual songs in '68, '69.

9    A.  Right.  There may have been individual songwriter's

10   agreements and not maybe a blanket situation at that time,

11   because they were leaving and going to Warner Brothers.

12   Q.  Okay.  And then I think you said that was in '77?

13   A.  I believe it was '76, '77.  Right around in that time

14   period.

15   Q.  Okay.  And then, after '76, '77, did you have a

16   publishing relationship with Mr. Clinton or Malbiz Music?

17   A.  Mr. Clinton was over at Warner Brothers at that time.

18   Q.  Okay.  Is that "no"?

19   A.  I'm sorry?

20   Q.  Was that a "No"?

21   A.  No, no.

22   Q.  And then when was -- after that '76-'77 period, he had

23   gone to Warner Brothers.  When was the next time you had a

24   publishing relationship with Mr. Clinton or Malbiz Music?

25   A.  It was approximately 1981, when Mr. Clinton called from

1   California, and they were running into trouble; and their

2   relationship with Warner Brothers had deteriorated, and they

3   were stranded in a hotel and needed some funds to help

4   support them or to bail them out, because they were just

5   stuck there, I think.

6       And Mr. Clinton had suggested recording a group called,

7   "*The P-Funk All Stars,*" and needed some additional funds; and

8   they wanted to try to get back up on their feet, because they

9   were just kind of down and out in California, and they had

10  nowhere to turn to.

11      So, that's when things started up again, about 1981, when

12  we sent some money out there to pay the hotel bill and some

13  studio costs and expenses at Paramount Studios on Melrose.

14  Q.  That was in 1981?

15  A.  I believe it was 1981.  And then Dobley Koroff, we had

16  sent some money to some people that I was doing business with

17  to help them to cash a check, because they couldn't get a

18  check cashed out there.

19      So, I had advanced or sent money to some friends of mine

20  that I had been doing business with to help Mr. Clinton to

21  get a check cashed and pay some bills.

22  Q.  Okay.  And these monies, were they advances or loans?

23  A.  Well, they were advances at the time.  I mean, we just

24  kept sending money out, because they were in, you know, dire

25  straits out there.

1    Q.   Okay.  And then after that '81 incident, when was your

2    next publishing relationship with Mr. Clinton?

3    A.   Well, they were out there for maybe another year or so.

4    And then they worked their way back to Michigan, and then we

5    did our next, you know, on a song-by-song basis is what it

6    might have been at that time, until the March 4th situation.

7    I mean, we had been advancing large sums of money, anyway.  I

8    mean, the dollars were escalating, like.

9        And, really, these are some of the first papers, the

10   March 4th and also the December 1982 papers were -- or

11   1983 -- I'm sorry -- when we started the relationship all

12   over again.

13   Q.   Did Capital Records ever loan the million dollars?

14   A.   They studied the situation very hard and deep, and they

15   wanted my total involvement, because they had expended quite

16   a lot of money and had not gotten finished product back; and

17   looking at the amount of money that I had involved in the

18   projects, and at that time I just had to have something a

19   little more substantial to see that I would get some kind of

20   a return coming back.

21       They did not end up going through with the deal.  They

22   looked at it and studied it very closely, and felt that they

23   wouldn't be able to recoup their monies.

24   Q.   Okay.  I want to direct your attention to Defendants'

25   Exhibit 16, which is the writers agreement dated December

96

1    2nd, 1983.

2    A.  Right.

3    Q.  Okay.  And, again, I want to direct your attention to

4    paragraph 8 of the agreement.  I just want to ask you:

5        Do you recall ever rendering -- from 1983 forward, do you

6    ever remember rendering statements to Mr. Clinton pursuant to

7    paragraph 8?

8    A.  No.  The advances that we had given him were just so

9    humongous that a statement would have been a joke.

10   Q.  A joke in what way?

11   A.  A joke, because the money earned would have been far, far

12   below what had been advanced.

13   Q.  But even if that were the case, wouldn't he have been

14   entitled to a statement reflecting that?

15   A.  Yes, he would have been, but he never even asked us, and

16   we were just writing checks out.

17   Q.  I direct your attention to Plaintiff's Exhibit 2, which

18   is entitled, "*Exclusive Songwriter's Agreement,*" dated

19   March -- excuse me -- April 4th, 1985.

20   A.  Right.

21   Q.  And I'm just going to keep sliding it up a little bit,

22   give you an opportunity to look at it, and ask if you have

23   ever seen this agreement before.

24       Are you familiar with it?

25   A.  I do recall the agreement; but, if I could see the

97

1   signatures on there, I do --

2   Q.   Sure.

3   A.   I did see *"Exclusive Songwriter's Agreement"* on there.

4   Q.   Let me skip ahead.

5        Now, the copy that I was furnished in discovery didn't

6   have a signature except for the one in the attached rider.

7        Are you familiar with this one?

8   A.   Yes, I am.

9   Q.   Okay.  My question is:  If you entered into a rider

10   agreement in December 2nd of '83 --

11   A.   Right.

12   Q.   -- for Mr. Clinton that purportedly went for five years,

13   why enter into an exclusive arrangement in April, about a

14   year and a half later, in April of '85?

15   A.   These would be for additional new material.

16   Q.   Additional new material?

17   A.   New songs, yeah.

18   Q.   Okay.  Was it your understanding that the writer's

19   agreement in December 2nd, '83, for a five-year period, with

20   two one-year options, totaling seven years, didn't include

21   the songs that the April 4th, '85 agreement included?

22   A.   They may have overlapped.  Is that what you are asking me

23   or -- I'm sorry.  I don't understand.

24   Q.   I'm following up on your question.  You said that the

25   April '85, I believe, the April '85 agreement was entered

1    into to cover the songs that the December 3rd, '83 ag'

2    didn't cover.

3    A.   Well, the December 1983 songs, that was the catalog that

4    went back.

5    Q.   Okay.

6    A.   1985 would be new compositions.

7    Q.   That went back to '83?

8    A.   No, no, no.

9    Q.   Or that went forward from '85?

10   A.   Forward.

11   Q.   So, the '83 agreement covered songs that went back prior

12   to '83?

13   A.   Yes.

14   Q.   And the '85 agreement covered songs that were '85

15   forward?

16   A.   Forward, right.

17   Q.   Creating a gap between '83 and '85?

18   A.   Unless we had some individual songwriter's agreements on

19   individual songs and not necessarily a blanket agreement at

20   that time.

21   Q.   Okay.  But with respect to just these two agreements, it

22   would have created a gap between December of '83 and April of

23   '85?

24   A.   Right.  Except like I said, for individual songs that

25   were -- where there would be individual agreements.

99

1    Q.  All right.

2         MR. WILSON:  I have no further questions at this

3    time, Your Honor.

4         THE COURT:  Redirect?

5         MR. RICHARD:  Yes, Your Honor, for clarification.

6                    REDIRECT EXAMINATION

7    BY MR. RICHARD:

8    Q.  Mr. Boladian, with respect to Defendants' Exhibit 18, the

9    document you have in front of you --

10   A.  Right.

11   Q.  -- as I understand your testimony, the first page was

12   the document that was signed in 1982 at the bank; is that

13   correct?

14   A.  Yes.

15   Q.  And you saw Mr. Clinton sign that at the bank?

16   A.  Yes, sir.

17   Q.  The remainder of that document, did I correctly

18   understand you to have testified was not signed until

19   December of 1983?

20   A.  But it would be retroactive.

21   Q.  Well, I'm not interested in the relationship.  All I'm

22   asking you about is the date the signatures were appended.

23   A.  Yes, sir.

24   Q.  So, all of the rest of it was not signed until 1983?

25   A.  Right.

100

1   Q.  And that was done in Mr. Hertz's office?

2   A.  Yes, it was.

3   Q.  And you witnessed Mr. Clinton -- or did you witness

4   Mr. Clinton sign that addendum in 1983 as well?

5   A.  I did, yes.

6   Q.  And at the time that you and Mr. Clinton signed the

7   addendum in Mr. Hertz's office in December of 1983, was that

8   entire document that you now have before you stapled together

9   as it is now?

10  A.  Yes.

11  Q.  Was anything in that document changed after that

12  signature in 1983?

13  A.  No.

14  Q.  So, as you hold it before you now, and it has been

15  introduced into evidence, is exactly the same as it was when

16  it was signed in 1983?

17  A.  Yes.

18          MR. RICHARD:  No further questions.

19          THE COURT:  All right.  Mr. Boladian, you may step

20  down.

21          Mr. Richard, please call your next witness.

22          MR. RICHARD:  Howard Hertz.

23          I have, by the way, Your Honor, two more

24  witnesses -- Mr. Hertz and the handwriting expert.

25          THE COURT:  We'll take a lunch break.  We will

Howard Hertz
Testimony

101

1    probably do that in about 40 more minutes, or whenever it's

2    the most convenient break time.

3              Mr. Hertz, right up here, please, sir.

4              DEPUTY CLERK:  Please raise your right hand.

5         *HOWARD HERTZ, DEFENSE WITNESS, DULY SWORN*

6              DEPUTY CLERK:  Be seated.

7              Please, state your full name and spell your last

8    name for the record.

9              THE WITNESS:  Howard Hertz, H-E-R-T-Z.

10                      DIRECT EXAMINATION

11   BY MR. RICHARD:

12   Q.  Mr. Hertz, what is your occupation?

13   A.  I'm an attorney.

14   Q.  Where are you licensed to practice?

15   A.  In the state of Michigan, and in the federal courts in

16   Michigan.

17   Q.  How long have you been licensed?

18   A.  For 25 years.

19   Q.  What's the nature of your practice?

20   A.  Primarily entertainment law.  Probably 80 percent of my

21   time is in entertainment law.

22   Q.  Has there been a time when you represented Armen Boladian

23   or his company Bridgeport Music?

24   A.  Yes.

25   Q.  Over what period of time did you represent them?

102

1    A.   I believe it started at the end of 1982, but probably

2    around August of '83 is when I really started doing a

3    considerable amount of work; and that went through 1988.   And

4    then I believe there was one transaction that my firm did in

5    1990.   I wasn't involved directly, but one of my partners

6    was, in terms of closing on the real estate that was referred

7    to earlier.

8    Q.   Did you represent Mr. Boladian and Bridgeport in

9    connection with an agreement with George Clinton that was

10   entered into in 1982 and 1983?

11   A.   Several agreements.

12   Q.   You have been in the courtroom and heard the testimony up

13   to now?

14   A.   Yes.

15   Q.   I'm referring to the agreement that testimony indicated

16   was memorialized by Document 18 in 1982 and then later in

17   December of 1983.

18       Were you involved with those documents?

19   A.   I was not involved in the March 1982 portion of it.   When

20   I got involved in 1983, the March 1982 portion was brought to

21   me as something that had already been accomplished, and I was

22   expanding on that agreement.

23   Q.   I'm showing you Defendants' Exhibit 18.   Is that the

24   document that you had before you, the front page of that,

25   that you are now referring to, that had already been

103

1    completed in 1982?

2    A.   Yes; that's correct.

3    Q.   Did you draft the remainder of the document?

4    A.   Yes, I did.

5    Q.   When did you draft it, what year?

6    A.   In December of 1983.

7    Q.   That's everything other than the first page?

8    A.   Correct.

9    Q.   That document purports to have the signatures of Armen

10   Boladian and George Clinton on it.  Was it signed in your

11   presence?

12   A.   Yes.

13   Q.   Where was that?

14   A.   It was in my office at the time, which was in Birmingham,

15   Michigan.

16   Q.   And at the time that it was signed, was it appended

17   together just as it is, as you now hold it?

18   A.   Well, it was stapled together that day.  I'm not sure.

19   Q.   Well, that's what I mean.  The entire document was

20   stapled together at that meeting?

21   A.   And put together, yes.

22   Q.   And did you actually witness the signatures by

23   Mr. Boladian and Mr. Clinton?

24   A.   Yes, I did.

25   Q.   Was it your understanding at that time that Mr. Clinton

104

1  was signing individually and on behalf of Malbiz Music?

2  A.  Yes.

3       MR. RICHARD:  No further questions, Your Honor.

4       THE COURT:  Cross-examine?

5       MR. WILSON:  Yes, Your Honor.

6                    CROSS-EXAMINATION

7  BY MR. WILSON:

8  Q.  Mr. Hertz, did you ever represent George Clinton or any

9  of his affiliated companies?

10 A.  Yes, I did.

11 Q.  And what time period did you represent Mr. Clinton?

12 A.  The first time I believe that I represented Mr. Clinton

13 was in 1984.  His manager, Nene Montes, asked me to represent

14 him with respect to a tax lien where he had failed to pay

15 income taxes, and there was a problem with the Internal

16 Revenue Service.  This was just before his bankruptcy, and I

17 started dealing with the Internal Revenue Service on his

18 behalf.

19 Q.  Was that just a one-time incident, or did you represent

20 him for anything after that?

21 A.  The next time that I represented him, I want to say it

22 was in 1986 or 1987.  He had some kind of trouble with a boat

23 that he had taken in for repair and wasn't able to pay for

24 it.  I think the people were threatening to sell the boat, or

25 something like that, and I had one or two phone conversations

105

1    with the boat company.

2        And then in 1987 or 1988, he had been offered a recording

3    contract with Prince's record label called "Paisley Park,"

4    and his then current managers and Mr. Clinton asked me to

5    represent him with respect to that recording contract.

6    Q.  Was there ever a period of time in which you represented

7    both Mr. Clinton and Mr. Boladian?

8    A.  Not with respect to the same subject matter, no.  In

9    other words, for example, with the Prince agreement, because

10   of the earlier agreements with Mr. Boladian, Mr. Boladian

11   would have been entitled to some kind of income stream from

12   the Prince agreements.  So, while I was hired to represent

13   Mr. Clinton to negotiate the Prince agreement, Mr. Clinton

14   had separate counsel who represented him with respect to the

15   relationships between him and Mr. Boladian.

16   Q.  Do you recall who that separate counsel was?

17   A.  Yes.  Andy Monroe.

18   Q.  But initially you began representing Mr. Clinton, I

19   believe you said, in '84 regarding a tax lien?

20   A.  Correct.

21   Q.  And also in 1984 you were representing Armen Boladian on

22   other matters?

23   A.  Totally separate matters, yes.

24   Q.  Now, you testified that, with the exception of the top

25   page, which is a page -- on Defendants' Exhibit 18, which is

1   a page with those six compositions, that you prepared and

2   witnessed the execution of the balance, which is the

3   addendum?

4   A.  Yes.

5   Q.  And was -- when you witnessed the execution, was the

6   agreement, as it appears in Defendants' Exhibit 18, the

7   entire agreement?  In other words, was the top page which you

8   didn't prepare already stapled to the addendum that you did

9   prepare?

10  A.  When it was originally signed on December 2nd, the list

11  of songs had not yet been typed.  We were all meeting

12  together --

13  Q.  I'm sorry.  The list of songs referred to on Exhibit A?

14  A.  Right.  My recollection, it hadn't physically been typed

15  when we were first signing agreements.

16      Then I believe Stephanie brought a handwritten list to my

17  office that day with all of these songs on it.  It was then

18  typed, and then we stapled it together the way you see it.

19  Q.  Okay.  I want to direct your attention to Exhibit B,

20  which is a transfer of copyright.

21  A.  Yes.

22  Q.  And you see in the portion there it says, "See Exhibit

23  A."  When you created Exhibit B, was that "See Exhibit A" in

24  there?

25  A.  It was put in there at the same time.

1    Q.   When you created the document or --

2    A.   No.

3    Q.   Okay.  When was --

4    A.   What happened was, if you read the addendum, the addendum

5    reads as if Exhibit B will be something that the owner will

6    sign in the future.  It says, *"At such time as requested,*

7    *owner shall execute a short-form assignment from owner to*

8    *publisher with respect to all compositions covered...in the*

9    *form attached hereto as Exhibit B."*

10        Well, when George was signing the agreements, they were

11   stapled together.  He saw his name there on page 2, signed

12   it; saw it again on the transferred copyright, and signed it.

13        And once we saw he had already signed it, we decided it

14   was best to complete the document while we were sitting

15   there.

16        So, that's why it was still on that same day that we then

17   added in *"See Exhibit A,"* and Stephanie brought the list of

18   the songs, and we actually attached the list.

19   Q.   So, on December 3rd, 1983, Exhibit A, a listing of the

20   compositions, didn't exist?

21   A.   Yes, it did, but it was some time during that day.

22   Q.   No.  You confused me here.  I thought you said that

23   Stephanie later brought a list in.

24   A.   Maybe a half hour, an hour later.  This was -- a series

25   of transactions were going on at this time involving the

1    recording studio --

2         THE COURT:  We need everybody in the courtroom to

3    sit quietly and not be disruptive to the witness.

4         I'm sorry I interrupted.  Go ahead.

5         THE WITNESS:  There was a series of transactions

6    going on.  Nene Montes, who is George Clinton's lawyer, was

7    there.  This took place over -- I'm going to estimate, and

8    I'd have to look; I do have time records.  I believe it was a

9    six or eight-hour period on that particular day that

10   transactions and documents were being created and modified

11   and meetings were taking place.

12        So, it's my recollection that it was, you know,

13   within a very short period of time, but on that same day,

14   that Stephanie brought over the list that I believe she had

15   handwritten of all of the compositions, and then it was typed

16   in and stapled together for everyone.

17   BY MR. WILSON:

18   Q.  Okay.  Given what you just said, when Mr. Clinton signed

19   the addendum, had Exhibit A already been typed and stapled

20   in, or was it added after he allegedly signed the Exhibit B?

21   A.  It was added after, but on the same day.

22   Q.  Okay.  But after he had signed Exhibit B?  In other

23   words --

24   A.  Right, yes.

25   Q.  Okay.  So, he would not have had the opportunity -- when

1   he signed this agreement and the Exhibit B, he wouldn't have

2   had any opportunity at that moment to review Exhibit A,

3   because it was added in -- typed up and added in afterwards?

4   A.  Correct.  He couldn't have physically seen it, but we

5   knew what the songs were.

6   Q.  Okay.  And I think you testified -- correct me if I'm

7   wrong -- that the portion on the first page of Exhibit B

8   where it says, "*See Exhibit A,*" that was typed in after he

9   had signed it, when you received the list from Stephanie?

10  A.  That's my recollection.

11  Q.  Did you ever have any conversations with Mr. Clinton

12  regarding the 1983 -- 1983, December 2nd, 1983 contract,

13  during your representation of Mr. Clinton?

14  A.  I'm not sure that I understand the question.

15  Q.  Okay.  Let me rephrase it.

16      You've testified you didn't represent both of them on the

17  same transaction.

18  A.  Right.

19  Q.  But when you represented Mr. Clinton in the Paisley Park

20  deal with Prince, that this agreement with Boladian had

21  already been entered into some time prior?

22  A.  Right.

23  Q.  Okay.  During the Prince negotiations and you're advising

24  Mr. Clinton, did you ever discuss with him the '83 agreements

25  that he had with Mr. Boladian?

110

1    A.   Not that I recall.

2    Q.   Did they at all impact the negotiations with Paisley

3    Park?

4    A.   I think it was the '85 agreements that would have

5    impacted the negotiations with Paisley Park, not the '83

6    agreements.

7    Q.   Okay.  And that is Plaintiff's Exhibit 2.  Is this what

8    you are referring to, the "Exclusive Songwriter's Agreement,"

9    dated April 4, 1985?

10   A.   Well, that was one of several agreements entered into on

11   that date; yes.

12   Q.   There were more agreements entered into on April 4th,

13   1985?

14   A.   Correct.

15   Q.   Do you recall what those agreements were?

16   A.   I believe so.

17   Q.   What were they?

18   A.   There was an exclusive executive producer's agreement

19   entered into; there were security agreements entered into;

20   and it was at this same time that there was also a lease for

21   the farm that was entered into between George and Armen

22   Boladian, or one of his entities.

23   Q.   And did you prepare this Plaintiff's Exhibit 2, this

24   "Exclusive Songwriter's Agreement"?

25   A.   Yes.

Ruth Holmes
Testimony

1    Q.  And were you witness -- do you recall the execution of

2    this agreement?

3    A.  Yes.

4    Q.  Were you present at the execution of this agreement?

5    A.  Yes.

6    Q.  Did you ever represent Malbiz Music, Inc.?

7    A.  I don't believe so.

8         MR. WILSON:  I have no further questions at this

9    time, Your Honor.

10         THE COURT:  Redirect?

11         MR. RICHARD:  No questions.

12         THE COURT:  All right.  Mr. Hertz, you may step

13    down.

14         Mr. Richard, please call your next witness.

15         MR. RICHARD:  Ruth Holmes.

16         DEPUTY CLERK:  Please raise your right hand.

17         *RUTH HOLMES, DEFENSE WITNESS, DULY SWORN*

18         DEPUTY CLERK:  Be seated.

19         Please, state your full name and spell your last

20    name for the record.

21         THE WITNESS:  My name is Ruth Holmes, H-O-L-M-E-S.

22                   DIRECT EXAMINATION

23    BY MR. RICHARD:

24    Q.  Ms. Holmes, please state your occupation?

25    A.  I'm a handwriting and document examiner located in

112

1    Bloomfield Hills, Michigan.

2    Q.  How long have you been engaged in that occupation?

3    A.  Since 1983.

4    Q.  Do you have any certifications with respect to that

5    specialty?

6    A.  Yes.  I'm Board-certified by the American Board of

7    Forensic Examiners.  I'm certified by the National

8    Association of Document Examiners.  I'm also a professional

9    member of the National Bureau of Document Examiners.

10    Q.  Approximately, how many different times have you been

11    engaged to do a handwriting analysis with respect to legal

12    proceedings?

13    A.  I have worked for over 550 clients and attorneys in the

14    Greater Detroit area.

15    Q.  Have you ever had occasion to engage in handwriting

16    analysis on behalf of any governmental agencies?

17    A.  I work frequently for the Oakland County prosecutor in

18    Oakland County, Michigan.  I've done some work for the FBI

19    and for the Health and Human Services.

20        MR. RICHARD:  Your Honor, if counsel has no

21    objection, rather than go into further detail, I would just

22    like to introduce as an exhibit the resume of Dr. Holmes or

23    Ms. Holmes.

24        MR. WILSON:  No objection.

25        THE COURT:  And the exhibit number is what?

1        MR. RICHARD:  152.

2        THE COURT:  Defendants' Exhibit 152 is admitted

3   without objection.

4    (DEFENDANTS' EXHIBIT NO. 152:  Received in evidence.)

5        MR. RICHARD:  Given that it is Number 152, Your

6   Honor, I'm sure, will be pleased to know that we have no

7   additional exhibits to introduce, with one exception.

8        I'm going to be asking Ms. Holmes about documents

9   which she has appended to a booklet for purposes of

10  illustration for ease of analysis, and I would like -- we

11  have submitted a copy to counsel.  I would like to

12  introduce -- this is the one additional one -- into evidence

13  166, and ask that it be presented to Your Honor, so you can

14  follow it.

15       THE COURT:  Any objection to Defendants' 166?

16       MR. WILSON:  Provided it's the exact same as the one

17  I have, Your Honor, I have no objections.  I haven't had an

18  opportunity to review that one.

19       THE COURT:  All right.  At the break, you will be

20  able to compare yours to this; and, if there is any

21  difference that affects your lack of objection, raise it with

22  me after the break.

23       Subject to any such change, Defendants' Exhibit 166

24  is admitted into evidence.

25    (DEFENDANTS' EXHIBIT NO. 166:  Received in evidence.)

114

1          MR. RICHARD:  Now, just for logistical purposes,
2    Your Honor, let me note to Mr. Holmes that, if you want any
3    of these documents to appear on the screen, they are going to
4    have to be shown back here.
5          Your Honor, is there any objection if the witness
6    steps back there at the time, so she can utilize the
7    overhead?
8          THE COURT:  She may.
9    BY MR. RICHARD:
10   Q.  So, at any time you are ready to do that, just step back
11   to the overhead projector --
12   A.  Thank you.
13   Q.  -- and you can do it from there.
14        You were engaged, were you not, in this case for the
15   purpose of analyzing certain signatures?
16   A.  I was asked to examine a number of documents.
17   Q.  And those documents included signatures that purported to
18   be those of George Clinton?
19   A.  That's correct.
20   Q.  Would you explain to the Court what the methodology was
21   that you used to perform the analysis?  I'm not asking you
22   for the specifics at this point, but just for a description
23   of what the steps were that you took.
24   A.  The steps that is required to examine a document is to
25   obtain documents which are recognized as known documents that

1    have been presented as having been signed by the person whose

2    signature you will henceforth examine.

3        And then I was presented with eleven additional

4    signatures and asked, based on the documents that I had

5    reviewed as known documents, whether it was possible to

6    determine that the person who wrote the known documents also

7    wrote the questioned documents.

8    Q.  For purposes of today's testimony, I'm going to ask you

9    to limit your testimony to those specific documents that I

10   discussed with you last evening --

11   A.  Right.

12   Q.  -- rather than the full eleven documents.

13       MR. RICHARD:  I note, Your Honor, there are more

14   documents included in this booklet then she will actually

15   testify to.

16   BY MR. RICHARD:

17   Q.  Ms. Holmes, would you tell the Court, and you can

18   describe them in this booklet while you're doing so, which

19   documents you utilized as the known documents?

20   A.  The known documents that I knew -- that I used were

21   documents which were also used as known comparative documents

22   in a case that I testified in 1996, and I -- they were the

23   same standards having been presented to me as having been

24   written by Mr. Clinton; and it was on that basis that I

25   proceeded to compare the other documents to that.

1    Q.   These were documents that were actually introduced into

2    evidence in that prior case?

3    A.   They were.

4    Q.   To your knowledge, those documents, the authenticity of

5    those documents were acknowledged by Mr. Clinton?

6    A.   Yes.

7    Q.   So, those were your known documents?

8    A.   Those are my known documents.

9    Q.   Would you point out to the Court which documents those

10   are in the booklet that you are utilizing?

11   A.   Yes.  Your Honor, you probably have a list of an index of

12   known documents.  This is the list of the known documents.

13   Q.   I think there's a tab in the booklet that says. "*Known*

14   *Documents*"; is that correct?

15   A.   Yes, there should be a list of known documents.  And

16   there would also be a composite of the known documents as

17   listed here.

18   Q.   It might be easier if -- maybe now would be a good time

19   to step to the overhead, and then you can project them.

20   A.   If you would like me to do that, I will.

21   Q.   With the Court's permission.

22        MR. RICHARD:  Your Honor, with your permission, I

23   will question her from back here, so --

24        THE COURT:  You may.  In fact, if you can do it

25   easily, if you go around to maybe stand at that table, so

117

1    that you put a little distance between yourself and the

2    witness, it normally works better.

3          MR. RICHARD:  Okay.

4          THE WITNESS:  This is the list of the known

5    documents that I used in the case in Antrim, Michigan, in

6    September of 1996; and this corresponds to the documents

7    that's labeled here.

8    BY MR. RICHARD:

9    Q.  Okay.  You can zoom into that.

10   A.  Okay.  I don't need to zoom in quite yet.

11        But you'll see that this is the front of the check,

12   Numbered K-1, K-2 and K-3; and on the reverse side of the

13   checks, since you can't look at both copies at the same time,

14   you will see the corresponding endorsement signatures, K-1,

15   K-2 and K-3.

16   Q.  So, those are your known documents?

17   A.  Those are my known documents.  And I have the same thing

18   here for Exhibit K-4, K-5, K-6; and the corresponding

19   documents endorsement signatures, K-4, K-5, K-6.

20   Q.  Now, would you illustrate for the Court, the questioned

21   documents that you reviewed and that I asked you last evening

22   to limit your testimony to?

23   A.  Okay.  Is that a sufficient number of -- description of

24   the known documents?

25   Q.  Unless His Honor has some questions, that's sufficient.

1   He'll let you know if he has questions.  He won't hesitate.

2   A.  Okay.

3       The first thing you do when you begin a document case is

4   you familiarize yourself very well with the known documents.

5   Q.  Before you do that, I would like you just to explain to

6   the Court which documents it was that you are referring to as

7   the questioned documents.

8   A.  Okay.  In composite form or is that --

9   Q.  That would be fine.  I just want it identified.

10  A.  All right.  Okay.

11      In green you can see marked here the six questioned --

12  excuse me -- the six known documents; and in question are now

13  nine other documents appearing on this page; and they were

14  put in this composite form in order to bring them to the same

15  line of vision.

16  Q.  All right.

17          MR. RICHARD:  Just to simplify things, Your Honor,

18  the questioned documents that we are concerned with are

19  Defendants' Exhibits 14, 16, 17 and 18, that have already

20  been introduced.

21  BY MR. RICHARD:

22  Q.  And you were here for the testimony so far today; is that

23  correct?

24  A.  Yes.

25  Q.  And did you learn that one of the documents that you had

1    listed as a questioned document was acknowledged in the

2    courtroom today by Mr. Clinton?

3    A.  Yes, I was.

4    Q.  So, you would then consider that a known document?

5    A.  I could consider that, if it has been accepted in the

6    court, that the example QD-4A has been acknowledged as a

7    signed -- as having been signed by Mr. Clinton.

8            MR. RICHARD:  Which, Your Honor, is the first page

9    of Exhibit 18.

10           THE WITNESS:  So that would move to the known

11   category.

12   BY MR. RICHARD:

13   Q.  All right.  Now, Ms. Holmes, if you would, just explain

14   to the Judge precisely what you did, illustrating how it was

15   that you reached an opinion with respect to whether or not

16   the signatures on these various documents are accurate.  And

17   I would ask you, in so doing, to limit your analysis to

18   Defendants' Exhibit 18.

19   A.  To Defendants' Exhibit 18?

20   Q.  Which is your Questioned Document 4A, B, C, D.

21   A.  Okay.  In order to make a comparison of a document, one

22   becomes familiar with what is known as a particular signature

23   style, and I would just like to point out in this composite

24   of the known endorsement signatures a few of the things which

25   we would be looking for in the other documents.

1    In this case, for instance, we have a very wide range of

2  variations.  For instance, in the different types of tops of

3  the documents, this has an angle at the top.  This has a

4  squeezed angle at the top.  This has a loop coming in here,

5  and this one has another angle.

6    So, the process of examination that -- I will move to a

7  closer example.

8    How do we move this in and out, if you could explain?

9  Q.  It says --

10    THE COURT:  I need you to keep your voice up, even

11  when you're talking to Mr. Richard.

12    THE WITNESS:  Excuse me, Your Honor.  Yes.

13    MR. RICHARD:  Would it help if we move the

14  microphone back?

15    THE COURT:  As long as you don't get papers back on

16  it, then it becomes worse rather than better.

17    THE WITNESS:  I'm sorry, Your Honor.

18    So, there are certain things we look for when we did

19  a handwriting comparison.  We look at the entry strokes.  We

20  look at the direction of the strokes.  You take the type of

21  angle that it may create.  What happens in the connections in

22  here, we look at where he was trying to form an "R."  We look

23  at something that becomes a rather very smooth figure-8

24  figure.  In this example, we see an initial hook followed by

25  a lifted "L."  You'll notice that this creates almost a

1    chair-like connection in here.  You will also notice that

2    there is a very tiny little attempt to put an "N" in here.

3              In this known document we have a circle "I" dot, and

4    in this case we have almost what looks like a teepee in here,

5    and, again, this movement that we find in here ending up in

6    the second -- the movement to the right.

7              In the second known signature, again, sometimes we

8    start with an initial hook; but, again, a flat-sided oval;

9    the oval ending up in a point, a loop that connects with

10   great fluidity in here, actually a "Y" that is created here,

11   even though that should have been an O-R-G.  And if you'll

12   notice, the second hump of the letter, the "E," is usually

13   taller; that is, the loop on the "E" is taller than the

14   preceding letter.

15             The final, once again, the initial inside hook.

16   Sometimes it has been more closed and sometimes it's more

17   opened.  The "L" that precedes, which is taller than the "C",

18   again, moving into the "I," we find sometimes this letter in

19   here, it's a little bit of almost a dent in here, but it's a

20   piece of an "N" or an attempt to look like an "N", and then

21   it proceeds on up with a small "E."

22             So, it is that type of detail that we look to when

23   we are actually comparing the documents.

24             So, in taking the document that is in question right

25   now, which is -- 4A has just been admitted to as a known

1    signature; that Mr. Clinton signed the signature, but it did

2    have all of the characteristics of his known writing.

3           Moving over to Document 4B, again, this is a

4    document that is in question.  Again, we find a variation in

5    the loop, the loop size.  We find this very fluid connection

6    in here.  We find the lift.  Sometimes you find a slight bend

7    coming down into this document, a very fluid movement into a

8    large "E", which is larger than the preceding "O" or the "G",

9    which is totally illegible here.

10          We see an initial hook.  We find the "L" taller than

11   the "C".  We find what I refer to as a bit of a chair; and

12   then we find, again, this little blip in here, which is the

13   "N".  We find the looped "T", and then we find a variety of

14   endings.

15          That one, I compared it to the rest of the

16   signatures, which were presented as known, I felt it was

17   sufficient evidence or a number of similarities to identify

18   that with the variety of Mr. Clinton's writing.  If you're

19   looking for the larger loop in here, you find this in these

20   documents here.  You also find the loop here in Questioned

21   Document 2.  So, that I found all of the similarities at some

22   point in time within the known, and I found it in this

23   addendum, which was marked by my QD-4B.

24          The other two pages of this agreement, which I have

25   marked QD-4C and D, we can bring in this point in time.

1    Again, we find the entry stroke which is sometimes a curve

2    and sometimes less of a curve.  We find great movement in

3    here.  We find the "E" larger than the next letter.  We also

4    find almost the zigzag.

5         Now, this zigzag is also seen in K-3.  If you see,

6    again, it's all falls within this normal range of variation

7    of Mr. Clinton; and, as you come back up into here, looking

8    at the large "E" at the end, which is larger than the letters

9    which precede it, you find the hook.  Sometimes it's closed.

10   Sometimes it's more opened.  We find the lifted "L", creating

11   this seat.  We find the hesitation in here.  That's why this

12   is flattened at the bottom, and then we find a looped "T".

13   But you will find that there aren't continued letters in

14   here, but they are still in the writing pattern of this

15   individual.

16        In 4D, again, you find the entry stroke.  Again, the

17   oval that is flattened on one side.  We don't know what

18   happened in here, whether there was something on the table,

19   the pen might have hit something, but there was a pen lift

20   down in here.  And, again, we find almost a scribbling in

21   this letter, the "G" and the very fluid loop.  We find a

22   smaller "C", but still within normal variation.  The lifted

23   "L", and then we find what I have referred to as the chair,

24   the space for the "N", and then the looped "L" in here.

25        That section of 4D, which had the confusion, we also

1    see this same type of fluid confusion down in here, with the

2    extra looping in the letters.

3         We find the O's that are different, but we still

4    find very frequently this, what I'm referring to as, a seat

5    and the hesitation where an "N" would be inserted.

6         And it was looking at these documents, the known and

7    the questioned, that I arrived at my opinion.

8    BY MR. RICHARD:

9    Q.   And you did arrive at an opinion?

10   A.   Yes.  Based on the documents that were presented to me at

11   this time and in September of 1996, my opinion was that the

12   person who wrote the known documents was the same person who

13   wrote the questioned documents.

14   Q.   Now, based upon your experience and your education, I

15   assume that there is a range of confidence that you are able

16   to develop in the course of analyzing the signature in one

17   case as opposed to another case.  Would that be fair?

18   A.   Right.

19   Q.   Would you explain to the Court the degree of confidence

20   that you are able to arrive at, with respect to your opinion,

21   considering what you've learned in this analysis?

22   A.   Yes.  If you consider that 50 percent -- that there

23   are -- 50/50 is a chance, but with the extent of the

24   examination of these known documents, I wrote in my letter of

25   opinion that there was a very high degree of probability,

125

1    which means that it would be above 85 to 95 percent.

2        So, in my expert opinion, it is -- the same person wrote

3    these documents.

4    Q.  Now, also, based upon your experience and education, how

5    difficult would it be for a person to forge this signature?

6    A.  It would be a very difficult signature to forge, in my

7    opinion.

8    Q.  I'm specifically calling your attention to the last

9    signature that purports to be George Clinton's on the final

10   page of your Questioned Document 4, which is Exhibit 18,

11   dated December 2nd, 1983, and let me ask you whether your

12   opinion with respect to those various signatures applies in

13   particular to that signature on that document.

14   A.  Yes, it does.  If I could lay these two together, there

15   are variables that come in.  You don't know how fast a

16   document was written, whether a person might have been

17   standing or sitting, or something like that.  But the

18   consistencies in looking at this signature, which is I guess

19   Exhibit Number 18, those which are very strong in its

20   consideration are the proportions, the raised "E", the "C",

21   and, again, I point out the "L" that is taller than the

22   preceding "C", that element of the writing which creates what

23   I'm referring to as a chair; the space for the "N", and then

24   moving up.

25       So, we find this also in the signature beneath it,

1    because we can show you examples.  When there are the curled

2    E's, we can find that in his other examples.  But I think

3    specifically, it's the proportion and the fluidity with which

4    this was written.  There were no interruptions in the stroke,

5    except what I explained earlier where the pen may have hit

6    something, but I believe that this same fluid movement in

7    here, in my opinion, is similar to that which was presented

8    as the known documents.

9            MR. RICHARD:  No further questions.

10           THE COURT:  Cross-examine?

11           MR. WILSON:  Yes, Your Honor.

12                         CROSS-EXAMINATION

13   BY MR. WILSON:

14   Q.   I guess you can remain there.

15        Ms. Holmes, with respect to the -- what you refer to as

16   the known signatures --

17   A.   Yes.

18   Q.   -- did you personally witness Mr. George Clinton signing

19   any of those known signatures?

20   A.   No, I did not.

21   Q.   And, if I recall, what you can testify to is that the

22   same person, whoever that may have been, who created the

23   known signatures, also created the questionable signatures?

24   A.   That is my opinion.

25   Q.   Okay.  But if someone, other than George Clinton, created

127

1   the known signatures and also created the questionable

2   signatures, you could only say that they were one and the

3   same person, but you cannot say that it was George Clinton

4   that created the signatures, correct?

5   A.   Yes.  I trust the attorneys that I work for.  When

6   something is presented to me as a known document, I work on

7   that basis.  If something should change, then I reserve the

8   right to review the document.

9   Q.   Okay.  In your review of the documents, did you review

10  the documents with respect to any alteration that may have

11  occurred in the document itself, or did you simply focus on

12  the signatures?

13  A.   I only looked at the signatures.

14  Q.   Okay.  In your analysis, would you have been able to

15  determine if a signature had been scanned or lifted from a

16  document that George Clinton actually signed and put onto

17  another document using a computer?

18  A.   I don't know what document you're referring to that I

19  reviewed.

20  Q.   No.  I'm just asking, could you, in your analysis, would

21  that have shown up?

22  A.   Would you repeat the question, please?

23  Q.   Okay.

24  A.   You're asking me to speak about something I haven't seen,

25  so --

128

1  Q.  No.  I'm just asking -- yeah, about your analysis, not

2  that you may have seen this or may not have seen it.

3       But in determining whether or not a questionable

4  signature is the same as a known signature, would your

5  analysis have taken into consideration the technology that

6  exists that would have allowed someone to scan a signature

7  and place it on a document that they didn't sign, yet it was

8  their signature, because it had been computer-generated onto

9  another document?

10  A.  For a person to do that, I think that you might be

11  referring to what we were calling questioned document -- what

12  I'm calling 4A?

13  Q.  Actually, I wasn't referring to a specific document.  I'm

14  just wondering if your examination -- let me back up.

15       You had said earlier that your examination did not extend

16  to whether a document itself had been altered.  You just

17  focused on the signature.

18  A.  I was concentrating on the signatures; yes, sir.

19  Q.  Okay.  So, what I was wondering is, when you concentrate

20  just on the signatures and their similarity, if one signature

21  had been scanned and placed on another document, since you

22  didn't check to see any alteration of the document, would a

23  scanned signature that was the same as the known signature in

24  your analysis show up to be the same as the known signature?

25  A.  If it was taken from the same source.

1  Q.  Okay.  And your analysis, though, since you didn't check

2  for alterations in the document, you really didn't look to

3  see if it was possible that a signature was scanned onto a

4  document that had not actually been signed?

5  A.  The document that was presented as Questioned Document 4,

6  and now has been admitted as a signed document, was not ever

7  presented to me, if that answers your question.

8  Q.  No.  Again, I'm not talking about a specific document as

9  I am referring to your technique of examination.

10     In your examination, there were certain things you look

11  for and certain things you didn't look for?

12  A.  Yes.

13  Q.  I want to know, does the scanning of a signature from one

14  document and placing it on another document, was that part of

15  what you looked for?

16  A.  No, it was not.

17  Q.  Okay.  All right.  So, basically, your expert opinion is

18  limited to known signatures that you were told George Clinton

19  signed, but you didn't see George Clinton sign, were similar

20  to questionable signatures that you wanted to know whether or

21  not were George Clinton -- you were asked whether or not were

22  George Clinton's signatures?

23  A.  That's correct.

24  Q.  Okay.  But you did not check to see if documents,

25  themselves, had been altered?

1    A.  I saw no alterations on the documents that I saw.

2    Q.  All right.  Another question:  You had testified by going

3    through the known samples that there was a wide spectrum or a

4    wide range --

5    A.  Yes.

6    Q.  -- of the way Mr. Clinton signed his name --

7    A.  Yes.

8    Q.  -- in various instances.

9        How does that compare to -- I hate to use the phrase

10    *normal,* that would indicate that he's not normal, but -- in

11    your experience, how does this spectrum compare to that of

12    other examinations you've done?

13    A.  You will find that over, the course of years, you'll find

14    a great deal of differences and similarities according to the

15    person who is writing it.

16    Q.  But if these documents were, in fact -- the questionable

17    documents were all signed, let's say, on the same day, would

18    you still experience -- you know, same day, around the same

19    time, or within hours of each other -- would you still

20    experience such a wide spectrum of differences?

21    A.  Oh, it's very possible to have a wide range of variation

22    within a short period of time.  As I pointed out, on one

23    document there was actually an interruption in the pen.  And,

24    again, watch out for the crumb on the table.  We don't know

25    if it fell into -- the pen stopped and then continued.

1    But the fluid position, in my opinion, was consistent in

2    all of the signatures that I examined as questioned

3    documents.

4    Q.  Okay.  And the fluid motion, basically, means that

5    whoever did these signatures didn't hesitate, as someone who

6    might be trying to copy, normally, hesitates to make sure

7    they get it right?

8    A.  That's right.

9    Q.  It simply means that, whoever did these signatures, just

10   did it, signed it like a person would normally sign their

11   signature?

12   A.  That's correct.

13   Q.  Okay.  And if someone was skilled enough and, let's say,

14   had seen Mr. Clinton's signature time and time again, because

15   they have done business with him over the course of the 30

16   years, it's possible that someone could, within this spectrum

17   of how he made his G's and his E's and his C's and his N's,

18   and the table and everything, it's possible that they could

19   have done such with fluidity without hesitation?

20   A.  In my opinion, not to the extent that we found a number

21   of similarities in this writing.  There are things that are

22   very subconscious or unconscious, and a person has a writing

23   habit over years of writing the same way, the same style,

24   that a person simulating a signature is very highly unlikely

25   to simulate, including the spacing, the proportions, the

132

1    movement.  So that, in my opinion, it would be very unlikely.

2    Q.  But you wouldn't go so far as to say that Mr. Clinton's

3    signature could not be forged?

4    A.  Yes, but not on these documents that I examined.

5    Q.  Okay.  But I think you used 85 percent before.  When

6    Mr. Richard said something about how sure, you said, "Well,

7    if we use 50/50, I would come in at 85."

8    A.  I said more than 85 would be.

9    Q.  Okay.

10   A.  It's a very high degree of probability that he wrote

11   these documents.

12   Q.  But it's not a hundred percent?

13   A.  It is not.  I did not see him write these signatures.

14          MR. WILSON:  All right.  No further questions.

15          THE COURT:  Redirect?

16                  REDIRECT EXAMINATION

17   BY MR. RICHARD:

18   Q.  Ms. Holmes, I want to clarify something you testified to

19   earlier.  You said that you had testified regarding

20   Mr. Clinton's signature in a prior case?

21   A.  Yes, I had.

22   Q.  And in that case there were documents that he

23   acknowledged in that case that you used as known documents?

24   A.  That is the same documents that I used here.

25   Q.  As the known documents?

133

1   A.  As the known documents.

2   Q.  And then, also with regard to Exhibit 18, did you not

3   compare the first page of the exhibit -- the signature on the

4   first page of Exhibit 18 with the questioned documents?

5   A.  Oh, I did.

6   Q.  So that is a signature that was acknowledged in this

7   courtroom today?

8   A.  Yes.

9            MR. RICHARD:  No further questions, Your Honor.

10           THE COURT:  Ms. Holmes, let me ask you several

11  questions.

12           THE WITNESS:  Yes.

13           THE COURT:  First, as I understand it, there are

14  accepted levels of certainty or uncertainty with which

15  handwriting experts testify.

16           THE WITNESS:  Right.  Correct.  Yes.

17           THE COURT:  There are seven of those levels?  Tell

18  me what those are.

19           THE WITNESS:  As I said, what I work off is, it's

20  possible, it's probable, and it's very probable, it's

21  highly -- very highly probable -- very highly probable.

22           THE COURT:  Okay.  So, there's a --

23           THE WITNESS:  Possible, probable.  I may have

24  skipped a possible.

25           THE COURT:  Possible, probable, certain?

134

1    THE WITNESS:  There is no such thing as certain.

2    THE COURT:  Okay.  So, possible, probable, highly

3    probable?

4    THE WITNESS:  Highly probable, and a very high

5    degree of probability.

6    THE COURT:  Okay.  In any event, you place this in

7    the highest level in that categorization?

8    THE WITNESS:  Yes.

9    THE COURT:  Defendants' 18, that has been admitted

10   into evidence, I have in front of me, and I don't know

11   whether there are additional copies that are in the courtroom

12   that people have been working off of.  The one that I have

13   with the blue sticker on it, which should be the original

14   that has been admitted, is a photocopy.

15   Have you ever seen an original of Defendants'

16   Exhibit 18?

17   THE WITNESS:  No.

18   THE COURT:  How do you know that the questioned

19   signatures you looked at, your QD-4A, 4B, 4C and 4D, how do

20   you know that those signatures were not photographed onto the

21   agreement from some other signature that Mr. Clinton signed?

22   THE WITNESS:  I do not, without examining the

23   original document.

24   THE COURT:  So, if somebody went to a photocopy

25   machine, took a signature of Mr. Clinton, cut it out and

135

1    pasted it on, whited over the edges so there wouldn't be any

2    shadow, and took a photocopy of it, they could present to you

3    a document just like Defendants' Exhibit 18, and your opinion

4    would be, the person who signed this was Mr. Clinton.

5         THE WITNESS:  I was told that there was no original

6    document; and so, if there is an original document so that

7    that can be verified, in that opinion, the one was a replica

8    of the other.

9         THE COURT:  Certainly, if you find an identical

10   signature somewhere else, you can deduce that the one was a

11   copy of the other.

12        THE WITNESS:  Yes.  I haven't examined that, but I

13   only had questioned documents that they were one signature.

14   I didn't have different documents with different signatures

15   on them.

16        THE COURT:  But you didn't see the original of

17   anything?

18        THE WITNESS:  On this document, no.

19        THE COURT:  All right.

20        Either side have questions to follow up on my

21   questions?

22        We can't hear.  You need to speak where we can all

23   hear you.

24        MR. RICHARD:  I want to see if she's got --

25                    REDIRECT EXAMINATION

136

1  BY MR. RICHARD:

2  Q.  You don't have the original in hand?

3  A.  No, I don't have the original here.  This is what I have.

4  This is the document, your 18.

5  Q.  Right.  Do you recall having ever testified with respect

6  to that same document in a prior case?

7  A.  No.  I did not testify -- it was a lease in the prior

8  case.

9  Q.  You'll notice that that signature --

10  A.  Okay.  This is removed --

11         THE COURT:  You need to speak loudly so we can all

12  hear you.

13         THE WITNESS:  I'm sorry.

14         MR. RICHARD:  I'm looking for -- there was a copy

15  of -- there it is.  All right.

16         THE WITNESS:  Yes.

17  BY MR. RICHARD:

18  Q.  All right.  Now, if you look at that last signature --

19         MR. WILSON:  Excuse me.  What are we looking at?

20         MR. RICHARD:  Exhibit 18.

21         MR. WILSON:  Okay.

22  BY MR. RICHARD:

23  Q.  The signature on the last page?

24  A.  Yes.

25  Q.  The "G" runs up into the typed-out portion that says,

137

1   *"Malbiz Music by,"* correct?

2   A.  Yes.

3   Q.  And one of the letters runs down below *"George Clinton"*?

4   A.  Yes.

5   Q.  And then the "G" on the second line runs up into the

6   *"George,"* does it not?

7   A.  Yes.

8   Q.  And several of the letters run down into *"George Clinton"*

9   below the second signature line, correct?

10  A.  True.

11  Q.  So, if somebody were to have copied this from another

12  document onto this one, they would have had to have had a

13  prior document that had a signature line that was set up in

14  that same fashion, would they not?

15  A.  Exactly.

16          MR. RICHARD:  No further questions.

17          THE COURT:  Mr. Wilson, any questions to follow up

18  on my questions?

19          MR. WILSON:  Yes.  Actually, it's a follow-up to

20  Mr. Richard's question.

21                  RECROSS-EXAMINATION

22  BY MR. WILSON:

23  Q.  Did you specifically check to see whether or not it could

24  have been altered in that particular way, through a

25  cut-and-paste or a computer scanning?

138

1    A.  The best way to do something like that would be to have a

2    clean signature, then you could lay it on top of any

3    document.  If you were taking it from a signed document, you

4    would find it quite difficult, because you would not be able

5    to clean it up, if you will, enough to lay it on there.

6    Q.  Well, I guess my question was:  Did you specifically

7    check for that in your examination of the documents?

8    A.  No.  The documents that I have were very clearly,

9    although it was a copy, there was no reason for me to suspect

10   anything about this document.

11   Q.  Okay.  So, if you were to, for example, see Plaintiff's

12   4, which is that same top document, but with nine songs in

13   there, you would have just focused on the signature and not

14   necessarily any alterations that may have occurred in the

15   balance of the document?

16   A.  No.  I was asked to examine the signatures, not the

17   records or how many records.

18   Q.  All right.

19          MR. WILSON:  Thank you very much.

20          THE COURT:  Ms. Holmes, looking again at the last

21   page of Defendants' 18, it's entitled "Exhibit B."

22          THE WITNESS:  Yes.

23          THE COURT:  It has the signatures that Mr. Richard

24   was talking about, where it goes up into the next line.  One

25   of the things you can do as a handwriting examiner is to

139

1  determine whether the words *"Malbiz Music by"* were likely

2  typed at the same time as the rest of the document; that is,

3  you can put a grid over this to determine whether that

4  document came out of a typewriter and went back in before

5  *"Malbiz Music"* was added on, right?  Do you do that kind of

6  work?

7          THE WITNESS:  No, I do not.  I'm not a typewriter

8  expert.  My specialty is in handwriting.

9          THE COURT:  All right.

10          Any further questions?  Mr. Richard?  Mr. Wilson?

11          MR. RICHARD:  No, Your Honor.

12          MR. WILSON:  No, Your Honor.

13          THE COURT:  All right.  Ms. Holmes, you may step

14  down.  Thank you.

15          MR. RICHARD:  Your Honor, I have no further

16  witnesses, unless you would permit me to recall Mr. Howard

17  Hertz to the stand to testify solely with respect to the

18  original document and why it is not in the courtroom.

19          THE COURT:  You can recall the witness, if you would

20  like.

21          MR. RICHARD:  All right.  Howard.

22    (**HOWARD HERTZ**, having been previously duly sworn, was

23  recalled by the defense.)

24          THE COURT:  Mr. Hertz, you are still under oath.

25          Mr. Richard, you may proceed.

Howard Hertz
Deposition

140

1      DIRECT EXAMINATION

2  BY MR. RICHARD:

3  Q.  Mr. Hertz, I'm directing your attention to Exhibit 18.

4  You know what I'm referring to, correct?

5  A.  Yes.

6  Q.  Do you know who the last person was known to have had the

7  original of the document?

8  A.  Yes.

9  Q.  Who was that?

10  A.  Me.

11  Q.  And what was the last thing that you know you did with

12  it?

13  A.  Well, this is my sixth time testifying, Your Honor, with

14  respect to various matters involving these documents.  The

15  last time that I know that I had them was in Los Angeles in

16  Federal District Court.  I remember having them in court.  I

17  remember taking them back to my office, and I've been unable

18  to locate them since.

19  Q.  Now, you have had, I assume from your testimony, frequent

20  occasion to look at the last page of this document?

21  A.  I have, as has opposing counsel in various depositions,

22  and that's on the record, that they have looked at the

23  originals and compared it to the copies.

24  Q.  Is the signature line or are those signature lines which

25  appear here purporting to have Mr. Clinton's signature on

1  them, do they appear on the documents now in evidence here

2  precisely as they appeared on the original that you last had?

3  A.  Yes.

4          MR. RICHARD:  No further questions.

5          THE COURT:  Cross-examine?

6          MR. WILSON:  Yes, Your Honor.

7                          CROSS-EXAMINATION

8  BY MR. WILSON:

9  Q.  Do you recall whether or not I was one of the opposing

10  counsel that had the opportunity to see the original?

11  A.  I don't believe so.

12  Q.  Okay.  I'll make it easy for you.  No, I did not,

13  despite --

14  A.  I don't think we've met before today, although we've

15  spoken on the phone.

16  Q.  All right.  Also, you said that you had testified I think

17  six times or so.

18  A.  I think this is my sixth.

19  Q.  With respect to this document?

20  A.  Well, with respect to various cases involving the

21  numerous copyrights of George Clinton.  I'm not saying each

22  time necessarily, although I believe it probably was each

23  time, that this document was at least mentioned.

24  Q.  And it would then seem that this was a rather important

25  document, since it came up from time to time in other pieces

142

1  of litigation?

2  A.  All of the documents were important.

3  Q.  Including this one?

4  A.  Yes.

5  Q.  All right.  Yet, this one, while you admit you had

6  possession of it, just somehow was lost or disappeared or

7  something?

8  A.  The whole set of the original documents I had in a

9  separate folder, and that whole folder is missing.  So, it's

10  not just this document.  And I have searched throughout my

11  entire law firm on three occasions.  I have had the people at

12  our off-premises documentation search through our two

13  thousand or so boxes of documents off premises.  I've

14  searched my house.  I've been unable to locate them.

15  Q.  How frequently does losing original documents occur in

16  your practice?

17  A.  This is only the second time that I know of from myself.

18  Q.  Okay.  What was the other time?

19  A.  The other time was on a divorce matter where someone came

20  in, brought me some documents, I put them in the file.  Then

21  she came back in for us to review the documents, and the file

22  was unable to be located.

23  Q.  And the last time you recall seeing this document was

24  approximately when?

25  A.  In 1997, I believe, when I testified in Los Angeles.

1  Q.  And you recall taking it back to your office, and you

2  don't recall what happened to it after that?

3  A.  Correct.

4  Q.  But you can -- your testimony is that you remember the

5  last page with such precision that you could look at this

6  photocopy and say that is exactly as the original?

7  A.  What I remember is that I personally took the originals

8  and had a series of copies made for all of the attorneys in

9  this case, and that this is one of those copies.  It was

10 introduced at a deposition, and this is one of those copies.

11 I don't have a photographic memory, no.

12 Q.  How can you be so sure that this copy, particularly the

13 last page of this copy, was one of the copies that you

14 personally made?

15 A.  I believe they were all Bate stamped at the time.  I

16 physically Bate stamped one set, and another set was

17 physically Bate stamped, and I looked at two of them at one

18 of the depositions, because there was some question why they

19 were Bate stamped differently.  I believe some had come from

20 Mr. Boladian's file, and some came from my file; and I looked

21 at the two, and they were identical.

22 Q.  You looked at two copies, and they were identical?

23 A.  At the time I looked at the original and a copy, but

24 before me was the original and two copies, actually, but that

25 was before I misplaced the originals.

Don Wilson
Presentations
to the

Court

144

1          MR. WILSON:  No further questions.

2          MR. RICHARD:  The defendants rest.

3          THE COURT:  Before in 1983, in your law practice,

4  you were using a typewriter, I take it, not a computer.

5          THE WITNESS:  Correct.

6          THE COURT:  Either side have any further questions

7  following up on mine?

8          MR. RICHARD:  No, sir.

9          THE COURT:  All right.  Mr. Hertz, you may step

10  down.

11          MR. RICHARD:  Nothing further.

12          THE COURT:  Mr. Wilson, will there be any rebuttal

13  case?

14          MR. WILSON:  No, Your Honor.

15          THE COURT:  I take it that both sides have rested.

16  Let's take a lunch break.  We will start back at 2:15 for

17  closing argument.

18      (A luncheon recess was taken at 1:11 p.m.)

19                    AFTERNOON SESSION
                       (2:20 P.M.)

20

21          THE COURT:  Please be seated.

22          Mr. Wilson?

23          MR. WILSON:  Yes, Your Honor.  I would like to see,

24  I think I handed in before lunch the exhibits.  I just need

25  to see them.

1    Good afternoon, Your Honor.  The case we've heard

2  this morning is a difficult case in that it involves an

3  on-again/off-again relationship for more than 30 years

4  between the plaintiff and the defendant and their various

5  entities.  However, there are certain facts that are not in

6  dispute.  Those facts are:

7    Mr. George Clinton wrote or co-wrote the songs that

8  are subject to this litigation, and that the copyright

9  interest in those songs can only be transferred in writing

10  under the federal copyright law.

11    Also, that, on or about August 31st, 1971,

12  Mr. Clinton entered into an agreement with Bridgeport Music,

13  Inc., wherein, in certain musical compositions for a

14  five-year period, Plaintiff's Exhibit 1, he entered it, and

15  they were subjected to a co-publishing arrangement whereby

16  Bridgeport Music and Malbiz Music each owned 50 percent

17  interest in the compositions, and they were to be

18  administered by Bridgeport Music.

19    Those compositions, however, were only the

20  compositions that were initially recorded by or on behalf of

21  Westbound Records, Inc.  All other compositions were either

22  owned by Malbiz or were previously, as Mr. Clinton testified,

23  transferred to various other publishing companies, including

24  Jobett and Gold Music.

25    Then we come to 1982, March 4th, 1982 agreement,

1    which the face page Mr. Clinton -- excuse me -- Mr. Boladian

2    acknowledged here in this court was materially altered by him

3    in that he added, after Mr. Clinton signed the March 4th

4    agreement, additional music compositions to the same list.

5    He added approximately 50 percent more, or an additional

6    three songs to the six songs that were already there,

7    bringing it to a total of nine songs.  This he did after

8    Mr. Clinton had signed that original agreement.

9         Moreover, on the attached addendum, which was dated

10   March 4, 1982, but Mr. Boladian and Mr. Hertz testified was

11   not executed until approximately eighteen months later, on

12   December 2nd, '83, was again materially altered by the fact

13   that Schedule A did not exist at the time that Mr. Clinton

14   signed or purportedly signed those agreements.

15        Mr. Hertz, I believe, testified that he prepared the

16   document, and some time later, I'm not sure if it was the

17   same day or shortly thereafter, Schedule A was added and

18   inserted into the document.

19        So, the two documents upon which the defendants base

20   their case, by their own admissions, were materially altered

21   in the fact that the significant number of songs were added.

22   In one case, the latter case with the addendum, Exhibit A,

23   has a substantial amount of musical compositions; whereas,

24   the other case, the alteration was just the addition of three

25   musical compositions to a list of six.

1    Ms. Holmes, the expert, testified that she reviewed

2    the documents simply as to the signatures and not with

3    respect to any alterations or transfer of the signatures from

4    one document perhaps to the document she was given in

5    question.

6    THE COURT:  Before we get to her, while we are

7    talking about this addendum to which Exhibit A is attached,

8    you say Exhibit A wasn't in existence when the document was

9    actually signed.

10    MR. WILSON:  That's correct.

11    THE COURT:  But what the document itself says is

12    that Malbiz, which is referred to as the owner, has assigned

13    to publisher, which is Bridgeport, the entire right, title

14    and interest of every kind, nature and description,

15    including, but not limited to, the titles referred to in the

16    March 4, 1982 agreement.  It goes on in paragraph 2 to say

17    that the owner -- that is, Malbiz -- also intended to and

18    does hereby assign to publisher all musical compositions

19    previously written by George Clinton prior to March 4, 1982,

20    including, but not limited to, those listed on Exhibit A.

21    So, even if there had not been an Exhibit A, the

22    document still would say that Malbiz assigned to Bridgeport

23    all interest in everything written up till March 4th, 1982,

24    except to the extent assigned to somebody else by a prior

25    written agreement.

1          MR. WILSON:  That's correct.

2          THE COURT:  Isn't that what that says?

3          MR. WILSON:  That's correct, Your Honor.  It says

4   that, but the problem is there are songs on Exhibit A that

5   were after this agreement.  And Exhibit A, while it was

6   clearly intended that there would be an Exhibit A, the fact

7   that Exhibit A was placed in after the signatures, and that

8   Exhibit A contains songs that were not previously owned by

9   Malbiz Music goes to the validity of the agreement, coupled

10  with the fact that Mr. Clinton says that he never signed this

11  agreement.

12          So, while certain songs were transferred, certain

13  songs were not transferred, and I think that --

14          THE COURT:  How do I know that from this agreement?

15  I mean, this agreement at least says everything up till March

16  4th, 1982 is assigned, does it not?

17          MR. WILSON:  That's correct, but it doesn't say

18  anything after March of '82 was assigned.

19          THE COURT:  So, if this agreement is valid, then you

20  have no claim with respect to anything written up until March

21  4, '82.

22          MR. WILSON:  If this agreement is found to be valid,

23  that would be correct.

24          THE COURT:  Okay.

25          MR. WILSON:  Just as with the '71 agreement, despite

1    the fact of not having been accounted to, as Mr. Boladian

2    testified, we do not contest that there should be a 50/50

3    ownership between Bridgeport and Malbiz of the songs that

4    were subject to the August 31st, 1971 agreement.

5            Going back to Ms. Holmes --

6            THE COURT:  And if the addendum that we've just been

7    talking about is valid; and, if December 2nd, 1983, agreement

8    itself is valid --

9            MR. WILSON:  I think they are one and the same.

10           THE COURT:  They are part of the same -- they are

11   attached as part of the same package.

12           MR. WILSON:  Okay.

13           THE COURT:  I'm talking about the writer's

14   agreement, that's between Mr. Clinton and Bridgeport.

15           MR. WILSON:  Oh, oh, the writer's agreement, okay.

16   Excuse me.  What is Your Honor's question?

17           THE COURT:  The two of those together would cover

18   the field, would they not?  If the writer's agreement entered

19   between Mr. Clinton and Bridgeport dated December 2nd, 1983,

20   if that is a valid agreement that was actually entered

21   between those parties; and, if the addendum that we've just

22   been discussing between Bridgeport and Malbiz, if that also

23   is valid, then Mr. Clinton doesn't have any claim here and

24   Malbiz doesn't have any claim here, is that right?

25           MR. WILSON:  No, that wouldn't be correct.  It would

1    just exclude certain songs.  If the Court were to find that

2    the addendum, including Schedule A, was entirely valid, then

3    Malbiz would not have a claim to those songs on Exhibit A.

4          THE COURT:  Well, but it says "including, but not

5    limited to those songs."  It says everything he wrote up

6    until March 4th, 1982.

7          MR. WILSON:  Exactly, but if --

8          THE COURT:  So, Malbiz doesn't have a claim to

9    anything written up till March 4, 1982, because of the

10   addendum.  And then there is the December 2nd, 1983, writer's

11   agreement, which says everything written up to that point,

12   Mr. Clinton gives up his right in.  And then he agrees to

13   write for Bridgeport after that.  Isn't that part of this

14   agreement?

15         MR. WILSON:  Well, yes.  If you found those two

16   agreements to be valid, then, again -- but there is, as

17   Mr. Boladian testified, there was a gap between the two

18   agreements.  I think he said there was a gap between the

19   April '85 agreement, which is why he entered into that second

20   one; and the -- I guess it would have been December of '83

21   agreement.

22         So, he testified that there was a gap between the

23   two agreements.  So, there are certain songs --

24         THE COURT:  What would the gap be -- and I

25   understand, you contest the validity of these, and you're

1   about to get to Ms. Holmes, and I won't keep you from getting

2   there, but I want to make sure I understand what we've --

3          MR. WILSON:  Okay.  Mr. Boladian testified that the

4   December 2nd, '83 agreement covered everything up until that

5   point, in terms of the transfer of Malbiz, everything up to

6   '82, including what was on Exhibit A.

7          THE COURT:  All right.  And so if that addendum --

8          MR. WILSON:  -- is valid, it only covered things up

9   to '82.

10          THE COURT:  Okay.  And then what does he have after

11   that?

12          MR. WILSON:  Well, he continued to write songs

13   after -- Mr. Clinton did -- after 1982.  Now, if he --

14          THE COURT:  But why -- the writer's agreement dated

15   December 2nd, '83, by that agreement, that's a go-forward

16   agreement, is it not?

17          MR. WILSON:  That's correct.

18          THE COURT:  So, starting December 2nd, 1983, for the

19   next five years, anything Mr. Clinton writes belongs to

20   Mr. Bridgeport under that agreement.

21          MR. WILSON:  If that agreement were valid.

22          THE COURT:  Right.  So, that takes care of December

23   2nd, '83, forward, if that agreement is valid; and the other

24   agreement, the addendum that we were talking about with

25   Exhibit A --

1    MR. WILSON:  Was up to March 4, '82.

2    THE COURT:  So, what you're saying, there is a gap

3    between March 4, '82 and December 2nd, '83 that is not

4    covered by either one.

5    MR. WILSON:  That's correct.

6    THE COURT:  Your claim in this case is for

7    everything written prior to '82 and after '83, as well as the

8    gap in between.  That is, you contest the validity of both of

9    those agreements.

10    MR. WILSON:  That's correct, Your Honor.

11    THE COURT:  But you say, even if valid, even if the

12    agreements are valid, you've got a window in there between

13    March '82 and December '83, where Malbiz is the owner of the

14    songs.

15    MR. WILSON:  Yes, based on those agreements;

16    however, you know, I would also say that perhaps if you were

17    to read all of the documents, including the songwriter,

18    including the '85 agreement, it's perhaps, I'm not absolutely

19    sure, that they may cover some of the songs even in the gap.

20    THE COURT:  Okay.

21    MR. WILSON:  Okay.  So, I'm pretty much basing it on

22    the testimony that Mr. Boladian gave here today that there

23    was an 18-month gap, at the least.

24    THE COURT:  All right.  I interrupted you.  You were

25    about to tell me about Ms. Holmes.

1    MR. WILSON:  Yes.  Ms. Holmes had testified as an

2    expert that she did not review any of the documents as to

3    alterations or as to transfer of signatures from one document

4    to the other.  In fact, she said she had no original

5    documents to review; and in the book that she prepared, in

6    her opinion letter dated, I think it was September 29, on

7    page 3, paragraph 3, she qualifies her own expert opinion by

8    saying that this opinion is subject to the examination of the

9    originals.

10    So, she realized that there were some drawbacks with

11    respect to only being able to view photocopies, in certain

12    instances sometimes several generations later photocopies of

13    the original documents.

14    In any event, even though she found it to be highly

15    certain -- I think were her words -- that the signatures were

16    of the same person, she also testified that she was told that

17    the known samples were told to her that they were known

18    samples by her attorney, not only for this case, but in a

19    previous case.  At no time did she ever witness Mr. Clinton

20    provide any known sample nor have him tell her that such a

21    signature was his signature.

22    All she could testify to was the fact that, based on

23    the spectrum of variances that existed in both the known

24    signatures and the questionable signatures, that the same

25    person wrote both signatures, whether they were Mr. Clinton's

1    signature lifted from one document and put on another, or if

2    the person, other than Mr. Clinton, was able to sign them

3    without hesitation, she could not say with any certainty,

4    other than that there was a very high probability that it was

5    the same person; but, again, she could not say that it was

6    Mr. Clinton.

7          As we heard earlier this morning from Mr. Hertz, the

8    originals were, for whatever reason, conveniently unavailable

9    to be presented in this case, despite Mr. Hertz knowing that

10   they were extremely important documents.  I think he had

11   testified that this was the sixth time that these documents

12   were in question in litigation, and I believe the prior five

13   times he had the originals available; but, in this particular

14   case, for some reason, the originals were lost, and they were

15   not available to even their own expert or to me for

16   examination on behalf of Malbiz Music.

17         There's also no dispute that Malbiz Music, Inc., was

18   incorporated under the laws of New York, and consequently is

19   subject to and governed as a corporation by those laws in the

20   state of New York.

21         There is also undisputed testimony that

22   Ms. Stephanie Clinton, as of December '80, owned 75 percent

23   of the stock of Malbiz Music, Inc., and her consent was

24   necessary for all transactions to be valid on behalf of

25   Malbiz Music.  We heard this testimony from Mr. Clinton as

1    well as Mrs. Clinton.

2           She also testified that at no time did she give her

3    consent to the execution of the March 4th, '82 addendum,

4    which actually was executed on I believe 12/2/83 or the -- or

5    the addendum that was executed actually on 12/2/83 that

6    purportedly was signed by George, transferring songs --

7    Mr. Clinton, transferring songs to Bridgeport.

8           On this particular point, New York law is quite

9    clear.  I mean, it's very clear.  Mr. Clinton testified that

10    he didn't have the authority to sign documents without the

11    consent of Mrs. Clinton; and in *TJI Reality, Inc. versus*

12    *Harris*, the cite is 672 New York Supplement Second 386, a

13    1988 case, the court held there that neither board of

14    directors of a corporation or any individual member or

15    members thereof may exercise authority to conduct business of

16    corporation in violation of fiduciary duties owed to the

17    corporation.  And, in fact, the court in *Burke v. Bevona*,

18    cited at 931 F.2d 998, a 1991 case, that court went further

19    to say that, under New York law, in order to bind a

20    corporation to extraordinary and unusual contract entered

21    into between corporate official and another party, it is

22    necessary to show that official has expressed authority to

23    enter into the contract.  And another court further in *In Re:*

24    *McMillan*, Bankruptcy Court, cite 204 BR 378, a 1997 case,

25    went on to say that, under New York law, to bind a

156

1    corporation to extraordinary contract entered into between a

2    corporate official and another party is necessary to show

3    that the official had expressed authority to do so.

4         While Mr. Boladian said he never asked, he just

5    assumed that Mr. Clinton had the authority to enter into

6    these contracts.  There's been no evidence to show that

7    Mr. Clinton had expressed authority to do so.  To the

8    contrary, both Mr. Clinton, himself, and Ms. Clinton

9    testified that Mr. Clinton didn't have the authority to do

10   it.  And there's a case that I think is very close on point,

11   given the fact that Mr. Boladian and Mr. Clinton had prior

12   dealings, and that would be the *John and Mary Markle*

13   *Foundation versus Manufactures Hanover Trust Company*, the

14   cite on that is 619 New York Supplement Second 109, 1994,

15   where the court ruled that the mere fact that the bank had

16   dealt exclusively with the corporation's treasurer with

17   regard to account activity did not give the treasurer

18   apparent authority to circumvent expressed dictates of

19   corporate resolutions.

20        There you had a case where the bank for many years

21   had dealt with the corporation treasurer; in fact, it dealt

22   exclusively with the corporation's treasurer.  And perhaps --

23   well, according to the case, the bank didn't know of the

24   requirements or the limitations on the authority of the

25   treasurer, and entered into a transaction which the

157

```
 1   corporation later set aside because the bank was unable to
 2   show that the treasurer had expressed authority as opposed to
 3   apparent authority.
 4           THE COURT:  I take it from your description that
 5   there was a document in the bank's files, a corporate
 6   resolution, that said the treasurer did not have the
 7   authority to do what he was doing.
 8           MR. WILSON:  No, that wasn't apparent from the case,
 9   Your Honor, the portion that I read.  I don't know if there
10   was any document that gave the bank prior notice.
11           THE COURT:  Ordinarily, a corporate resolution would
12   be in the bank files, right?
13           MR. WILSON:  Yes.  But I don't know if even the
14   corporate resolution in this particular case covered whatever
15   the treasurer did with respect to apparent authority.
16           So, what we have here is that these cases where, if
17   you look at the agreements, purportedly Mr. Clinton
18   transferred all of the assets of Malbiz to Bridgeport with no
19   evidence of any consideration flowing to Bridgeport.  The
20   closest we've come to any consideration is Mr. Boladian
21   saying that he did give George Clinton some money.  But I
22   think with his own testimony, he testified that, as far as he
23   knew, he had never written any checks to Malbiz Music, Inc.
24           And so, you know, that then, basically, goes into
25   Ench v. versus Breslin, another New York case, 659 New York
```

158

1   Supplement Second 893, a 1997 case, which basically said that

2   the Business Judgment Doctrine, which was one of apparent

3   authority, does not protect actions of corporate officer in

4   authorizing an agreement -- in this case it was reciprocal

5   agreements for an easement -- and the corporation could void

6   the transaction where benefit received by corporation was far

7   outweighed by value of consideration it gave.

8           And here's a situation where there was really, as

9   far as Malbiz Music, Inc., a separate corporation and a

10   separate entity in the eyes of the law, received no valid

11   consideration with respect to these transfers.  And that's

12   why in my direct examination of Mr. Clinton, I made it clear

13   to him that, you know, his cause of action had been

14   dismissed; and I was here solely representing Malbiz Music,

15   Inc., and let him know that any of the testimony that he

16   might have given could, in fact, subject him to liability

17   with Malbiz Music, Inc., perhaps, or with the defendants or

18   with third parties, if certain contracts were to be found

19   valid or invalid, as the case may be.

20           And I brought that up to Mr. Clinton to make sure

21   that he fully understood that, by his testimony that he did

22   not have the authority to enter into these contracts, which

23   he acknowledges he never signed; but, if this Court should

24   find that he did sign those contracts, by his own admission

25   as to not having authority, and Malbiz being in a position to

1    void those contracts under New York law, that perhaps the

2    defendants could have a cause of action against Mr. Clinton,

3    in reliance on the fact that, without proper authority, he

4    nonetheless executed these contracts.

5          So, when you look at the evidence presented and the

6    shifting burdens and who is responsible for proving what,

7    when you look at the validity of the agreements, we have

8    agreements that were -- I'm speaking now of the addendum and

9    that top sheet to the addendum, the March 4th top sheet, and

10   the addendum itself -- we have situations where both of those

11   contracts were materially altered after Mr. Clinton's

12   signature by adding song titles; and, while it may be argued

13   in the one, certainly not in the six that went from nine,

14   there is no language in there purporting that an additional

15   three songs could be added to that contract, that contract

16   must fail.  I mean, you cannot make changes to a contract,

17   and then, when caught, go back and say, "Oops, my bad, let's

18   go back to before I changed it; and forget that I had added

19   some songs to it, and change the contract."

20         So, I believe that contract should be invalid

21   because of the admitted alterations.

22         Also, with respect to the December '83 -- I will

23   refer to it as the December '83 contract, because that's when

24   they said it was actually executed, although it is dated

25   March 4, '82, I believe there, by the insertion of Exhibit A,

1    despite the language, with Exhibit A not being accurate songs

2    on there reflecting the titles that were written or owned by

3    Malbiz up to March 4, '82, also materially alters the intent

4    of that contract; and, therefore, that agreement should be

5    invalid, coupled with the fact that Mr. Clinton alleges that

6    he didn't sign the contracts.  And I don't think the

7    testimony of the expert goes far enough to establish and meet

8    defendants' burden of proof that Mr. Clinton did, in fact,

9    sign those contracts.

10          But if we set that off to the side for a moment and

11   say that for the sake of argument that Mr. Clinton did sign

12   those contracts, then we still have to contend with New York

13   law with respect to the defendants' failure to show that he

14   had the expressed authority to enter into those; and, as the

15   cases illustrated, apparent authority under New York law for

16   contracts of this type is not sufficient.

17          Mr. Boladian never even inquired whether or not

18   Mr. Clinton had the authority.  It's true he had dealt with

19   Mr. Clinton while it was a d/b/a up through 1977, of which

20   Mr. Clinton had the authority to do anything he wanted.  But

21   after -- and he could actually do things after it was

22   incorporated up to December of 1980.  But at the time he

23   transferred the 75 percent of ownership of Malbiz in December

24   of 1980 to Ms. Clinton, and had made the agreement with her

25   that the actions on behalf of the corporation required her

1    consent as majority shareholder, anything Mr. Clinton did

2    beyond that, even though it might have appeared he had the

3    authority, without the expressed authority, the corporation

4    under New York law has the -- is able to void out those

5    transactions.

6           And, again, we have not seen any evidence that would

7    establish Mr. Clinton's expressed authority.  In fact, all we

8    have really is evidence to the contrary, both Mr. Clinton and

9    Ms. Clinton saying he didn't have the expressed authority;

10   and Mr. Boladian saying, *"I don't know, I just assumed he*

11   *did."*

12          And with respect to that, I believe, since this

13   phase of the trial is only limited to the ownership of the

14   compositions, I believe what is in order is to review --

15          Well, first of all, depending on how this Court

16   rules with respect to the validity of the contract, I think,

17   in any event, there will be a necessity to go back and review

18   the schedule of compositions that Malbiz has submitted with

19   this complaint that it claimed it infringed and perhaps

20   revise those in light of the '71 agreement, and perhaps in

21   light of the other agreements with respect to I guess the '82

22   and the '83 agreements, as well as the songwriter agreement

23   of December 2nd, '83.

24          But I think that this Court, given the cases in New

25   York and how they are right on point with respect to who the

1    bank dealt with, as well as the necessity of the defendants

2    to show expressed authority, which they failed to do, I think

3    that those contracts that Mr. Clinton signed on behalf of

4    Malbiz Music can only be found to be invalid and void by

5    Malbiz Music, Inc.

6           THE COURT:  All right.

7           MR. WILSON:  Thank you.

8           THE COURT:  Thank you.

9           Mr. Richard?

10          MR. RICHARD:  May it please the Court?

11          I begin by addressing this issue of the so-called

12   material alterations.  Counsel said that my client was

13   relying upon two documents.  In fact, that's not accurate.

14   The one document, the document in which six songs were added,

15   has not been introduced into evidence, is not relied upon by

16   my client, and is not relevant here.  Nevertheless --

17          THE COURT:  The document where three were added to

18   the pre-existing six?

19          MR. RICHARD:  That's correct.

20          Nevertheless, I would pause for a moment to point

21   out that the testimony, which was undisputed by my client, by

22   Mr. Boladian, was that the three that were added had been

23   agreed upon and simply didn't have titles yet; that he was

24   authorized to add them, and that he had a power of attorney

25   to do so.  Mr. Clinton never took the stand, again, to

1    dispute that.  It remains the undisputed testimony in the

2    record of this court.

3           So, while the document, itself, has no direct

4    materiality here, the continued suggestion by counsel that

5    Mr. Boladian materially altered it in some fashion that was

6    inappropriate, is simply not supported by the testimony.  It

7    was altered in a manner which was agreed to and, in fact,

8    empowered by a specific power of attorney for that purpose.

9           With respect to the issue of Exhibit A, I will

10   address in just a moment the issue of this so-called gap in

11   the time period; but the fact remains that I believe that the

12   issue that the Court has carved out for adjudication today

13   really rests on Exhibit 18.  If Exhibit 18 is valid for the

14   reasons that I'll get to in a moment, I think the case is

15   over; that the plaintiff has failed to carry its burden.

16          So, let me address that first.

17          Counsel claims that this document as well was

18   altered by virtue of the fact that Exhibit A, which is a list

19   of titles, was added to it later.  In the first place, as

20   Your Honor pointed out, paragraph 2 says that both

21   Mr. Boladian -- I mean -- Mr. Clinton and Bridgeport signed

22   all interest in all musical compositions written prior to

23   March 4th, 1982, including, but not limited to, those listed

24   on this list, which suggests that the titles on this list

25   were written prior to 1982.

The testimony, however, once again, entirely undisputed in this case by Mr. Hertz, the witness whose veracity has not been challenged in this case and about whom nobody has introduce any evidence to suggest that he has any reason to perjure himself, his testimony was that all of these documents were prepared within a single transaction that was taking place over several hours; and that Exhibit A was prepared and brought to them by Stephanie Clinton, by agreement of the parties, with the understanding that it was brought to them for the purpose of appending it to this document. Interestingly, the document itself at the time it was signed refers to Exhibit A, which tends to corroborate his testimony that the parties intended to add an Exhibit A.

Now, his testimony that it was appended while all parties were present and with their understanding and agreement is undisputed in this case. It is a red herring.

The fact is that there is no reason to suggest that anybody improperly altered this agreement; more importantly, that the agreement does not accurately reflect what the parties intended for it to say.

Now, that being the case, we have this issue of the so-called gap between 1982 and December of 1983. There has been no evidence introduced in this court that there were any compositions that were created during this so-called gap period; or that, if they were, they were assigned, the

1   interest was ever owned by or copyrighted by or assigned to

2   Malbiz.

3          Now, I point out to the Court that we already have

4   in the record of this case documents to establish that Malbiz

5   was dissolved by the state of New York in 1981, December of

6   1981.  It was not reinstated until last year, when it was

7   reinstated in order for this case to continue.

8          During that interim period, in 1982, Mr. Clinton

9   declared bankruptcy, in which he waived all rights to any

10  interest in any compositions.  Your Honor already has

11  determined that by virtue of not having listed them.

12         THE COURT:  I thought that was 1984.

13         MR. RICHARD:  I'm sorry.  1984, that's correct.  It

14  makes no difference for the point I'm trying to make here,

15  but you have an excellent memory.  It was 1984.

16         The point is, there was no Malbiz to have

17  copyrighted these compositions or to have it assigned to

18  during this period of time.  They could only have been owned,

19  for all we know here, by one person, which was George

20  Clinton; and he declared bankruptcy and failed to list them

21  and, therefore, waived any right he had to them.

22         I might also point out, Your Honor, that the burden

23  here is upon Malbiz, but there has not been any evidence

24  introduced in this case that anybody -- Mr. Clinton,

25  Stephanie, anybody -- ever assigned, in the first place, that

1    Malbiz ever copyrighted any one of the compositions that

2    we're talking about, or any composition at any time, or that

3    Mr. Clinton ever assigned anything to Malbiz at any time.

4    There is just no evidence of that.

5         And the burden here is to establish that Malbiz has

6    some claim to some of the compositions that we're dealing

7    with, and it simply hasn't been met.

8         Counsel, himself, told this Court at the very

9    beginning of his comments that, under copyright law, which I

10   did not claim to be expert in, there must be a written

11   document of transfer in order for a title or copyright to go

12   to another person.  We haven't seen any evidence of anything

13   here.

14        I would like to address the issue of Mr. Clinton's

15   authority.

16        I am not familiar with the law of New York that

17   counsel refers to.  This issue did not arise before we

18   arrived here today, so I did not have the opportunity to

19   review the cases that he has cited today.

20        My understanding of the law, which is, as far as I

21   know, is the law throughout this country -- I, frankly, have

22   never seen it say anything different -- is that, while a

23   person cannot simply assume that a corporate officer has the

24   authority to bind the corporation, which may well be what

25   those cases hold, that, if a corporation acts affirmatively

1    or with knowledge <u>acquiesc</u>es in an officer being clothed with

2    the apparent authority to bind the corporation, that a third

3    party will not be permitted to be injured later by the

4    corporation denying that that officer had that authority.

5         Now, what we deal with here is not some bank or big

6    corporate entity.  We deal with two individuals -- George

7    Clinton and his wife, Stephanie Clinton -- who between them

8    owned one hundred percent of this company.  The two of them

9    together went to the bank with my client, Mr. Boladian, and

10   in his presence and in the presence of Stephanie, in fact,

11   all of the shareholders of this corporation, Mr. Clinton

12   signed the first page of Exhibit 18, intending to bind the

13   corporation, and clearly clothing Mr. Clinton with the

14   authority to do so.

15        Now, nobody testified that Mr. Boladian or anyone on

16   behalf of Mr. Boladian's corporation was ever told that that

17   authority was revoked at any time or ceased to exist, and I

18   specifically asked Stephanie Clinton if she ever told anybody

19   at any time that George Clinton did not have authority to act

20   for the corporation, and she conceded that she did not; and,

21   in fact, both of them conceded that it was, in fact, George

22   Clinton who, as a matter of practice, always signed on behalf

23   of Malbiz Music.

24        For them to now come into this court and say, *"He*

25   *never had authority because of a secret agreement that the*

1    *two of us had between us, even though we not only failed to*

2    *communicate it to third parties, and in particular to*

3    *Mr. Boladian or his company, and even though we acted*

4    *intentionally to suggest to them that he did have that*

5    *authority,"* is, to say the least, disingenuous, and I cannot

6    believe that the law of New York, and surely not the law of

7    Florida, would sustain that and permit them to undo this

8    contract on this basis.

9          With respect to the signature of Mr. Clinton, what

10    we have here today is a whole series of suggestions and

11    speculations, although I will say that Mr. Clinton has

12    affirmatively testified that he never signed Exhibit 18;

13    that's not his signature, that testimony conflicts directly

14    with the testimony of Mr. Boladian, who says he did sign it,

15    and he signed it in his presence.

16          Perhaps more importantly, it conflicts directly with

17    the testimony of Mr. Hertz, a duly qualified and licensed

18    lawyer, who, there is no evidence, has any stake in the

19    outcome of this case, and who nobody has suggested has any

20    question with regard to his integrity or his honesty,

21    Mr. Hertz says he drafted the documents, and he was present

22    and watched Mr. Clinton personally sign the last page of

23    Exhibit 18.

24          And then we had Ruth Holmes, the handwriting expert.

25    Again, her testimony was not disputed by any competent

169

1    testimony.  There was no expert who took the stand to suggest

2    that he or she disagreed with Ruth Holmes, and there was no

3    cross-examination of Ruth Holmes that indicated that anything

4    that she postulated to this Court was not credible.

5        There was one thing.  It was speculation.  The

6    speculation that it was possible that one could copy the

7    signature from one page to another and, thereby, would appear

8    to be the same signature as the known signatures.  As I

9    pointed out in my cross-examination, what we have here is an

10   unusual signature block, which has separate signature lines

11   for Malbiz Music by George Clinton, and then for George

12   Clinton himself, and that the signatures overwrite, overlap

13   into the typed names of the corporations; and, in addition,

14   the signature on the second line overlaps onto the George

15   Clinton on the first line, so that one must logically

16   conclude, if this were copied from another document, it would

17   have had to have been copied as an entire signature block.

18       Now, this speculation is interesting, but nobody has

19   introduced in this trial any other document with any such

20   signature block from which it could have been copied.  These

21   documents have been known to opposing counsel and to

22   Mr. Clinton for some time in this case.  They have also been

23   aware of the fact that Ruth Holmes was going to be called as

24   an expert witness, and more than that, they knew exactly what

25   she was going to say, because she's testified to it in prior

1    trials.

2         So, if, in fact, there was any evidence that this

3    had been lifted and copied from another document, there is no

4    excuse for the failure of Mr. Clinton and his counsel to

5    bring that other document or at least another document into

6    this court that had a similar signature line on it.

7         In short, Your Honor, the burden of proof here

8    today, which was clearly carved out by this Court in the

9    order that we have this one-day trial, was for Malbiz to

10   prove that it had some interest in the compositions that or

11   the basis for the complaint herein sufficient for it to

12   sustain this case against my clients, Armen Boladian and

13   Bridgeport, on its own, without Mr. Clinton who no longer is

14   a party here.

15        It's failed to carry that burden.  I think at the

16   very least one would have to say that the weight of the

17   evidence falls in favor of my clients, but I would go beyond

18   that, and I would suggest that there has not even been a

19   *prima facie* case created here, except for the singular

20   testimony, self-serving testimony, of Mr. Clinton, which

21   itself is contradicted by the very documents that he himself

22   has signed.

23        Thank you.

24        THE COURT:  Mr. Richard, let me ask you a question.

25   I understand the apparent gap, the failure to prove

1    with respect to when any of these songs were written.  Assume

2    for me for a moment that some were written during each of the

3    time frames between this agreement and that, and so forth.

4           First, is there an agreement that covers the March

5    4, '82 to December 2nd, '83 time frame?  That is, you've told

6    me about some failures of proof, failure to make an

7    assignment, failure to prove any songs were written during

8    that gap.  On the other hand, for the period prior to that,

9    the period after December 2nd, '83, you have documents that

10   would indicate that Bridgeport has the rights to whatever

11   songs were written during that time period.

12          Is it correct that you have not presented any

13   documents giving Bridgeport a right to compositions made

14   between March 4, 1982 and December 2nd, 1983?

15          MR. RICHARD:  That's correct, Your Honor.  I don't

16   even know if there were any compositions written in that

17   period of time, but I'm not aware of that.  I cannot tell you

18   that there were, nor can I tell you that there were no

19   agreements in that gap period, but I have not presented any.

20   For the reasons I've indicated, I think it's not relevant.

21          THE COURT:  The other question I had dealt with the

22   testimony of Mr. Boladian that he has never provided

23   Mr. Clinton any accounting.  His explanation was, *"The*

24   *amounts were so out of kilter, that he clearly wasn't*

25   *entitled anything, he had gotten more advances and more*

172

1    *loans,*" but it seems to me that's no defense to the failure

2    to provide information.  If there is an agreement to provide

3    information, then the obligation is to provide information.

4              MR. RICHARD:  I think --

5              THE COURT:  Maybe the answer is, it's a one-hundred

6    percent assignment at this point, so there's no reason to

7    provide the accounting.  But what do you do with that issue?

8              MR. RICHARD:  Well, I think there is another defense

9    which was not addressed at any great length; but,

10   nevertheless, there was sufficient testimony to sustain it,

11   and that was the comment made by Mr. Boladian that

12   Mr. Clinton never asked for that information.  The law is

13   that the parties, by their conduct, can interpret a contract

14   in such a fashion that they desire; and, in fact, can modify

15   it by its conduct.

16              I think that what happened here was that it was

17   apparent that, for whatever reason, either because the

18   parties understood that there was insufficient money coming

19   in, or because Mr. Clinton just didn't care to see it,

20   Mr. Clinton never asked for it.  It never became an issue

21   between them, until we came to this courtroom, and counsel

22   was seeking some basis for suggesting some impropriety by

23   filing this complaint.  But the fact is that there is no

24   testimony, except the testimony of my client, that never was

25   there a time that Mr. Clinton ever asked for this

173

1    information, and they just fell into a pattern in which it

2    was not traded; it was not provided.

3          Even the complaint, I might note, to my

4    recollection, doesn't suggest that my clients refused to

5    provide it when requested to do so.

6          Mr. Della Maria is shaking his head.

7          No, he's not disagreeing with me.  He had another

8    argument, which is the hundred-percent assignment.

9          THE COURT:  Well, Count I of the complaint is that

10   the defendants, Boladian and Bridgeport, breached the

11   songwriter agreements by, among other things, failing to

12   timely account and pay monies.

13         MR. RICHARD:  Right, I agree.  I'm just saying that

14   what Mr. Boladian said was that the reason he had not been

15   providing the accounting was that it was never asked for, and

16   I guess it was their pattern not to do it.

17         What I'm saying to the Court is, while the complaint

18   is now saying that he never provided it, there is no evidence

19   in here other than -- to dispute what Mr. Boladian said,

20   which is that, during the life of this contract, before this

21   lawsuit was filed, it was the practice of these parties that

22   that information was not provided to Mr. Clinton.

23   Apparently, he never demanded that he receive it.  So, they

24   conducted themselves as though it were not necessary, for

25   whatever reason.

1    THE COURT:  Well, Mr. Clinton certainly testified

2  that he didn't get accountings.  What you're saying is, he

3  may have said he didn't get accountings, but he didn't say he

4  asked for them.

5    MR. RICHARD:  Yes.  What I'm saying, Your Honor, is

6  that there is no dispute that he did not get the accountings.

7  Both parties agree with that.  The fact that he didn't get

8  them doesn't mean that my client has done anything which is

9  actionable.  And one of the questions is:  Did the parties

10 conduct themselves in such a fashion that they had a practice

11 and procedure that didn't require that it be provided?  Even

12 though Mr. Clinton was entitled to demand it under the

13 contract, but he never did.

14    By the way, I also --

15    THE COURT:  And your position is, he's not entitled

16 to any money, because he has assigned whatever any rights he

17 had, the amount owed was more, and so --

18    MR. RICHARD:  It's a wash anyway, because the

19 testimony in this case is undisputed that he was advanced far

20 more than ever came in, and that he ultimately assigned

21 everything to my clients.  So, whatever may have been a

22 technical violation of the contract; and, again, I question

23 whether it was a violation, but whatever may have been at one

24 time, becomes moot when you reach where we are today.

25    THE COURT:  And the 50 percent that Mr. Clinton was

1    entitled to with respect to the pre-1971 songs, what happened

2    to that amount in the '83 agreements?  Do those all get now

3    assigned a hundred percent so that Mr. Clinton is not

4    entitled to any share of that anymore, or at least pledged, I

5    guess?

6           MR. RICHARD:  Well, I -- I mean, my posture, if I

7    were to address it, would be that he would not be entitled to

8    it, because, again, the testimony was that the reason he

9    entered into this is that he had received large sums of money

10   from Mr. Boladian or from Bridgeport.  He was asking that he

11   receive additional large sums of money going forward, plus

12   that he received Mr. Boladian's participation in gaining him

13   credit with another company; and that, in order to give him

14   that, Mr. Boladian insisted that Mr. Clinton waive all of his

15   prior rights with regard to any of these compositions and

16   assign one hundred percent of all of the rights to

17   Bridgeport.

18          Now -- so, whatever may have been owned in the

19   interim, with that consideration, was given up.

20          THE COURT:  All right.  Rebuttal?

21          MR. WILSON:  Yes.  First of all, Your Honor, with

22   respect to the transfer of copyright, both Mr. Clinton and

23   Mrs. Clinton testified that the copyrights were transferred

24   from Mr. Clinton to Malbiz.  He had written for Malbiz, and

25   there was no testimony to dispute the fact that he had

1    written those songs for Malbiz.

2         Secondly, with respect to the bankruptcy -- excuse

3    me -- with respect to the dissolution of Malbiz by the

4    secretary of state for New York, when it was reinstated under

5    New York law, it is reinstated retroactively, so there didn't

6    create a gap between it being reinstated last year and being

7    dissolved back in 1981.  The reinstatement was retroactive

8    back to 1981, which is why the state required the filing of

9    all tax returns for which it was dissolved to be filed.

10        THE COURT:  It would be consistent, however, with

11   the notion that no songs were written during the period that

12   the corporation was allowed to lapse.

13        MR. WILSON:  I'm not sure I understand why the lapse

14   of the corporation meant no songs were written.

15        THE COURT:  Well, it doesn't mean no songs were

16   written; but, if there is a period where a person is not

17   writing any songs, then it would make sense, perhaps, to

18   allow the corporation to lapse, rather than paying the fees

19   attendant to keeping the corporation in good standing.  On

20   the other hand, if the corporation is still operating, songs

21   are still being written and the corporation still has

22   business, one would expect, ordinarily, for the corporate

23   papers to be properly filed and the corporation not to lapse.

24        MR. WILSON:  That's true.  Or someone who is a

25   professional songwriter could continue to write songs, but

1  not have sufficient funds to keep the corporation going,

2  which is what happened in this case.  It simply lapsed

3  because of the failure to file and pay the taxes.  I think

4  one thing that came out, there was a period of time in

5  Mr. Clinton's career where he was in need of money.

6       Also, with respect to the accountings, I want to

7  clear up something.  All of the agreements that we've

8  discussed with respect to the accounting, specifically

9  provide that Bridgeport was under a duty to account

10 periodically throughout the year.  It was not conditioned on

11 Mr. Clinton or Malbiz being in an earned capacity, nor was

12 there a requirement that they request accountings.

13      Mr. Clinton was not under any obligation to request

14 accountings.  There was simply a contractual obligation on

15 behalf of Bridgeport to render those accountings no less than

16 twice a year.

17      So, to say, *"Well, I didn't give him accountings,*

18 *but he didn't ask for them,"* is no defense for not having

19 given them in the first place.  And Mr. Clinton did testify

20 that he had not received any accountings; and, in response to

21 one of my questions, that he had requested accountings but

22 hadn't gotten any.

23      THE COURT:  Ordinarily, in a case for a breach of an

24 agreement like that, one would expect Plaintiff's Exhibit 1

25 to be the demand letter saying, *"You owe me an accounting*

178

1   *under this paragraph.  Where is it?"* or "*Provide it by*
2   *X-date,"* or something along those lines.
3          MR. WILSON:  Yeah.
4          THE COURT:  There's nothing like that here.
5          MR. WILSON:  I think Mr. Clinton -- and he
6   testified, he was seeing Armen almost daily or frequently,
7   and he kept asking him when the accountings -- the only time
8   we received an accounting was when it was ordered by Judge
9   Realin Central District of Los Angeles, where he demanded,
10  since no accountings had ever been rendered to Mr. Clinton,
11  that he order that accountings be made.  Now, he had ordered
12  accountings being made back for 20-some years, and what we
13  got was I think from 1990 through '96.  We had gotten six
14  accountings.
15         THE COURT:  We are getting outside of the record of
16  evidence at this point, but I do recall this coming up at
17  some stage of the pretrial proceedings.
18         MR. WILSON:  But I just wanted to make the point
19  that --
20         THE COURT:  There is a Central District of
21  California case where the district judge has ordered
22  accountings over a period of time, and now you're complaining
23  that you didn't get those.
24         MR. WILSON:  Well, no, I'm not so much -- I was
25  complaining at the time, but what I used that illustrate the

179

1    purpose of --

2            THE COURT:  Remind me, you must have told me this

3    earlier, I'm sure that my first question I asked when all of

4    this came up was:  Why are we having another lawsuit if the

5    Central District has already looked at it?  What are we doing

6    here?

7            MR. WILSON:  Well, the thing is, that lawsuit,

8    Mr. Clinton was not a party.  It was between Nene Montes and

9    Mr. Boladian.  That was a -- there were different parties,

10   and that lawsuit I believe has since been settled.

11           THE COURT:  Okay.

12           MR. WILSON:  But the point really being is that the

13   agreements did not only obligate Bridgeport to render

14   accountings if and when requested by Mr. Clinton, there was a

15   contractual obligation to render the accountings, and even

16   Mr. Boladian testified that, given the -- what he believed to

17   be a disparity between the advances that he made and the

18   earnings that existed, Mr. Clinton was still entitled to an

19   accounting, even if it showed that he was substantially

20   unrecouped.

21           THE COURT:  If the agreements are valid, Mr. Clinton

22   is not entitled to any money.

23           MR. WILSON:  Well, I don't know --

24           THE COURT:  That's true, isn't it?

25           MR. WILSON:  I don't know if that's necessarily

1   true; because, if the 1985 discharge of the bankruptcy

2   eliminated over a million dollars' worth of unrecouped money

3   that Mr. Boladian allegedly gave to Mr. Clinton, then there

4   could be, with that million-two-debt wiped out, if that, in

5   fact, was the debt, there could be monies, because there's

6   been significant earnings after that.

7          THE COURT:  Well, what would the monies be for?

8          MR. WILSON:  The monies would be licensing the -- or

9   use of the compositions by third parties, either as artists

10  recording them or in samples.

11         THE COURT:  And what percentage would Malbiz be due?

12         MR. WILSON:  Malbiz would be due, at the very least,

13  50 percent, given Your Honor's ruling prior that Mr. Clinton,

14  because he didn't list the fact that he had these contracts

15  of songwriters, is not entitled to claim his song-writing

16  share.  Then, it would simply be Malbiz's co-publishing share

17  of certain compositions under the '71 agreement; and it would

18  then be those six songs, if the Court found that the

19  alteration of adding the three other songs was not material

20  enough to defeat the validity of that top sheet, which,

21  again, you know, my clients --

22         THE COURT:  I guess my question is this:

23         How do I know that there's been any use of any

24  copyrighted song for which Malbiz didn't assign one hundred

25  percent of the revenue to Bridgeport?

1          MR. WILSON:  Well, because there really has been no

2  evidence, other than these documents that they are alleging

3  Mr. Clinton signed on behalf of Malbiz, that Malbiz made any

4  assignment, other than the '71, when it was still a d/b/a.

5          THE COURT:  Well, if we assume that those documents

6  are valid, if you assume that the 1982 and 1983 agreements

7  are valid, then what evidence do I have that there is

8  anything to account for?

9          MR. WILSON:  Well, you wouldn't have --

10         THE COURT:  Those agreements say, do they not, that

11  a hundred percent of the revenue goes to Malbiz?

12         MR. WILSON:  That's correct.

13         THE COURT:  I mean, goes to Bridgeport.

14         MR. WILSON:  Goes to Bridgeport; that's correct.

15         THE COURT:  So, if Bridgeport is entitled to a

16  hundred percent, then the responsibilities to make an

17  accounting back to Mr. Clinton is meaningless, is it not?

18         MR. WILSON:  Well, it would be with respect to --

19  from the dates forward, of the effective dates forward of

20  those agreements.  It wouldn't necessarily have covered the

21  period between '71, where Malbiz and Bridgeport each owned 50

22  percent and there was a duty to account, and let's say, '82

23  or '83, unless Bridgeport is saying, *"Look, by acquiring the*

24  *hundred percent interest in those songs at a later date, that*

25  *absolved us of the ten, eleven years prior, when we didn't*

182

1    *have a hundred percent, of ever accounting to you for your*

2    *share."*

3            THE COURT:  So, you say that the addendum assigned

4    ownership from March 4, '82 forward, if it was valid, but

5    didn't assign a right to royalty payments prior to that?

6            MR. WILSON:  That would be correct.  I'm saying

7    that, if for some reason --

8            THE COURT:  So, if there was a 1972 composition that

9    was still being played or is still being played now, your

10   position is, Malbiz got a 50 percent interest in it in 1972;

11   Malbiz is entitled to any royalties for 1972 up until 1982;

12   and then, if the 1982 agreement is valid, from that point

13   forward Bridgeport had it all?

14           MR. WILSON:  That would be correct; if those

15   agreements were determined valid, I don't think it would

16   absolve Bridgeport of not having to account since '71 to '82.

17           THE COURT:  And so what do you want me to do now?

18   You've had the trial.  The evidence is what it is.  I have no

19   way to know that there was ever a song written that was

20   played outside the period where Bridgeport has a hundred

21   percent right.

22           MR. WILSON:  All right.  Well, I think the first

23   thing is, what I would like for you to do is find that those

24   '82 and '83 agreements are not valid.  At which point then,

25   we wouldn't have to discuss the assignment of when certain

1    songs were created or not created.

2        I think that, you know, with respect to the top

3    sheet -- I'll call it the *"top sheet"* -- that was the one

4    that was executed at the bank in '82, I think Defendants'

5    Exhibit 18.

6        THE COURT:  The first page of Defendants' 18.

7        MR. WILSON:  Yeah.  Mrs. Clinton was there; she was

8    at the bank.  She testified that she and Mr. Clinton had

9    discussed that, and that she consented.  So, there is no

10   inconsistency with this so-called secret agreement.  She was

11   there; she consented.

12       Mr. Boladian testified that the addendum, which now

13   is attached to that top sheet, was not attached to the top

14   sheet at the time, nor did he testify that Mrs. Clinton was

15   back at Howard Hertz's office several days later, when -- or

16   actually it was longer than that, because he initially

17   testified it was several days later, but then he later

18   testified that it actually wasn't prepared and executed until

19   December 2nd of '83, some 18 months later.  And so, you

20   know --

21       THE COURT:  Is when the rest of it got signed.

22       MR. WILSON:  That's when the rest of it was prepared

23   and signed.  So, you know, to say that we took this top sheet

24   that was approved and stuck it onto an agreement that wasn't

25   signed until 18 months later, so the whole thing must be

1   approved, I think is erroneous.

2          And, you know, as opposing counsel had indicated, he

3   wasn't aware of the New York law.  I had spent considerable

4   time, knowing that this was a New York corporation,

5   researching the New York law and, you know, came up with the

6   cases that I cited earlier, regarding the apparent and the

7   expressed.  I mean, what it does is, it is New York law that

8   is designed to protect these corporations from contracts of

9   this nature, where, you know, basically a hundred percent of

10   the so-called assets are transferred with little or no

11   compensation flowing to the corporation.

12          I mean, if you look at the corporation as a

13   corporation, and for a moment forget that the shareholders

14   are related, and look at the corporation as a separate entity

15   under the law, you have a situation where, possibly, because

16   Mr. Clinton again says he never signed these contracts, but

17   you're looking at a situation where possibly a corporate

18   officer goes out, signs contracts, takes the money

19   personally, and has given away all of the assets of the

20   corporation, which under the law is a separate entity.  It's

21   that that the New York cases I cited and the New York law is

22   looking to protect.  And they didn't make a distinction

23   whether or not the corporate officer and the majority

24   shareholder were married, or happen to be in the same family,

25   or anything.  The law just simply spelled out that, if an

The Courts Decision

185

1    officer goes out and executes an extraordinary or unusual

2    type of contract, which I think this clearly is -- you give

3    away these valuable copyrights for nothing to the

4    corporation -- then the burden is on -- and the case I cited,

5    it was a licensee, because it was a license that was granted,

6    but -- it's the person, the party who executed the contract

7    with the corporation, the burden is on them to show that

8    there existed expressed authority by the corporate officer to

9    enter into that agreement.

10             THE COURT:  All right.  Thank you.

11             MR. WILSON:  Thank you, Your Honor.

12             THE COURT:  I'm going to take a recess.  It's my

13    intention, if I can, to get you a ruling today on the record.

14    I need to read the cases that Mr. Wilson has cited, spend a

15    little more time with the exhibits and go back over my notes.

16             Let's take a recess until 4:30; and I will expect,

17    if possible, to get you a ruling at that time.

18             We'll be in recess.

19         (A recess was taken from 3:27 p.m. to 4:42 p.m.)

20             THE COURT:  Please be seated.

21             Let me begin by telling you the result, and then

22    I'll back up and explain the reason for the decision.

23             Judgment will be entered in the case in favor of the

24    defendants.

25             The factual background of the case is this:

1          An agreement was entered between Bridgeport and

2    Malbiz on August 31st, 1971.  At that time Malbiz was a sole

3    proprietorship of Mr. Clinton.  That agreement, by its terms,

4    was for five years.

5          There is some disagreement in the testimony about

6    whether it ran its course or was terminated by settlement

7    close to the end of that period.

8          In any event, Mr. Clinton entered agreements with

9    others in the mid '70s upon termination of the Bridgeport

10   agreement, including Warner Brothers.  He also did work for

11   or on labels of Gold Forever and Carnival.

12         In about 1977, Malbiz was incorporated.  At that

13   time Mr. Clinton was the sole shareholder.

14         In about 1980, he gave 75 percent of the shares to

15   Stephanie Clinton, who was not Ms. Clinton at that point, but

16   had a similar relationship with Mr. Clinton.

17         An agreement was entered on March 4th, 1982, between

18   Malbiz and Bridgeport.  I find that that was a valid and

19   binding agreement.  I find that Mr. Clinton signed it; that

20   he had actual authority of Malbiz to sign it.

21         That agreement initially listed six specific titles.

22   That agreement is a one-page document, the first page of

23   Defendants' Exhibit 18, also the first page of Plaintiff's

24   Exhibits 3 and 4, although Plaintiff's Exhibit 4 is a copy

25   that has had three additional songs added to the list.

1       The agreement is not all together clear on what it

2  was intended to provide. It seems to have one or more

3  missing paragraphs. In any event, there are parts of it that

4  are hard to understand. In particular, there is a

5  subparagraph A that is missing a subject and verb, and seems

6  to have money being paid to the -- a hundred percent of all

7  money being paid to the owner. It appears that there are

8  other provisions that somehow got omitted from that one page.

9       That is not important, because on December 2nd,

10  1983, Malbiz and Bridgeport entered an addendum to that

11  agreement that clarified the agreement and expanded the

12  agreement. The parties intended that addendum to be

13  effective as of March 4, 1982, the same date as the original

14  agreement.

15       I find that Mr. Clinton signed that addendum on

16  behalf of Malbiz; that he had actual authority to do so.

17       My finding that Mr. Clinton had actual authority to

18  enter these agreements is based on all of the circumstances,

19  including the fact that he is the writer, whose work was the

20  very being of Malbiz. He's the one that had the business

21  initially as a sole proprietorship and formed the

22  corporation. Although he gave away 75 percent of the

23  corporation to his future wife, he was still, by his own

24  account, a corporate officer. He signed at least one other

25  document on behalf of Malbiz that he has acknowledged validly

188

1    signing on behalf of Malbiz.

2           Based on all of those circumstances, I do not credit

3    the assertion that Mr. Clinton was acting beyond his

4    authority by entering agreements dealing with works he had

5    created.  I, therefore, conclude that he had actual

6    authority.  I note, parenthetically, that he almost surely

7    also had apparent authority to take those actions.

8           I have reviewed the New York cases that were cited.

9    None is quite like this.  There may be some question about

10   whether the applicable law is New York law or Michigan law.

11   Some of these papers provide that they will be governed by

12   Michigan law.  When someone enters a contract in Michigan on

13   behalf of a corporation, I suspect that the law of Michigan

14   may well control the validity of that contract, not the law

15   of New York.

16          But, in any event, the principle in New York, that

17   extraordinary contracts require actual authority of the

18   corporate officer, involves circumstances different than

19   these.  These are assignments of artistic works created by

20   the person who signed the agreement.  It would be an

21   extraordinary reading of New York law, or the law of any

22   other state, to suggest that Bridgeport could not enforce an

23   agreement entered under those circumstances.

24          In any event, as I indicated, my finding on the

25   facts is that Mr. Clinton had actual authority to enter these

1    contracts.

2         The March 4th, 1982, agreement, as clarified or

3    modified by the addendum executed on December 2nd, 1983, with

4    the statement that it was to be effective as of March 4th,

5    1982, recognizes the involvement of Malbiz with these works.

6         I assume, for purposes of my ruling, that

7    Mr. Clinton had assigned to Malbiz his rights in the works at

8    issue; and that Bridgeport recognized that by entering the

9    agreement with Malbiz.

10        I have not overlooked the testimony that Bridgeport

11   was not aware that Malbiz had been incorporated, and I note

12   that the March 4, 1982 agreement is with Malbiz, but then

13   has, in parentheses, George Clinton, which would provide some

14   support for the notion that the parties viewed Malbiz as a

15   proprietorship that was equivalent to Mr. Clinton rather than

16   as a separate corporation.  But I assume, for purposes of my

17   ruling, that Mr. Clinton had assigned his rights to Malbiz,

18   and that Bridgeport was dealing with Malbiz.

19        Still, the March 4, 1982 agreement, coupled with its

20   addendum, assigned to Bridgeport one hundred percent of all

21   rights in compositions created prior to March 4th, 1982.

22        Therefore, Malbiz has no right to recover any

23   payments with respect to such compositions.  There is nothing

24   in the March 4th, 1982 agreement that expressly creates a

25   right of any accounting, and that is not surprising in an

190

1    agreement that assigns the right of a hundred percent of the

2    proceeds to Bridgeport.  That is, it would make not very much

3    sense to require Bridgeport to account, when Bridgeport had

4    the right to receive all of the payments.

5          There was then another agreement entered on December

6    2nd, 1983.  It is entitled *"Writer's Agreement."*  It is

7    Defendants' Exhibit 16 and also Plaintiff's Exhibit 6.  I

8    find that it was signed by Mr. Clinton; that it is a valid

9    and binding agreement.  That agreement is between Bridgeport

10   and Mr. Clinton, himself.  Malbiz is not mentioned.

11         Malbiz apparently had been dissolved in the state of

12   New York.  The representation was made that that was at the

13   end of 1981.  I note that there is no proof in this trial

14   record about that.

15         The December 2nd, 1983, writer's agreement makes

16   Mr. Clinton the equivalent of an employee-for-hire of

17   Bridgeport with respect to the works created from that point

18   forward during the term of the agreement.  In the agreement,

19   Mr. Clinton warrants his title to such works.  In paragraph

20   5(a), Mr. Clinton warrants and represents to Bridgeport that

21   Mr. Clinton has the full right, power and authority to enter

22   into and perform the agreement, and to grant and vest in

23   publisher -- that is, Bridgeport -- all the rights referred

24   to free and clear of any and all claims, rights and

25   obligations, whatsoever.  That's not a direct quote, but

1    that's a paraphrase of the language of the agreement.

2              The agreement gives no indication by Mr. Clinton

3    that the rights to such songs belong to Malbiz rather than to

4    Mr. Clinton.

5              As set forth on the summary judgment ruling, any

6    rights of Mr. Clinton were rights that were required to be

7    disclosed in the bankruptcy proceeding.  By making no claim

8    that he had any such rights, Mr. Clinton lost the ability to

9    bring his claims here.  The fact that in this agreement he

10   warranted that those were his claims is inconsistent with any

11   assertion now that those claims for the songs created on or

12   after December 2nd, 1983, in fact, belong to Malbiz.

13             In any event, in this record there is no proof that

14   Malbiz became the owner of any rights in any composition

15   created after March 4th, 1982.  There is reason to doubt on

16   this record whether there were any creations during that

17   period.

18             Ms. Clinton, testified, for example, that she did

19   not recall any songs being written during that period, during

20   the period from 1980 to 1985.  But, in any event, there is no

21   proof in this record that there are -- that there were any

22   songs composed between March 4th, 1982, and December 2nd,

23   1983, in which Malbiz had any rights.

24             There was a later agreement entered between

25   Mr. Clinton and Bridgeport in 1985.  That agreement is not at

192

1     issue in this case.

2         The December 2nd, 1983, writer's agreement does have

3     an accounting provision in it, but the right to an accounting

4     under that agreement would be the right of Mr. Clinton, not

5     any right of Malbiz, who was not a party to that agreement.

6     For the reasons set forth in connection with summary

7     judgment, Mr. Clinton has no claim here for an accounting

8     under that agreement.  Malbiz clearly also does not have a

9     right to an accounting under that agreement or with respect

10    to rights in songs created after December 2nd, 1983, with

11    respect to which Mr. Clinton warranted that he himself had

12    all ownership and right.

13        I will enter a short order that will say, for the

14    reasons set forth on the record, judgment will be entered for

15    defendants.

16        Are there any other points on which any party wants

17    findings or anything else you would like me to address?

18        MR. WILSON:  Not at this time, Your Honor.

19        THE COURT:  We'll be in recess.

20    (The proceedings concluded at 5:01 p.m.)

21              *    *    *    *    *    *    *    *

22

23

24

25

193

1   I certify that the foregoing is a correct transcript from the
2   record of proceedings in the above-entitled matter.

3   _____                    2-14-01
4   Judy A. Ellan, RPR                                   Date
    Official U.S. Court Reporter
5

6

7                            INDEX
8

9   OPENING STATEMENT BY MR. WILSON......................... 2

10  OPENING STATEMENT BY MR. RICHARD....................... 3

11              *   *   *   *   *   *   *   *

12              *PLAINTIFF'S CASE-IN-CHIEF*

13

14  WITNESSES FOR THE PLAINTIFF:

15  George Edward Clinton

16      Direct Examination by Mr. Wilson.................. 6
        Cross-Examination by Mr. Richard................. 29
17      Redirect Examination by Mr. Wilson............... 37

18

    Stephanie Lynn Clinton
19
        Direct Examination by Mr. Wilson................. 41
20      Cross-Examination by Mr. Richard................. 54
        Redirect Examination by Mr. Wilson.............. 58
21
                *   *   *   *   *   *   *   *
22

    PLAINTIFF RESTS..................................... 59
23
                *   *   *   *   *   *   *   *
24

25

194

1                    _DEFENSE CASE-IN-CHIEF_

2    WITNESSES FOR THE DEFENSE:

3    Armen Boladian

4         Direct Examination by Mr. Richard.................... 60
          Cross-Examination by Mr. Wilson..................... 66
5         Redirect Examination by Mr. Richard................ 99

6    Howard Hertz

7         Direct Examination by Mr. Richard.................. 100
          Cross-Examination by Mr. Wilson..................... 104
8

     Ruth Holmes

9
          Direct Examination by Mr. Richard.................. 111
10        Cross-Examination by Mr. Wilson..................... 126
          Redirect Examination by Mr. Richard................ 132
11        Examination by the Court........................... 133
          Redirect Examination by Mr. Richard............... 135
12        Recross-Examination by Mr. Wilson.................. 137
          Examination by the Court........................... 138

13   Howard Hertz (Recalled)

14
          Direct Examination by Mr. Richard.................. 140
15        Cross-Examination by Mr. Wilson..................... 141
          Examination by the Court........................... 144

16                *   *   *   *   *   *   *   *

17
     DEFENDANTS REST...................................... 144
18
     CLOSING ARGUMENT BY MR. WILSON....................... 145
19
     CLOSING ARGUMENT BY MR. RICHARD...................... 162
20
     REBUTTAL ARGUMENT BY MR. WILSON...................... 175
21
     RULING.............................................. 185
22
                *   *   *   *   *   *   *   *
23

24

25

1                    PLAINTIFF'S EXHIBITS

2    NO.:                                              IN EVID.

3    1         Three-page letter dated 8/31/71, to          59
               Bridgeport Music from George Clinton
4
     2         Thirteen-page composite exhibit consisting   59
5              of a ten-page document entitled, "Exclusive
               Songwriter's Agreement," dated 4/4/85,
6              a one-page document entitled, "Rider to
               Exclusive Songwriter's Agreement," a one-page
7              document entitled, "Exhibit A," and a one-page
               document entitled, "Exhibit B"
8
     3         Seven-page composite exhibit consisting of    59
9              a one-page agreement, two-page document
               entitled, "Addendum," dated 3/4/82, two-page
10             document entitled, "Exhibit A," and a two-page
               document entitled, "Exhibit B"
11
     4         Five-page composite exhibit consisting of     59
12             an agreement and an addendum dated 3/4/82

13   5         Two-page document entitled, "Addendum,"       59
               dated 3/4/82, with attachments consisting
14             of a two-page Exhibit A and a two-page
               Exhibit B
15
     6         Nine-page document entitled, "Writer's        59
16             Agreement," dated 12/2/83

17                    *   *   *   *   *   *   *   *

18                    DEFENSE EXHIBITS

19   NO.:                                              IN EVID.

20   14        Eight-page document entitled,                 65
               "Preliminary Joint Venture Agreement"
21
     16        Nine-page document entitled, "Writers         65
22             Agreement"

23   17        Two-page document entitled, "Addendum         65
               to Writers Agreement"
24

25

196

| 1 | 18 | Seven-page composite exhibit consisting of a one-page agreement, two-page document entitled, "Addendum," dated 3/4/82, two-page document entitled, "Exhibit A," and a two-page document entitled, "Exhibit B" | 65 |

| 4 | 152 | Resume of Ruth E. Holmes, CDE, consisting of two pages | 113 |

| 6 | 166 | Notebook prepared by Ms. Holmes | 113 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25