**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

GEORGE CLINTON,

      *Plaintiff,*

v.                            Case No. 4:25cv108-MW/MJF

ARMEN BOLADIAN;
BRIDGEPORT MUSIC, INC.;
WESTBOUND RECORDS, INC.;
NINE RECORDS, INC.;
SOUTHFIELD MUSIC, INC.; and
EASTBOUND RECORDS, INC.,

      *Defendants.*

_____/

### DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE AND MEMORANDUM OF LAW IN SUPPORT

PLEASE TAKE NOTICE that Defendants ARMEN BOLADIAN ("Boladian"), BRIDGEPORT MUSIC, INC., ("Bridgeport") WESTBOUND RECORDS, INC., ("Westbound"), NINE RECORDS, INC., ("Nine") SOUTHFIELD MUSIC, INC., ("Southfield") and EASTBOUND RECORDS, INC. ("Eastbound") (collectively "Defendants") request that this Court impose sanctions on Plaintiff GEORGE CLINTON ("Plaintiff" or "Clinton") and his counsel of record pursuant to Rule 11 of the Federal Rules of Civil Procedure, on the grounds that (1) they have knowingly raised numerous claims in this action which have already been

1

adjudicated against Plaintiff and his privies in prior legal proceedings between the parties, (2) Clinton is judicially estopped from asserting these claims, and (3) the claims are otherwise factually and legally frivolous. Specifically, Defendants seek the non-monetary sanction of dismissal with prejudice of all of Plaintiff's claims against Defendants, and monetary sanctions for the attorney's fees and costs Defendants incurred in bringing this Motion and opposing this frivolous action, issued jointly and severally against Plaintiff and his counsel of record herein.

Good cause exists to grant this motion as Plaintiff's subject claims are utterly frivolous, both factually and legally, and were brought for an improper purpose, all of which is explained in the attached Memorandum of Law. As discussed in the Local Rule 7.1(B) and Rule 11 Certificate, Notice of Defendants' Intent to file the instant motion, a true and correct copy of the below Memorandum of Law, and all supporting documents and Exhibits were all served on Clinton's counsel on June 11, 2025. As such, more than twenty-one (21) days have elapsed since such service.

The Defendants' request for Rule 11 sanctions is based on this Motion, the attached Memorandum of Law in Support, and the Exhibits thereto.

## **LOCAL RULE 7.1(K) REQUEST FOR ORAL ARGUMENT**

PLEASE ALSO TAKE NOTICE that Defendants request one hour of oral argument time pursuant to Local Rule 7.1(K).

## <u>CERTIFICATE OF GOOD FAITH CONFERENCE</u>
## <u>PURSUANT TO LOCAL RULE 7.1(B) AND RULE 11 CERTIFICATE</u>

Pursuant to Local Rule 7.1(B), the undersigned counsel conferred with counsel for Plaintiff and is authorized to represent that Plaintiff objects to the relief sought under Rule 11 as set forth in the foregoing Motion and attached Memorandum of Law. Pursuant to Rule 11, FED. R. CIV. P., the undersigned counsel further certifies that more than 21 days have elapsed since service of the Defendants' Notice to File Rule 11 Motion, the Attached Memorandum of Law, and all Exhibits and supporting documents thereto, on Plaintiff's counsel on June 11, 2025.

Dated: July 3, 2025

Respectfully submitted,

KING & BALLOW

*/s/ Richard S. Busch*
Richard S. Busch (*Pro Hac Vice*)
David Niemierzycki (Fla. Bar. 1023763)
KING & BALLOW
26 Century Boulevard, Suite NT700
Nashville, TN 37214
Telephone: (615) 259-3456
rbusch@kingballow.com

*/s/Barry Richard*
**BARRY RICHARD** (Fla. Bar 105599)
Barry Richard Law Firm
101 East College Avenue, Suite 400
Tallahassee, FL 32301
(850) 274-1814
barryrichard@barryrichard.com
dawnkrow@barryrichard.com
*Attorneys for Defendant*

3

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11

### I.    INTRODUCTION

On March 11, 2025, Clinton and his attorney, Ben Crump, conducted a show at the hallowed Apollo Theatre in Harlem, New York, in which they announced to the world they would be filing a $100 million lawsuit against Armen Boladian for, they claimed, stealing Clinton's musical compositions and sound recordings in all sorts of allegedly nefarious ways. In the 111-year history of the Apollo Theatre, it was the most elaborately spawned fictional yarn ever told.[1] Mr. Clinton's Original Complaint brought fourteen causes of action alleging decades of infringement, fraud, civil theft, conversion, and other causes of action designed to malign the Defendants' rightful exploitation of the works at issue.

However, in two separate previous cases, one in this very courthouse, Clinton

---

[1] In a fashion so theatrical that Saul Goodman ("Breaking Bad," "Better Call Saul") would blush, Attorney Crump bombastically announced the headline catching "100 million dollar lawsuit" against Boladian on the steps of the iconic Harlem Apollo Theater, disingenuously and divisively asking the public how "this white man" "ends up with all the copyrights, all the intellectual property rights, and getting all of George Clinton's royalties…." (https://www.youtube.com/watch?v=umbCFpQMuDs&t=202s at 3:52-4:05). As discussed fully herein, these allegations and claims are factually and legally frivolous, but Clinton's counsel was unashamedly attempting to take advantage of and stoke the passions of an uninformed public. There are news reports that a biopic about Mr. Clinton's life is being planned, and the press conference and this lawsuit are clearly designed to generate interest in that movie. https://variety.com/2024/film/news/eddie-murphy-george-clinton-biopic-bill-condon-amazon-1236197626/.

1

made the same allegations against Mr. Boladian and his companies for which Boladian is the sole shareholder.[2] Clinton lost both cases.

As discussed in multiple filings, on April 18, 2025, counsel for Defendants advised counsel for Clinton that Defendants would be serving a Rule 11 motion upon counsel no later than April 23, 2025. On April 22, 2025, however, as tacit admission that the claims were unfounded, *even before* Defendants served their first putative Rule 11 Motion on counsel for Clinton, Clinton served on Defendants' counsel a proposed Amended Complaint removing some of the baseless claims. Then, after receipt of the first putative Rule 11 Motion on April 23, 2025, Counsel for Clinton elected to further amend the Complaint removing further frivolous claims and allegations. Despite warning, however, Clinton's counsel then chose to file this third version of the Complaint. This third attempt is still frivolous, and sanctions are warranted, for the reasons discussed below.[3]

---

[2] Defendant Nine is a distributor for Westbound, Southfield is an ASCAP affiliated publisher and Eastbound is another of Boladian's record labels. None have any substantive relationship to the claims herein. Boladian Dec, at ¶¶ 3, 4.

[3] In addition to the frivolous claims, Clinton still included in the latest Complaint frivolous allegations, including that "[D]efendants Successfully Scheme[d] to Defraud Clinton" (Am. Compl. at p. 8) and alleged that Boladian is a "copyright troll". In addition to having *nothing to do with the claims at bar*, these allegations are manifestly and demonstrably false and, as to the former, have been adjudicated against Clinton. Such allegations will also be subject to a separate motion to strike pursuant to FED. R. CIV. P. 12(f).

## II.    SUMMARY OF THE ARGUMENT

As explained to Clinton's counsel in Defendants' first-served Rule 11 Motion, *res judicata*, collateral estoppel, judicial estoppel, statute of limitations, and federal preemption vitiated all of Clinton's claims alleged within the Original Complaint. The impact of the two previous actions, and some of those same legal principles, also preclude the claims in The First Amended Complaint.

All of Clinton's causes of action in the First Amended Complaint now necessarily hinge on the validity of his alleged copyright termination and reversion of rights, under either 17 U.S.C. § 203 or § 304, related to the compositions and sound recordings at issue in the 1999 Florida Litigation and the 2011 California Action (as defined below). As discussed fully below, the failure to list the musical compositions or sound recordings, or reversionary rights, in Clinton's 1984 Bankruptcy proceeding precludes him from bringing the instant claims under the doctrines of bankruptcy estoppel, *res judicata*, and collateral estoppel. Furthermore, as to the Westbound Sound Recordings, under the applicable agreements between Westbound and Clinton, they were works for hire under the 1909 Copyright Act, which is applicable to those sound recordings as they were recorded prior to October 19, 1976, the enactment date of the Copyright Act of 1976, and thus also obviously before January 1, 1978, the effective date. Thus, they are not eligible to be recaptured by Clinton as a matter of law under either 17 U.S.C. § 203 or § 304. Clinton is also

3

both collaterally estopped and judicially estopped from arguing to the contrary.[4]

Even if that were not the case, many of the termination claims including the allegedly "fraudulent" retention of rights – *are not even ripe on their face*.[5]

## III.    BACKGROUND

Because of the impact that the two previous cases have on the instant claims, it is important for the Court's edification for Defendants to briefly recount the procedural posture of both cases, and Clinton's relationship with Boladian and his

---

[4] As discussed fully below, Clinton claimed in the 2011 California Action that he did not sign any agreements with Westbound regarding the Westbound Masters, and all that existed was an oral agreement. When his counsel was confronted with the actual agreements, and documents proving Clinton did sign them, (Exhibit 12 with attachments hereto), Clinton abandoned his infringement and other claims regarding the Westbound Masters. Ex. 13, Amended Complaint; Ex. 14. His abandonment of those claims means he is barred from arguing to the contrary now. N.D. Fla. Loc. R. 15.1(A) ("Allegations in a prior pleading that are not set out in the amended pleading are deemed abandoned."); *Bilal v. Driver*, 251 F.3d 1346, 1347 n.1 (11th Cir. 2001); *Dinkins v. Leavitt*, No. 1:07-CV-0486-TWT-AJB, 2007 U.S. Dist. LEXIS 102709, at *27-28 (N.D. Ga. Dec. 17, 2007) (abandoned claims cannot be resurrected in a new lawsuit under *res judicata*) *report and recommendation adopted by* 2008 U.S. Dist. LEXIS 11113 (N.D. Ga. Jan. 11, 2008), *aff'd* 315 Fed. Appx. 171, 174-76 (11th Cir. 2008), *reh'g en banc denied* 345 Fed. Appx. 534 (11th Cir. 2009), *cert. denied sub nom. Dinkins v. Sebelius*, 558 U.S. 844, *reh'g denied* 558 U.S. 1065 (2009). Furthermore, in other, recent litigation in which he is involved, because it suited him to say so, Clinton specifically asserted that he was an employee of Westbound. Ex. 16, at 4. The exact opposite of what he had previously claimed in this action. Doc. No. 1, at ¶¶ 76, 78.

[5] Thus, Clinton's claims for infringement due to Defendants' alleged exploitation post infringement are also frivolous as discussed herein. In this regard, Clinton conflictingly alleges that Defendants have refused to exploit the works (Am. Compl. at ¶ 55) *and* that they are exploiting the works to collect royalties that they are allegedly withholding from Clinton (Am. Compl. at ¶ 91).

entities.

### A. Clinton's Bankruptcy and Relationship with Boladian, Bridgeport, and Westbound.

Armen Boladian has been the sole owner of the named entities since the 1960s. Boladian Dec. ¶2. Westbound is his record label and owns sound recordings. Boladian Dec. ¶3. Bridgeport is his publishing company and thus owns and administers musical compositions. Boladian Dec. ¶4. In quick summary, and as relevant to this motion, Clinton and the group "The Funkadelics," for which Clinton was the lead singer, began recording for Westbound in or about 1969. Boladian Dec. ¶5. In 1972, Clinton signed a work for hire agreement (the "Agreement") in which he agreed Westbound was the owner of the sound recordings he recorded for Westbound. Boladian Dec. ¶6; Ex. 12 at attached Ex. C at ¶ 1 ("Company [Westbound] hereby employs Artist [Clinton]… as a recording artist and musician for the purpose of making master recordings … Artist hereby accepts such employment upon all the terms and conditions of this Agreement."); *id*. at ¶ 11 ("All master recordings made hereunder, as well as all performances thereon and all phonograph records derived therefrom, together with any property rights therein, whether presently existing or hereinafter created, will be the exclusive property of Company free of any claim whatsoever by Artist or by anyone deriving rights from Artist."). In 1975, Clinton wanted to leave Westbound to go to another record label and Boladian accepted his request, granting him a release from the Agreement. As

5

part of Clinton's departure, Clinton executed a Modification of the 1972 Agreement, which modified the Agreement, shortening the term thereof and also confirming that Westbound owned all sound recordings Clinton had ever recorded for Westbound. Boladian Dec. ¶ 7; Ex. 12, at Ex. B to Duvall Letter at ¶¶ 1, 2 (referencing the Agreement and saying: "In consideration of the mutual covenants herein contained and for other good and valuable consideration, receipt of which is hereby acknowledged, you and we hereby agree to **modify the aforesaid Agreement** only in accordance with the terms and conditions as more fully set forth below.") (emphasis added).[6]

As discussed in footnote 4 *supra*, and below, despite obviously executing these agreements, Clinton alleged initially in bad faith in the 2011 California Action that there were no written agreements, allegations he then withdrew and abandoned upon the threat of Rule 11 sanctions, *see* Exhibits 12 and 13 hereto, but has now reasserted here. Am. Compl. ¶¶ 32-4. Not only that, but also as discussed in footnote 4, and *infra,* Clinton claimed he was an employee of Westbound in recent litigation, Ex. 16, at 4, Clinton's Mot. for Summary Judgment in *Worrell v. Clinton*, *et al.*, 22-cv-11009 (E.D. Mich), while he pleaded the exact opposite here. Doc. No. 1, at ¶¶

---

[6] The 1975 Modification continues, in paragraph 3: "You hereby acknowledge and agree that we [Westbound] shall retain in perpetuity the exclusive worldwide right, title and interest in and to all master recordings and the copyrights thereon embodying their performances…."

76, 78; Am. Compl. ¶ 62. However, over and above these already fatal deficiencies, Clinton is also now barred by *res judicata* and collateral estoppel from claiming that these written agreements are not valid in any and all respects as discussed above in footnote 4.

On the music publishing side, in 1971 Bridgeport on the one hand, and Clinton on the other (on behalf of his music publishing company, Malbiz Music, Inc. ("Malbiz")), entered into a co-publishing agreement in which Bridgeport and Malbiz would own 50/50 all musical compositions written by Clinton during the time Clinton was recording for Westbound. Boladian Dec. ¶ 8. On March 4, 1982, the parties entered into an agreement in which Malbiz assigned to Bridgeport certain songs, and then on December 2, 1983, the parties entered into an "Addendum" to the March 4, 1982, agreement in which Clinton on behalf of Malbiz assigned to Bridgeport all of Malbiz's interest in all songs Clinton wrote or co-wrote prior to March 4, 1982, including the songs that were subject to the March 4, 1982 agreement. Boladian Dec. ¶¶ 9-10.

In June 1984, Clinton filed for bankruptcy: he did not list any musical compositions, sound recordings, right to receive royalties, or any related contingent or future rights in the Petition or Schedules. Ex. 1. He did, however, identify owing creditors Boladian and his companies a total of $2.4 million. *Id*.

### B.  The 1999 Florida Litigation[7]

In *Clinton, et al. v. Boladian, et al.*, 99-cv-242, (N.D. Fla.) (Hinkle, J.) (the "1999 Florida Litigation") (Complaint attached hereto as Exhibit 2), Clinton and Malbiz filed a Complaint alleging: (1) Boladian/Bridgeport stole the musical compositions Clinton wrote that were owned by Malbiz, (2) the copyright assignment documents upon which Boladian/Bridgeport were relying were not signed by Clinton but alternatively, if they were, he had previously given Malbiz to his wife so he did not have the authority to sign them, and (3) Clinton had not been paid publishing and songwriter royalties he was owed.

Importantly for purposes of this motion, on summary judgment, Judge Hinkle held that because Mr. Clinton's 1984 Bankruptcy documents did not list any musical compositions or right to royalties on the Schedules, he was thus estopped from claiming "any rights in the copyrights or on royalties from those compositions[.]" *See* this Court's Order attached as Exhibit 3, at 2 n.1. All issues related to Clinton's bankruptcy were thus fully litigated before Judge Hinkle and Clinton cannot relitigate them again now.

Clinton/Malbiz's copyright ownership and assignment claims, and related claims went to trial. Judge Hinkle ruled Clinton assigned Bridgeport all musical

---

[7] Although the most rudimentary investigation would have disclosed it, Clinton's counsel apparently did not know of this litigation until Defendants marked it related to this action. *See* Ex. 17, Email Correspondence.

compositions written by him prior to March 4, 1982 (through the Addendum dated December 2, 1983), that Clinton had the authority to execute those assignments on behalf of Malbiz, and that Bridgeport was the owner of all such musical compositions. Judge Hinkle also ruled that Clinton had no rights in compositions created thereafter based on a 1983 Writer's Agreement. *See, e.g.*, Ex. 4, 1999 Florida Litigation, Trial Tr. at 189:19-23 (Judge Hinkle: "[T]he March 4, 1982 agreement, coupled with its addendum, assigned to Bridgeport one hundred percent of all rights in compositions created prior to March 4th, 1982. Therefore, Malbiz has no right to recover any payments with respect to such compositions"); *id*. at 190:15-18 ("The December 2nd, 1983, writer's agreement makes Mr. Clinton the equivalent of an employee-for-hire of Bridgeport with respect to the works created then on during the term of the agreement."). Clinton filed an appeal, which was dismissed. Exhibit 5. Clinton later filed a motion to set aside the Judgment for alleged fraud on the Court against Boladian and his counsel (Barry Richard) which was denied by Judge Hinkle,[8] by Order in which he concluded: "Malbiz essentially rehashed the merits, now adding additional factual assertions" and therefore it "cannot meet th[e] test" to set aside the judgment because "Malbiz's 'new' evidence is not new at all, the

---

[8] Even further, Judge Hinkle later ordered Malbiz's counsel to file and serve an unequivocal statement that she had no basis for alleging misconduct by Barry Richard, in order to avoid sanctions. *See* Ex. 7, at 8. Malbiz's counsel filed the retraction. 99-cv-242, Doc. No. 106.

evidence could have been found with reasonable diligence prior to trial, and the evidence if presented probably would not have changed the result." Exhibit 6, at 3, 4. Highly relevant here is Judge Hinkle's rationale:

> Malbiz supports its fraud assertion partly by quoting testimony out of context, and partly by attacking Bridgeport's handling of the March 4, 1982 contract. The issue at trial, however, was the validity of the "Addendum" executed on December 2, 1983. Malbiz asserts that Mr. Clinton did not sign the "Addendum" and that the document is phony. But that is precisely the issue that Malbiz tried and lost at the original trial. Malbiz has provided no evidence that Bridgeport committed fraud in the trial of that issue. Malbiz had a full and fair opportunity to litigate this case - and specifically the issue of whether the "Addendum" was a valid document duly signed by Mr. Clinton - at the original trial. The evidence on which Malbiz now relies was available at that time, or would have been available with reasonable diligence. Malbiz lost not because any witness for Bridgeport committed perjury, and not because anybody committed fraud on this court. Instead, Malbiz lost because, after a full and fair trial at which both sides were represented by counsel and had an opportunity to present their best case, the evidence supported Bridgeport. Malbiz is not entitled to a second bite at the apple.

*Id*. at 5-6. Malbiz later filed another appeal in the case, with the Eleventh Circuit affirming the judgment of Judge Hinkle. 54 F. App'x 684 (11th Cir. 2002). Obviously, collateral estoppel and *res judicata* prohibit relitigating all of those issues and claims, including all issues related to Clinton's bankruptcy, but that is precisely what the Original Complaint attempted to do, and what the First Amended Complaint still attempts to do by claiming that Clinton has a right to terminate Bridgeport's ownership of all of the musical compositions at issue in the 1999 litigation.

This Court should also be aware that Clinton thereafter, in subsequent

litigation, admitted committing perjury at the trial:

> Q:    Now, in -- you are aware of a lawsuit that you filed against Armen Boladian and Bridgeport music in 1999 in federal court in Florida; correct?
>
> A:    Yeah.
>
> Q.    Okay. And in that case, you testified that prior to assigning the compositions owned by Malbiz to Bridgeport music, you had given Malbiz to your then wife, Stephanie Clinton; so therefore, you did not have the authority to enter into the deal with Bridgeport music. You said that; correct?
>
> A:    I said that mistakenly. My lawyers advised me to say that. I didn't agree with them then, but I said it, yes.
>
> Q:    And you've admitted in testimony – in fact, in questioning when I asked you questions back in 2002 about it, you admitted that you had committed perjury when you -- when you gave that testimony?
>
> A:    I said -- I said yes, my lawyer told me to do it, and I said it. And I said that then.
>
> Q:    Okay. Why did you say it if it wasn't true?
>
> A:    Because my lawyer told me to say it.

Ex. 8, *Boladian, et al. v. Clinton*, Case No. BC 576665 (Cal. Super. Ct.), 2019

Deposition of George Clinton Transcript, Vol. I, at 166:23-167:21.

> Q:    All right. Malbiz Music, Inc., you said that was formed in '67, '66, somewhere in that neighborhood?
>
> A:    Uh-huh.
>
> Q:    Is that a publishing company?
>
> A:    Yes.

Q:    Do you own any interest in Malbiz Music, Inc. today?

A:    That's what the courts say, but I don't – what did I say? The courts say I don't but I say I do.

Q:    Okay. Are you the sole owner of Malbiz Music, Inc.?

A:    I will tell you this, what my lawyer told me to say. … Against my wishes said – stated that I should say that I gave it to my wife.

Q:    In fact, you never did give it to your wife?

A:    No.

Q:    So you committed perjury then in federal court –

A:    Yes.

Q:    – when you testified –

A:    Yes.

…

Q:    So you knowingly testified in open court that, in fact, you gave Malbiz Music to your wife when, in fact, you did not, is that correct? …

A:    Yes, I said that.

Ex. 9, *Bridgeport Music, Inc., et al. v. Dimension Films, et al.*, Case No. 3:01-0412

(M.D. Tenn.), 2002 Deposition of George Clinton Transcript, Vol. I, at 87:13-89:10.

### C. The 2011 California Action

In 2011, Clinton filed another action in federal court, this time in Los Angeles (the "2011 California Action"), and this time against Boladian individually, and his record label Westbound, in a wide-cast, fifteen-count Complaint, very similar to the

12

Original Complaint in this case, alleging essentially that: Clinton never executed any agreement concerning the sound recordings Clinton recorded for Westbound in the late 1960s and 1970s; Clinton was neither accounted to nor paid royalties to which he was entitled; Boladian and Westbound engaged in fraud and copyright infringement among many other dastardly things; and Clinton should be declared the owner of all such sound recordings and receive damages. There were also other unrelated claims against Westbound and numerous parties.[9] Ex. 10, *Clinton v. Boladian, et al.*, Case No. cv-11-10062 (C.D. Cal.), Original Complaint.

The court dismissed the Original Complaint for failure to prosecute without prejudice to the filing of an Amended Complaint. Ex. 11. In the interim, Boladian/Westbound's counsel wrote to Clinton's counsel to advise of the frivolity of the claims against Boladian/Westbound, and advised, among other things, as follows (with supporting documents): (1) Clinton did execute a work for hire agreement with Westbound acknowledging the sound recordings he recorded for Westbound were owned by Westbound, and a separate agreement reiterating that Westbound was the owner of all sound recordings Clinton recorded for Westbound as part of his departure from Westbound; (2) there is contemporaneous

---

[9] Clinton also alleged that Westbound was wrongfully exploiting the so-called "Warner Masters," which were sound recordings Clinton owned from his time recording for Warner Brothers. *See* Ex. 13. The Court ultimately dismissed these claims with prejudice as well in the California Action. *Clinton v. Boladian*, No. CV 11-10062-R, 2013 U.S. Dist. LEXIS 198324, at *4-8 (C.D. Cal. May 2, 2013).

correspondence between Clinton's lawyer and Boladian/Westbound's lawyer regarding such agreements (just in case Clinton once again falsely claimed he did not sign those documents); (3) Boladian did account to Clinton as correspondence proves; and (4) Clinton did not list either the Westbound Sound Recordings or any right to receive royalties on his 1984 Bankruptcy Petition or Schedules so he is barred from claiming any such right for the same reasons Judge Hinkle found the same with respect to Clinton's claim to publishing royalties in the 1999 Florida Litigation. Boladian/Westbound's counsel advised that Boladian/Westbound would seek Rule 11 sanctions if Clinton nonetheless proceeded with these claims against Boladian and Westbound. Exhibit 12, Letter with Exhibits.

Clinton thereafter filed an Amended Complaint but abandoned the aforementioned claims against Boladian/Westbound. Ex. 13, Amended Complaint; Ex. 14. The Defendants' motion to dismiss the Amended Complaint in that case was then granted. Ex. 15.[10] The abandonment of these claims prohibits Clinton from resurrecting them in this action, *see* authorities in footnote 4, among the many other reasons that the claims against Westbound in this action are frivolous, all discussed below.

---

[10] *Clinton v. Boladian*, No. CV 11-10062-R, 2013 U.S. Dist. LEXIS 198324, at *8 (C.D. Cal. May 2, 2013) (Real, J.).

## IV.   ARGUMENT

Rule 11 sanctions are warranted for Clinton's assertion of frivolous claims against the Defendants. The Court is well familiar with the Rule 11 standards and the wide array of remedies it has the discretion to award, including attorneys' fees and dismissal. For the numerous independent reasons discussed in turn below, all of the allegations and claims raised by Clinton in this case are frivolous.

### A. The Works at Issue are Not Subject to Termination under Either Section 203 or Section 304.

#### 1. Clinton is Judicially Estopped From Claiming Termination Rights in the Bridgeport Musical Compositions and Westbound Sound Recordings Because They were Omitted From His Bankruptcy Filings.

##### a. Failure to include Reversionary Interests Bars Clinton's Claims.

These claims are frivolous at the threshold for the same reason decided in the 1999 Florida Litigation: they were not listed in Mr. Clinton's 1984 Bankruptcy Petition. *See* Ex. 1, Bkrpcy Petition; Ex. 3, at 2 n.1 ("In his bankruptcy schedules, however, Mr. Clinton did not list any assets or rights to payment in the past or in the future - whether fixed or contingent and whether based on contract or the copyright laws or anything else - relating to these compositions. Mr. Clinton's bankruptcy schedules asserting he owned no such rights estop him from now claiming the contrary."). **This Court noted specifically that a right to future payment and any fixed or contingent interest based on copyright law needed to be asserted in**

**Clinton's bankruptcy schedule, otherwise he would be estopped from claiming any rights to such interests.** *Id*. Clinton's failure to list <u>any</u> interest in the musical compositions or rights to royalties on the Schedules estopped him from claiming "**<u>any</u>** rights in the copyrights or on royalties from those compositions[.]" *Id*. (emphasis added). This conclusion has a preclusive effect on asserting issues and claims now based on the same set of facts, *Madura v. BAC Home Loans Servicing, LP*, 593 F. App'x 834, 843 (11th Cir. 2014); *Otoh v. Fannie Mae*, No. 24-12431, 2025 U.S. App. LEXIS 6962, at \*12-13 (11th Cir. Mar. 26, 2025), in addition to supporting estoppel.

"Section 541(a)(1) of the Bankruptcy Code defines 'property of the estate' to include 'all legal or equitable interests of the debtor in property as of the commencement of the case.'" *Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. v. Alvarez (In re Alvarez)*, 224 F.3d 1273, 1276 (11th Cir. 2000) (quoting 11 U.S.C. § 541(a)(1)). "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Id*. at 1279 (quoting *Segal v. Rochelle*, 382 U.S. 375, 379 (1966)); *accord Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 750 (3d Cir. 2013); *Watson v. H.J. Heinz Co.*, 101 F. App'x 823, 825 (Fed. Cir. 2004); *In re Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993). **"In fact, every conceivable interest of the debtor, future, nonpossessory,**

contingent, speculative, and derivative, is within the reach of § 541." *Watson*, 101 F. App'x at 825 (quoting *In re Yonikus*, 996 F.2d at 869) (emphasis added). This includes "even a contingent, reversionary interest[.]" *Morton v. Kievit (In re Vallecito Gas, LLC)*, 461 B.R. 358, 377 (Bankr. N.D. Tex. 2011) (citing *In re Graves*, 609 F.3d 1153 (10th Cir. 2010); *Matter of Hernando Healthcare, Inc.*, 157 B.R. 701, 703-04 (Bankr. M.D. Fla. 1993) ("Section 541 of the Bankruptcy Code is broad enough to encompass Debtors' equitable interest, *i.e.*, a reversionary interest in this Fund, notwithstanding its inchoate nature[.]")).

Here, to the extent terminable under the Copyright Act, Clinton's interests would be categorized as contingent future reversionary interests which would vest upon service of a valid termination notice. *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 26 (2d Cir. 2015) (citing *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 162 (1985)). Clinton acquired any contingent future reversionary rights on October 19, 1976, the enactment date of the Copyright Act of 1976.[11] *Id*. Accordingly, he was

---

[11] Even though the law creating the termination rights was enacted as part of the 1976 Copyright Act (17 U.S.C. § 304(c)(3)), since the Westbound Recordings were all created prior to January 1, 1978, the case law is clear that determination of whether the works were made for hire is still governed by the 1909 Act. *See* 17 U.S.C. § 302 (limiting the applicability to those works created after January 1, 1978). Where a work was made for hire under the 1909 Act, the employer was entitled to the renewal term, and Section 304 is inapplicable. *See Stewart v. Abend*, 495 U.S. 207, 254, 254 n. 19 (1990); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 743-44 (1989); 17 U.S.C. § 304(c) ("In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, **other than a copyright in a work made for hire**…") (emphasis added).

required to list these reversion rights in his Bankruptcy proceeding, lest he be estopped from claiming them. *See* Ex. 3, at 2 n.1 (Judge Hinkle concluding Clinton is estopped from claiming "any rights in the copyrights or on royalties from those compositions" due to his failure to list them as assets in his bankruptcy petition) (collecting cases);[12] *Watson*, 101 F. App'x at 825-26 ("The district court held that 'the failure to disclose intellectual property assets results in the assets remaining property of the bankruptcy estate after discharge of the bankruptcy,' and that because the bankruptcy estate still held the intellectual property at issue, Watson lacked standing to bring the suit."). The same principle applies to the sound recordings at issue, where no interest at all was listed in Clinton's bankruptcy petition. He is estopped from asserting these claims now.

### b. Excusable Neglect Does Not Salvage Clinton's Claims.

During the meet-and-confer process, Clinton's counsel argued that the doctrine of excusable neglect excuses Clinton's failure to include his future interests in Bankruptcy and does not divest him of his termination rights. Not so.

### i) Res Judicata *and Collateral Estoppel Bar Litigation of the Bankruptcy Petition*

As a threshold matter, Clinton is barred under *res judicata* and collateral

---

[12] Ex. 4, at 191:5-12 ("As set forth on the summary judgment ruling, any rights of Mr. Clinton were rights that were required to be disclosed in the bankruptcy proceeding. By making no claim that he had any such rights, Mr. Clinton lost the ability to bring his claims here.").

estoppel from now trying to relitigate any of the issues settled by the Bankruptcy Proceeding. In addition to that proceeding's findings having their own preclusive effect, the issue of Clinton's bankruptcy petition was front and center in the 1999 Florida litigation. While Clinton has claimed subsequently that the information in the Petition is not accurate, he may not do so under both the doctrines of collateral estoppel and *res judicata*, and any attempt to do so would itself be frivolous. Clinton's Bankruptcy Petition was actually litigated in the 1999 Florida Litigation, and the findings of Judge Hinkle are preclusive as to arguments he made or could have made back in that litigation.

### ii)    *Excusable Neglect Is Not Applicable Here*

In addition, excusable neglect as a basis for relief to escape consequences of litigants' mistakes and their attorneys' mistakes, *e.g.*, under Bankruptcy Rules 9006(b) and 9024, is *only* applicable: (1) where no prejudice to other parties will result;[13] and (2) is only applicable *within* the given Bankruptcy proceeding.[14] While the doctrine *might* have allowed for the reopening of the Bankruptcy proceeding, or allowed tardy amendment to Clinton's list of assets *during* the proceedings, trying to apply the doctrine over forty years after-the-fact is inapt here. The doctrine clearly does not apply, as "inadvertence, ignorance of the rules, or mistakes construing the

---

[13] *In re Wing*, 55 B.R. 91, 93 (Bankr. D.D.C. 1985).
[14] *See Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 387-95 (1993).

rules do not usually constitute 'excusable' neglect[.]" *Pioneer Inv. Servs.*, 507 U.S. at 392. *See also In re Lopez*, 39 B.R. 433, 437 (Bankr. D.R.I. 1984) ("Neglect is generally not excusable where it results from lack of knowledge of substantive and procedural aspects of bankruptcy practice.") (collecting cases). Rather, "Congress plainly contemplated that the courts would be permitted, [when] appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Advanced Estimating Sys. v. Riney*, 77 F.3d 1322, 1324 (11th Cir. 1996) (quoting *Pioneer Inv. Servs.*, 507 U.S. at 388).

The Supreme Court in *Pioneer* set out four factors for determining whether excusable neglect is applicable during the bankruptcy proceedings: (1) the danger that the neglect caused prejudice; (2) the length of the delay resulting from the neglect and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was in the reasonable control of the party guilty of neglect; and (4) whether the party guilty of neglect acted in good faith. *Rhino Cellular, Inc. v. Greenberg (In re Greenberg)*, No. 06-10328, 2006 U.S. App. LEXIS 14266, at *6 (11th Cir. June 9, 2006) (citing *Pioneer Inv. Servs.*, 507 U.S. at 395). Clinton loses on all four even if applicable 41 years later in this action, which they are not.

First, permitting Clinton to take advantage of the doctrine forty-one years after the fact clearly weighs against the first two factors. As discussed above, Clinton's

future interests vested eight years prior to the 1984 Bankruptcy proceeding. At no time between 1984 and present has Clinton ever acted to remedy the defect. As for the third and fourth *Pioneer* factors, Clinton has proffered *no* reason for the delay and can proffer none other than unfamiliarity with Bankruptcy procedure, which as discussed above is not a proper ground. *Pioneer*, 507 U.S. at 392; *In re Lopez*, 39 B.R. at 437.

Further, the Defendants would clearly be prejudiced here. The Defendants were creditors in the 1984 bankruptcy proceedings, with Clinton stating he owed Boladian and his entities a total of $2.4 million. Exhibit 1. As discussed above, he is precluded for multiple reasons from now contesting that debt or the amount of it.

Regardless, the Court need not even apply these factors as it is not the Court overseeing the bankruptcy proceedings (which have been closed for four decades). *Furthermore,* none of the relief available to Clinton under the doctrine, even if applicable, would lift the bankruptcy estoppel forty-one years after-the-fact – especially given the manifest prejudice to the Defendants who were creditors in those proceedings.

### 2. *The Westbound Masters Are Works for Hire and Thus Not Terminable by Clinton, and Clinton is Estopped From Arguing that the Sound Recordings are Not Works for Hire.*

As an independent ground for sanctions and dismissal, an artist under a work for hire agreement under the 1909 Copyright Act (applicable to works created prior

to the effective date of January 1, 1978), assigned nothing and has no right to terminate the record label's ownership in the first place. *See, e.g.*, *Wilson v. Dynatone Publ'g Co.*, 892 F.3d 112, 119 (2d Cir. 2018) ("[U]nder § 304, in the case of works created (in the relevant time period) for an 'employer for whom such work is made for hire,' the employer for hire becomes effectively the author and owns not only the initial term, but also the renewal term.") (quoting 17 U.S.C. § 304(a)(1)(B)); 17 U.S.C. § 304(c) ("In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, **other than a copyright in a work made for hire**…") (emphasis added).

Clinton recorded the Westbound sound recordings as works for hire and is estopped from claiming otherwise. The Agreement with Westbound was a work for hire agreement, Ex. 12, at p. 16 of 81 ("Company hereby employs artist…. Artist hereby accepts such employment upon all of the terms and conditions of this Agreement."), taking Clinton out of the purview of any termination/reversion interest in those recordings. In 1975, Clinton and Westbound modified the 1972 Agreement, and in so doing agreed that Westbound "shall **retain** in perpetuity the exclusive worldwide right, title and interest in and to all master recordings and the copyrights thereon embodying the performances of the Group [Funkadelic] delivered to [Westbound] prior to the date of this Agreement." *Id*. at Ex. B at ¶3 (emphasis added). The use of "retain" is important here as the Agreement

specifically noted that Clinton was an "employee" of Westbound and that the Sound Recordings were owned by Westbound as a result, *i.e.*, there was no assignment. That is because, under the operative 1909 Copyright Act, the work for hire doctrine governed all works created by employees in the regular course of their employment. *See Cmty. for Creative Non-Violence*, 490 U.S. at 743-44; *see also* 17 U.S.C. §§ 203, 304 (providing an author the right to terminate a "*grant*") (emphasis added). And as discussed above, as a result of his abandonment of his claims related to the Westbound Masters in the 2011 California Litigation, Clinton is barred by *res judicata* from contesting in any way the validity of the aforementioned agreements. *See* Exhibits 12 and 13; N.D. Fla. Loc. R. 15.1(A); *Bilal*, 251 F.3d at 1347; *Dinkins*, 2007 U.S. Dist. LEXIS 102709, at *27-28.

Finally, Clinton and his lawyers' bad faith is demonstrated by Clinton's duplicity in other current litigation. In a lawsuit pending against him in federal court in Detroit, because it was in his interest to do so, Clinton affirmatively stated that he was an employee of Westbound in pleadings filed on March 26, 2025, less than one month before he filed the instant action. *See* Ex. 16, at 4, Clinton's Mot. for Summary Judgment in *Worrell v. Clinton*, *et al.*, 22-cv-11009 (E.D. Mich) ("[C]ontracts signed by Westbound's owner in February and March 1974" "reflect[]" Clinton's "indisputable employment"). Yet, here, where it suits him to say the opposite, that he was not an employee, Clinton and his lawyers do just that, stating: "Plaintiff is

not and has never been an employee of any of the Defendants," Doc. No. 1, at ¶ 76, and "Plaintiff never signed a work for hire agreement with any of the Defendants nor did he sign any employment agreements with any of them." *Id*. at ¶ 78. Tellingly, realizing that he was taking diametrically opposed positions in simultaneous lawsuits, Clinton removed this allegation in the First Amended Complaint, but still recognizes that the instant suit hinges on the fact that works were not made for hire, such that they would fall outside of the ambit of his termination notices. *See* Am. Compl. at ¶ 62 (recognizing that "This termination right is available for any work not considered a work made for hire," and providing the incorrect definition of works made for hire).[15]

## B. The Declaratory Judgment Claims are Not Ripe.

Even if the works were somehow still subject to termination, it is black-letter law that "[a] declaratory judgment may only be issued in the case of an 'actual

---

[15] Clinton's definition comes from the now-operative 1976 Copyright Act (17 U.S.C. § 101). **This too is knowingly frivolous**. As discussed above, as all of the sound recordings at issue were recorded prior to the enactment date of the Copyright Act of 1976, whether or not these works are made-for-hire would need to be evaluated under the 1909 Copyright Act. Courts interpreting reversions of sound recordings under the 1909 Copyright Act have held that works for hire are not subject to terminations. *See, e.g.*, *Wilson*, 892 F.3d at 119 ("[U]nder § 304, in the case of works created (in the relevant time period) for an 'employer for whom such work is made for hire,' the employer for hire becomes effectively the author and owns not only the initial term, but also the renewal term.") (quoting 17 U.S.C. § 304(a)(1)(B)); 17 U.S.C. § 304(c) ("In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire…") (emphasis added).

controversy.' 'The controversy must be definite and concrete, touching the legal relations of the parties having adverse legal interests.'" *Stevens v. Osuna*, 877 F.3d 1293, 1312 (11th Cir. 2017). Here, there is no justiciable controversy for many of the works because (1) Clinton has already received the portion to which he claimed entitlement under the reversion;[16] or (2) certain terminations have not reached their effective date, *regardless* of whether they are statutorily valid.

Indeed, Clinton himself admits that many of his termination claims and the corollary copyright infringement claims are not ripe. For many of the works, the effective termination dates listed in the Schedules to the Complaint are not until 2026 at the earliest and 2032 at the latest. Doc. Nos. 32-1 (Exhibit A), 32-3 (Exhibit C). As such, these claims are facially unripe, ignoring their other patent fatal legal flaws discussed above. The Eleventh Circuit affirmed the dismissal of a similar "premature" declaratory judgment action pertaining to Section 203 terminations finding "[t]he issues [we]re … not yet fit for adjudication." *Smith v. Casey*, 741 F.3d 1236, 1245 (11th Cir. 2014). Here, many of the termination claims are nearly one

---

[16] Clinton lists certain works he claims Bridgeport is infringing following purported termination in Exhibit A to the First Amended Complaint. However, **despite not being obligated to for the reasons discussed herein,** Bridgeport did in fact relinquish rights to Clinton for his shares of certain compositions (other portions of those compositions were obtained from third parties). For example, Clinton has received his share of the titles "Get Dressed," "Man's Best Friend," "Loopzilla," "Pot Sharing Tots," "Computer Games," "Atomic Dog," "Free Alteration," and "One Fun at a Time." *Yet,* Clinton disingenuously represented to the Court that he has not received those interests.

year away, and the furthest approximately seven years away, from being ripe. Under the binding precedent of this circuit, Clinton's claims must be dismissed as they are frivolous due to the clear lack of ripeness.

### C. Clinton's Claims for Copyright Infringement Must Fail.

Clinton's copyright infringement claim likewise is frivolous. Copyright infringement is a straightforward cause of action with only two elements: ownership of a valid copyright and unapproved copying of the protectable elements of said copyright. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Clinton cannot meet this *prima facie* case for all of the reasons discussed fully above.

In addition to what has been said above regarding bankruptcy estoppel, *res judicata* and collateral estoppel, many if not most of the termination notices are for Clinton's *pro-rata* share. The import being that Defendants will still own a fractional share of the Works *even if* Clinton's notices are effective (they are not). It is blackletter law that a copyright co-owner cannot sue another co-owner for infringement. *Gordon v. Lee*, No. 1:05-CV-2162-JFK, 2007 U.S. Dist. LEXIS 35361, at *39-40 (N.D. Ga. May 14, 2007) (citing *Oddo v. Ries*, 743 F.2d 630, 632-33 (9th Cir. 1984)).

### D. Clinton's Claim for Fraud is Baseless, Barred by *Res Judicata*, and Inadequately Pleaded.

#### 1. *Any Pre-Termination "Fraud" is Barred by* Res Judicata or the applicable Statute of Limitations.

The *only* non-conclusory factual allegations pertaining to *any* alleged fraud comes in Section II of the First Amended Complaint styled as "Defendants Successfully Scheme to Defraud Clinton." Am. Compl. ¶¶ 32-41. However, the allegations herein pertain *only* to how Defendants purportedly acquired the rights to the Works at issue in the first instance. As discussed above, all of these matters have been well settled in the 1999 Florida Litigation and the 2011 California Action. And, even if these issues hadn't been well settled, they clearly would be time barred now given that the *latest*-in-time allegation is from 1990 (Am. Compl. ¶ 33). *See* Fla. Stat. Ann. § 95.11(3) (providing for a four-year limitations period for actions sounding in fraud under Florida Law); *McCormick v. Hanover Grp.*, No. 302011, 2012 Mich. App. LEXIS 961, at *16 (Ct. App. May 15, 2012) (applying a six-year limitations period for actions in Fraud under Michigan Law).

That is, in addition to being completely barred from consideration by this Court under *res judicata*, collateral estoppel, and statutes of limitations, these factual claims are wholly irrelevant to the actually pending claims. Even if these allegations are just vestige of the initial complaint, that does not salvage them from being frivolous. Clinton, having been well apprised of the issues in the first-served Rule

27

11 Motion had ample opportunity to strike these irrelevant and moot factual allegations.

### 2. The Remaining Conclusory Allegations of Fraud are Inadequately Pleaded.

Rule 9 of the Federal Rules of Civil Procedure clearly imparts a heightened pleading standard for causes of action sounding in fraud. "Pleading a fraud claim with particularity means 'identifying the who, what, when, where, and how of the fraud alleged.'" *Datum Software, Inc. v. Citizant, Inc.*, No. 23-12538, 2024 U.S. App. LEXIS 19947, at *13 (11th Cir. Aug. 8, 2024). The *Datum* Court elucidated, holding that:

> Specifically, the complaint must show:
>
> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id.* (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)). Failure to adhere to this standard necessarily calls for dismissal. *Id*.

When stripped of the allegations barred by *res judicata* and collateral estoppel discussed *supra*, the only remaining allegations related to fraud are found under the header for the Fourth Cause of Action for "Fraud For Recaptured Works" ¶¶ 88-96. These threadbare allegations do not meet the standard expressed in *Datum* and

*Garfield*. There are only vague references to misrepresentations made by Defendants as to the ownership of the Works. *See generally*, Am. Compl. ¶¶ 88-96. Clinton makes no effort to identify "precisely what statements were made" much less the "time and place" of the same, much less the "content of such statements" despite, as alleged, being the recipient of these statements. *See, e.g.*, Am. Compl. ¶ 92.

### E. Clinton's Fifth Cause of Action for Preliminary Injunction Fails Because it is a Request for Relief, Not A Cause of Action.

"Injunctive relief is not a cause of action but a remedy." *Brown v. Bank of Am., N.A.*, No. 2:12-CV-00132-RWS, 2013 U.S. Dist. LEXIS 22724, at *4 n.3 (N.D. Ga. Feb. 19, 2013) (citing *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005)). That is, this "cause of action" is not, truly, a cause of action but relief. Regardless of the semantics, Clinton cannot establish entitlement to an injunction. Issuance of a preliminary injunction requires Plaintiff to show a likelihood that he will succeed on the merits of his claims. *Study Edge, LLC v. Skoolers Tutoring Ctr., LLC*, 2017 U.S. Dist. LEXIS 216268, *2-3, Case No. 1:17cv76-MW/GRJ (N.D. Fla. Dec. 8, 2017) (request for preliminary injunction denied because Plaintiff failed to show a likelihood of success on the merits of its claims for copyright infringement). As explained above, he cannot do so since the composition copyrights in the catalog belong to Defendants, not Clinton, and he abandoned all claims in the sound recordings, which also belong to Defendants. It is thus Defendants, not Clinton, who have the right to exploit the copyrights. It was

29

frivolous to bring the aforementioned claims as a matter of law.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for Rule 11 sanctions should

be granted.

Dated: June 11, 2025                             Respectfully submitted,

KING & BALLOW

*/s/ Richard S. Busch*
Richard S. Busch (*Pro Hac Vice*)
David Niemierzycki (Fla. Bar. 1023763)
KING & BALLOW
26 Century Boulevard, Suite NT700
Nashville, TN 37214
Telephone: (615) 259-3456
*rbusch@kingballow.com*


*/s/Barry Richard*
**BARRY RICHARD** (Fla. Bar 105599)
Barry Richard Law Firm
101 East College Avenue, Suite 400
Tallahassee, FL 32301
(850) 274-1814
barryrichard@barryrichard.com
dawnkrow@barryrichard.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendants, certifies that this brief contains 7606 words, which complies with the word limit of L.R. 7.1(F).

DATED: June 11, 2025            By: */s/*Richard S. Busch
                                    Richard S. Busch