# EXHIBIT 12

COrr

# KING & BALLOW

### LAW OFFICES

6540 LUSK BOULEVARD

SUITE 250

SAN DIEGO, CALIFORNIA 92121

TELEPHONE: 858/597-6000

FACSIMILE: 858/597-6008

www.kingballow.com

December 19, 2012

*Via E-mail and Federal Express*
*lhclough@sbcglobal.net*
*jlucas@stroock.com*
*drozansky@stroock.com*

Larry H. Clough, Esq.
21757 Devonshire Street, Suite 2
Chatsworth, CA 91311

Daniel A. Rozansky, Esq.
John J. Lucas, Esq.
Stroock & Stroock & Lavan LLP
2029 Century Park East; 16th Floor
Los Angeles, CA 90067-3086

      Re:   *George Clinton v. Nene Montes, et al.*
              Case No. CV 11-10062-R (SH)

Gentlemen:

As you know, we represent Defendants Armen Boladian, Westbound Records, Inc., ("Westbound"), and Sync2Picture, LLC, in the above referenced matter. We are aware of the intent of Stroock & Stroock & Lavan LLP ("Stroock") to substitute for Mr. Clough as Mr. Clinton's counsel and have received a copy of the request for substitution. For the reasons discussed below, we oppose the substitution. The allegations made by Mr. Clinton in this action are not only false, as even a basic investigation would have revealed, but the legal claims are also barred as a matter of law. As a result, we intend to serve counsel with a Rule 11 motion for sanctions, along with a motion to dismiss/summary judgment shortly. As the signatory to the pleadings in this action, Mr. Clough is a party responsible under Rule 11, so we object to him being removed from the action, and, by this letter, we are putting Stroock on notice that they too will be responsible under Rule 11 should they advance this frivolous action beyond its present posture.

Mr. Clinton's Complaint asserts that only a 1969 "oral agreement" between he and Westbound exists with respect to the master sound recordings released by Westbound (referred

NASHVILLE OFFICE:

1100 UNION STREET PLAZA · 315 UN ON STREET · NASHVILLE, TENNESSEE 37201 · TELEPHONE: 615/259-3456 · FACSIMILE: 615/254-7907

Mr. Clough
Mr. Rozansky
Mr. Lucas
December 19, 2012
Page 2

to in the Complaint as the "Westbound Sound Recordings"). These sound recordings are identified in the Complaint as being included on the following albums titled: *Funkadelic, Free Your Mind and Your Ass Will Follow, Maggot Brain, America Eats Its Young, Cosmic Slop, Standing on the Verge of Getting it On, Let's Take it to the Stage,* and *Tales of Kidd Funkadelic*.

Mr. Clinton contends that he has never been "...provided an accounting or royalties..." owed to him under this supposed "oral agreement," and thus requests that the Court rescind the oral agreement and award him ownership of the master recordings. Not only are Mr. Clinton's claims without factual or legal support, they are completely fabricated and barred for many reasons.

In 1975, Mr. Clinton wanted to terminate his written recording agreements with Westbound. *See,* March 20, 1975 letter attached hereto as **Exhibit A**, from Phonogram, Inc., to Clinton's attorney Richard M. Shelton. On September 24, 1975, as a result, Mr. Clinton and Westbound entered into a termination agreement, in which Mr. Clinton acknowledged and agreed that Westbound "shall retain in perpetuity the exclusive worldwide right, title and interest in and to all master recordings and the copyrights thereon embodying the performances of the Group [Funkadelic] delivered to [Westbound] prior to the date of this Agreement and that with respect to these previously delivered master recordings, the same shall be subject to our royalty obligations to you as are contained in the Agreement." (emphasis added). *See* **Exhibit B, ¶ 3**. "The Agreement" identifying the royalty obligations is a 1972 written agreement between Mr. Clinton and Westbound, attached hereto as **Exhibit C**. I note that neither of the 1972 or 1975 Agreements are mentioned in any way in the Complaint. The allegation of only a verbal agreement between the parties is thus demonstrably false.

Since Mr. Clinton has made it a practice of denying he signed or entered into various agreements over the years, we also attach hereto subsequent letters between Mr. Clinton's lawyer and Westbound's lawyer, in which the lawyers discuss Mr. Clinton's delivery obligations under the September, 1975 agreement. *See* various letters attached cumulatively hereto as **Exhibit D**. Mr. Clinton also received royalties and accountings under his agreements with Westbound, as reflected in letters his lawyers wrote to Westbound in which they asked for clarification of statements, and supposedly missing statements, which were provided. *See* **Exhibit E**. This correspondence demonstrates the absolute falsity of the factual allegations made by Clinton in this action.

As a result of the foregoing, Mr. Clinton's claims fail as a matter of law. In 1984, as I am sure you are aware, Mr. Clinton filed for bankruptcy. He listed Mr. Boladian, Westbound and related companies as creditors in the amount of $2,400,000. He did not, however, list on his bankruptcy schedules any right to receive royalties from the Westbound Sound Recordings. His failure to do so prevents him from asserting the claims he has raised in this action. See *Jethroe v. Omnova Solutions, Inc.,* 412 F.3d 598 (5th Cir. 2005); *Barger v. City of Cartersville,* 348 F.3d 1289 (11th Cir. 2003); *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778 (9th Cir. 2001);

Mr. Clough
Mr. Rozansky
Mr. Lucas
December 19, 2012
Page 3

*Hay v. First Interstate Bank, N.A., 978 F.2d 555* (9th Cir. 1992); *Sec. Ins. Co. v. Machevsky*, 81 Fed. Appx. 241 (9th Cir. 2003); *Edwards v. Alamo Group (USA)*, 24 Fed. Appx. 693 (9th Cir. 2001).

Mr. Clinton and his counsel are well aware of this fact. In 1999, Mr. Clinton and his publishing company, Malbiz Music ("Malbiz") filed an action against Mr. Boladian and Bridgeport Music, Inc. ("Bridgeport") in the United States District Court for the Northern District of Florida (the "Florida action"), asserting that he did not ever assign any of the musical compositions to Bridgeport, either individually or on behalf of Malbiz. The Court ultimately held that Mr. Clinton was judicially estopped from receiving any royalties from any of the compositions because he did not list any right to any royalties from any compositions on his 1984 bankruptcy petition. *See* Order attached hereto as **Exhibit F**. The same principle applies here. As evidenced by the 1975 Agreement, and the other attachments to this letter, Mr. Clinton knew he had rights to royalties with respect to the Westbound Sound Recordings and yet failed to list this asset on his bankruptcy schedules. His failure to do so now precludes him from asserting any rights to those royalties. *See* Mr. Clinton's bankruptcy schedules attached hereto as **Exhibit G**.

You should also know that Mr. Clinton has provided untruthful testimony under oath. In the Florida action, recognizing that the evidence was overwhelming that, on behalf of his publishing company, Malbiz, he did assign ownership of the musical compositions to Bridgeport, Mr. Clinton testified that he had assigned ownership of Malbiz to his wife before entering into the assignment with Bridgeport, effectively alleging that the transfer was void because he did not have the right to sign it. The federal judge rejected that testimony. Later, in other litigation, Mr. Clinton testified under oath that his testimony in the Florida action was knowingly false, as he never transferred ownership of Malbiz to his wife. He claimed he provided that false sworn testimony because his lawyer told him to do so.

Finally, Mr. Clinton's claims are barred by the statute of limitations and laches. If it were true, as Mr. Clinton alleges, that "in the past 40 years, the Westbound Sound Recordings have consistently generated millions of dollars through direct sales and sampling by other artists, yet Westbound has never properly accounted or paid Clinton royalties," Mr. Clinton should have brought this action well before now.

Please be advised that Mr. Jeffrey Thennisch, whose name appeared on Mr. Clinton's Complaint and who professes to be Mr. Clinton's attorney in Michigan, has been twice sanctioned by federal courts in Michigan for bringing frivolous litigation against Mr. Boladian and his related entities. *See* Orders attached hereto as **Exhibit H**. The federal judge stated that he believed the intent of the litigation was to harass Mr. Boladian, and remarked that the harassment must stop. We believe this lawsuit to be a continuance of those frivolous proceedings.

Mr. Clough
Mr. Rozansky
Mr. Lucas
December 19, 2012
Page 4


As a result of the foregoing, and as stated above, we oppose the substitution of counsel, and are demanding that this action be immediately dismissed, while reserving our right to move for Rule 11 sanctions for fees and costs already incurred.   I am available to discuss these issues further at your convenience.

All rights reserved.

Very truly yours,

Paul H. Duvall

PHD:sj
Enclosures

# EXHIBIT A

LAW OFFICES

# LEVIN AND BERGER

LEONARD L. LEVIN
BURTON BERGER
MARVIN L. HERMAN
ARNOLD B. MALK

SUITE 2140
221 NORTH LA SALLE STREET
CHICAGO, ILLINOIS 60601
TELEPHONE 312/782-5397

CABLE ADDRESS "GOLIN"

March 20, 1975

Mr. Richard M. Shelton
Attorney at Law
79 West Monroe Street
Chicago, Illinois   60603

                    Re:   Funkadelics

Dear Dick:

Providing that the group known as "The Funkadelics" either
receive a release from Westbound Records of their current
recording contract or a court, of last resort, enters a decree
finding that the current contract between Westbound Records
and the Funkadelics is void, and of no effect, Phonogram, Inc.
will then enter into it's usual form of artist contract with
the group embodying the following terms:



1.  $50,000 advance on signing, chargeable against
    any and all royalties accruing under the con-
    tract.

2.  Record a minimum of 2 LPs and ~~a maximum of~~ 4
    LPs, at Phonogram's election, during the in-
    itial term and each option year of the contract.

3.  Release a minimum of 2 LPs during the initial
    term and each option year of the contract.

4.  Advances per LP:

        Initial Term:      $65,000.00 each.
        First Option Year: $70,000.00 each.
        Second Option Year: $80,000.00 each.
        Third Option Year: $100,000.00 each.
        Fourth Option Year: $100,000.00 each.

    The above advances shall cover all recording
    costs and shall be chargeable against royalties.
    *payable  one/half  upon commencement  of recording
    1/2 on delivery*

*on copies*

TO:  Mr. Richard M. Shelton
March 20, 1975
Page Two

5.  Royalty rates:

   Domestic Records – singles and albums – 10%
   of 90% of the suggested retail list price,
   less a packaging deduction equal to 10.24%
   of the suggested retail list price.

   Tape – worldwide – 7½% of 90% of the suggested
   retail list price, less $.75 for tape packaging.

   Foreign Records – 40% of the net amount received
   by Phonogram.

   Club/Mail Order – 40% of the net amount received
   by Phonogram.

   Budget – 40% of the net amount received by
   Phonogram.

6.  Term:  The initial term shall be from the date of
   contract up to and including the close of 12 months
   following receipt by Phonogram of the first com-
   pletely mixed and edited LP, plus four-one year
   options.

7.  In the event Phonogram exercises the third option,
   it will advance $50,000.00 upon the effective date
   of the fourth option year, chargeable against
   royalties.

8.  Some of the members of the group record for Casa-
   blanca Records under the assumed name of "The
   Parliaments".  Written approval must be obtained
   from Casablanca for the contract between Phonogram,
   Inc. and the Funkadelics.  In addition, no new
   contract or extension of the current contract
   should be entered into with Casablanca (exclusive
   of any remaining options that may be exercised by
   Casablanca pursuant to its current agreement) and
   if and when the contract with Casablanca terminates,
   either by its terms or otherwise, Phonogram shall
   then have the exclusive services of the group

TO:  Mr. Richard M. Shelton
March 20, 1975
Page Three


       known as "The Parliaments" for the remainder
       of Phonogram's contract with the Funkadelics.

With the kindest of personal regards and best wishes.

          Sincerely,

          LEVIN AND BERGER

          LEONARD L. LEVIN

LLL:jlv

# EXHIBIT B

14643 Joy Road
Detroit, Michigan 48228

Dated: 9/24/75

Mr. George Clinton
p/k/a/ & a/k/a/ "Funkadelic"
c/o Weiss & Meibach
888 Seventh Avenue
New York, New York 10019

Dear Mr. Clinton:

Your signature under the words "AGREED TO AND ACCEPTED"
below shall constitute the following binding agreement between
us:

1.   Reference is made to that certain agreement dated
August 30, 1972 (the "Agreement") by and between you individually
and also known as jointly as a member of the recording artist
group professionally known as "Funkadelic" (hereinafter referred
to collectively as the "Group") and us with respect to the
recording and production of phonograph records by the Group.

2.   In consideration of the mutual covenants herein contained
and for other good and valuable consideration, receipt of which
is hereby acknowledged, you and we hereby agree to modify the
aforesaid Agreement only in accordance with the terms and conditions
as more fully set forth herein below.

3.   You hereby acknowledge and agree that we shall retain
in perpetuity the exclusive worldwide right, title and interest
in and to all master recordings and the copyrights thereon embodying
the performances of the Group delivered to us prior to the date of
this Agreement and that with respect to these previously delivered

master recordings, the same shall be subject to our royalty
obligations to you as are contained in the Agreement.

4.   Notwithstanding anything to the contrary contained in
the Agreement, the term of said agreement is hereby sooner terminated
as of the date hereof upon the following terms and conditions.

(i)  You shall have the obligation to produce and deliver to
us additional master recordings to comprise one (1) 33-1/3 RPM long
playing phonograph album or the equivalent thereof ("the Album")
no later than February 1, 1976, it being understood and agreed
that the termination of our exclusive rights for the production
and recording of master recordings by the Group shall be conditioned
upon the delivery of the aforesaid master recordings.

(ii)  The Album to be delivered to us hereunder shall be subject
to our total approval with respect to the studios to be designated
and at times and places to be designated for the purpose of making
master recordings.  The musical compositions to be recorded shall
be original and never previously recorded and shall be approved
by us prior to recording , and each master recording made shall be
subject to our approval as commercially satisfactory for manufacture
and sale of phonograph records.  You hereby agree that the total
costs for the recording of said Album shall not exceed THIRTY FIVE
THOUSAND DOLLARS ($35,000.00) and we shall be responsible for the
payment of said recording costs as defined in the Agreement , however,
our obligation shall not exceed the payment of THIRTY FIVE THOUSAND
DOLLARS ($35,000.00).  Any costs in excess of THIRTY FIVE THOUSAND
DOLLARS ($35,000.00) shall be your responsibility and shall be paid
by you.  All master recordings made hereunder shall be subject to the
rerecording restrictions of the Agreement and all of said compositions

-2-

music publisher, Bridgeport Music, Inc., in accordance with the Agreement between us.

(iii)  Upon the delivery of the satisfactory master recordings as set forth in this paragraph, we shall provide you with a written receipt of same and, from the date of such written receipt, you hereby agree that we shall have 120 days from said date on which to release, advertise and promote the aforesaid Album without any competition by a third party record company of any product embodying the performances of the Group.  After said 120 day period, you shall be free to have product release by a third party record company embodying the performances of said Group.  The conditions as set forth in this paragraph are material to the modification of the Agreement and in the event that you shall breach these conditions then, and in such event, the Agreement shall not be sooner terminated and you further agree that the breach of this Agreement will cause irreparable damage to us and will justify our seeking equitable relief and an injunction in addition to any other available remedies we may have.

5.  Upon the delivery of the aforesaid Album, we shall no longer be under any other obligation to accept or release any other master recording of the Group pursuant to the Agreement.

6.  You acknowledge and agree that we have performed all of our obligations due you under said Agreement and we shall have no obligation to pay to you any advances other than our commitment to be responsible for the recording costs of said album which is not to exceed THIRTY FIVE THOUSAND DOLLARS ($35,000.00).  Said costs shall be charged to you as an advance in accordance with the Agreement.  You shall be entitled to receive royalty payments for the Album delivered to us

-3-

hereunder pursuant to the Agreement in the amount specified in the Agreement subject to our recouping all other costs and advances made thereunder.

7.   Except as specifically provided in paragraph 3 hereinabove, you hereby release us, our stockholders, subsidiary and affiliated corporation, and their successors, assigns and licensees, from any and all existing or future claims of every kind and character arising under or relating to said Agreement and you hereby agree to indemnify, save and hold us harmless from any and all loss or damage (including attorneys' fees) arising out of or connected to any claim by a third party including all other individual musicians who have performed as a member of the Group during the term of the Agreement.

8.   This agreement shall not be altered or amended, except by writing executed by all parties hereto.

9.   This agreement has been entered into in the State of Michigan, and the validity , interpretation and legal effect of this agreement shall be governed by the laws of the State of Michigan applicable to contracts entered into and performed entirely within the State of Michigan,with respect to the determination of any claim, dispute or disagreement, which may arise out of the interpretation, performance, or breach of this agreement.

                                    Very truly yours,

                                    WESTBOUND RECORDS, INC.

                                    By: _____
                                        Armen Boladian, President

AGREED AND ACCEPTED:

_____
George Clinton

# EXHIBIT C

38

A G R E E M E N T

meibod 38
Doyle Reporting Inc.   7/21/78

AGREEMENT made this 30th day of August, 1972,
by and between WESTBOUND RECORDS, INC. of 14843 Joy Road, Detroit,
Michigan (hereinafter referred to as "COMPANY") and the undersigned
persons, (hereinafter referred to as "ARTIST") individually and jointly as
a member of the Group known as:

FUNKADELIC,      GEORGE CLINTON, PRODUCER.

1.      (A)  Company hereby employs Artist in his individual
capacity and as a member of the Group mentioned above, any variation
thereof or such other group as the Company may designate (such group
being hereinafter referred to as "The Group"), as a recording artist and
musician for the purpose of making master recordings, from which phono-
graph records will be produced which embody the recorded performances of
Artist, and for such purposes as are normally incidental thereto.  Artist
hereby accepts such employment upon all of the terms and conditions of this
Agreement.

(B)  During the initial term and option periods of this Agree-
ment, and any extensions or renewals thereof, Artist shall not perform for the
purpose of making master recordings or phonograph records for any person or
business entity other than Company.  For a period of five (5) years following
the termination or expiration of this Agreement Artist shall not perform for
such purpose (for anyone other than Company) any musical composition or
other material recorded hereunder.

(C)  Artist acknowledges that the services to be rendered by
him and the rights granted by him hereunder are unique and extraordinary and
that the breach of this Agreement will cause irreparable damage to Company
and will justify Company's application for equitable relief in addition to any
available remedies.

2.      (A)  Artist will render services at recording sessions scheduled at times and places designated by Company.   Company shall select the musical compositions or other material to be performed by Artist and shall also determine the number and identity of the musicians, vocalists and other performers (if any) to be recorded at such sessions.  Upon Company's request (exercisable in its sole discretion), Artist shall repeat any performance recorded hereunder.

(B)  Artist agrees to record a minimum of two (2) 33 1/3 RPM LP phonograph record album sides and two (2)  45 RPM single record sides or their equivalent during the initial term of this Agreement and during each subsequent option period.  Notwithstanding the foregoing, Artist shall record additional record sides at Company's request, and  such additional sides may in Company's discretion be applied in satisfaction of such minimum obligation in any subsequent option period of this Agreement.

(C)  If, during the initial term of this Agreement or any option period, the minimum number of record sides specified above are not recorded by reason of Artist's failure or refusal to record such record sides or if Artist fails or refuses to render services at any recording session scheduled by Company.  Company may elect to extend the initial term of this Agreement or the option period during which such failure or refusal occurs, as the case may be, until such minimum number of record sides are recorded by Artist or until Artist renders such services.  Written notice of Company's election to extend this Agreement pursuant hereto shall be mailed to Artist by certified mail, not more than thirty (30) days after the expiration of the initial term or option period, as the case may be.

(D)  Phonograph records manufactured from master recordings made hereunder shall be distributed and offered for sale under such trademarks, trade names or labels and by such distributors and licensees as Company alone

-2-

may determine.

(E) Company shall have the right to determine which of Artist's performances shall be coupled with other performances of the Artist, upon phonograph records of such sizes and speeds as Company alone shall determine.

(F) Company shall have the right to couple performances rendered by the Artist with performances rendered by others upon phonograph records of such sizes and speeds as Company alone shall determine.

3. Company agrees to pay all costs of recording sessions hereunder, including without limitation the costs of arrangers, musicians, copyists, vocalists, payments due to any union pension and welfare fund, payroll and employment taxes and recording costs (such as studio time, equipment and personnel charges and mastering costs). All such payments and costs shall be considered the Company's advances to the Artist which shall be recouped from any royalties or other payments due to Artist from Company. Any costs or expenses which are incurred by Company by reason of Artist's failure to appear or tardiness in appearing at a recording session scheduled by Company shall be paid by the Artist to the Company as Artist's absolute liability without reference to any royalties due and payable to Artist, and Company, at its option, may deduct such costs or expenses from such royalties.

4. Company agrees to pay to Artist in consideration of the services to be rendered by Artist hereunder:

(A) A royalty of three (3 %) per cent of the suggested list price (exclusive of all sales and excise taxes and duties, and less the portion of such price allocated by the Company to containers or packaging) for ninety (90%) per cent of all phonograph records (exclusive of pre-recorded tapes) sold at retail within the United States under the authority of Company, on both sides of which are embodied only performances recorded hereunder, and which are paid for and not subject to return; and one-half (1/2) of such royalty with respect

-3-

to pre-recorded tapes (contained in cartridges or otherwise) sold at retail within the United States under the authority of Company, embodying performances recorded hereunder, and which are paid for and not subject to return.

(i) Artist acknowledges receipt of the sum of Five Thousand ($5,000.00) Dollars paid by Company to Artist at the time of the execution of this Contract. Company represents that it will pay to Artist another Five Thousand ($5,000.00) Dollars within six (6) months of the signing of this Contract, which sum Company acknowledges does not constitute royalties and is not recoupable by the Company.

(B) With respect to phonograph records sold at retail outside of the United States under the authority of Company which contain performances rendered by Artist hereunder, Company will pay to Artist a royalty equal to one-half (1/2) of the royalties specified in subdivision (A) of this paragraph. Such royalties, at Company's election from time to time, may be based upon the suggested retail list price for such records in the country of manufacture or the country of sale or England or the United States, and shall be computed in the national currency of the country so elected. Artist shall be paid at the same rate of exchange as Company is paid, provided, however, that royalties on such sales shall not be due and payable until payment therefor has been received by Company in the United States of America.

(C) (i) In the event that any performance rendered by Artist hereunder is coupled on a phonograph record with any performance rendered by another Artist, it is agreed that as to such record, Artist shall receive that proportion of the royalties payable to Artist (as herein provided) as the number of Artist's performances embodied on such record bears to the total number of performances embodied thereon.

(ii) In the event that any master recording made hereunder embodies Artist's performance together with the performances of another artist or artists to whom Company is obligated to pay a royalty, it is agreed that the royalty payable to Artist (as herein provided) with respect to phonograph
SEE RIDER ATTACHED **

-4-

\*\*RIDER To Contract between Westbound Records, Inc. and Funkadelic, George Clinton, Producer –

4 (C) (ii)  –   records made from such master recording, shall be multiplied by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of such royalty artists (including Artist) having performances embodied thereon, and in such case the costs of recording chargeable to Artist pursuant to Paragraph 3 hereof shall be multiplied by the same fraction.

(D)  In the event that phonograph records embodying any of Artist's performances recorded hereunder are sold at retail through any direct mail-order operation, including but not limited to record clubs, the royalties payable to Artist shall be one-half (1/2) of the royalties otherwise due and payable as herein provided.  No royalty shall be payable to Artist with respect to phonograph records distributed to subscribers of such operation by reason of the purchase of a specified number of phonograph records or by reason of distributions to subscribers of "bonus" or "free" records.  If Company is paid by any mail-order and/or record club distributing licensee on any basis less favorable than that basis upon which royalties are payable to Artist pursuant to Paragraph 4 (A) above, then Company shall be entitled to pay royalties hereunder on the same basis as it is paid by such licensee.

(E)  No royalties shall be payable on "disc jockey" or "promotional" copies of records distributed for promotional purposes, and no royalties shall be payable with respect to any phonograph records for which Company does not receive payment.  No royalties shall be payable on phonograph records which are sold as distress merchandise or which are sold by Company for less than fifty (50%) per cent of Company's full wholesale price therefor (as such price is established from time to time by Company prior to the calculation of any discounts, allowances or commissions deductible therefrom).

(F)  No royalties shall be payable to Artist until Company has fully recouped all advance payments and all other charges against Artist's royalties pursuant to this Agreement or any other agreement between the parties.

5.    (A)  The initial term of this Agreement shall commence as of the date first indicated above and shall continue for a period of five (5) years.

(B)  Company shall have irrevocable options to extend the term of this Agreement  - No Option Periods.

Each such option shall be deemed automatically exercised by Company, unless Company gives Artist written notice prior to the expiration of the initial term, or extended term as the case may be, of its intention not to exercise a given option. All terms and conditions herein contained shall be applicable during said option periods.

6. Royalties herein stated to be due and payable to Artist, charges or expenses properly deducted therefrom, will be computed for the preceding six (6) calendar month period within eighty (80) days after June 30 and December 31 of each year so long as phonograph records embodying Artist's performances recorded hereunder are sold and paid for. Such royalties will be paid to Artist within such eighty (80) day period and will be accompanied by appropriate royalty statements. All royalty statements and all other accounts rendered by Company to Artist will be binding upon Artist and not subject to any objections by Artist for any reason unless specific objection in writing, stating the basis thereof, is received by Company within one (1) year from the date rendered in which event such statements shall be binding in all respects except for those specifically stated in such written objections. All royalty statements, payments, notices and correspondence to Artist shall be sent to Artist at the address indicated above unless prior written notice to the contrary is received from Artist by Company.

7. Artist hereby grants to Company the sole and exclusive right to use and permit others to use Artist's name, likeness, biographical material and facsimile signature and the name of the group for advertising and trade purposes in connection with the manufacture, distribution, sale and exploitation (individually and as a member of the group) of phonograph records embodying artist's performances recorded hereunder, and in advertising Company, its artists and products. Artist hereby acknowledges that the name of the Group is during the term of this Agreement owned jointly by Company and the members of the Group,

-6-

and Artist hereby agrees not to use the name of the Group in any manner whatsoever without the express consent of Company and the other members of the Group.

8. Artist represents that Artist is a member of the Group, and Company acknowledges that it is entering into agreements similar to this Agreement with the other members of the Group. All additions to or replacements of members of the Group and all matters which affect performances of the Group shall be mutually agreed upon by Company and a majority of the then-existing members of the Group.

9. In the event Artist wishes to retain the services of a manager, business advisor, booking agent or other similar representative, such representative shall be mutually agreed upon by Artist and Company.

10. Artist acknowledges that Artist is engaged in the business of musical entertainment. Artist hereby represents and warrants that Artist is free to enter into this Agreement and that Artist is under no disability, restriction or prohibition which will interfere in any manner with Artist's full compliance with and performance under this Agreement. Artist also warrants and represents that no performance recorded by Company hereunder will infringe or violate any right of any person or firm and that Company may exploit such master recordings made hereunder without liability or obligation to any other person or firm. In the event that Artist is a minor, Artist agrees to cause Artist's parent or guardian to execute the guarantee annexed hereto as Exhibit "A". Artist agrees to indemnify, save and hold Company harmless from any loss, damage or expense (including attorneys' fees) arising out of or connected with any claim by any third party which is inconsistent with the warranties, covenants or representations made by Artist in this Agreement.

11. All master recordings made hereunder, as well as all performances embodied thereon and all phonograph records derived therefrom, together with any property rights therein, whether presently existing or hereafter created,

-7-

will be the exlusive property of Company free of any claim whatsoever by Artist or by anyone deriving rights from Artist. Without limiting the generality of the foregoing, Company shall have the exclusive right throughout the world in its sole discretion and at any time to manufacture, advertise, sell, lease, license, distribute or otherwise exploit said property and to authorize others to do so or to refrain from doing so.

12. Company is not obligated to make or sell records manufactured from the master recordings made hereunder or to license such master recordings or to have Artist record the minimum member of record sides referred to in Paragraph 2 (B).

13. Company, in its sole discretion, may assign this Agreement or any of Company's rights hereunder to any other person, firm or corporation.

14. Artist agrees and guarantees that with respect to any musical composition created in whole or in part by Artist, either alone or in collaboration with others, and which is recorded by Artist hereunder, the copyright proprietor thereof will upon request grant to Company or its designee a mechanical license authorizing Company or its designee to manufacture and sell phonograph records embodying such musical composition as performed by Artist hereunder upon payment of a royalty of not more than one and one-half (1 -1/2 ¢) cents with respect to each such phonograph record manufactured and sold by Company. In the event that such a license is not granted to Company or its designee and Company or its designee pays royalties to such proprietor in excess of the amount specified in the preceding sentence, Artist agrees that the difference between such specified royalty and the royalty paid by Company or its designee may be deducted from the royalties agreed to be paid to Artist hereunder.

15. The parties agree that if at any time one party has materially breached any provision of this Agreement so as to constitute a default hereunder, the other party may terminate this Agreement by giving notice of such default in accordance with this Paragraph. As a condition precedent to any assertion by Company or Artist that the other is in default in performing any obligation con-

-3-

tained herein, the party alleging the default must advise the other in writing of the specific facts upon which it is claimed that the other is in default and of the specific obligation which it is claimed has been breached, and said other party shall be allowed a period of thirty (30) days after receipt of such written notice within which to cure such default. The parties agree that no breach of any obligation shall be deemed to be incurable during such thirty (30) day period.

16.   For the purpose of this Agreement:

(A) "Master recording", whenever referred to herein is intended to mean any original recording of sight and/or sound, whether on magnetic recording tape or wire, lacquer or wax disc, film or any other substance or material, whether now known or unknown, which is used in the manufacture of phonograph records or audio-visual performances.

(B) "Performance", whenever referred to herein is intended to mean any musical rendition or artistic service in connection with the production of a master recording including, but not limited to, arranging, conducting, accompanying, supervising and playing of any instrument.

(C) "Phonograph record", "record" or "phonograph recording", whenever referred to is intended to mean any and all objects manufactured in whole or in part from master recordings and which are intended to reproduce sound, including, but not limited to, wire, disc, film cylinder and (except where otherwise stated) tape, whether embodying sound alone or sight and sound or sound synchronized with visual images, e.g., audio-visual devices.

17.   This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and no modification, amendment, waiver, termination or discharge of this Agreement or any provision thereof shall be binding upon Company unless confirmed by a written instrument signed by an officer of Company. No waiver of any provision of or any default under this Agreement shall affect Company's right thereafter to enforce such

provision or to exercise any right or remedy in the event of any other default, whether or not similar. The validity, construction and effect of this Agreement, and all extensions and modifications thereof, shall be construed in accordance with the laws of the State of Michigan applicable to agreements wholly to be performed therein. Any notice to be sent to Company shall be sent to it at the address set forth above. Any notice to be sent to Artist shall be sent to the address set forth beneath Artist's signature. Notices shall be sent by certified or registered mail, return receipt requested.

IN WITNESS WHEREOF, the parties hereunto have caused this Agreement to be executed as of the date first indicated above.

In The Presence Of:

WESTBOUND RECORDS, INC.

By: _____

Armen Boladian

Its_____President_____

"Company"

FUNKADELIC

By: _____

GEORGE CLINTON, PRODUCER

"ARTIST"

# EXHIBIT D

written · 1/26/76
~~typed~~ · sent

Norman Kurtz, Esq.
598 Madison Avenue
NY  10022

RE: WESTBOUND/FUNKADELIC

Dear Norman:

George Clinton has been trying to reach Armen Boladian since before Christmas to secure his approval for the booking of recording studio time for the production of the last Funkadelic LP as required pursuant to Paragraph 4 (ii) of the September 28, 1975 Release Agreement.

He has been unable to reach Armen until today and unable to book the studio without Armen's approval.

In his conversation with George today, Armen advised George that he could not dicuss the album until the earliest, this weekend as he is tied up with the Congressional hearings in Newark.

Pursuant to the Release Agreement, Thang is to deliver the LP to us by no later than February 1 which is this Saturday. Clearly there is no way that Thang can deliver the album to Westbound by that time as George will probably not be able to speak to Armen before then regarding the booking of studio time.

George has advised me that it will take 3-4 weeks from the time he goes into the studio to deliver a completed album. He has been ready to go into the studio since early December and could go in tomorrow if the time was approved.

Because of Armen's unavailability to give the approval required for the recording to take place and thus George's inability to record the album, it is necessary to extend the delivery date to a month from the date Armen approved of the recording time.

We understand and are sympathetic with the reasons for Armen's unavailability but wonder if you could possibly approve the studio time on his behalf so we could get the project going.

George feels that he is losing valuable sales by not having a new Funkadelic LP to correspond with his current tour dates.

Can you please call me this afternnon so we can modify the existing Agreement and plans for this LP.

S

CABLE ADDRESS
WEISSMEIB, NEW YORK

LAW OFFICES
# WEISS & MEIBACH

NATHAN M. WEISS
INA LEA MEIBACH

—

GARY B. BAKER

888 SEVENTH AVENUE
NEW YORK, N. Y. 10019
(212) 765-4936

February 10, 1976

Normand R. Kurtz, Esq.
Kurtz & Vassallo, P.C.
598 Madison Avenue
New York, New York  10022

RE: FUNKADELICS & WESTBOUND

Dear Norman:

George has advised me that he has cleared studio time
with Armen and pursuant to his understanding with Armen,
the completed album will be delivered to Armen by Feb-
ruary 29, 1976 and that Armen has accepted this late
delivery date.  (To be on the safe side, let us say
March 1, 1976, since the 29th is on a Sunday).

Will you kindly confirm the delivery of said album by
such date by signing in the space provided below.

Thank you for your cooperation.  Warmest personal regards.

Sincerely,

Ina Lea Meibach

ILM:es
cc: Peter Rudge

Accepted and Agreed To:

Normand R. Kurtz as Attorney
for Westbound Records

KURTZ & VASSALLO, P. C.

598 MADISON AVENUE

NEW YORK, NEW YORK 10022

JOHN A. VASSALLO
NORMAND R. KURTZ

RICHARD A. ABRAMS

ATTORNEYS AT LAW

(212) 421-1870

CABLE ADDRESS: STRAITAMED
TELEX: 423866



FEB 13 1976

February 11, 1976

Ina Lea Meibach
WEISS & MEIBACH
888 Seventh Avenue
New York, N.Y. 10019

   Re: Funkadelics & Westbound

Dear Ina:

I am in receipt of your letter of February 10th with respect to
the above captioned matter, wherein you advised that the album
to be delivered to Westbound, in accordance with the conditional
release agreement, would not be completed in accordance with the
terms of the aforesaid agreement, therefore, a new delivery date
had to be arranged with Westbound.

I now understand this delivery date to be March 1st, 1976 and
advise you accordingly, pursuant to the release agreement, that
from the date of delivery the non-competition clause will be
operative.

You have asked me to confirm delivery of the album by such date.
I cannot do that other than confirm our client's acceptance of
late delivery with the proviso of the non-competition clause
in operation as I do not know when the album will be delivered.

I will, however, advise Armen to write to you the confirmation
of delivery of that album when Westbound receives same.

Kindest regards,

     Sincerely,

     Normand R. Kurtz

NRK:cem

c.c. Mr. Armen Boladian

KURTZ & VASSALLO, P. C.

598 MADISON AVENUE

NEW YORK, NEW YORK 10022

JOHN A. VASSALLO
NORMAND R. KURTZ
RICHARD A. ABRAMS

8 June, 1976

RECEIVED
JUN 0 9 1976

ATTORNEYS AT LAW

(212) 421-1870

CABLE ADDRESS: STRAITAMED
TELEX: 425265

Ms. Ina Meibach
Weiss & Meibach
888 Seventh Avenue
New York, New York

Dear Ina:

            Re  George Clinton/P.K.A. "Funkadelic"
                Release Agreement/Westbound Records, Inc.

Reference is made to the above-captioned agreement, and to our
recent telephone conversations regarding the finalization of the
LP and delivery of same to our client, Westbound Records, Inc.
Just to set the record straight, I have discussed with Armen, the
timing, with respect to the receipt by him of the masters and, in
addition, the missing material which is necessary for Westbound
to release the product.

Armen received the initialed master recordings on April 8, 1976
in Los Angeles, California.  As you are aware, he was dissatisfied
with the lack of "single material" and requested that George go
back into the studio and cut new material for potential use as
a single release.  George agreed to Armen's suggestion and, as
I understand it, delivery of the new master was made only some
days ago.

Therefore, Westbound is now in receipt of sufficient master recordings
which it deems commercially satisfactory for the release of an album,
however, it is not, to date, in receipt of the necessary art work
which has always been prepared by George for the album cover.

As I reported to you recently, Bridgeport Music has not obtained
the necessary songwriter's agreements for the compositions embodied
on this album to date, and there are some other outstanding agreements
as yet, unexecuted.  Would you kindly follow through on this matter
and arrange to get the necessary agreements executed, in order that
we may prepare the copyright on this material.

Last, but not least, Armen reports that George has not, as yet,
provided label copy for the release of the album.

                        - more -

Ms. Ina Meibach               - 2 -                8 June, 1976


I would suggest to you that when Westbound is in receipt of the
finished art work, label copy, and songwriter's agreements, it
will be in a position to release this album.

As promised, enclosed please find a copy of the Malbiz Music Co./
Bridgeport Music Co. agreement you requested.

Kindest regards.

                                    Sincerely

                                    Normand R. Kurtz

NRK/pbr
Enclosure:

cc:  Mr. Armen Boladian
     Westbound Records

DICTATED BUT NOT READ:

WESTBOUND RECORDS INC.
14643 Joy Road
Detroit, Michigan 48228

Dated:    June 15, 1976

Mr. George Clinton
p/k/a & a/k/a "Funkadelic"
c/o Weiss & Meibach
888 Seventh Avenue
New York, New York 10019

Dear Mr. Clinton:

This will acknowledge, and constitute written
receipt as provided for in sub-paragraph 4(iii) of the
agreement between you and us dated September 24, 1975,
that we have received on this date and have approved
of in all respects the master recordings sufficient to
comprise the album referred to in sub-paragraph 4(i) of
such agreement.

Very truly yours,

WESTBOUND RECORDS INC.

By: _____
    Armen Boladian, President

# EXHIBIT E

WEISSMEIB, NEW YORK

LAW OFFICES

# WEISS & MEIBACH

888 SEVENTH AVENUE
NEW YORK, N. Y. 10019

(212) 765-4936

NATHAN M. WEISS
INA LEA MEIBACH

JAY D. KRAMER

June 6, 1977

Norman R. Kurtz, Esq.
Kurtz & Vassallo
598 Madison Avenue
New York, New York  10022

Re: George Clinton -w- Westbound
Records, Inc. and Bridgeport Music

Dear Norman:

It appears from our files that we are missing
writer's statements for George Clinton for the period
January, 1971 through December 31, 1973 and from July,
1974 to the present.  In respect of publishing, we need
statements from June 30, 1970 to the present.

For the Funkadelics, we need statements from
January, 1971 through December 31, 1973 and from July,
1974 to date.  The producer's income statement is required
from July, 1970 through December, 1973 and from July, 1974
to date.  Publisher's statements from Westbound are needed
from inception to date except for January through June,
1974 which we have copies of.

I would appreciate your assisting us in obtaining
the foregoing statements as soon as possible.

Very truly yours,

Jay D. Kramer

JDK:wm

KURTZ & VASSALLO, P. C.

598 MADISON AVENUE

NEW YORK, NEW YORK 10022

June 8, 1977

JOHN A. VASSALLO
NORMAND R. KURTZ

RICHARD A. ABRAMS

ATTORNEYS AT LAW

(212) 421-1870

CABLE ADDRESS: STRAITAHED
TELEX: 429286

Jay Kramer, Esq.
Weiss & Meibach
888 Seventh Avenue
New York, N. Y. 10019

    Re: George Clinton with Westbound Records, Inc.
       and Bridgeport Music, Inc.

Dear Jay:

I am in receipt of your letter of June 6th with respect
to the above-captioned matter and specifically your
request on behalf of George Clinton and the Funkadelics
for statements.

I presume from the contents of your letter that your clients
have either lost or misplaced these statements. You
are, of course, aware that you are requesting duplicate
copies of statements going from the most recent accounting
period back to January 1971 in most instances. I will,
of course, forward your letter on to our clients and
ask them if they could assist you in any way, but I cannot
guarantee that duplicates of these statements are avail-
able since you can appreciate that they go back a long time.
In any event, to the extent of whatever is available,
I will ask my clients to cooperate and arrange for dupli-
cates to be sent with the understanding that there is really
no obligation to do so other than an attempt in good faith
to cooperate with your clients since all of the original
statements were received by your clients in the first
instance.

      Sincerely yours,

      KURTZ & VASSALLO, P. C.

      By

       Normand R. Kurtz

NRK:cjm

LAW OFFICES

# WEISS & MEIBACH

868 SEVENTH AVENUE
NEW YORK, N. Y. 10019

(212) 765-4936

NATHAN M. WEISS
INA LEA MEIBACH

JAY D. KRAMER

June 9, 1977

Mr. Mel Epstein
130 West 57th Street
New York, New York

Re: George Clinton with Westbound Records
Inc. and Bridgeport Music, Inc.

Dear Mel:

I have received a letter from the attorney for Westbound and Bridgeport to the effect that all of the statements we requested were actually rendered to George and that it will take some time to obtain duplicate copies.

Since, as you are aware, we are pressing to complete George's personal tax returns as soon as possible and it is not likely that I will have the duplicate statements within a short time, I would appreciate your reviewing your records once again to make sure that the statements are not in your files.

Kindest regards,

Jay D. Kramer

JDK:wm

LAW OFFICES

# WEISS & MEIBACH

888 SEVENTH AVENUE
NEW YORK, N. Y. 10019
(212) 765-4936

NATHAN M. WEISS
INA LEA MEIBACH

———
JAY D. KRAMER

July 18, 1977

Normand R. Kurtz, Esq.
Kurtz & Vassallo, P.C.
598 Madison Avenue
New York, New York 10022

Re: George Clinton -w- Westbound
    Records, Inc. and Bridgeport Music

Dear Normand:

I am writing to thank you for the statements you recently forwarded to us with respect to the above. I have now had the opportunity to review the statements with our accountant and there still appears to be missing the following:

1) In respect of Westbound, producer's statements for the period July 1, 1970 to December 31, 1970, all producer's statements for 1972, producer's statements for July 1, 1973 to December 31, 1973, producer's statements for July 1, 1974 to December 31, 1974 and producer's statements for January 1, 1975 through June 30, 1975.

2) In respect of publishing, the statements from inception to June 30, 1970, statements for all of 1971 and 1972, statements for July 1, 1973 to December 31, 1973, from July 1, 1974 to December 31, 1974 and from January 1, 1975 to June 30, 1975.

3) In respect of Westbound - Funkadelics, the statements for the whole of 1972 and 1973 and the statements for January 1, 1975 to June 30, 1975.

4) In respect of Bridgeport Music, publishing statements from July, 1970 to date and writer statements for the whole of 1972 and July 1, 1974 to December 31, 1974.

I would greatly appreciate your kind assistance once again in obtaining these statements for us as soon as possible.

Very truly yours,

Jay D. Kramer

JDK:wm

KURTZ & VASSALLO, P. C.

596 MADISON AVENUE

NEW YORK, NEW YORK 10022

July 21, 1977

JOHN A. VASSALLO
NORMAND R. KURTZ

RICHARD A. ABRAMS

ATTORNEYS AT LAW

(212) 421-1870

CABLE ADDRESS: STRAITANEG
TELEX: 423268

Jay D. Kramer, Esq.
Weiss & Meibach
888 Seventh Avenue
New York, N. Y. 10019

Re:  George Clinton with Westbound Records, Inc.
and Bridgeport Music

Dear Jay:

I am in receipt of your letter of July 18th with respect
to the above-captioned matter wherein you acknowledge
receipt of the statements requested by your office. As
you can appreciate, our client has tried to extend all
courtesies to George Clinton and the Funkadelics in
duplicating statements which were obviously lost or mis-
placed by your client.

Now you are requesting further statements as a courtesy
of our client, and we will, of course, forward on your
request. I do not know if these statements are readily
available and as soon as I receive information from our
client, I will let you know.

You have been kind enough to compliment me for the assistance
I have given you in obtaining these statements. Please note
that our client acted immediately upon our request. However,
I have been urging your office to obtain songwriter's agree-
ments from your client. I believe that there is a good
deal of correspondence on this matter with Ina. Would you
please assist us and our client in obtaining these contracts?

Sincerely yours,

KURTZ & VASSALLO, P. C.

By _____
Normand R. Kurtz

NRK:cjm
cc: Armen Boladian

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

GEORGE CLINTON, et al.,

      Plaintiffs,

v.                                   CASE NO.   4:99cv242-RH

ARMEN BOLADIAN, et al.,

      Defendants.

_____/

## PRETRIAL ORDER

    This order confirms the rulings entered on the record
of the pre-trial conference on September 13, 2000.  For the
reasons set forth at that time,

    IT IS ORDERED:

    1.  Defendants' motion for summary judgment is GRANTED
IN PART and TAKEN UNDER ADVISEMENT IN PART.

    2.  Summary judgment is granted against plaintiff

ENTERED ON DOCKET 9/19 BY ___
[Rules 58 & 79(a) FRCP or 32(d)(1) & 55 FRCRP]
Copies mailed to: _Adam Stewart,_
_Nelson Richard,_
_Bobby Keman,_
_Della Maria,_
_Suik, SS, KJR,_
_Query_

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
TALLAHASSEE, FLA.

00 SEP 19  AH 9: 23

FILED

George Clinton on all of his claims.[1]  I do <u>not</u> direct the

entry of judgment under Federal Rule of Civil Procedure

---

[1] The basis of this ruling was set forth on the record.
A brief summary is as follows.  All of Mr. Clinton's claims
in this lawsuit derive from his having written musical
compositions prior to his filing of a bankruptcy petition in
1984; in response to defendants' motion for summary
judgment, Mr. Clinton makes no assertion to the contrary.
If, as Mr. Clinton claims in this lawsuit, he has any rights
in the copyrights on or royalties from those compositions,
then at the time he filed the bankruptcy petition he also
had rights in those copyrights or to past or future
royalties; he makes no claim that he has acquired such
rights more recently.  In his bankruptcy schedules, however,
Mr. Clinton did not list any assets or rights to payment in
the past or in the future – whether fixed or contingent and
whether based on contract or the copyright laws or anything
else – relating to these compositions.  Mr. Clinton's
bankruptcy schedules asserting he owned no such rights estop
him from now claiming the contrary.  <u>See, e.g., Chandler v.
Samford University</u>, 35 F. Supp. 2d 861 (N.D. Ala. 1999);
<u>Scoggins v. Arrow Truck Co.</u>, 92 F. Supp. 2d 1372 (S.D. Ga.
2000); <u>Payless Wholesale Distributors, Inc. v. Alberto
Culver</u>, 989 F.2d 570 (1st Cir. 1993); <u>Oneida Motor Freight,
Inc. v. United Jersey Bank</u>, 848 F.2d 414 (3d Cir. 1988),
cert. denied, 488 U.S. 967, 109 S. Ct. 495, 102 L. Ed. 2d
532 (1988); <u>In Matter of Coastal Plains, Inc.</u>, 179 F.3d 197
(5th Cir. 1999).  Moreover, even if Mr. Clinton owned such
assets when he filed his bankruptcy petition, they became
the property of the bankruptcy estate and, because
unscheduled, have not been abandoned back to Mr. Clinton.
<u>See, e.g., United States v. Grant</u>, 971 F.3d 1037 (1st Cir.
1992); <u>Brooks v. Beatty, et al.</u>, 25 F.3d 1037 (1st Cir.
1994) (unpublished decision); <u>In re Winburn</u>, 167 B.R. 673
(N.D. Fla. 1993); <u>In re Kottmeier</u>, 240 B.R. 440 (M.D. Fla.
1999).

54(b).

3.   The motion for summary judgment is taken under
advisement with respect to claims of plaintiff Malbiz Music,
Inc.   Malbiz may file by not later than Wednesday, September
27, 2000, further materials of the type permitted by Federal
Rule of Civil Procedure 56 addressing the issues of (a)
whether Mr. Clinton signed the December 1983 agreement
purportedly conveying to defendant Bridgeport Music, Inc.
all rights in the compositions at issue and royalties
therefrom,[2] and (b) the date and manner in which Mr. Clinton
assigned to Malbiz any rights in the compositions at issue
or royalties therefrom.[3]

_____

[2] The record now includes Mr. Clinton's affidavit that
during the bankruptcy proceeding - more than 15 years ago -
he told his attorneys he did not sign the agreement.   This
is not a clear statement, under oath, that he in fact did
not sign the agreement.   Additional time has been provided
Malbiz for the filing of an additional affidavit so
indicating, if that is indeed Mr. Clinton's testimony.

[3] Notably absent from the complaint is any clear
statement that Mr. Clinton assigned any rights to Malbiz.
Defendants have sought summary judgment, correctly noting
that, as set forth in footnote 1 above, Mr. Clinton cannot
properly claim any interest in the compositions or royalties
at issue.   Defendants have submitted a 1983 agreement by
which Mr. Clinton conveyed all rights in the compositions or

3

4.   The remaining issues are severed for separate trials as follows.  The issue of liability on Malbiz's complaint will be tried first.  Trial of that issue will commence on Tuesday, October 10, 2000, at 9:00 a.m.  By agreement of all parties as set forth in the pretrial stipulation, trial will be to the court without a jury.

5.   Trial of damages on Malbiz's complaint (if Malbiz prevails on liability) and trial of all issues raised by the counterclaims will take place during the two-week trial period commencing Monday, December 4, 2000.

6.   By not later than one week prior to trial, any party planning to introduce deposition testimony at trial

---

royalties to Bridgeport.  This is sufficient to place the burden on Malbiz, as the plaintiff and thus the party with the burden of proof regarding its claims, to submit record evidence, of the type described in Rule 56, from which a finder of fact could find that Mr. Clinton validly conveyed rights in the compositions or royalties to Malbiz.  Any such conveyance, in order to support Malbiz's claims, would (a) have to predate any valid conveyance by Mr. Clinton to Bridgeport, and (b) have to predate Mr. Clinton's filing of his bankruptcy petition (because, from the date of filing that petition, any such rights owned by Mr. Clinton became the property of the bankruptcy estate and could not be validly conveyed by Mr. Clinton).  Summary judgment will be entered against Malbiz unless it submits clear evidence of a valid conveyance of rights to Malbiz.

shall notify each other party of the pages and lines of
deposition testimony to be introduced.  By not later than
two business days before trial, each other party so notified
shall notify the party proposing to introduce the deposition
testimony of any other parts of the deposition that the
other party proposes to have introduced at the same time.
By not later than the day before trial, each party shall
notify each other party of any objections the party has to
introduction of the proposed deposition testimony identified
in accordance with this paragraph.  Nothing in this
paragraph affects the use of depositions for impeachment of
testifying witnesses.

7.  Exhibits offered at trial (a) shall be numbered in
accordance with the exhibit lists submitted as part of the
pre-trial stipulation, or (b) if the court has granted leave
to file a revised exhibit list after submission of the pre-
trial stipulation, shall be numbered in accordance with the
revised exhibit list, or (c) may be numbered in accordance
with any more recent exhibit list filed with the consent of
all parties.  Exhibits may not be renumbered except as

5

authorized by this paragraph.

SO ORDERED this _18th_ day of September, 2000.


Robert L. Hinkle
United States District Judge

Case 4:99-cv-00242-RH    Document 591    Filed 09/19/00    Page 7 of 10



Pensacola Division                                                Gainesville Division
Room 129                                                          Room 243
100 N. Palafox Street                                             401 SE First Avenue
Pensacola, FL 32501-4863                                          Gainesville, FL 32601
(850)-435-8840 Fax 433-5972                                       (352)380-2400 Fax380-2424

Northern District of Florida
OFFICE OF THE CLERK
Robert A. Mossing, Clerk
110 E. Park Avenue, Room 122
Tallahassee, FL 32301-7755
(850)-942-8826 Fax 942-5830

Counsel of Record

re: evidence/exhibit preparation for trial

Dear Counsel;

Pursuant to pretrial requirements of the U.S. District Court for the Northern District of Florida, this letter
provides guidelines for the preparation and handling of trial exhibits.

General information and minimum requirements

1.    Counsel for each party in any case should, in advance of trial, mark each exhibit proposed to be offered
      in evidence or otherwise tendered to any witness during trial. Exhibits will retain the same number as
      they are listed in the pretrial stipulation throughout court proceedings whether identified, offered or
      admitted. To avoid confusion, it is preferred that like parties share exhibit numbers. If it is not practical
      for co-plaintiffs or co-defendants to share exhibit numbers, like parties may identify exhibits by placing
      the party's name prior to the exhibit number on all exhibit stickers and exhibit lists (for example: Smith-
      1, Jones-1, etc.).

2.    The exhibits should be individually marked for identification with a secured sticker denoting the
      appropriate party, the case number and the exhibit number (see Attachment 1). Exhibits should be
      numbered in accordance with the pretrial stipulation. Composite exhibits should have identified
      subexhibits denoted by a letter following the exhibit number (example: Exhibit 1 is a medical file;
      documents from the file are marked 1a, 1b...1z, 1aa, etc.).

3.    After identification of an exhibit at trial, the courtroom deputy clerk will retain custody of the exhibits.
      The courtroom deputy cannot anticipate the need for exhibits by counsel during examination and cross-
      examination of witnesses. Counsel should be prepared to ask for exhibits by exhibit number or counsel
      may request exhibits during breaks between witnesses. Counsel may wish to have additional copies
      of documentary exhibits on hand for use in examining witnesses. All exhibits that are intended as part
      of the record should be returned to the courtroom deputy clerk when examination of the witness is
      completed.

4.    The Eleventh Circuit Court of Appeals has established that documents of unusual bulk or weight and
      physical exhibits other than documents shall not be transmitted by the Clerk of this Court with the
      record on appeal (see FRAP 11 - 11th Circuit Rules). Oversized exhibits, posters, and
      nondocumentary exhibits may be used at trial for demonstrative purposes, but they will be returned to
      counsel at the conclusion of trial. This includes sensitive exhibits in criminal trials. If the court of
      appeals requests exhibits that are retained by counsel, it is the responsibility of counsel to make
      arrangements for transportation and shipping of those exhibits to Atlanta.

The mission of the Office of the Clerk is to provide the highest quality support to the judges and chambers staff of the Northern District of
Florida in their role of administering justice to the citizens of this district.

Recommendations for marking

Some steps in exhibit preparation make the use of exhibits in trial flow faster and more efficiently. The following suggestions are not requirements of the court and may not be practical or economical in some trials.

Three-ring binders. Counsel may find it useful, in situations where voluminous paper exhibits are to be offered, to place the exhibits in three-ring binders with a numbered tab index.

Oversized exhibits and posters. As previously mentioned, any oversized exhibits, non-documentary exhibits and posters will be returned to counsel at conclusion of trial. Counsel should consider filing file size (8.5 x 11") copies of posters and photographs of nondocumentary exhibits if they wish these exhibits considered in any appeal.

Return of exhibits

The Clerk will return all oversized, sensitive and nondocumentary exhibits to counsel at the conclusion of trial. The Clerk will retain and dispose of all other retained exhibits in accordance with Local Rule 5.2 (see Attachment 1). Please note that it is the responsibility of counsel to retrieve exhibits from the clerk upon the decision of this court or, in the event of an appeal, upon the decision of the appeals court.

If you have any questions regarding trial exhibits, please contact the courtroom deputy clerk for the judicial officer assigned to your case.

Sincerely,

ROBERT A. MOSSING, CLERK
by

Valerie J. Rhaburn
Courtroom Deputy Clerk

Attachment 1

---

Local Rule 5.2 Exhibits - Disposition

(A) All exhibits offered or received in evidence during any proceeding in this court shall be delivered to the clerk who shall keep them in custody unless otherwise ordered by the court, except:

(1) Sensitive exhibits, such as, but not limited to, illegal drugs, explosives, weapons, currency, articles of high monetary value, exhibits of a pornographic nature, or the like, shall be retained by the submitting law enforcement agency or party who shall then be responsible to the court for maintaining custody and the integrity of such exhibits, and

(2) The clerk may, without special order, permit an official court reporter to retain custody pending preparation of the transcript.

(B) All models, diagrams and exhibits remaining in the custody of the clerk shall be retrieved by the parties within three (3) months after the case is finally decided, unless an appeal is taken. In all cases in which an appeal is taken, all exhibits shall be retrieved within thirty (30) days after the filing and recording of the mandate of the appellate court finally disposing of the case.

(C) If exhibits are not retrieved as required by this rule, the clerk may destroy them or make such other disposition as may be authorized by the court.

Northern District of Florida - Local Rule 5.2

Standard exhibit labels examples

| GOVERNMENT EXHIBIT 1 | PLAINTIFF'S EXHIBIT 2 | DEFENDANT'S EXHIBIT 3 A |
|---|---|---|
| case number | TCA 99-40999-RH | 4:99-cv-999-RH |
| Government Gold Label | Plaintiff Pink Label | Defendant Blue Label |

Alternate exhibit labels

These larger labels or labels like them may be used as an alternative to the standard labels. These labels are available in limited quantities from the clerk's office and are especially useful in marking posters, binders and other large exhibits.

| Plaintiff's Exhibit # 1 | Defendant's Exhibit # 1 |
|---|---|
| Date (blank - to be filled in at trial)    ID'd | Date (blank - to be filled in at trial)    ID'd |
| Date _____ IN EVID. | Date _____ IN EVID. |
| Case #: TCA 99-40999-MMP | Case #: 4:99-cv-999-MMP |
| Case Style: John Q. Doe | Case Style: John Q. Doe |
| vs. William Z. Smith | vs. William Z. Smith |
| Plaintiff Large Gold Label | Defendant Large Blue Label |

The mission of the Office of the Clerk is to provide the highest quality support to the judges and chambers staff of the Northern District of Florida in their role of administering justice to the citizens of this district.

Attachment 2 - EXAMPLE OF EXHIBIT LIST

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JOHN Q. DOE,
    Plaintiff

v.                                                  TCA 99-40999-JUDGE
                                                 4:99-cv-999-JUDGE

WILLIAM Z. SMITH and
THE CITY OF GOTHAM,
    Defendants
_____/

**Example Plaintiff's Trial Exhibit List**

| Pltf # | Date ID'd | Date Admitted | Witness(es) | Description |
|---|---|---|---|---|
| 1 | leave blank | leave blank | Paul Jones | Letter to John Doe from Paul Jones dated 3/1/95 re: salary review. |
| 2a | leave these two columns blank - to be filled in during trial | | Dr. David Brown | Audiotape of meeting on 5/1/95. |
| 2b | | | "  " | Transcript of pltf exh 2a - audiotape |
| 3 | | (Stipulated) | Sally Smith, Paul Jones | Poster - Map of USA (for demonstrative purposes only) |
| 3a | | | | File size copy of map pltf exh 3 |
| 4 | | | | Poster - enlargement of photos 4a-g for demo purposes |
| 4a-g | | | | Photos - 4" x 6" of: a - automobile b - tires c - etc. |
| 5 | | | | Brown Leather Briefcase |
| 5a | | | | Photo of briefcase - pltf exh 5 |
| 6 | | | | Acme Co. Procedures manual - 1995 |
| 6a | | | | Enlarged excerpt of page 42 from pltf exh 6 |

# EXHIBIT G

STATE OF MICHIGAN
IN THE 39TH JUDICIAL CIRCUIT COURT
COUNTY OF LENAWEE

ARMEN BOLADIAN, et al.,

        Plaintiffs/Counter-Defendants,

      v                                                              Case No. 96-7197 CK
                                                                     Hon. Timothy P. Pickard

GEORGE CLINTON, et al.,

        Defendants/Counter-Plaintiffs,

_____/

FILED
39th CIRCUIT COURT

MAY 1 7 2004

LOU ANN MURPHY
LENAWEE CO CLERK REGISTER

# Attachment to Declaration

# of Jeannine Huber

# Exhibit Volume II

# VOLUNTARY CASE: DEBTOR'S PETITION

United States Bankruptcy Court

FOR THE ___Eastern_____ DISTRICT OF __Michigan-Southern Division__

## ORIGINAL

In re  George Edward Clinton, Jr.

Social Security No. 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                          Case No. 84-02629

Debtor [include here all names used by Debtor within last 6 years;

Ray Reynolds Graves

## VOLUNTARY CASE: DEBTOR'S PETITION

1. Petitioner's post-office address is ___839 Knapp, Brooklyn, Michigan 49230_____

County where petitioner resides ___Lenawee_____

2. Petitioner has resided [or has had his domicile or has had his principal place of business or has had his principal assets] within this district for the preceding 180 days [or for a longer portion of the preceding 180 days than in any other district].

3. Petitioner is qualified to file this petition and is entitled to the benefits of title 11, United States Code as a voluntary debtor.

[if appropriate] 4. A copy of petitioner's proposed plan, dated _____ is attached [or Petitioner intends to file a plan pursuant to chapter 11 [or chapter 13] of title 11, United States Code].

WHEREFORE, petitioner prays for relief in accordance with chapter 7 [~~or chapter 11 or chapter 13~~] of title 11, United States Code.

Signed ___Robt. S. Hertzberg_____
          ROBERT S. HERTZBERG, Attorney for Petitioner
Address 255 E. Brown St., Ste. 250
          Birmingham, Michigan 48011

[Petitioner sign if not represented by attorney.]

___George Edward Clinton Jr. Pred._____
GEORGE EDWARD CLINTON, JR.
839 Knapp
Brooklyn, Michigan 49230

I, _____, the petitioner named in the foregoing petition, certify under penalty of perjury that the foregoing is true and correct.

Signature: _____
                                          Petitioner

EXHIBIT
6

NOTE: This form may be used to commence a voluntary case under chapter 7, 11 or 13 of the Bankruptcy Code. A chapter 9 petition requires other allegations (see 11 U.S.C. § 109(c)) but this form may be adapted for such use.

The title of the case, in the caption of the form, should include other names used by the debtor, such as trade names, doing business names, married names and maiden names. This will help enable creditors to identify property the debtor when notices and orders are transmitted to the creditors.

A joint petition, available for an individual and spouse, may be filed under chapter 7, 11 or 13. See 11 U.S.C. § 302. Form No. 2 may be used for this purpose.

The unsworn declaration at the end of the petition conforms with Public Law 94-550, 90 Stat. 2534, 28 U.S.C. § 1746 (1976) which permits the declaration to be made in the form indicated with the same force and effect as a sworn statement. The form may be adapted for use outside of the United States by adding the words "under the laws of the United States" after the word "perjury."

2



A-3

## LIST OF CREDITORS

| | | |
|---|---|---|
| Armen Boladian<br>24361 Greenfield Rd.<br>Southfield, MI  48075 | Recording<br>Contracts | $600,000.00 |
| Bridgeport Music, Inc.<br>24361 Greenfield Rd.<br>Southfield, MI  48075 | Publishing | 600,000.00 |
| Capitol Records, Inc.<br>1750 N. Vine St.<br>Hollywood, CA  90028 | Recording<br>Contracts | 1,500,000.00 |
| Casablanca Records<br>8335 Sunset Blvd.<br>Los Angeles, CA  90069 | Advances on<br>Royalties | 300,000.00 |
| EMI America Records<br>A Division of Capitol<br>  Records, Inc.<br>6920 Sunset Blvd.<br>Los Angeles, CA  90028 | Recording<br>Contracts | 1,000,000.00 |
| Get Set, Inc.<br>c/o Earle Lambert<br>Attorney at Law<br>10950 Wilshire Blvd.<br>Los Angeles, CA  90024 | Music Set<br>Construction | 200,000.00 |
| Get Set, Inc.<br>650 N. Bronson Ave.<br>Los Angeles, CA  90004 | Music Set<br>Construction | 200,000.00 |
| Larrabee Sound Recording Studio<br>8811 Santa Monica<br>Los Angeles, CA  90069 | Use of Recording<br>Facilities | 40,000.00 |
| Leber, Steve<br>65 W. 55th Street<br>New York, NY  10019 | Managerial<br>Services | 700,000.00 |
| Leber Krebs, Inc.<br>65 W. 55th Street<br>New York, NY  10019 | Managerial<br>Services | 700,000.00 |
| Nine Records, Inc.<br>24361 Greenfield Rd.<br>Southfield, MI  48075 | Recording<br>Contracts | 600,000.00 |



| | | |
|---|---|---|
| Polygram Records<br>8335 Sunset Blvd.<br>Los Angeles, CA  90069 | Advances on<br>Royalties | 800,000.00 |
| Rudich, David<br>Attorney at Law<br>9255 Sunset Blvd, Ste. 414<br>Los Angeles, CA  90069 | Legal Service<br>Commissions | 300,000.00 |
| Walters, Norby<br>1650 Broadway<br>New York, NY  10019 | Booking Agency<br>Commissions | 30,000.00 |
| Westbound, Inc.<br>24361 Greenfield Rd.<br>Southfield, MI  48075 | Recording<br>Contracts | 600,000.00 |
| Worrell, Bernard<br>956 Melrose Place<br>Plainfield, NJ  90017 | Royalty<br>Commissions | 150,000.00 |
| IRS<br>Special Procedures<br>477 Michigan Avenue<br>McNamara Building<br>Detroit, MI  48226 | | 13,000.00 |

GEORGE EDWARD CLINTON, JR.

DATED: 7/13/84

# SCHEDULES OF ASSETS AND LIABILITIES
## United States Bankruptcy Court

for the ____EASTERN____ _____ District of ____MICHIGAN____

In re    GEORGE EDWARD CLINTON, JR.

Debtor (include here all names used by debtor within last six years)

Case No. _____

## Schedule A — STATEMENT OF ALL LIABILITIES OF DEBTOR

Schedules A-1, A-2, and A-3 must include all the claims against the debtor or his property as of the date of the filing of the petition by or against him

### Schedule A—1.—Creditors having priority.

| Nature of claim | Name of creditor and complete mailing address including zip code (if unknown, so state) | Specify when claim was incurred and the consideration therefor, when claim is contingent, unliquidated, disputed or subject to setoff evidenced by a judgment, negotiable instrument, or other writing or incurred as partner or joint contractor, so indicated, specify name of any partner or joint contractor on any debt | Indicate if claim is contingent, unliquidated or disputed | Amount of claim |
|---|---|---|---|---|
| a. Wages, Salary, and commissions, including vacation severance pay and sick leave pay owing to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the debtor, not exceeding $2,000 to each, earned within 90 days before filing of petition or cessation of business, if earlier (specify date); | | | | $<br>—0— |
| b. Contributions to employee benefit plans for services rendered within 180 days before filing of petition or cessation of business, if earlier (specify date); | | | | —0— |
| c. Deposits by individuals, not exceeding $900 for each for purchase, lease, or rental of property or services for personal, family, or household use that were not delivered or provided. | | | | —0— |
| d. Taxes owing (itemize by type of tax and taxing authority)<br><br>(1) To the United States.<br>(2) To any state.<br>(3) To any other taxing authority | d.(1)  Internal Revenue Service<br>Special Procedures<br>477 Michigan Avenue<br>McNamara Building<br>Detroit, Michigan 48226 | | | 13,000.00<br>—0—<br>—0— |
| | | | Total | $13,000.00 |

FORM 6 A-1 OCT. 1, 1979

Sc|  |le A-2. — Creditors Holding Security

| | Description of security and date when obtained by creditor | Specify when claim was incurred and the consideration therefor; when claim is contingent, unliquidated, disputed, subject to setoff, evidenced by a judgment, negotiable instrument, or other writing, or incurred as partner or joint contractor, so indicate; specify name of any partner or joint contractor on any debt | Indicate if claim is contingent, unliquidated or disputed | Market value | Amount of cl without dedu of value of sec |
|---|---|---|---|---|---|
| None | | | | $<br><br>—0— | $<br><br>—0— |
| | | | Total | —0— | —0— |

## Schedule B. — STATEMENT OF ALL PROPERTY OF DEBTOR

Schedules B-1, B-2, B-3, and B-4 must include all property of the Debtor, as of the date of the filing of the petition by or against him.

### Schedule B—1. — Real property.

| Description and location of all real property in which debtor has an interest (including equitable and future interests, interests in estates by the entirety, community property, life estates, leaseholds, and rights and powers exercisable for his own benefit) | Nature of interest (specify all deeds and written instruments relating thereto) | Market value of debtor's interest without deduction for secured claims listed in Schedule A-2 or exemptions claimed in Schedule B-4 |
|---|---|---|
| | | $ |
| 839 Knapp<br>Brooklyn, Michigan 49230 | Property subject to Land Contract Forfeiture | 370,000.00 |
| | Total | $370,000.00 |

### Schedule B—2. — Personal Property.

| Type of property | Description and location | Market value of debtor's interest without deduction for secured claims listed on Schedule A-2 or exemptions claimed in Schedule B-4 |
|---|---|---|
| | | $ |
| a. Cash on hand | | 20.00 |
| b. Deposits of money with banking institutions, savings and loan associations, credit unions, public utility companies, landlords, and others | | –0– |
| c. Household goods, supplies, and furnishings | All household items were leased | –0– |
| d. Books, pictures, and other art objects; stamp, coin, and other collections; | miscellaneous | 600.00 |
| e. Wearing apparel, jewelry, firearms, sports equipment, and other personal possessions | miscellaneous wearing apparel | 500.00 |
| f. Automobiles, trucks, trailers, and other vehicles | | –0– |
| g. Boats, motors, and their accessories | | –0– |
| h. Livestock, poultry, and other animals | 50 chickens, 3 dogs and 2 cats | 150.00 |
| i. Farming supplies and implements | | –0– |
| j. Office equipment, furnishings, and supplies | | –0– |
| k. Machinery, fixtures, equipment, and supplies (other than those listed in items j and l) used in business | | –0– |
| l. Inventory | miscellaneous records | 100.00 |
| m. Tangible personal property of any other description | | –0– |
| n. Patents, copyrights, franchises, and other general intangibles (specify all documents and writings relating thereto) | | –0– |
| o. Government and corporate bonds and other negotiable and nonnegotiable instruments | | –0– |
| p. Other liquidated debts owing debtor | | –0– |
| q. Contingent and unliquidated claims of every nature, including counterclaims of the debtor (give estimated value of each) | | |
| r. Interests in insurance policies (itemize surrender or refund values of each) | | –0– |
| s. Annuities | | –0– |
| t. Stocks and interest in incorporated and unincorporated companies (itemize separately) | | –0– |
| u. Interests in partnerships | | –0– |
| v. Equitable and future interest, life estates, and rights or power exercisable for the benefit of the debtor (other than those listed in schedule B-1) (specify all written instruments relating thereto) | | –0– |
| | Total | $1,370.00 |

FORM 4 B-1, B-2 OCT. 1, 1979

7

Schedule B–3 — Property not otherwise scheduled.

| Type of Property | Description and location | Market value of debtor's interest without deduction for secured claims listed in Schedule A-2 or exemption claimed in Schedule B-4 |
|---|---|---|
| a. Property transferred under assignment for benefit of creditors, within 120 days prior to filing of petition (specify date of assignment, name and address of assignee, amount realized therefrom by the assignee, and disposition of proceeds so far as known to debtor) | | $ <br> –0– |
| b. Property of any kind not otherwise scheduled | | –0– |
| | Total | –0– |

☐ Debtor selects the following property as exempt persuant to 11 U.S.C. § 522(d) ☐ (or the laws of the State of

Schedule B–4. — Property claimed as exempt.

| Type of property | Location, description, and, so far as relevant to the claim of exemption, present use of property | Specify statute creating the exemption | Value claimed exempt |
|---|---|---|---|
| | | | $ |
| (1)  Cash on hand | | 11 U.S.C. § 522(d)(5) | 20.00 |
| (2)  Books & pictures | | 11 U.S.C. § 522(d)(3) | 600.00 |
| (3)  Wearing apparel | | 11 U.S.C. § 522(d)(3) | 500.00 |
| (4)  Inventory | | 11 U.S.C. § 522(d)(5) | 100.00 |
| (5)  Animals | | 11 U.S.C. § 522(d)(5) | 150.00 |
| | | Total | $1,370.00 |

FORM 6 B-3, B-4 OCT. 1, 1979

8

# SUMMARY OF DEBTS AND PROPERTY

[From the statements of the debtor in schedules A and B]

| Schedule | | Total |
|---|---|---|
| | **DEBTS** | |
| A-1/a,b | Wages, etc. having priority.............................................. | —0— |
| A-1(c) | Deposits of money ...................................................... | —0— |
| A-1/d(1) | Taxes owing United States ............................................. | 13,000.00 |
| A-1/d(2) | Taxes owing states .................................................... | —0— |
| A-1/d(3) | Taxes owing other taxing authorities .................................. | —0— |
| A-2 | Secured claims ........................................................ | —0— |
| A-3 | Unsecured claims without priority ..................................... | 8,333,000.00 |
| | Schedule A total | $8,846,000.00 |
| | **PROPERTY** | |
| B-1 | Real property (total value) ........................................... | 370,000.00 |
| B-2/a | Cash on hand .......................................................... | 20.00 |
| B-2/b | Deposits ............................................................. | —0— |
| B-2/c | Household goods ...................................................... | —0— |
| B-2/d | Books, pictures, and collections ..................................... | 600.00 |
| B-2/e | Wearing apparel and personal possessions ............................. | 500.00 |
| B-2/f | Automobiles and other vehicles ....................................... | —0— |
| B-2/g | Boats, motors, and accessories ....................................... | —0— |
| B-2/h | Livestock and other animals .......................................... | 150.00 |
| B-2/i | Farming supplies and implements ...................................... | —0— |
| B-2/j | Office equipment and supplies ........................................ | —0— |
| B-2/k | Machinery, equipment, and supplies used in business .................. | —0— |
| B-2/l | Inventory ............................................................ | 100.00 |
| B-2/m | Other tangible personal property ..................................... | —0— |
| B-2/n | Patents and other general intangibles ................................ | —0— |
| B-2/o | Bonds and other instruments .......................................... | —0— |
| B-2/p | Other liquidated debts ............................................... | —0— |
| B-2/q | Contingent and unliquidated claims ................................... | —0— |
| B-2/r | Interests in insurance policies ...................................... | —0— |
| B-2/s | Annuities ............................................................ | —0— |
| B-2/t | Interests in corporations and unincorporated companies ............... | —0— |
| B-2/u | Interests in partnerships ............................................ | —0— |
| B-2/v | Equitable and future interests, rights, and powers in personalty ..... | —0— |
| B-3/a | Property assigned for benefit of creditors ........................... | —0— |
| B-3/b | Property not otherwise scheduled ..................................... | —0— |
| | Schedule B total | $371,370.00 |

Unsworn Declaration under Penalty of Perjury of Individual to Schedules A and B

I, GEORGE EDWARD CLINTON, JR. , certify under penalty of perjury that I have read the foregoing schedules, consisting of 11 sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Executed on 7/28/04                                    Signature

We, _____ and _____ , certify under penalty of perjury that we have read the foregoing schedules, consisting of ____ sheets, and that they are true and correct to the best of our knowledge, information, and belief.

Executed on _____                          Signature

Signature

9

# SUMMARY OF DEBTS AND PROPERTY

[From the statements of the debtor in schedules A and B]

| | Total |
|---|---|
| **DEBTS** | |
| Wages, etc. having priority | |
| Deposits of money | –0– |
| Taxes owing United States | –0– |
| Taxes owing states | 13,000.00 |
| Taxes owing other taxing authorities | –0– |
| Secured claims | –0– |
| Unsecured claims without priority | 8,833,000.00 |
| Schedule A total | $8,846,000.00 |
| **PROPERTY** | |
| Real property (total value) | 370,000.00 |
| Cash on hand | 20.00 |
| Deposits | –0– |
| Household goods | –0– |
| Books, pictures, and collections | 600.00 |
| Wearing apparel and personal possessions | 500.00 |
| Automobiles and other vehicles | –0– |
| Boats, motors, and accessories | –0– |
| Livestock and other animals | 150.00 |
| Farming supplies and implements | –0– |
| Office equipment and supplies | –0– |
| Machinery, equipment, and supplies used in business | 100.00 |
| Inventory | –0– |
| Other tangible personal property | –0– |
| Patents and other general intangibles | –0– |
| Bonds and other instruments | –0– |
| Other liquidated debts | –0– |
| Contingent and unliquidated claims | –0– |
| Interests in insurance policies | –0– |
| Annuities | –0– |
| Interests in corporations and unicorporated companies | –0– |
| Interests in partnerships | –0– |
| Equitable and future interests, rights, and powers in personalty | –0– |
| Property assigned for benefit of creditors | –0– |
| Property not otherwise scheduled | –0– |
| Schedule B total | $371,370.00 |

**Unsworn Declaration under Penalty of Perjury of Individual to Schedules A and B**

I, GEORGE EDWARD CLINTON, JR. , certify under penalty of perjury that I have read the foregoing schedules, consisting of 11 sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Executed on 7/30/84 . Signature _____

_____ and _____, certify under penalty of perjury that we have read the foregoing schedules, consisting of _____ sheets, and that they are true and correct to the best of our knowledge, information, and belief.

Executed on _____ . Signature _____

Signature _____

Note

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

In the matter of

GEORGE EDWARD CLINTON   Debtor./                    Case No. 84-02629-G

AFFIDAVIT OF ATTORNEY FOR THE DEBTOR

I am the attorney for the debtor(s) in the above-entitled case.  I have on the 6 day of August, 1984, in connection with the representation of my client(s), performed the following, to wit:

   a. Advised and fully discussed with my client(s) the grounds for objections to discharge as set forth in Section 727 of the Bankruptcy Code.

   b. Advised and fully discussed with my client(s) the kind of debts which may be non-dischargeable by virtue of Section 523 of the Bankruptcy Code.

   c. Advised and fully discussed with my client(s) the meaning and effect of a discharge, as set forth in Section 525(a) and 524(b) of the Bankruptcy Code.

   d. Advised and discussed with my client(s) redemption of personal property as permitted by Section 722 of the Bankruptcy Code and the rights accorded to him thereunder.

   e. Advised and discussed with my client(s) the meaning and effect of a reaffirmation of debts as permitted by Section 525(c) of the Bankruptcy Code and the applicable non-bankruptcy law, particularly the fact that such agreements are not required under that law and that my client(s) has/have no obligation to reaffirm any debt.

   f. I have fully discussed the exemption provisions of the Bankruptcy Code and explained the options available to my client(s), and the exemptions have been selected in light of our discussion.

I have also advised and discussed with said client(s) all other matters pertinent to said client(s) bankruptcy proceeding.

                                        Attorney for the Debtor(s) (P-34785)
                              Address: 255 E. Brown #250
                                        Birmingham  MI.  48011
                              Telephone (313) 540-8282

WAIVER OF RIGHT TO DISCHARGE HEARING

I understand the Court has scheduled a discharge hearing, at which I have been notified to appear, to inform me whether a discharge has been granted or the reason why a discharge has not been granted.  I further understand I may waive my right to appear at the discharge hearing.  I do understand, however, that if I have a reaffirmation of a debt, I do have to make a personal appearance on the date previously set therefor

   ✓   I do hereby waive my right to a discharge hearing.  I will not appear on the scheduled date.

   ___   I wish to retain my right to a discharge hearing and will appear on the date previously set.

                              Debtor:
                              Debtor:
                                        (If a joint petition was filed)

Please note:  This form must be filed with the Bankruptcy Court no later than ten days after the First Meeting of Creditors.

11

# STATEMENT OF FINANCIAL AFFAIRS FOR DEBTOR NOT ENGAGED IN BUSINESS

United States Bankruptcy Court

for the _____ EASTERN _____ District of _____ MICHIGAN _____

In re    GEORGE EDWARD CLINTON, JR.

Debtor (include here all names used by debtor within last six years)    Case No. 84-02629

## STATEMENT OF FINANCIAL AFFAIRS FOR DEBTOR NOT ENGAGED IN BUSINESS

(Each question should be answered or the failure to answer explained. If the answer is "none," this should be stated. If additional space is needed for the ans to any question, a separate sheet, properly identified and made a part hereof, should be used and attached.

The term "original petition," as used in the following questions, shall mean the petition filed under Rule 1002, 1003, or 1004.)

1. Name and residence.
a. What is your full name and social security number?

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

b. Have you used, or been known by, any other names within the 6 years immediately preceding the filing of the original petition herein? (If so, give particulars.)

Funkadelic, P-Funk & Parliament

c. Where do you now reside?

839 Knapp
Brooklyn, Michigan 49230

d. Where else have you resided during the 6 years immediately preceding the filing of the original petition herein?

Providence Drive
Southfield, Michigan 48037

2. Occupation and income.
a. What is your occupation?

Entertainer

b. Where are you now employed? (Give the name and address of your employer, or the address at which you carry on your trade or profession, and the length of time you have been so employed or engaged.)

Numerous jobs pursuant to singing engagements

c. Have you been in a partnership with anyone, or engaged in any business during the 6 years immediately preceding the filing of the original petition herein? (If so, give particulars, including names, dates, and places.)

No.

d. What amount of income have you received from your trade or profession during each of the 2 calendar years immediately preceding the filing of the original petition herein?

1982
$10,000.00 (approximately)
1983
$15,000.00 (approximatley)
Advances for recording costs

e. What amount of income have you received from other sources during each of these 2 years? (Give particulars, including each source, and the amount received therefrom.)

3. Tax returns and refunds.
a. Where did you file your federal and state income tax returns for the 2 years immediately preceding the filing of the original petition herein?

The Debtor has not filed tax returns in the last couple years

b. What tax refunds (income and other) have you received during the year immediately preceding the filing of the original petition herein?

None

c. To what tax refunds (income or other), if any, are you, or may you be, entitled? (Give particulars, including information as to any refund payable jointly to you and your spouse or any other person.)

None

FORM 7 PAGE 1 OCT. 1, 1979



...accounts and safe deposit boxes.
a. What bank accounts have you maintained, alone or together with any other person, and in your own or any other name, within the 2 years immediately preceding the filing of the original petition herein? (Give the name and address of each bank, the name in which the deposit maintained, and the name and address of every other person authorized to make withdrawals from such account.)

None

b. What safe deposit box or boxes or other depository or repositories have you kept or used for your securities, cash, or other valuables within the 2 years immediately preceding the filing of the original petition herein? (Give the name and adress of the bank or other depository, the name in which each box or other depository was kept, the name and address of every other person who had the right of access thereto, a brief description of the contents thereof, and, if the box has been surrendered, state when surrendered, or, if transferred, then transferred, and the name and address of the transferee.)

None

Books and records.
a. Have you kept books of account or records relating to your affairs within the 2 years immediately preceding the filing of the original petition herein?

None

b. In whose possession are these books or records? (Give names and addresses.)

N/A

c. If any of these books or records are not available, explain.

N/A

d. Have any books of account or records relating to your affairs been destroyed, lost, or otherwise disposed of within the 2 years immediately preceding the filing of the original petition herein? (If so, give particulars, including date of destruction, loss, or disposition, and reason therefor.)

No

Property held for another person.
What property do you hold for any other person? (Give name and address of each person, and describe the property, or value thereof, and all writings relating thereto.)

None

7. Prior bankruptcy.
What cases under the Bankruptcy Act or title 11, United States Code have you previously been brought by or against you? state the location of the bankruptcy court, the nature and number of each case, the date when it was filed, and whether a discharge was granted or refused, the case was dismissed, or a composition, arrangement, or plan was confirmed.)

No

Receiverships, general assignments, and other modes of liquidation.
a. Was any of your property, at the time of the filing of the original petition herein, in the hands of a receiver, trustee, or other liquidating agent? (If so, give a brief description of the property, the name and address of the receiver, trustee, or other agent, and, if the agent was appointed in a court proceeding, the name and location of the court, the title and number of the case, and the nature thereof.)

N/A

b. Have you made any assignment of your property for the benefit of your creditors, or any general settlement with your creditors, within one year immediately preceding the filing of the original petition herein? (If so, give particulars, the name and address of the assignee, and a brief statement of the terms of assignment or settlement.)

N/A

Property in hands of third person.
Is any other person holding anything of value in which you have an interest? (Give name and address, location and description of the property, and circumstances of the holding.)

None

FORM 7 PAGE 2 OCT. 1, 1979

13



(see attached sheet)

...ng..., and..............................................
...or is to any suit pending at the time of the
...ter petition herein? (If so, give the name and
location of the court and the title and nature of the proceed-
ing....)

...were you a party to any suit (terminated within the
...immediately preceding the filing of the original petition
...) (If so, give the name and location of the court, the
...title and nature of the proceeding, and the result.)

No

c. Has any of your property been attached, garnished,
or seized under any legal or equitable process, within the
year immediately preceding the filing of the original petition
herein? (If so, describe the property seized or person
garnished, and at whose suit.)

No

11. Loan repaid.
    What repayments on loans in whole or in part have you
made during the year immediately preceding the filing of
the original petition herein? (Give the name and address of
the lender, the amount of the loan and when received, the
amounts and dates of payments and, if the lender is a relative
or insider, the relationship.)

No

2. Transfers of property.
    a. Have you made any gifts, other than ordinary and usual
presents to family members and charitable donations, during
the year immediately preceding the filing of the original
petition herein? (If so, give names and addresses of donees
and dates, description, and value of gifts.)

No

b. Have you made any other transfer, absolute or for the purpose
of security, or any other disposition, of real or tangible personal
property during the year immediately preceding the filing of the
original petition herein? (Give a description of the property, the
date of transfer or disposition, to whom transferred or how
disposed of, and, if the transferee is a relative or insider, the
relationship, the consideration, if any, received therefor, and the
disposition of such consideration.)

N/A

3. Repossessions and returns.
    Has any property been returned to, or repossessed by, the
seller or by a secured party, during the year immediately pre-
ceding the filing of the original petition herein? (If so, give
particulars including the name and address of the party get-
ting the property and its description and value.)

None

4. Losses.
    a. Have you suffered any losses from fire, theft, or
gambling during the year immediately preceding or since
the filing of the original petition herein? (If so, give particulars;
including dates, names, and places, and the amounts of
money or value and general description of property lost.)

None

b. Was the loss covered in whole or part by insurance? (If
so, give particulars.)

N/A

5. Payments or transfers to attorney.
    a. Have you consulted an attorney during the year imme-
diately preceding or since the filing of the original petition
herein? (Give date, name, and address.)

HERTZBERG & GOLDEN,
255 E. Brown St., Ste. 250, Birmingham, MI 480...

b. Have you during the year immediately preceding or
since the filing of the original petition herein paid any money
or transferred any property to the attorney or to any other
person or his behalf? (If so, give particulars, including
amount paid or value of property transferred and date of
payment or transfer.)

c. Have you, either during the year immediately preceding
or since the filing of the original petition herein, agreed to
pay any money or transfer any property to an attorney at
law, or to any other person on his behalf? (If so, give particu-
lars, including amount and terms of obligation.)

(see Fee Disclosure Statement)

I, GEORGE EDWARD CLINTON, JR. ...........certify under penalty of perjury that I have read the answers contained in the foregoing
statement of financial affairs and that they are true and correct to the best of my knowledge, information, and belief.

Executed ___7/27/84___                    Debtor _____

*NOTE: See Note to Form No. 1 for discussion of unsworn statement at the end of this form.

We,_____ and _____, certify
under penalty of perjury that we have read the foregoing statement, consisting of _____ sheets, and that they are true and correct to
the best of our knowledge, information, and belief.

Executed on _____

                                          Debtor _____

                                          Debtor _____

FORM 7 PAGE 3 OCT. 1, 1979

14



10.a. (1)  UNITED STATES -v- CLINTON
           83-CV-6306-AA (Tax Claim)

     (2)   GET SET, INC.  V  CLINTON
           Los Angeles Superior Court (1981)

     (3)   LARRABEE SOUND -v- CLINTON
           Los Angeles Superior Court (1983)

     (4)   LEBER & KREBS -v- CLINTON
           New York Supreme Court (1980)

     (5)   DAVID KLDICH -v- CLINTON
           Los Angeles Superior Court (1980)

     (6)   BERNARD WARRELL --v- CLINTON
           Los Angeles Superior Court (1984)

     (7)   ROSE SINACOLA -v- CLINTON
           Land Contract Forfeiture
           Lenawee County Circuit Court (1984)

# EXHIBIT H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANYCE H. TILMON-JONES, individually
and in her capacity as Personal Representative
of the Estate of Abrim Tilmon, Jr.,

       Plaintiff,

                                 Case No. 06-14048

v.

                                 Hon. John Corbett O'Meara

BRIDGEPORT MUSIC, INC., a
Michigan corporation, and
ARMEN BOLADIAN, an individual,

       Defendants.

_____/

## ORDER GRANTING MOTION FOR SANCTIONS

Before the court is Defendants' motion for sanctions, which has been fully briefed.  The

court did not hear oral argument.

The parties settled this action on September 6, 2007.  On January 26, 2010, Plaintiff filed

a motion to enforce the settlement, which was withdrawn on February 18, 2010. Plaintiff filed a

motion to set aside the settlement for fraud on the court on November 19, 2010.  After

Defendants responded to the motion, asserting that it had no merit, Plaintiff withdrew the motion

on January 4, 2011.  At that time, Defendants sought sanctions, which the court declined to grant

in light of Plaintiff's voluntary withdrawal of the motion.

On November 1, 2011, Plaintiff re-filed her motion to set aside the settlement, alleging

fraud on the court and making serious allegations of misconduct on the part of defense counsel.

Finding Plaintiff's motion to be without merit, the court denied it.  Defendants seek sanctions

again, pursuant to Rule 11 and 28 U.S.C. § 1927.

Defendants have now been forced to defend against Plaintiff's frivolous attempts to re-open this matter twice. The first time, the court gave Plaintiff's counsel the benefit of the doubt, in light of the fact that Plaintiff voluntarily withdrew the motion. This time, the court must conclude that not only were Plaintiff's motions without merit, but also that Plaintiff's counsel should have known, at the time of filing of the second motion, that they were without factual or legal basis. Faced with Defendants' first response and motion for sanctions, Plaintiff's counsel continued to press to re-open this matter a second time, based upon the same facts presented in the first motion. This is not reasonable behavior and it suggests to the court that Plaintiff's counsel has not filed these motions based upon their merit, but for the improper purpose of harassing Defendants. Further, in doing so, Plaintiff's counsel has vexatiously and unreasonably multiplied these proceedings.

Accordingly, the court finds that sanctions are appropriate pursuant to Rule 11 and 28 U.S.C. § 1927. See Runfola & 'Assocs., Inc. v. Spectrum Reporting II, Inc., 88 F.3d 368, 373-74 (6th Cir. 1996) (sanctions appropriate as a result of "the persistence in pursuing [a] claim after the pleader has or should have become aware of its lack of merit"). Plaintiff's counsel shall pay Defendants' reasonable attorney's fees and costs in responding to both motions to set aside the settlement. Defendants shall submit the appropriate affidavits and billing records in support of their request for fees within ten days of the date of this order. The court also imposes a sanction of $5,000 to be paid to the Clerk of the Court forthwith.

**SO ORDERED.**

s/John Corbett O'Meara
United States District Judge

Date: September 26, 2012

-2-

5:06-cv-14048-JCO-MKM   Doc # 110   Filed 09/26/12   Pg 3 of 3   Pg ID 3087

     I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, September 26, 2012, using the ECF system.

                            s/William Barkholz
                            Case Manager

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANYCE TILMON-JONES,
individually, and in her capacity as Personal
Representative of the Estate of Abrim Tilmon, Jr;
CATHERINE M. CARTWRIGHT,
an individual resident of the state of Michigan;      Case No. 11-13002
STEVEN M. TILMON,
an individual resident of the state of Indiana;       Hon. John Corbett O'Meara
GLOBAL ROYALTY NETWORK &
PUBLISHING, a Gibraltar Corporation,

     Plaintiffs,

v.

BRIDGEPORT MUSIC, INC.,
a Michigan corporation; SOUTHFIELD MUSIC, INC.,
a Michigan corporation; WESTBOUND RECORDS, INC.,
a Michigan corporation; NINE RECORDS, INC.,
a Michigan corporation; SYNC2PICTURE, LLC,
a Michigan limited liability company; and
ARMEN BOLADIAN, an individual resident
of the state of Michigan,

     Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS
TO DISMISS COMPLAINT AND FOR SANCTIONS**

Before the court is Defendants' amended motion to dismiss the complaint or for summary

judgment, which was filed October 31, 2011.[1] Rather than file a response, Plaintiffs filed a

request for the court to consider Defendants' motion under Rule 56 and for discovery on

November 28, 2011. Defendants filed a motion to strike Plaintiffs' request as untimely on

---

[1] Defendants filed a motion to dismiss the original complaint on September 23, 2011,
which was rendered moot by the filing of the amended complaint on October 15, 2011.

December 5, 2011, which has been fully briefed.  Defendants also filed a motion for sanctions on January 19, 2012, to which Plaintiffs responded on February 6, 2012.  This matter was reassigned from Judge Friedman on January 20, 2012.

## **BACKGROUND FACTS**

This action involves a dispute regarding the ownership of copyrights to various musical compositions.  Plaintiffs are Janyce Tilmon-Jones, individually and in her capacity as personal representative of the Estate of Abrim Tilmon, Jr.; Catherine M. Cartwright and Steven M. Tilmon, heirs to the Estate of Abrim Tilmon, Jr.; and Global Royalty Network and Publishing. Defendants are Bridgeport Music, Inc.; Southfield Music, Inc.; Westbound Records, Inc.; Nine Records, Inc.; Sync2Picture, LLC; and Armen Boladian.  Boladian is president of each of the Defendant companies, except for Sync2Picture.[2]  Bridgeport and Southfield are Boladian's music publishing companies; Westbound and Nine Records are his record labels.

Abrim Tilmon, Jr., was a songwriter, recording artist, and producer known for his work as a founding member and lead singer for the musical group the Detroit Emeralds.  During the 1970s, Abrim Tilmon entered into songwriter agreements with Bridgeport Music, assigning his interest in numerous musical works to Bridgeport.  On March 31, 1976, and December 17, 1980, Abrim Tilmon entered into two additional agreements with Bridgeport, assigning his interest in musical compositions, including the forty-one songs at issue in this suit (the "Abrim Tilmon Catalogue").  See Compl. at ¶¶ 23-24.  In accordance with these agreements, Bridgeport and Southfield filed and received copyrights to the Abrim Tilmon Catalogue. Compl. at ¶ 27.

---

[2] Plaintiff's complaint does not articulate any claims against Sync2Picture.  Accordingly, the court will dismiss it from this action.

Abrim Tilmon died in 1982. Pursuant to the Copyright Act of 1976, a copyright expires after twenty-eight years and may be renewed either by registration or automatically. If the author is deceased at the time of renewal, as was the case here, the renewal copyright automatically vests in the surviving spouse and/or children. Plaintiffs contend that each of the renewal copyrights in the Abrim Tilmon Catalogue automatically vested in the Estate of Abrim Tilmon at the time of their renewal periods. Plaintiffs allege, however, that Defendants "falsely and fraudulently claimed and continued to claim ownership to the renewal term of the musical works complained of herein by, among other things, renewing each of the musical works complained of herein with the U.S. Copyright Office." Compl. at ¶ 33.

Defendants contend that Bridgeport's copyright administrator, Jane Peterer Music Corporation, filed renewals for thirty-four songs of the Abrim Tilmon Catalogue with the U.S. Copyright Office. See, e.g., Compl. at Exs. 7, 9, 13. The renewal applications, attached to the complaint, list Abrim Tilmon or Plaintiff Tilmon-Jones as the copyright claimant, not Bridgeport.

Defendants also filed copyrights to new versions and arrangements of seventeen Abrim Tilmon Catalogue songs in 1998. Defendants contend that these copyrights were filed during Bridgeport's ownership period and that all list Abrim Tilmon as the author of the words and music and Bridgeport as the author of the arrangement.

On September 14, 2006, Plaintiff Tilmon-Jones, individually and as personal representative of the Estate of Abrim Tilmon, filed an action in this court against Bridgeport and Boladian. See Case No. 06-14048. In that case, Tilmon-Jones alleged copyright infringement and sought a declaration of ownership of two songs from the Abrim Tilmon Catalogue: "Feel the

-3-

Need" and "Yes, I Know I'm in Love." The parties entered into a settlement agreement and the court entered a consent order of settlement on September 6, 2007.

On November 19, 2010, Tilmon-Jones filed a motion to set aside the settlement order in Case No. 06-14048, arguing that it had been procured through fraud on the court. Tilmon-Jones withdrew the motion on January 4, 2011, but re-filed it on November 1, 2011. On January 10, 2012, the court rejected Tilmon-Jones's attempt to re-open the matter, finding that her accusations of fraud did not have a basis in fact.

Plaintiffs, including Tilmon-Jones, filed this action on July 13, 2011, seeking a declaratory judgment that they own the renewal term copyrights in the Abrim Tilmon Catalogue and asserting copyright infringement and various state claims. Plaintiffs filed an amended complaint on October 31, 2011, which Defendants have moved to dismiss.

### LAW AND ANALYSIS

Defendants seek dismissal or summary judgment on Plaintiffs' claims on various grounds, including failure to state a claim, release, res judicata, statute of limitations, and federal preemption of state claims. Because the parties have presented materials outside the complaint, such as the parties' settlement agreement, the court will treat Defendants' motion as one for summary judgment.

### I.    Release

Defendants contend that Plaintiffs' claims are barred by the settlement agreement and release executed in the 2006 action. Dated August 31, 2007, the release was signed by Janyce Tilmon-Jones, Catherine Cartwright, and Steven Tilmon. The agreement provides:

> WHEREAS, the ESTATE, TILMON-JONES, AND HEIRS
> voluntarily and with full knowledge of their rights and the

-4-

> provisions herein, now desire to settle, comprise and dispose of the
> District Court Action claims, *and any and all other claims they*
> *have or might have against COMPANIES [Boladian and*
> *Bridgeport] including, but not limited to, any claims that may*
> *arise in the future pursuant to any newly discovered facts which*
> *are not yet known* to the ESTATE, TILMON-JONES and HEIRS.

Defs.' Ex. B (emphasis added).  The release further provides:

> TILMON-JONES, ESTATE and HEIRS hereby release and
> forever discharge Armen Boladian, individually, and Bridgeport as
> well as their officers, directors, employees, attorneys, other agents,
> successors and assigns, privies in contract, from all . . . causes of
> action . . . or claims of any kind . . . whether now known, disputed
> or undisputed, accrued or unaccrued, liquidated or contingent,
> foreseen or unforseen, asserted or unasserted, filed or not yet filed,
> in contract, tort, at law, or in equity, or before any local, state or
> federal court, administrative agencies or departments, existing at
> the time of this Agreement, or which subsequently may exist or
> arise following the execution of this Agreement, *that could have*
> *been brought* by TILMON-JONES, ESTATE and HEIRS
> pertaining to the causes of action contained in the District Court
> Action for which this Agreement pertains.

Defs.' Ex. B at ¶ 5 (emphasis added).  In addition, the release states:

> TILMON-JONES, ESTATE and HEIRS acknowledge that they
> may hereafter discover claims or facts in addition to or different
> from those which they know or believe to exist with respect to the
> District Court Action for which this Agreement pertains, but that it
> is their intention hereby to fully, finally and forever to settle and
> release any and all released matters, disputes and differences,
> known or unknown, suspected or unsuspected, which now exist,
> may exist, or heretofore have existed between COMPANIES on
> the one hand, and TILMON-JONES, ESTATE and HEIRS on the
> other hand with respect to the District Court Action.

id. at ¶ 6.

Like any contract, an unambiguous release must be construed as written.  Kellogg Co. V.

Sabhlok, 471 F.3d 629, 632 (6th Cir. 2006) (Michigan law).  "The scope of a release is controlled

by the language of the release. . . .  If the language of the release is unambiguous, it must be

construed as written. A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation." Id. (citations and internal quotation marks omitted).

The broad language of the release clearly bars Plaintiffs' claims in this matter. Plaintiffs do not argue that the release is ambiguous or unenforceable. Rather, Plaintiffs suggest that the settlement and release should be set aside because they were obtained through "fraud on the court." Indeed, perhaps realizing that the release is fatal to their claims, Plaintiffs attempted to set aside the settlement in the 2006 action. The court has already rejected this argument as being without merit. See Case No. 06-14048, Docket No. 101. Plaintiffs also suggest, in general, that Defendants' motion is premature and that discovery is needed. However, no discovery is necessary or material to the interpretation of the release, which is unambiguous as a matter of law.

Plainly, the parties' intent was to bar claims that were brought or could have been brought in the 2006 action. The copyright renewals at issue in this case were filed at the U.S. Copyright Office, and publicly available, between 1998 and 2004. See Amended Complaint. A list of the songs at issue here was attached to the 2006 Complaint. Had Plaintiffs exercised reasonable diligence, they could have brought claims related to all the songs at issue in the 2006 action.

## II.    Res Judicata

For these reasons, Plaintiffs' claims are barred by res judicata as well as release. "The preclusive effect of a federal-court judgment is determined by federal common law." Taylor v. Sturgell, 553 U.S. 880, 891 (2008). "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were *or could have been* raised in that action."

-6-

Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 528 (6th Cir. 2006) (citing Federated Dept.

Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981)). Res judicata, or claim preclusion, has four

elements:

> (1) a final decision on the merits by a court of competent
> jurisdiction; (2) a subsequent action between the same parties or
> their privies; (3) an issue in the subsequent action which was
> litigated or which should have been litigated in the prior action;
> and (4) an identity of the causes of action.

Rawe, 462 F.3d at 528 (citation omitted).

The elements of claim preclusion are met here.  First, the there was a final decision on the

merits of the 2006 action, as a result of the parties' settlement.  Second, this action involves the

same parties or their privies.  The Estate of Abrim Tilmon and Janyce Tilmon-Jones were

plaintiffs in the 2006 action; and, although not plaintiffs, Catherine Cartwright and Steven

Tilmon signed and agreed to be bound by the settlement agreement.[3]  Bridgeport Music and

Armen Boladian were defendants in the 2006 action; it is undisputed that Defendants Southfield

Records, Westbound Records, and Nine Records are all affiliate companies of Bridgeport and

Boladian. See Sanders Confectionary Prods. Inc. v. Heller Financial, Inc., 973 F.2d 474, 481 (6th

Cir. 1992) ("Privity in this sense means a successor in interest to the party, one who controlled

the earlier action, or one whose interests were adequately represented.").

---

[3] Global Royalty Network & Publishing was not a party to the 2006 action.  Plaintiffs
Tilmon-Jones, Cartwright, and Tilmon apparently assigned some rights to the Abrim Catalogue
to Global in 2007, after the judgment was entered in the 2006 action.  See Defs. Ex. F; Compl.
at Ex. 1.  To the extent Plaintiffs could have pursued causes of action related to those songs in
the 2006 action, Global is precluded from vindicating those rights here.  See 18A Wright &
Miller, Federal Practice & Procedure § 4462 ("Many cases recognize the rule that claim,
defense, and issue preclusion bind – and also benefit – a nonparty who takes property by transfer
from a vanquished party after judgment.").

-7-

Third, as discussed above, issues related to the copyright ownership of the Abrim Catalogue songs could have and should have been litigated in the 2006 action.[4]  A list of those songs was attached to the 2006 complaint and the copyright renewals related to them were publicly available at that time.  With the exercise of reasonable diligence, any dispute or issue regarding the copyright renewals or claimed ownership of the Abrim Catalogue could have been discovered and brought in the 2006 action.  Therefore, Plaintiffs' claims are barred by claim preclusion.

## III.    Discovery

Plaintiffs suggest that Defendants' motion is premature and that discovery is needed.[5]  As noted above, however, no discovery is necessary for the court to determine that Plaintiffs' claims are barred by release and res judicata as a matter of law.  Other than passing mentions of release and res judicata, Plaintiffs have failed to address Defendants' other arguments in favor of dismissal.  For example, Defendants argue that Plaintiffs have failed to state a claim with respect to the copyright renewals because those renewals correctly name Abrim Tilmon and/or Plaintiffs as the copyright owners.  Plaintiffs have not responded to this argument; again, Plaintiffs do not need discovery in order to articulate why they have stated a claim in their complaint as a matter of law.  The same is true for Defendants' arguments that Plaintiffs' state law claims are

---

[4] The only example of alleged infringement after the 2007 settlement in the complaint is Plaintiffs' claim that Defendant Westbound Records violated 17 U.S.C. § 1202 by putting a false copyright notice on *The Original Eight Mile* CD, which includes the Tilmon song, "Feel the Need."  Defendants claim, however, that the copyright notice on the CD is correct and that 17 U.S.C. § 1202 does not apply.  Plaintiffs do not respond to Defendants' arguments and have thus waived the opportunity.

[5] Defendants have moved to strike Plaintiffs' motion for discovery/response as untimely.  The court declines to strike Plaintiffs' motion.

-8-

preempted by federal copyright law and all of Plaintiffs' claims are barred by the statute of limitations and laches.  Plaintiffs had an opportunity to set forth legal argument and authority as to why their complaint should survive Defendants' motion to dismiss or for summary judgment. They chose not to do so and have thereby waived their opportunity.  See Guarino v. Brookfield Twp. Trustees, 980 F.2d 399, 405 (6th Cir. 1992) ("This burden to respond [to a dispositive motion] is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden – for example, by remaining silent – its opportunity is waived and its case wagered.").

IV.    Sanctions

        Indeed, Plaintiffs' failure to set forth argument and legal authority in response to each of Defendants' arguments can only lead the court to conclude that their complaint utterly lacks factual and legal support. This would have been clear to Plaintiffs had they conducted a reasonable inquiry before filing their complaint or, at the very least, when they received Defendants' motions to dismiss and for sanctions.  Further, Plaintiffs continue to press the serious allegations that the judgment in the 2006 action was procured through fraud on the court, or as the result of Defendants' alleged failure to produce documents, when this court has already found that Plaintiffs' allegations in this regard were without merit.

        In addition to filing a clearly meritless action, Plaintiffs filed the Declaration of Jane Peterer, containing inflammatory allegations having nothing to do with the issues this court had to decide regarding Defendants' motion to dismiss.  Before filing the Peterer Declaration, Plaintiffs' counsel sought $1 million from Defendants in exchange for Plaintiffs' promise not to file it, suggesting that it was not filed for its merit, but for an improper purpose.  After the court

-9-

sealed the Peterer Declaration, Plaintiffs' attorney Gregory Reed filed his own declaration, summarizing and repeating allegations contained in the Peterer Declaration, in an apparent attempt to circumvent the sealing of the Peterer Declaration. Mr. Reed has been sanctioned by Judge Borman for filing the same Reed Declaration in Case No. 03-72211, Docket No. 97. Nonetheless, Mr. Reed has not withdrawn his declaration in this matter.

After considering Plaintiffs' response to Defendants' motion for sanctions, the court concludes that Plaintiffs' attorneys – Gregory Reed and Jeffrey Thennisch – have filed a frivolous action to harass Defendants and have multiplied the proceedings unreasonably and vexatiously, in violation of Fed. R. Civ. P. 11 and 28 U.S.C. § 1927. Plaintiffs' attempts to re-litigate their copyright dispute with Defendants and to harass them by interjecting irrelevant accusations of wrongdoing must end. As a deterrent against future misconduct, the court will award Defendants their reasonable attorney fees and costs incurred in defending this action, to be paid by Gregory Reed and Jeffrey Thennisch, jointly and severally. Defendants shall submit an affidavit and billing records in support of their request for fees and costs within ten days of the date of this order.

## ORDER

Accordingly, IT IS HEREBY ORDERED as follows:

Defendants' motion to dismiss [docket no. 25] is GRANTED.

Defendants' motion to strike the Declaration of Gregory J. Reed [docket no. 32] is GRANTED.

Defendants' motion to strike Plaintiffs' response [docket no. 37] is DENIED.

-10-

5:11-cv-13002-JCO-MKM   Doc # 67   Filed 09/26/12   Pg 11 of 11   Pg ID 3592

Defendants' motion for sanctions [docket no. 48] is GRANTED.

Defendants' motion to file a response to the Declaration of Gregory J. Reed [docket no.

53] is DENIED.

Defendants' motions to supplement the record [docket nos. 55, 56, and 57] are

GRANTED.

**SO ORDERED.**

s/John Corbett O'Meara
United States District Judge

Date:  September 26, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record
on this date, September 26, 2012, using the ECF system.

s/William Barkholz
Case Manager

-11-